IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. _____

_____

IN RE RICHARD VASQUEZ,

*Movant*

_____

**AMENDED MOTION FOR ORDER AUTHORIZING CONSIDERATION
OF A SUBSEQUENT PETITION FOR WRIT OF HABEAS CORPUS**

_____

**Thomas M. Farrell**
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, TX 77002-2904
(713) 353-6677
tfarrell@mcguirewoods.com

*Counsel for Movant, Richard Vasquez*

**CAPITAL CASE:   NO EXECUTION DATE**

**Exhibit**

**C**

exhibitsticker.com

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. _____

_____

IN RE RICHARD VASQUEZ,

*Movant*

_____

## CERTIFICATE OF INTERESTED PERSONS
_____

The undersigned certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2-1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualifications or recourse.

1. Richard Vasquez, Movant

2. Bryan Collier, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent

3. State of Texas

*/s/ Thomas M. Farrell*
Thomas M. Farrell

Counsel for Movant, Richard Vasquez

1

Richard Vasquez, who is confined on death row in the State of Texas, moves the Court, under 28 U.S.C. § 2244(b)(3)(A), for authority to file the Subsequent Petition for Writ of Habeas Corpus attached to this Motion as Exhibit 1. Attached as Exhibit 2 is the April 19, 2023, Position Statement from the Nueces County District Attorney that "in the interests of justice, Mr. Vasquez's conviction and sentence should be set aside." Vasquez respectfully show as follows:

## SUMMARY OF PROPOSED PETITION

It is now undisputed that Richard Vazquez was convicted of capital murder and sentenced to die based on critical evidence that everyone—Vasquez; the witnesses who provided the evidence; and the State of Texas itself—now recognizes to be utterly false. Moreover, in prior proceedings, this Court has already determined—without then knowing that it was false—that the evidence in question was highly material on the critical question of whether Vasquez acted with the *mens rea* necessary for a capital-murder conviction and whether he was prejudiced by his counsel's constitutionally deficient performance at the penalty stage.

Specifically, Vasquez's proposed petition concerns alleged evidence that, before purportedly beating her to death, Vasquez injected Miranda Lopez, a four-year old child, with a massive and lethal dose of cocaine, twice the amount that would have killed an adult. This evidence came from two witnesses: Dr. Ronald Backer, a toxicologist whose lab tested a sample of Miranda's blood, and Dr. Lloyd

White, the Nueces County Medical Examiner who performed Miranda's autopsy.

**Dr. Backer and Dr. White have both recently recanted their trial testimony.**
Dr. Backer now acknowledges that the Toxicology Report prepared by his lab was
burdened by an "**irreconcilable conflict**." As a result, Dr. Backer has confirmed
that the Toxicology Report and his trial testimony that Miranda had cocaine in her
system were **"*not* reliable evidence."** Dr. White, for his part, has disavowed his
trial testimony on cocaine and all references to cocaine in Miranda's autopsy report.

As explained in the proposed petition attached hereto, when the State of Texas
was advised that Dr. Backer and Dr. White had recanted their testimony due to the
lack of any reliable evidence that there was cocaine in Miranda's system, **the State
immediately acknowledged that Vasquez is entitled to relief from his conviction
and sentence and so informed the court that was then presiding over Vasquez's
case**. The State thereby confirmed that its normal interest in the finality of criminal
judgments is outweighed in Vasquez's case by the more compelling interest in
ensuring that defendants are not convicted and sentenced to death based on evidence
that, as here, is demonstrably false. On April 19, 2023, the State of Texas, acting
through the duly elected Nueces County District Attorney, "reiterate[d] the position
that Mr. Vasquez is entitled to habeas relief and that his conviction and sentence
should be set aside."

The trial record reflects that this damning evidence, false as it was, was the determining factor between a conviction for manslaughter and one for capital murder. On this we need not speculate. It is amply demonstrated by the State's argument to the jury that the alleged presence of a lethal dose of cocaine in Miranda's system constituted the most important evidence in the case—the "straw that broke the camel's back" on the *mens-rea* issue. It is also confirmed by the fact that the jurors, apparently struggling to form a consensus on *mens rea*, returned a guilty verdict on capital murder just 15 minutes after having the false evidence of cocaine read back to them during their deliberations.

Without the false evidence of cocaine, no reasonable factfinder would have found Vasquez guilty of capital murder or found him eligible for the death penalty.[1] Vasquez is thus actually innocent of the crime for which he was convicted and actually innocent of the death penalty. The jury, moreover, was presented with this false evidence through violations of Vasquez's Due Process rights under the Fourteenth Amendment and his right to the effective assistance of counsel under the Sixth Amendment, such that carrying out his sentence—death at the hands of the State of Texas—would violate his rights under the Eighth Amendment to the United States Constitution.

---

[1] Vasquez demonstrates in his proposed subsequent petition that the only other evidence that could have supported a *mens rea* finding (evidence of car-crash equivalency) was itself false and admitted in violation of the Due Process Clause.

## VASQUEZ MEETS THE PRIMA FACIE
## REQUIREMENTS OF 28 U.S.C. § 2244(b)(3)(C)

Vasquez has made the prima facie showing required by 28 U.S.C. § 2244(b)(3)(C).  The factual predicate for his claim—including the disavowal by Dr. Backer and Dr. White of any suggestion that Miranda had cocaine in her system and their acknowledgment that the Toxicology Report was utterly unreliable—could not have been discovered previously through the exercise of due diligence.  Moreover, the facts underlying the claim—including that Miranda had not really been injected with cocaine—establish by clear and convincing evidence that no reasonable factfinder would have found Vasquez guilt of capital murder or eligible for the death penalty.  Finally, the jury verdicts that led to Vasquez's conviction and sentence would not have been rendered but for constitutional errors, consisting of the submission and reliance on demonstrably false evidence; the State's failure to disclose exculpatory *Brady* material; and the denial of Vasquez's right to the effective assistance of counsel.

## VASQUEZ'S SUBSEQUENT PETITION
## IS NOT BARRED BY 28 U.S.C. § 2244(d)(1)

The one-year period of limitation set forth in 28 U.S.C. § 2244(d)(1) does not bar Vasquez's proposed petition.  The one-year period could not have commenced running until March 2019, at the very earliest, as that is the earliest date on which

the factual predicate for Vasquez's claims could have been discovered through the exercise of due diligence.

While more than three years have elapsed since that date, most of that time, under 28 USC § 2244(d)(2), cannot be counted toward the one-year period of limitation. The period from March 2019 until August 2021 (two years and eight months) cannot be counted because, during that time, the pertinent judgment against Vasquez was under review in a properly filed application for post-conviction review pending in state court. Similarly, the period from January 2022 to December 2022 (11 months) cannot be counted because, during that time, the pertinent judgment was under collateral review in a separate application for post-conviction review in state court.

Thus, the only relevant period that could potentially be counted in the calculation is the five months from the August 25, 2021 denial of Vasquez's 2015 Application to the filing on January 12, 2022 of his 2022 Application and the few weeks between the denial of his 2022 Application and the filing of this Motion.[2]

In addition, given that Vasquez is actually innocent of the capital murder and of the death sentence, any expiration of the statute of limitations is no impediment to the consideration of his claims. *See McQuiggin v. Perkins*, 569 U.S. 383 (2013).

---

[2] The time since the denial on December 14, 2022 of Vasquez's 2022 Application should arguably be excluded as well. Since December 14, 2022, Vasquez's appeal of the denial of his Rule 60(b) motion has been pending in this Court under Case No. 22-70009.

## VASQUEZ'S SUBSEQUENT PETITION IS NOT
## BARRED BY ANY PROCEDURAL DEFAULT

Vasquez's petition is not barred by any procedural default in state court. Procedural default does not bar review when the Petitioner can show "cause for the default and prejudice from a violation of federal law." *Martinez v. Ryan*, 566 U.S. 1, 10 (2012). Here, there is good cause for Vasquez's failure to have raised the cocaine issue as a stand-alone claim prior to the filing of his 2022 Application in state court.

First, as explained in detail in the proposed petition attached hereto, despite the exercise of reasonable diligence, Vasquez did not discover that the cocaine evidence used against him was false until March 2019.

Second, any argument that reasonable diligence should have led to the discovery of the issue at an early point would, if accepted, demonstrate that Vasquez received the ineffective assistance of counsel at trial and in his initial efforts to obtain post-conviction relief. The ineffective assistance of counsel in Vasquez's prior habeas applications, although not sufficient to state an independent claim for relief, "may establish cause for a prisoner's procedural default of a claim for ineffective assistance at trial." *Id*. at 9. Here, since the structure and design of the Texas system make it virtually impossible for an ineffective assistance claim to be asserted on direct review, the failure of Vasquez's prior habeas counsel to raise that trial counsel was ineffective for not exposing that the cocaine evidence was false constitutes

"cause" to allow Vasquez to now pursue this claim for ineffective assistance at trial.

*Trevino v. Thaler*, 569 U.S. 413, 417 (2013).

Third, Vasquez's evidence that he is actually innocent of capital murder and actually innocent of the death penalty provide the gateway that allows him to now obtain review of constitutional claims that might otherwise be defaulted.

Finally, Vasquez can obviously prove prejudice from the constitutional violations that infected his trial. Those violations allowed the jury to hear demonstrably false evidence that, as the State of Texas argued, made the difference between a conviction for capital murder and one for manslaughter or criminally negligent homicide.

## CONCLUSION

Three propositions critical to Vasquez's proposed petition are established beyond any question. First, Vasquez was tried based on highly inflammatory evidence that was demonstrably false. Second, that evidence was critically important to Vasquez's conviction and sentence. Third, the State of Texas has three times acknowledged (most recently on April 19, 2023) that this conviction and sentence should not stand, thereby obviating any concerns about respecting the finality of the judgment against Vasquez. In these circumstances, Vasquez should, at a minimum, be allowed to file his subsequent petition for review and consideration

by the District Court. Fundamental fairness to Vasquez—and the integrity of our system of criminal justice—demand no less.

Vasquez should not be put to death based on false evidence that was critical to his conviction and sentence. He should be authorized to file the attached petition to prevent this patently unconstitutional result.

Attached hereto as Exhibit 3 are the materials referenced in paragraphs (2)-(5) of the Clerk's letter dated February 8, 2023.

Date: April 20, 2023                    Respectfully submitted,

                                        /s/ Thomas M. Farrell
                                        Thomas M. Farrell
                                        McGuireWoods LLP
                                        845 Texas Ave., Suite 2400
                                        Houston, TX 77002-2904
                                        (713) 353-6677
                                        tfarrell@mcguirewoods.com

                                        Counsel for Movant, Richard Vasquez

## CERTIFICATE OF COMPLIANCE

I certify that a copy of this Motion has been prepared in proportionally spaced typeface that is 14-point and larger and contains 1723 words.

                                        /s/ Thomas M. Farrell
                                        Thomas M. Farrell

9

## CERTIFICATE OF SERVICE

I certify that a copy of this Motion has been served on April 20, 2023, by

Certified Mail, Return Receipt Requested, and by Email, to the following:

Cara Hanna
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
Cara.hanna@oag.texas.gov

*/s/ Thomas M. Farrell*
Thomas M. Farrell

173392350_1

| | |
|---|---|
| **From:** | Stephanie Rocha <stephanie.rocha@nuecesco.com> |
| **Sent:** | Wednesday, April 19, 2023 2:29 PM |
| **To:** | Farrell, Thomas M. |
| **Cc:** | Mark Gonzalez |
| **Subject:** | 98-CR-0730-E |
| **Attachments:** | 98-CR-0730-E.pdf |

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Good afternoon,

Please find the attached document on behalf of District Attorney, Mark Gonzalez.

**Thank you,**

**Stephanie Y. Rocha**
**Administrative Secretary**
**Nueces County District Attorney's Office**
**Office: 361-888-0621**
**Stephanie.Rocha@nuecesco.com**



Exhibit

A

## POSITION OF THE NUECES COUNTY DISTRICT ATTORNEY

1.     I am the District Attorney for Nueces County, Texas.

2.     I understand that Richard Vasquez was convicted of capital murder and sentenced to death in Case No. 98-CR-0730-E in the 148th Judicial District Court of Nueces County, Texas.

3.     In May 2019, I reviewed the circumstances surrounding Richard Vasquez's attempts to obtain post-conviction habeas relief from that conviction and death sentence. I determined, on behalf of the State of Texas, that the Subsequent Application for Post-Conviction Writ of Habeas Corpus that Mr. Vasquez filed on April 15, 2015, was meritorious and that Mr. Vasquez was entitled to relief.

4.     Accordingly, at my direction, my office informed the Court at the hearing on Mr. Vasquez's application (June 3, 2019) that the State of Texas agreed to the Findings of Fact and Conclusions of Law proposed by Mr. Vasquez and further agreed that Mr. Vasquez's conviction and sentence should be set aside.

5.     I understand that Mr. Vasquez is continuing to pursue relief from his conviction and sentence by filing certain new applications and motions. To the extent I have authority to respond on behalf of the State of Texas to any such applications and motions, I hereby reiterate the position that Mr. Vasquez is entitled to habeas relief and that his conviction and sentence should be set aside.

6.     In the interests of justice, Mr. Vasquez's conviction and sentence should be set aside.

_____
Mark A. Gonzalez

153677944_1.DOCX

## DECLARATION OF THOMAS M. FARRELL

I, Thomas M. Farrell, declare, under penalty of perjury, as follows:

1.    My name is Thomas M. Farrell. I have personal knowledge of all facts stated in this Declaration, and all such facts are true and correct. I am the attorney of record for Movant Richard Vasquez.

2.    On March 1, 2023, I inquired of Willa Cockshutt, Assistant Attorney General for the State of Texas, whether the State would consider consenting to the habeas relief sought by Applicant Richard Vasquez.

3.    On March 3, 2023, Ms. Cockshutt responded that she was not authorized to discuss my request. She told me that she had been informed by her supervisor to refer me to "the DA's office."

4.    Thereafter, I contacted the Nueces County District Attorney who indicated to me, as set forth in the position statement he signed on April 19, 2023, that Richard Vasquez is entitled to habeas relief and that his conviction and sentence should be set aside.

Executed in Houston, Harris County, Texas, on the 19th day of April, 2023.


_____

Thomas M. Farrell

173351806v1

Exhibit

B

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

U.S. COURT OF APPEALS
RECEIVED
Feb 08, 2023
FIFTH CIRCUIT

| | |
|---|---|
| **RICHARD VASQUEZ, JR.,** ) | **CASE NO. _____** |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | |
| ) | **CAPITAL CASE** |
| **BRYAN COLLIER,** ) | **NO EXECUTION DATE** |
| **DIRECTOR, TEXAS** ) | |
| **DEPARTMENT OF** ) | |
| **CRIMINAL JUSTICE,** ) | |
| **CORRECTIONAL** ) | |
| **INSTITUTIONS DIVISION** ) | |
| ) | |
| **Respondent.** ) | |

# PROPOSED SUBSEQUENT PETITION FOR WRIT OF HABEAS CORPUS

Thomas M. Farrell
State Bar No. 06839250
tfarrell@mcguirewoods.com

McGuireWoods LLP
845 Texas Avenue, Suite 2400
Houston, Texas 77002
Telephone: (713) 571-9191
Facsimile: (713) 571-9652

**Exhibit**

**1**

**Page**

I.    INTRODUCTION ...........................................................................1

II.    JURISDICTION ...........................................................................4

III.    CLAIMS FOR RELIEF ...............................................................4

IV.    PROCEDURAL HISTORY ..........................................................6

     A.     Conviction and Direct Appeal...........................................6

     B.     First State Habeas Application...........................................6

     C.     First Federal Habeas Petition ............................................7

     D.     Subsequent Habeas Application in State Court (2015).......................8

     E.     Subsequent Habeas Application in State Court (2022)....................10

     F.     1983 Complaint in Federal Court.......................................11

V.    FACTS ON COCAINE ALLEGEDLY IN MIRANDA'S SYSTEM .........11

     A.     The False Evidence of Cocaine Intoxication ......................11

     B.     The Truth about Cocaine................................................13

     C.     The Materiality of the Cocaine Evidence...........................16

     D.     The State Withheld Exculpatory Information from Vasquez
         Regarding the Toxicology Report.....................................20

     E.     Discovery by Vasquez's Counsel that the Cocaine Evidence
         was False ...............................................................22

     F.     Prior Consideration of the Cocaine Issue...........................26

     G.     Resolution of Vazquez's 2022 Application .......................28

VI.    FACTS ON CAR-CRASH EQUIVALENCY AND SHORT FALLS ........30

     A.     The False Evidence on Car-Crash Equivalency and Short Falls .......30

     B.     The Truth About Car-Crash Equivalency and Short Falls.................34

     C.     Materiality of the Evidence on Car-Crash Equivalency and
         Short Falls...............................................................41

     D.     Discovery that the Evidence of Car-Crash Equivalency and
         Short Falls was False...................................................42

     E.     Prior Consideration of Car-Crash Equivalency and Short Falls ........44

CLAIM ONE ............................................................................................... 47

> Vasquez is entitled to habeas relief because he is actually innocent of the crime of capital murder. Without the false evidence on cocaine and the junk science that marred his trial, no rational juror would have found that Vasquez acted with the mens *rea* necessary for a capital-murder conviction. Imposing the death penalty on Vasquez in these circumstances would violate the Eighth and Fourteenth Amendments to the United States Constitution. Vasquez asserts this actual-innocence claim both as a gateway for consideration of other constitutional claims and as a free-standing claim that independently requires relief. ............................................................................................ 47

CLAIM TWO ............................................................................................... 49

> Vasquez is entitled to habeas relief because he is actually innocent of the death penalty. Without the false evidence of cocaine and the junk science that marred his trial, no rational juror would have provided the affirmative answers necessary under Texas law to impose the death penalty. Imposing the death penalty on Vasquez in these circumstances would violate the Eighth and Fourteenth Amendments to the United States Constitution. Vasquez asserts this actual-innocence claim both as a gateway for consideration of other constitutional claims and as a free-standing claim that independently requires relief. ............................................................................................ 49

CLAIM THREE ............................................................................................ 50

> Vasquez is entitled to habeas relief because the State of Texas failed to disclose to Vasquez exculpatory information related to the false evidence of cocaine, in violation of the Due Process Clause of the United States Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963). ............................................................................................................ 50

CLAIM FOUR ............................................................................................. 52

> Vasquez is entitled to habeas relief because false evidence on cocaine (presented with knowledge of its falsity or through prosecutorial misconduct) materially affected and contributed to his capital conviction and death sentence, in violation of the Due Process Clause of the United States Constitution. ............................................................................. 52

TABLE OF CONTENTS
(continued)

Page

CLAIM FIVE ........................................................................................................54

Vasquez is entitled to habeas relief because false evidence on cocaine
(even if unknowingly presented with no prosecutorial misconduct)
materially affected and contributed to his capital conviction and death
sentence, in violation of the Due Process Clause of the United States
Constitution..................................................................................................54

CLAIM SIX ..........................................................................................................56

Vasquez is entitled to habeas relief because the failure of his trial
counsel to discover and expose the falsity of the cocaine evidence
denied him the effective assistance of counsel guaranteed by the Sixth
Amendment to the United States Constitution. ...........................................56

CLAIM SEVEN ....................................................................................................57

Vasquez is entitled to habeas relief because junk science and false
evidence regarding the force of the blows to Miranda's head
materially affected and contributed to his capital conviction and death
sentence, in violation of the Due Process Clause of the United States
Constitution..................................................................................................57

CLAIM EIGHT .....................................................................................................58

Vasquez is entitled to habeas relief because the failure of his trial
counsel to investigate and counter the evidence of sexual assault
denied him the effective assistance of counsel guaranteed to him by
the Sixth Amendment to the United States Constitution.  This claim
has already been adjudicated, but without the benefit of the new
evidence discussed herein.  This new evidence and Vasquez's proof of
actual innocence allow the reassertion of this Claim. ..................................58

CLAIM NINE .......................................................................................................60

Vasquez is entitled to habeas relief because the failure of his trial
counsel to investigate and present available mitigating evidence
denied him the effective assistance of counsel guaranteed to him by
the Sixth Amendment to the United States Constitution.  This Claim
has already been adjudicated, but without the benefit of the new
evidence discussed herein.  This new evidence and Vasquez's proof of
actual innocence allow the reassertion of this Claim. ..................................60

CONCLUSION ......................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland,*
    373 U.S. 83 (1963)...............................................................*passim*

*Ex parte Chabot,*
    300 S.W.3d 768 (Tex. Crim. App. 2009) .............................................10

*Giglio v. United States,*
    405 U.S. 150 (1972)...............................................................*passim*

*Ex Parte Henderson,*
    246 S.W.3d 690 (Tex. Crim App. 2007) ...........................................29

*Ex Parte Henderson,*
    384 S.W.3d 833 (Tex. Crim. App. 2012) ...........................................41

*Johnson v. Williams,*
    568 U.S. 289 (2013)..................................................................47

*Kuhlmann v. Wilson,*
    477 U.S. 436 (1986).............................................................59, 61

*Kyles v. Whitley,*
    514 U.S. 419 (1995).............................................................51, 52

*Miller v. Pate,*
    386 U.S. 1 (1967)...............................................................48, 52

*Napue v. Illinois,*
    360 U.S. 264 (1959).............................................................48, 52

*Sawyer v. Whitley,*
    505 U.S. 333 (1992)..................................................................49

*Strickland v. Washington,*
    466 U.S. 668 (1984)..................................................................57

*Trevino v. Thayer,*
    569 U.S. 413 (2013)..................................................................57

*United States v. Mason,*
  293 F.3d 826 (5th Cir. 2002) ............................................................51

*Vasquez v. Quarterman,*
  No. CC-05-059, 2008 WL 859147 (S.D. Tex. Mar. 28, 2008) ......................7

*Vasquez v. Thaler,*
  389 F. App'x 419 (5th Cir. 2010) .......................................................7

**Statutes**

28 U.S.C. § 2241(d) .........................................................................4

28 U.S.C. § 2254 ........................................................................1, 4, 7

42 U.S.C. § 1983 ..........................................................................11

CCA, May 6, 2021 .........................................................................vii

TEX. CODE CRIM. PROC. ARTICLE 11.071, § 5...........................................29

TEX. CODE CRIM. PROC. ARTICLE 11.071, § 5(a) .................................11, 29

TEX. CODE CRIM. PROC. ARTICLE 11.071, § 5(a)(2) ...................................29

TEX. CODE CRIM. PROC. ARTICLE 11.071, § 5(a)(3) .................................30

TEX. CODE CRIM. PROC. ARTICLE 11.073.................................8, 27, 28, 44

TEX. PENAL CODE § 19.02(b)(1) ...........................................................1

**Other Authorities**

Federal Rules of Civil Procedure Rule 60(b)...........................8, 59, 60, 61

United States Constitution .....................................1, 49, 50, 57

United States Constitution Sixth Amendment .........................................*passim*

United States Constitution Fourteenth Amendment................................48

United States Constitution Eighth and Fourteenth
  Amendments .......................................................................4, 47, 49, 50

United States Constitution Due Process Clause ..................................*passim*

v

## TABLE OF EXHIBITS AND EVIDENCE

| | |
|---|---|
| Exhibit A | Subsequent Application for Post-Conviction Habeas Relief (State Court), filed April 15, 2015 |
| Exhibit B | CCA Order remanding Subsequent Application for review on the merits, entered March 23, 2016 |
| Exhibit C | Transcript of State Court Hearing, June 3, 2019 |
| Exhibit D | Exhibits 1-168 admitted at State Court Hearing, June 3, 2019 |
| Exhibit E | Proposed Findings of Fact and Conclusions (State Court), filed June 3, 2019 |
| Exhibit F | Findings of Fact, Conclusions of Law, Recommendation, and Order, entered in State Court, February 26, 2021 |
| Exhibit G | Objections to Findings of Fact, Conclusions of Law, Recommendation and Order by District Court, filed in CCA, May 6, 2021 |
| Exhibit H | CCA Per Curiam Opinion, entered August 25, 2021 |
| Exhibit I | Declaration of Dr. Jimmie Valentine, dated December 17, 2021 |
| Exhibit J | Declaration of Thomas M. Farrell, dated January 12, 2022 |
| Exhibit K | Declaration of John Gilmore, dated December 14, 2021 |
| Exhibit L | Declaration of Nicholas Trenticosta, dated December 10, 2021 |
| Exhibit M | Declaration of Richard Vasquez, dated December 8, 2021 |
| Exhibit N | Declaration of Thomas M. Farrell, dated February 6, 2023 |
| Exhibit O | First Amended Subsequent Application, filed January 26, 2022 |
| Exhibit P | CCA Order, December 14, 2022 |

All of these exhibits, except Exhibits N, O, and P, were in the state-court record, were presented to the United States District Court for the Southern District of Texas in Case No. 05-59, and are before the United States Court of Appeals for the Fifth Circuit in Case No. 22-70009

## PROPOSED SUBSEQUENT PETITION
## FOR WRIT OF HABEAS CORPUS

Richard Vasquez submits this Subsequent Petition for Writ of Habeas Corpus pursuant to the Constitution of the United States and 28 U.S.C. § 2254. Vasquez respectfully shows as follows:

## I.    INTRODUCTION

At Richard Vasquez's 1999 trial for capital murder, the State of Texas used to devastating effect alleged evidence that, before purportedly beating her to death, Vasquez injected Miranda Lopez with a massive and lethal dose of cocaine, twice the amount that would have killed an adult. This cocaine evidence was the centerpiece of the State's effort to convince the jury that Vasquez acted with the *mens rea* necessary for capital murder.[1] It also formed a critical part of the State's case at the punishment phase of trial that Vasquez was a monster deserving of the death penalty.

---

[1] A capital-murder conviction requires proof beyond a reasonable doubt that the defendant "intentionally or knowingly" caused the death of an individual. TEX. PENAL CODE § 19.02(b)(1). To prove an intentional killing, the State must prove that the defendant had the "conscious objective or desire" to cause the individual's death. *Id.*, § 6.03(a). To prove a knowing killing, the State must prove that the defendant was "aware that his conduct [was] reasonably certain to cause" the individual's death. *Id.*, § 6.03(b). In the State's telling at trial, anyone depraved enough to inject cocaine into a four-year old child must have had the "conscious objective or desire" to kill her. With somewhat less emphasis, the State also suggested that the requisite *mens rea* could be inferred from supposed evidence that Vasquez struck Miranda with the same force she would have experienced if ejected from a car traveling at 65 miles per hour. That evidence, however, is itself now known to be false, as demonstrated below.

Not surprisingly, this highly inflammatory cocaine evidence resonated with the jury. During deliberations, the only questions the jury asked related to the cocaine issue. With "evidence" this prejudicial, Vasquez's conviction and sentence were preordained.

But recent developments reveal that the cocaine evidence on which the State relied so forcefully was **false**. The trial evidence on cocaine came from two witnesses: Dr. Ronald Backer, a toxicologist whose lab tested a sample of Miranda's blood, and Dr. Lloyd White, the Nueces County Medical Examiner who performed Miranda's autopsy. **Dr. Backer and Dr. White have both recently recanted their trial testimony.** Dr. Backer now acknowledges that the Toxicology Report prepared by his lab was burdened by an "irreconcilable conflict." As a result, Dr. Backer has confirmed that the Toxicology Report and his trial testimony that Miranda had cocaine in her system were **"*not* reliable evidence."** Dr. White, for his part, has disavowed his trial testimony on cocaine and all references to cocaine in Miranda's autopsy report.

In short, the proposition that Vasquez injected Miranda with cocaine, which virtually guaranteed his conviction and death sentence, *never* had any valid basis in fact. These circumstances, which Vasquez has only recently discovered, would by themselves entitle him to habeas relief and require that his conviction and sentence be set aside.

2

There is, though, an additional circumstance that makes Vasquez's claim for habeas relief even more compelling. **Here, the State of Texas itself agreed that Vasquez was entitled to relief from his conviction and sentence, in part because of the false evidence on cocaine and in part because Vasquez's trial was also marred by junk science on the forces necessary to cause fatal head trauma to infants.** The State thereby acknowledged that the interest it normally has in the finality of criminal judgments is outweighed by the State's more compelling interest in ensuring that defendants are not convicted and sentenced to death based on evidence that is demonstrably false. The State of Texas' concession that Vasquez's trial was materially impaired by false evidence and junk science is of enormous significance. As the State acknowledged, Vasquez's conviction and sentence should not stand.

The State of Texas' concession was made in 2019, during the course of proceedings on Vasquez's 2015 state-court application. It was made by the Nueces County District Attorney who was duly elected and empowered to make this kind of determination on the State's behalf. The State's concession, moreover, has never been withdrawn and was effectively reaffirmed when the State decided to refrain from opposing Vasquez's 2022 state-court application. Presumably, in the interests of justice and to promote the predictability and consistency that Due Process requires in the imposition of the death penalty, the Attorney General's office will, in response

3

to this Petition, once again reaffirm the State's position that Vasquez's conviction and sentence should be set aside.

## II.    JURISDICTION

This Court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Richard Vasquez was convicted in the 148th Judicial District of Nueces County, Texas, which is within the Southern District of Texas.  This Court has subject matter jurisdiction under 28 U.S.C. § 2254.

## III.    CLAIMS FOR RELIEF

The State's use of false evidence of cocaine intoxication to convict Vasquez and to sentence him to death, together with the junk-science and other issues recounted in this Petition, give rise to the following claims for relief:

**Claim 1:**    Vasquez is entitled to habeas relief because he is actually innocent of the crime of capital murder.  Without the false evidence on cocaine and the junk science that marred his trial, no rational juror would have found that Vasquez acted with the *mens rea* necessary for a capital-murder conviction.  Imposing the death penalty on Vasquez in these circumstances would violate the Eighth and Fourteenth Amendments to the United States Constitution.  Vasquez asserts this actual-innocence claim both as a gateway for consideration of other constitutional claims and as a free-standing claim that independently requires relief.

**Claim 2:**    Vasquez is entitled to habeas relief because he is actually innocent of the death penalty.  Without the false evidence of cocaine and the junk science that marred his trial, no rational juror would have provided the affirmative answers necessary under Texas law to impose the death penalty. Imposing the death penalty on Vasquez in these circumstances would violate the Eighth and Fourteenth Amendments to the United States Constitution.  Vasquez asserts this actual-innocence claim both

4

as a gateway for consideration of other constitutional claims and as a free-standing claim that independently requires relief.

**Claim 3:** Vasquez is entitled to habeas relief because the State of Texas failed to disclose to Vasquez exculpatory information related to the false evidence of cocaine, in violation of the Due Process Clause of the United States Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963).

**Claim 4:** Vasquez is entitled to habeas relief because false evidence on cocaine (presented with knowledge of its falsity or through prosecutorial misconduct) materially affected and contributed to his capital conviction and death sentence, in violation of the Due Process Clause of the United States Constitution.

**Claim 5:** Vasquez is entitled to habeas relief because false evidence on cocaine (even if unknowingly presented with no prosecutorial misconduct) materially affected and contributed to his capital conviction and death sentence, in violation of the Due Process Clause of the United States Constitution.

**Claim 6:** Vasquez is entitled to habeas relief because the failure of his trial counsel to discover and expose the falsity of the cocaine evidence denied him the effective assistance of counsel guaranteed to him by the Sixth Amendment to the United States Constitution.

**Claim 7:** Vasquez is entitled to habeas relief because the junk science and false evidence regarding the force of the blows to Miranda's head materially affected and contributed to his capital conviction and death sentence, in violation of the Due Process Clause of the United States Constitution.

**Claim 8:** Vasquez is entitled to habeas relief because the failure of his trial counsel to investigate and counter the evidence of sexual assault denied him the effective assistance of counsel guaranteed to him by the Sixth Amendment to the United States Constitution. This claim has already been adjudicated, but without the benefit of the new evidence discussed herein. This new evidence and Vasquez's proof of actual innocence allow the reassertion of this claim.

5

**Claim 9:** Vasquez is entitled to habeas relief because the failure of his trial counsel to investigate and present available mitigating evidence denied him the effective assistance of counsel guaranteed to him by the Sixth Amendment to the United States Constitution. This claim has already been adjudicated, but without the benefit of the new evidence discussed herein. This new evidence and Vasquez's proof of actual innocence allow the reassertion of this claim.

## IV.    PROCEDURAL HISTORY

### A.    Conviction and Direct Appeal

On June 22, 1999, Richard Vasquez was convicted and sentenced to death for the capital murder of Miranda Lopez, a child under the age of six. On August 30, 2000, Vasquez filed a direct appeal of his conviction and death sentence in the Texas Court of Criminal Appeals. On October 3, 2001, the Texas Court of Criminal Appeals affirmed the conviction and sentence.

### B.    First State Habeas Application

On June 27, 2001, while his direct appeal was still pending, Vasquez filed a post-conviction application for writ of habeas corpus in state court. On May 19, 2004, after an evidentiary hearing, the trial judge recommended that Vasquez's application for writ of habeas corpus be denied. On January 26, 2005, the Texas Court of Criminal Appeals adopted the trial judge's findings and conclusions and denied Vasquez's application.

Under Texas procedure, this 2001 state-court application represented Vasquez's first opportunity to raise a claim of ineffective assistance of counsel

(IAC). While an IAC claim was made, it did not relate to counsel's handling of the State's alleged evidence (now know to be false) that Miranda had a lethal dose of cocaine in her system.

## C.    First Federal Habeas Petition

On January 26, 2006, Vasquez filed a timely petition for habeas relief under 28 U.S.C. § 2254 in the United States District Court for the Southern District of Texas.

Vasquez's federal petition raised three claims. In Claim One, he demonstrated that he was denied the effective assistance of counsel due to his lawyers' failure to develop and present available mitigating evidence. In Claim Two, Vasquez showed that he was denied the effective assistance of counsel due to counsel's failure to investigate and counter the State's evidence of sexual assault. On Claim Three, he established that he was denied the effective assistance of counsel on direct appeal because his appellate lawyer was laboring under a conflict of interest.

In a Memorandum and Order dated March 28, 2008, this Court denied habeas relief on all three claims. *Vasquez v. Quarterman*, No. CC-05-059, 2008 WL 859147 (S.D. Tex. Mar. 28, 2008). The United States Court of Appeals for the Fifth Circuit subsequently affirmed. *Vasquez v. Thaler*, 389 F. App'x 419 (5th Cir. 2010).[2]

---

[2] Both this Court and the Fifth Circuit held that Vasquez's trial counsel provided constitutionally deficient representation with respect to the development and presentation of mitigating evidence. Vasquez was nevertheless denied relief based on *Strickland*'s prejudice prong.

7

On January 26, 2022, Vasquez filed a motion under Rule 60(b) of the Federal Rules of Civil Procedure for relief from the Memorandum and Order and related judgment (from March 28, 2008) denying his federal habeas petition. On July 11, 2022, the District Court denied that motion. On August 9, 2022, Vasquez filed a Notice of Appeal. On November 10, 2022, Vasquez filed in the United States Court of Appeals for the Fifth Circuit (Case No. 22-70009) a motion for a certificate of appealability. That motion remains pending.

### D.    Subsequent Habeas Application in State Court (2015)

In 2013, the Texas legislature enacted a statute allowing for post-conviction habeas relief upon a showing that currently available scientific evidence, had it been available at trial, would likely have precluded conviction. TEX. CODE CRIM. PROC. ART. 11.073. On April 14, 2015, Vasquez filed a state-court application for relief under that statute (the "2015 Application"). CR, Vol. 1 at 115.

The Texas Court of Criminal Appeals determined that Vasquez's application was timely and could go forward under this statute. The Court of Criminal Appeals remanded the application to the trial court to "review on the merits" whether new science on biomechanics (and on the forces necessary to cause fatal head injuries in infants) would have made a difference, had it been available and presented at Vasquez's trial, on two issues: (1) whether Vasquez caused Miranda's death, and

8

(2) if so, whether he acted with the *mens rea* required for capital murder. *Id.*, Vol. 2 at 243.

After remand, the trial court scheduled a hearing for June 3, 2019, to hear evidence on these issues. *Id.*, Vol. 2 at 349. In preparation for the hearing, Vasquez (through the undersigned counsel) assembled an overwhelming body of new scientific evidence demonstrating that the State's testimony from Vasquez's trial on car-crash equivalency and on the ability of "short falls" to produce fatal injuries in infants was false.[3]

Before the hearing commenced, Vasquez previewed that evidence for the State and shared with the State the proposed findings of fact and conclusions of law that he planned to file with the court. Farrell (2022) Decl. at ¶ 15. After reviewing the materials Vasquez presented, the State withdrew its opposition to Vasquez's habeas application, agreed to the findings and conclusions proposed by Vasquez, and indicated its intent to inform the court of the State's agreement that Vasquez was entitled to relief from his conviction and sentence. *Id.*

At the hearing on June 3, 2019, Vasquez offered, without objection, the body of evidence that he had previously previewed for the State. Tr. at 12. The State offered no evidence at all, let alone any controverting evidence. **Instead, the State**

---

[3] The evidence at trial indicated that Miranda struck her head in a fall from a bathroom stool shortly before Vasquez called 911, thus making the science on "short falls" highly relevant to his defense.

9

of Texas stated on the record, in open court, that the State agreed with Vasquez's proposed findings and conclusions and agreed that the record established Vasquez's right to habeas relief. *Id.* at 8-12, 69.

On February 26, 2021, notwithstanding the State's agreement that relief was appropriate, the trial court issued findings of fact and conclusions of law along with a recommendation that Vasquez be denied relief. CR, Vol. 3 at 595. On August 25, 2021, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied habeas relief.

### E.   Subsequent Habeas Application in State Court (2022)

On January 12, 2022, Vasquez filed in state court a subsequent habeas application (the "2022 Application") asserting six claims for relief, including those set forth in this Petition. First, Vasquez asserted two *Chabot*[4] claims that his sentence and conviction were procured through false evidence that Miranda had cocaine in her system. Second, Vasquez asserted a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). Third, Vasquez asserted an actual-innocence claim. Fourth, Vasquez asserted two claims that he received ineffective assistance of counsel through the failure of his lawyers to challenge the false cocaine evidence.

---

[4] *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009).

As discussed in more detail below, the 2002 Application is the first opportunity that Vasquez had to assert independent grounds for relief based on the false cocaine evidence.

On December 14, 2022, the Texas Court of Criminal Appeals dismissed the 2022 Application, "without considering the merits of the claims," on the ground that Vasquez had not satisfied the requirements of Article 11.071, 5(a) of the Texas Code of Criminal Procedure for the filing of a subsequent application.

### F.     1983 Complaint in Federal Court

On January 24, 2022, Vasquez filed in this Court a complaint under 42 U.S.C. § 1983, Case No. 22-cv-00012, alleging that he was denied procedural due process in the resolution of his 2015 Application in state court.  On July 8, 2022, the Court dismissed the complaint.  On August 5, 2022, Vasquez filed a notice of appeal from that dismissal.  On January 9, 2023, Vasquez filed a motion to dismiss the appeal (Fifth Circuit Case No. 22-70008).  On January 27, 2023, the Fifth Circuit granted that motion.

## V.     FACTS ON COCAINE ALLEGEDLY IN MIRANDA'S SYSTEM

### A.     The False Evidence of Cocaine Intoxication

The cocaine evidence that Vasquez addresses in this Petition came from three sources:  Dr. Ronald Backer, a toxicologist whose laboratory tested a blood sample drawn from Miranda before she died; Dr. Lloyd White, the Nueces County Medical Examiner who had commissioned that testing; and the Toxicology Report issued by

Dr. Backer's lab and attached by Dr. White to his autopsy report. App. Exhs. 13, 24, 27.

Although Dr. Backer was not shown the Toxicology Report during his testimony at trial, he testified unequivocally about the test results set forth in that report. Dr. Backer swore, without reservation, that the testing performed by his lab revealed "an acute toxic" amount of cocaine in Miranda's blood and that, from his calculations, the cocaine was "put in her body" somewhere between one and two hours before her admission to the hospital. App. Exh. 27 at 7, 13, 14.

Dr. Backer was clear that the testing reflected in the Toxicology Report detected cocaine in Miranda's blood twice, through two different test methods. First, according to Dr. Backer's testimony, his laboratory detected cocaine in Miranda's blood through an initial screen (a test for "Drugs of Abuse") that came back positive. *Id*. at 7. Second, in Dr. Backer's telling, a subsequent test (with an instrument called a "gas chromatograph mass spectrometer") not only confirmed the presence of cocaine but revealed cocaine in Miranda's system at a shockingly high level. *Id*. at 6, 7.

Dr. White testified that, based on the Toxicology Report, he listed "cocaine intoxication" as a "contributing condition" to Miranda's death in his autopsy report. App. Exh. 13 at 38. He further explained that "contributing conditions" are "things that are unrelated directly at least to the cause of death, but to things that may have

12

had a deleterious or harmful effect on the individual." *Id*. Dr. White also answered "yes" to a question about whether "Miranda had double the amount of what was lethal in an adult of cocaine." *Id*. at 59.

**B.    The Truth about Cocaine**

As noted, Dr. Backer testified that the tests performed by his laboratory confirmed the existence of cocaine in Miranda's system not once, but twice. Specifically, he indicated that the initial screen was positive for cocaine and that the second "GC/MS" confirmation test reliably showed 0.18 mg/L of parent cocaine and 0.42 mg/L of a cocaine metabolite. Both aspects of this testimony were false. App. Exh. 29 at 3–4.

First, according to the Toxicology Report itself, the initial screen, under the heading "Drugs of Abuse Screen," was "negative," not "positive," indicating that there was *no* cocaine at *any* level in Miranda's blood. Dr. Backer falsely stated the reverse of this in his testimony. App. Exh. 27 at 7.  Second, while the Toxicology Report does reference the 0.18 Mg/L and 0.42 Mg/L figures described by Dr. Backer, he falsely testified that those results from the GC/MS confirmation were meaningful and reliable. *Id*. at 7, 10-12.

In truth, the purported results from the GC/MS confirmatory test were utterly meaningless. If Miranda's blood really had 0.18 mg/L of parent cocaine and 0.42 mg/L of a cocaine metabolite, the "Drugs of Abuse" screen would necessarily have

13

been "positive," but it was actually reported as "negative." App. Exhs. 28 & 29. In other words, the Toxicology Report was at war with itself, with an initial negative result that cannot possibly be squared with a later positive result. *Id.* Because of this direct conflict between the test results, neither result was reliable, which means that Dr. Backer's unequivocal testimony that there was cocaine in Miranda's system lacked *any* foundation. *Id.* Dr. Backer's testimony that the test results from his lab confirmed the presence of cocaine was thus false. *Id.*

In light of this conflict in the Toxicology Report, Dr. Backer recently recanted his trial testimony. In a Declaration dated May 1, 2019, Dr. Backer acknowledged that there was an "irreconcilable conflict" in the Toxicology Report between the "negative" result from the "Drugs of Abuse" screen and the levels of cocaine and metabolite reported from the GC/MS confirmation test. App. Exh. 28. Dr. Backer further acknowledged that this same "irreconcilable conflict" infected his trial testimony. *Id.* Finally, Dr. Backer acknowledged that, given this "irreconcilable conflict," the Toxicology Report and his trial testimony were "not reliable evidence." *Id.*

Dr. White has also recanted his trial testimony, providing a sworn Declaration (May 23, 2019) in which he confirmed the existence and significance of the fatal flaw in the Toxicology Report:

14

In reviewing the Toxicological Laboratory Report, I can see now that it states that the "Drugs of Abuse Screen" was "negative." I do not believe that, in 1998 and 1999, I would have appreciated the significance of this negative finding or its impact on the finding below it from the "Confirmed GC/MS" test of 0.18 mg/L of Blood Parent cocaine and 0.42 mg/L of Blood Benzoylecgonine. I now understand, from having reviewed the Declaration of Ronald Backer, who signed the Toxicological Laboratory Report in March 1998 as President of Universal Toxicology Laboratories, that there is an "irreconcilable conflict" between the negative finding on the Drugs of Abuse Screen and the later finding of the presence of parent cocaine and benzoylecgonine and that such conflict means, in Dr. Backer's words, that the Toxicology Laboratory Report is "unreliable evidence." I did not know that in 1998 and 1999; if I had known it, I would not have listed cocaine intoxication as a contributing condition for Miranda Lopez, nor would I have testified about cocaine in her system at Mr. Vasquez's trial.

Had I known what I know today, I would have insisted on a second toxicology report, and I would have taken steps to independently verify its accuracy, before including any mention of cocaine in my autopsy report or findings.

App. Exh. 30.

Here is the bottom line on cocaine: The only two witnesses who testified to cocaine in Miranda's system now acknowledge that their testimony was false. **And the State of Texas itself, having endorsed the findings and conclusions that Vasquez submitted in support of his 2015 Application, conceded that the cocaine evidence offered at trial was false.** Tr. at 8-12; 69. In short, everyone now agrees that the cocaine evidence was unreliable and constituted no evidence at all.

## C.    The Materiality of the Cocaine Evidence

It would be impossible to overstate the role that the cocaine evidence played at Vasquez's trial. From the testimony of Dr. Backer and Dr. White that Miranda's blood had 0.18 mg/L of parent cocaine and 0.42 mg/L of a cocaine metabolite, the State spun for the jury a tale that Vasquez used a needle to inject into Miranda twice the amount of cocaine that would have killed an adult and that he did so, an hour or two before she was rushed to the hospital, to stop her from struggling as he tortured her to death. Parts of this fanciful story were invented from whole cloth,[5] but all of it started with the false premise that the tests performed by Dr. Backer's lab reliably detected cocaine in Miranda's blood. And, as the trial record reveals, this was all part of a calculated effort to portray Vasquez as a depraved monster who must have acted with the *mens rea* required for a capital-murder conviction.

The State set the stage for this effort by using the cocaine evidence as the crescendo of its opening statement, which ended with the State telling the jury that there would be evidence that Miranda had in her blood "twice the amount [of cocaine] it would take to kill an adult" and that this cocaine evidence would be

---

[5] Neither Dr. Backer nor Dr. White could testify as to how the cocaine allegedly got into Miranda's blood, but the State nevertheless asserted to the jury that Vasquez used a needle to inject cocaine into Miranda. *See, e.g.*, App. Exhs. 17–22 ("he shoots her up with cocaine"; "look at when he shot her up with cocaine"; "she had to be injected"; "why would he inject her with cocaine"—to "stop her from struggling"; "he lied about injecting her with the lethal dose of cocaine"; "no one told him to shoot her up with cocaine").

critical on *mens rea*, helping to prove that "Richard Vasquez intentionally and knowingly caused the death of Miranda, a four-year old child." App. Exh. 17 at 14.

Then, after developing the false cocaine evidence through the testimony of Dr. Backer and Dr. White, the State took the opportunity to discuss cocaine issues with many other trial witnesses in an obvious effort to keep cocaine foremost in the jury's mind. *See, e.g.,* trial testimony of Yezenia Banuelus; Brenda Lopez; Carlos Cardena; Huy Nguyen; Richard Vasquez; Joel Kutnick.

The State continued its strategy to hammer home this horrific story of unbelievable cruelty in its closing argument. As with its opening statement, the State used the cocaine evidence as the final point in its closing, highlighting the supposed evidence that Miranda's blood had "twice the amount of cocaine it would take to kill an adult" and arguing that the cocaine evidence "proves that the Defendant intentionally or knowingly killed Miranda, a four-year-old little girl." App. Exh. 18 at 20.

When it came time to respond to the closing argument of Vasquez's lawyers, the State doubled down on its cocaine theory, acknowledging, because it was "so important" and the "straw that breaks the camel's back," that it was a centerpiece of the *mens-rea* theory. As the State argued:

> And, the cocaine, yes, it's not in the indictment. Yet it's so important, because it gives you the totality of the entire crime.

17

*   *   *

So you say, "Why would he inject her with cocaine? Why?" and I suggest to you, well, it will stop her from struggling, it will stop her from screaming, stop her from escaping. He knew. He knew all about drugs and tolerance levels. He knew that giving a large amount to a little person or someone not used to it would be lethal. He knew that over time you would take more and in the beginning you take less; not a difficult concept for a drug user to understand. So why? I suggest to you that, like they say, it's the straw that breaks the camel's back. That way he would know for sure that she wouldn't be able to talk. She wouldn't be able to testify. She would surely be dead.

App. Exh. 19 at 45.

It is thus clear that, from the beginning to the end, it was the State's strategy to use the cocaine evidence to get over its *men-rea* hurdle. And we know that the strategy worked. During guilt/innocence deliberations, the jury made only one substantive request: "We need a copy of the testimony from the toxicologist pertaining as to the estimated time that the cocaine was introduced into Miranda's system." App. Exh. 165. When the court responded that it could only have testimony read back if the jury pointed to a specific aspect on which they disagreed, the jury reported: "We disagree on the testimony of the toxicologist pertaining as to the time estimates given that cocaine entered Miranda's system in order to reach total of .46 at the time the blood was drawn at the hospital." *Id.*

At that point, after 4:00 pm on June 18, 1999, the court reporter read back to the jury a portion of Dr. Backer's testimony. *Id.* ***Less than 15 minutes later***, at 4:30

18

pm, the jury announced that it had reached a unanimous verdict: guilty of capital murder.[6]

Having successfully used the cocaine evidence to obtain a guilty verdict, the State—not surprisingly—then continued its heavy reliance on this issue in its closing argument at the punishment phase of Vasquez's trial. App. Exh. 21 at 11.

Given the critical importance of the cocaine evidence to the State's case, it is no surprise that the materiality of the cocaine evidence has already been judicially determined. This Court denied Vasquez habeas relief on his claim of ineffective assistance of counsel on the ground that counsel's deficient performance didn't matter. This Court found that no level of lawyering—no matter how competent and proficient—could have overcome the compelling force of the evidence—now known to be false—that Miranda "had a lethal dose of cocaine in her system" that, according to the State, Vasquez had injected into her. App. Exh. 5 at 21. The evidence that Miranda "had twice the lethal dose of cocaine in her system, which a drug addict [like Vasquez] above others would have understood," "provided a substantial basis of the jury's *mens rea* determination." *Id.* at 12-13.

---

[6] Vasquez was not charged with killing Miranda by introducing cocaine into her system. CR, Vol. 1 at 8-11. The indictment was limited to the charge that he killed her by striking her in the head with his hand. Cocaine, in fact, was nowhere mentioned in the indictment. *Id.* It follows that the jury could only have been considering the cocaine issue—as the State urged it to do—on the issue of whether Vasquez struck Miranda in the head with the *mens rea* required for a capital-murder conviction.

This conclusion, subsequently affirmed by the United States Court of Appeals for the Fifth Circuit, resolved the materiality question in a final and binding way that the State of Texas is estopped to deny. *See* App. Exh. 6.

## D.   The State Withheld Exculpatory Information from Vasquez Regarding the Toxicology Report

As noted above, the State elicited testimony from Dr. Backer at trial about the toxicology results, but did not offer the Toxicology Report itself into evidence as a stand-alone exhibit. That circumstance alone suggests that the State may well have had concerns—the same concerns that Vasquez has only recently discovered—about the reliability of the report.

Moreover, documents from the State's files, never disclosed to Vasquez before trial, provide strong circumstantial evidence that the State in fact harbored doubts about the Toxicology Report, but decided nevertheless to use its purported results (through Dr. Backer's oral testimony) to demonize Vasquez.

First, there is a document indicating that the State initially intended to offer the Toxicology Report into evidence. *See* Exhibit B to the Farrell (2023) Decl. (legal research and handwritten notes indicating a prosecutor's conclusion that the Toxicology Report is "admissible under business records or public records exception to hearsay").

Then, there are typewritten notes of a prosecutor's pre-trial interview with the chemist at Dr. Backer's lab (Donna Trautman) who performed the chromatography

20

test on Miranda's blood. *See* Exhibit C to the Farrell (2023) Decl. Those notes indicate that Ms. Trautman explained to the prosecutor the relationship between the first result reflected on the Toxicology Report (initial screen for "Drugs of Abuse") and the second result ("Confirmed GC/MS") in a way that would have revealed the fatal inconsistency on which Vasquez now relies.[7]

This is critical because, without the explanation that Ms. Trautman provided to the prosecutors before trial, it would not have been clear to those untrained in toxicology (including Vasquez and his trial lawyers) that, if an initial screen for drugs of abuse were negative, a gas-chromatography test on the same blood sample could not possibly indicate the existence of any amount of cocaine. *See* Gilmore Decl., ¶¶ 9-12; Trenticosta Decl., ¶¶ 7-10; Farrell (2022) Decl., ¶ 9.

Ultimately, the State did not offer the Toxicology Report into evidence as a stand-alone exhibit. The information obtained from the Trautman interview, never disclosed to Vasquez, seems to explain why: The State was apparently aware of the fundamental flaw in the report, but nevertheless determined that getting cocaine

---

[7] The State did not make these documents available to Vasquez until 2022, after he had already filed his 2022 Application in state court. They were made available, moreover, under highly unusual circumstances. In 2019, the State informed Vasquez that it had mistakenly destroyed the Vasquez file based on a demonstrably false certification, signed by the District Attorney, that there were no longer any legal proceedings pending in the Vasquez matter. Then, sometime later in 2019, the State informed Vasquez that some portion of the file had mysteriously been found, though it does not appear that the two documents referenced in the text were among those that somehow reappeared. Finally, in 2022, when Vasquez's counsel again asked to see whatever was left of the file, materials were provided that included the two documents referenced above. *See* Farrell (2023) Declaration.

evidence into the record through Dr. Backer's oral testimony was critical to establishing the *mens rea* needed for a capital-murder conviction.

### E.    Discovery by Vasquez's Counsel that the Cocaine Evidence was False

The undisputed evidence demonstrates that Vasquez and his counsel did not actually discover that the State's cocaine evidence was false until May 2019:

- The fact that trial counsel did not discover the falsity of the cocaine evidence during the course of their representation of Vasquez is established by the Declaration of John Gilmore. Gilmore Decl. at ¶ 10.

- The fact that Vasquez's counsel in the first round of state and federal habeas applications did not discover the falsity of the cocaine evidence during the course of his representation of Vasquez is established by the Declaration of Nicholas Trenticosta. Trenticosta Decl. at ¶ 8.

- The fact that Vasquez's current counsel did not discover the falsity of the cocaine evidence until May 2019 is established by the Declaration of Thomas M. Farrell. Farrell (2022) Decl. at ¶¶ 9, 13.

The circumstances, moreover, reveal that the delay until May 2019 in discovering the falsity of the cocaine evidence did *not* result from any failure to exercise due diligence. As all of Vasquez's lawyers have explained, one would only appreciate that there was a fatal conflict in the Toxicology Report if one understood that a screen for "Drugs of Abuse" was capable of detecting cocaine. Without a detailed understanding of toxicology, a lay person seeing the "Negative" result under the "Drugs of Abuse Screen" would naturally have understood, given the specific

22

and positive results under the GC/MS section of the Toxicology Report, that the "Drugs of Abuse" screen tested for *other* drugs and did *not* include a screen for cocaine. *See* Gilmore Decl., ¶ 11; Trenticosta Decl., ¶ 8; Farrell (2022) Decl., ¶ 9.

In other words, it is not reasonable to expect any lawyer to have appreciated that a negative result on the Drugs of Abuse screen was inconsistent with a positive GC/MS finding for cocaine.[8]   Indeed, this point is compellingly made by the testimony of Dr. White.  Even Dr. White, an experienced medical examiner who routinely commissioned toxicology reports (but who was not himself a toxicologist), did not appreciate, when he reviewed the Toxicology Report in 1998 and 1999, that there was any inconsistency or that a "negative" finding for Drugs of Abuse signified the absence of cocaine. App. Exh. 30.  If a highly trained forensic pathologist could miss this issue, there is no basis on which to conclude that lawyers should nevertheless have discovered it.

And, there can be no legitimate claim that, in the exercise of due diligence, Vasquez's lawyers should have retained their own toxicologist to review the report at any time prior to 2019.  Vasquez's lead trial lawyer, John Gilmore, has in fact

---

[8] On the other hand, it is entirely reasonable to expect an experienced toxicologist to have that appreciation.  In fact, if Dr. Backer had reviewed the Toxicology Report before his testimony, which presumably he did, the fatal conflict in it would have been immediately apparent, suggesting that Dr. Backer's testimony was either intentionally false or provided with a degree of recklessness that is tantamount to knowingly and intentionally providing false testimony. *See* Declaration of Dr. Jimmie Valentine, Exh. I, ¶ 10.

provided a detailed explanation indicating that, at the time of trial, there was no need

for an independent defense toxicologist:

> During my representation of Mr. Vasquez, I was aware that Dr. Lloyd White had commissioned a Toxicology Report (Exhibit 1 hereto) on a blood sample drawn from Miranda Lopez after her admission to the hospital. I was also aware that the Toxicology Report showed, under the heading "Confirmed GC/MS," that Miranda's blood had 0.18 mg/L of parent cocaine and 0.42 mg/L of a cocaine metabolite. I anticipated that the State would likely argue at trial that Vasquez had intentionally introduced the cocaine into Miranda's system.

> To prepare for the State's anticipated argument at trial that Vasquez had administered the cocaine to Miranda, we interviewed Dr. White. Dr. White was the appropriate person to interview on the cocaine issues because Dr. White had commissioned the Toxicology Report and, based on it, had listed "cocaine intoxication" as a "contributing condition" to Miranda's death. Dr. White had a reputation for being forthcoming with defense counsel. We had every reason to believe that he would answer our questions truthfully and, to the extent there were any doubt or concern about the Toxicology Report, that he would disclose that information to us.

> Dr. White did not reveal to us (during our pre-trial interview of him or at any time thereafter) that there was any issue or concern about the validity of the results reported in the Toxicology Report. To the contrary, Dr. White indicated confidence in those results. Dr. White did discuss with us the possible ways in which cocaine could have entered Miranda's system. Consistent with his reputation as a straight shooter, he provided information helpful to the defense, suggesting that Miranda could have eaten the cocaine on her own, without Vasquez's intervention. As documented in our typed notes of the interview (Exhibit 2 hereto), Dr. White went so far as to check with the toxicologist and to report back to us the toxicologist's response that "[the] quantities of cocaine found in the victim are consistent with orally ingesting."

> Dr. White's willingness to check with the toxicologist and his report back to us on the toxicologist's views regarding the "quantities of cocaine found in the victim" constituted to us reconfirmation by Dr.

24

White and by the toxicologist of the accuracy and validity of the portion of the Toxicology Report showing the presence of 0.18 mg/L of parent cocaine and 0.44 mg/L of cocaine metabolite. Based on this confirmation, we had no reason to believe that the results in the Toxicology Report were suspect or that any further investigation or follow-up was warranted.

I understand that Mr. Vasquez's current lawyers have a Declaration from Dr. Backer dated May 1, 2019, stating that there is an "irreconcilable conflict" in this Toxicology Report and that, as a result, the report (and Dr. Backer's related testimony) were "not reliable evidence." As I understand it, the conflict exists between the "Negative" result from the "Drugs of Abuse Screen" and the levels reported under the heading "Confirmed GC/MS." From reading Dr. Backer's Declaration, I now understand that a "Negative" result under "Drugs of Abuse Screen" indicates that there was no cocaine in Miranda Lopez's blood, which conflicts with the specific entries under the "Confirmed GC/MS" heading.

During the course of our representation of Richard Vasquez, we did not understand that this conflict existed in the Toxicology Report. In particular, we were not aware that the "Drugs of Abuse Screen" included cocaine. Rather, given the positive (and specific) results for cocaine that appear under the "Confirmed GC/MS" heading, and given the confirmation we received from Dr. White, we would have understood that the "Drugs of Abuse Screen" must have tested for drugs *other* than cocaine, in which case there would be no conflict in the report.

Gilmore Decl., ¶¶ 5-11.

The fact that Vasquez's subsequent counsel (the undersigned) retained a toxicologist in 2019 and thereby discovered the falsity of the State's cocaine evidence does not support any inference that Vasquez's prior counsel could and should have done so at an earlier point in time. As subsequent habeas counsel has explained, he—like Mr. Gilmore and like Dr. White—had no inkling that there was

25

an inconsistency in the Toxicology Report or any understanding that a screen for Drugs of Abuse would have detected cocaine. Rather, he—like Mr. Gilmore and Dr. White—would have understood from the positive GC/MS result that the Drugs of Abuse screen was *not* designed to test for cocaine. *See* Farrell (2022) Decl. at ¶ 9.

As a result, the retention of a toxicologist in 2019 was unrelated to any hope of proving that there was no cocaine in Miranda's blood. Rather, subsequent counsel retained a toxicologist to address a completely separate point (the means of ingestion) that, at trial, had been adequately addressed by Dr. White's admission that the levels reflected in the GC/MS result were consistent with oral ingestion. *Id.* at ¶ 8. The separate inquiry into toxicology by Vasquez's current counsel in 2019 did fortuitously lead to the discovery that the cocaine evidence was false, but that does not necessarily indicate that reasonable due diligence would have required any earlier retention of a toxicologist.

### F. Prior Consideration of the Cocaine Issue

Because Vasquez's counsel was unaware of the issue, the State's reliance on false cocaine evidence was *not* a stand-alone claim for relief in Vasquez's initial habeas application in state court (2001), in his first federal petition (2006), or in his second state application (2015).

Nevertheless, because Vasquez had discovered the issue by the time of the evidentiary hearing in 2019 on the 2015 Application, he submitted evidence at that

hearing demonstrating that the Toxicology Report was totally unreliable and that Dr. Backer's testimony was false. He did so *not* because these circumstances were asserted as an independent ground for relief, but because they were potentially relevant to the assessment of the claims that *were* pending in Vasquez's 2015 Application: whether new science on biomechanics and "short falls" would have made a difference had it been available at the time of Vasquez's trial.[9] Farrell (2022) Decl. at ¶ 17.

In Findings of Fact and Conclusions of Law on the 2015 Application, dated February 26, 2021, the state trial court recognized the implications of this issue, stating "[c]ertainly, the findings as stated in the Toxicology Report raise[] concerns." CR, Vol. 3 at 652. But, instead of dealing with the impact of the false cocaine evidence on the pending claims, the court simply assumed that there was a "clerical error" in the Toxicology Report and further assumed that the error occurred in the initial negative entry, as opposed to the subsequent positive entry. *Id.* at 653. These assumptions were not supported by *any* evidence.[10]

---

[9] Under Article 11.073, Vasquez had to show that new science unavailable at the time of trial would likely have led to different result. On the *mens-rea* issue, Vasquez met this burden in part by showing that new science would have refuted the State's evidence of car-crash equivalency. But, to avoid any suggestion that evidence of cocaine intoxication would have independently supported the jury's *mens-rea* determination, Vasquez went further and demonstrated that the State's cocaine evidence was itself unreliable, based as it was on false testimony from Dr. Backer and Dr. White.

[10] One could of course speculate as to the source of the conflict. Did a technician mistakenly include in the report positive test results from someone else's blood (not Miranda's)? Or, after the

In any event, given the trial court's resolution of the new-science issues under Article 11.073, the trial court's findings on cocaine—and the Court of Criminal Appeals' later adoption of them—were not necessary to the ultimate judgment denying Vasquez's 2015 Application and thus should be deemed wholly irrelevant to the claims Vasquez now asserts. Alternatively, to the extent they could otherwise have relevance here, the 2019 "findings" on cocaine, which are really only rank speculation, should be disregarded because they represent a completely unreasonable determination of the facts in light of the evidence presented.

### G.    Resolution of Vazquez's 2022 Application

As the foregoing makes clear, Vasquez's 2022 Application marks the first time that false evidence on cocaine formed the basis of independent claims for relief. The Texas Court of Criminal Appeals on December 14, 2022, denied those independent claims on the ground that Vasquez had not made the showing necessary to go forward on a subsequent application under Texas law.

That conclusion, Vasquez contends, was clearly erroneous, since Vasquez's claims were actually cognizable under all three exceptions to the general ban in

---

initial negative result on Miranda's blood, did her sample get contaminated with someone else's blood? Or, after the initial negative screen, was there an equipment or instrumentation malfunction? Or, as the trial court speculated, was there a "clerical" error in the report? If so, was the error in the initial negative entry or did it occur in the later positive entry? There was no basis in the record before the trial court on which to adopt any one of these speculative explanations.

Article 11.071, Section 5, on considering claims asserted for the first time in subsequent applications.

Indeed, all of Vasquez's claims were based on the recantations by Dr. Backer and by Dr. White of their trial testimony, which did not take place until May 1, 2019 (Dr. Backer) and May 23, 2019 (Dr. White).    App. Exhs. 28 & 30.    These recantations occurred years after Vasquez filed his initial application (2001) and his subsequent application (2015).[11]    Under these circumstances, Vasquez easily established that his claims satisfied the requirements of Article 11.071, Section 5(a). *See, e.g., Ex Parte Henderson*, 246 S.W.3d 690, 692 (Tex. Crim App. 2007)(holding, in nearly identical circumstances, that expert witness recantations made after an initial application can form the basis of a subsequent application under Texas law).

Given the incredibly important role that the false evidence on cocaine played at trial, Vasquez also showed, by a preponderance of the evidence, that, but for constitutional violations in the presentation of false evidence on cocaine, no rational juror could have found Vasquez guilty beyond a reasonable doubt.    *See* TEX. CODE CRIM. PROC. ART. 11.071, § 5(a)(2).    Vasquez additionally showed, by clear and convincing evidence, that, but for these constitutional violations, no rational juror

---

[11] Collectively, the Declarations submitted by Vasquez established that Vasquez and his counsel did not know or have any reason to expect that Dr. Backer and Dr. White would recant their trial testimony until May 2019.  They also established, as already noted above, that Vasquez and his counsel did not know or have reason to suspect that there was an irreconcilable conflict in the Toxicology Report until April or May 2019.

would have answered the punishment-phase special issues in the State's favor.[12] *Id.*
§ 5(a)(3).

## VI.   FACTS ON CAR-CRASH EQUIVALENCY AND SHORT FALLS

As noted, the State relied heavily on the false cocaine evidence to meet its
*mens-rea* hurdle.   That said, the State also suggested that the force with which
Vasquez supposedly hit Miranda also helped to support a finding that he acted with
the requisite intent or knowledge.   But, to give resonance to this part of its argument,
the State was relegated to the use of junk science that has been thoroughly debunked
in the years since Vasquez's trial.   Specifically, the State used the testimony of Dr.
Michael Burke (the neurosurgeon who operated on Miranda) and Dr. White (the
medical examiner who performed her autopsy) to discredit the notion that Miranda
could have died from anything other than savagely inflicted child abuse.   As we now
know, and as the State has acknowleged, this testimony was scientifically invalid
and essentially false.

### A.   The False Evidence on Car-Crash Equivalency and Short Falls

Dr. Burke testified that the "only time" the level of injury sustained by
Miranda's brain is "seen is in a high-speed motor vehicle accident, 65 miles an hour,

---

[12] The United States Court of Appeals for the Fifth Circuit has already determined that there were
but two factors that led the jury to the *mens-rea* determination that Vasquez was guilty of capital
murder:  the cocaine evidence addressed in this Petition and the supposed fact that Vasquez struck
Miranda in the head with forces equal to ejection from a speeding car.   Vasquez separately
demonstrated at the hearing on his 2015 Application that the evidence on car-crash equivalency
was itself false.

ejected from the car, severe head trauma. That's the mechanism of injury we're talking about." *See* Exh. D, App. Exh. 16 at 79. Dr. Burke further testified, in reference to Miranda's brain injury:

- "Again, it's the high speed motor vehicle accident that causes this kind of picture."

- "[W]ith respect to this particular incident again, it's the equivalent of being ejected from a motor vehicle at 65 miles an hour on a high-speed rollover."

- "This child got the living daylights beat out of her to the point that she quit breathing and there was nothing that could be done about it."

- Vasquez struck Miranda with "the strength of a 65-mile an hour car."

*Id.* at 79, 87, 91-92.

Dr. Burke effectively told the jury that there were literally only two ways that Miranda could have sustained her fatal brain injuries: being ejected from a car traveling at 65 miles per hour or being severely beaten by Mr. Vasquez with blows that were as strong as if she had been ejected from a car at 65 miles per hour. As Dr. Burke said, in the absence of evidence of a severe car crash, "[t]here is nothing else" that can cause injuries of the type suffered by Miranda other than "child abuse." *Id.* at 92. Since Miranda was not in a car accident, her condition presented a "hallmark of child abuse," with no other possible explanation. *Id.*

To substantiate this testimony, Dr. Burke pointed only to various studies and papers on Shaken Baby Syndrome that, in Dr. Burke's words, told physicians and

child-abuse experts what they could and should say about the cause of pediatric head

injury "when we all [go] to Court." *Id.* at 92. Dr. Burke, however, failed to disclose

that these studies and papers were promoted, not by scientists, but by prosecutors,

and that they lacked any scientific basis. *See, e.g.*, Holmgren, Prosecuting The

Shaken Infant Case (2001) (Exh. D, App. Exh. 167). The prosecutor who wrote one

widely cited paper on how to prosecute cases of alleged child abuse, citing only court

cases, not scientific studies, exhorted experts to testify just as Dr. Burke did in this

case:

> A key component on expert testimony on SBS involves translating the
> mechanisms of trauma into constructs jurors can readily understand
> and which adequately reflect the men rea requirements for the charge.
> This can be done in a variety of ways. First, experts can provide
> analogies for the degree of violence associated with this conduct. For
> example, the expert can testify that the forces the child experiences are
> the equivalent of a 50-60 m.p.h. unrestrained motor vehicle accident.

*Id.* at 307.

By equating Miranda's injuries to those from a high-speed car crash, Dr.

Burke was following the time-honored practice advocated by this prosecutor and

others of using analogies (now known to be scientifically invalid) to inflame juries

against those accused of child abuse. *See* Tuerkheimer, *The Next Innocence Project*

(2009) at 29; Papetti, *Outside the Echo Chamber* (2019), at 311-12 (Exh. D, App.

Exhs. 90, 154, 167).

To reinforce this point, the State highlighted the supposed evidence that a fall from a bathroom stool (described by Vasquez as having occurred shortly before he discovered Miranda in distress) could not have caused Miranda's brain injury and subsequent death. Dr. White testified that the manner of Miranda's death was "homicide," defined by Dr. White as "death caused by an action of another person." *See* Exh. D, App. Exh. 13 at 43. In the context of a discussion about the number and force of inflicted blows from Mr. Vasquez, Dr. White also testified that Miranda "was struck hard enough to produce fatal injury." *Id.* at 41. Through this testimony, Dr. White effectively testified that Miranda's fall from the stool in the bathroom could not have caused her death.

Dr. White also testified that "[m]ost fatal falls are from height; in other words, at least ten or fifteen feet. Falls from so-called ground level or falls from a very low level producing fatal injuries are very, very rare; although they do occur." *Id.* at 42. According to Dr. White's testimony, a fall of the type that Miranda sustained from the stool in the bathroom would be "very unlikely" to cause fatal injuries. *Id.* Through this testimony, when coupled with his testimony that Miranda's death was a homicide that resulted from a person striking Miranda hard enough to produce fatal injury, Dr. White effectively testified that the kind of seemingly minimal forces that would, in a juror's mind, have been sustained in a short fall from a stool could not have caused Miranda's death.

33

Dr. Burke, as already noted, testified that the "only time" the level of injury sustained by Miranda's brain is "seen is in a high-speed motor vehicle accident, 65 miles an hour, ejected from the car, severe head trauma. That's the mechanism of injury we're talking about." *See* Exh. D, App. Exh. 16 at 79. Dr. Burke further testified, in reference to Miranda's brain injury, that "[a]gain, it's the high speed motor vehicle accident that causes this kind of picture." *Id.* Dr. Burke claimed that, in the absence of evidence of a severe car crash, "[t]here is nothing else" that can cause injuries of the type suffered by Miranda other than "child abuse." *Id.* at 92. Since Miranda was not in a car accident, her condition presented a "hallmark of child abuse," with no other possible explanation. *Id.* Through this testimony, Dr. Burke, like Dr. White, effectively indicated that forces like those from Miranda's fall from the bathroom stool could not have caused her fatal injuries and did not in fact cause her death.[13]

### B.    The Truth About Car-Crash Equivalency and Short Falls

It is now clear that there has never been any scientific or medical support for the car-crash analogy that Dr. Burke used so forcefully to demonize Vasquez. As stated in the 2006 Fourth Edition of an authoritative text (Medicolegal Investigation of Death), "[w]hen testifying as to the degree of impact, statements such as: *'forces*

---

[13] This testimony, false as it was, had a bearing on *mens rea* even if one were to assume that Miranda never fell from the stool. The testimony cemented the idea that low-level forces, like those that jurors would assume to be generated in a short fall, could not have been fatal, thus indicating that Vasquez must have struck Miranda with forces consistent with an intent to kill.

*equivalent to thirty miles per hour' or 'a fall from a three-story building'* have been used to serve as an analogy for the jury. These statements are not supported by scientific facts." Exh. D, App. Exh. 65 at p. 377 (italics in original; bold added).

Additional studies also make clear that Dr. Burke's car crash analogy lacked any scientific foundation. For example, as reported by Dr. Barnes, Chief of the Section of Pediatric Neuroradiology at Stanford University Medical Center, "it is no longer generally accepted that short falls can never cause [subdural hemorrhage, retinal hemorrhage, and encephalopathy] . . . or that massive force—typically described as the equivalent of a multi-story fall or a car accident—is required." Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting it Right (2012). Exh. D, App. Exh. 82 at p. 214.

And, of great significance on this point is the action of the National Association of Medical Examiners. In 2001, NAME issued a Position Paper associating fatal brain injuries in children with motor vehicle accidents and falls from considerable height (greater than 10 feet) and essentially saying that short falls cannot cause similar results. But, in October 2006, NAME withdrew that Position Paper and at the same time published additional papers that cast substantial doubt on its 2001 pronouncements. Exh. D, App. Exhs. 156 & 157.

Many other studies since Vasquez's 1999 trial also establish the lack of any scientific validity to Dr. Burke's 65-mph car-crash testimony:

- 2004: Geddes, et al, <u>The Evidence for Shaken Baby Syndrome</u>, stating: "No one would be surprised to learn that a fall from a two story building or involvement in a high speed road traffic crash can cause retinal and subdural bleeding, but what is the minimum force required? It is one thing clearly to state that a certain quantum of force is necessary to produce a subdural hematoma; it is quite another to use examples of obviously extreme force . . . and then to suggest that they constitute the minimum force necessary." (Ellipses in original.) App. Exh. 108 at p. 719.

- 2005: Bandak, <u>Shaken Baby Syndrome: a Biomechanical Analysis of Injury Mechanisms</u>, reporting that the practice of equating severe brain injuries in children in only "qualitative" terms usually referring to "falls from great heights onto hard surfaces or from severe motor vehicle crashes" is "unsubstantiated" and results from a "lack of education an experience in Injury Biomechanics." App. Exh. 76 at pp. 71-72.

- 2008: Barnes, et al., <u>Traumatic Spinal Cord Injury: Accidental Versus Nonaccidental Injury</u>, reporting on a case study that disproved with a biomechanical analysis the "previously accepted" view that, "in the absence of a history of significant trauma (<i>i.e.</i>, a motor vehicle accident or 2-story fall)" subdural and retinal hemorrhages and infant encephalopathy are "diagnostic of" nonaccidental injury and child abuse. App. Exh. 114 at p. 178.

- 2009: Imwinkelried, <u>Shaken Baby Syndrome: A Genuine Battle of the Scientific (and Non-Scientific) Experts</u>, revealing that "prosecution experts frequently give analogies. The most common analogies are to the amount [of force] generated by high speed automobile accidents and a fall from a several-story building . . . [but] it is fallacious to conclude that the amount of force generated in these types of accidents is the necessary minimum quantum of force." App. Exh. 162 at text accompanying notes 122-127.

- 2011: Barnes, <u>Imaging of Nonaccidental Injury and the Mimics: Issues and Controversies in the Era of Evidence-Based Medicine</u>,

36

stating that "injury on an accidental basis" consisting of severe brain injury "does not require a force that can only be associated with a motor vehicle accident or multistory fall." App. Exh. 81 at p. 212.

- 2014: Squier, "Shaken Baby Syndrome and Forensic Pathology," reporting that "we now know that these assumptions [that severe pediatric brain injury] require[] forces . . . equivalent to a multi-story fall or a motor vehicle accident" are "wrong." App. Exh. 163 at p. 248.

- 2019: Papetti, Outside the Echo Chamber, concluding "[t]he motor vehicle and multi-story analogies, which filled the child abuse literature and courtrooms for decades . . . were without basis." App. Exh. 90 at p. 314.

In short, Dr. Burke's analogy provided dramatic support for the State's efforts to dehumanize Vasquez, but it had no scientific or medical validity.

Similarly, the testimony that the State proffered at trial to the effect that Miranda's injuries could not have resulted from a short fall—and therefore must have resulted solely from blows that Vasquez inflicted with extreme force—has been thoroughly debunked, both in a general sense and in a specific sense. Generally, there are now dozens of medical and scientific studies, papers, and textbooks on forensic pathology and biomechanics confirming that short falls from minimal distances can and do cause fatal brain injuries in infants. Those materials are summarized in the proposed Findings of Fact and Conclusions of Law that Vasquez submitted in state court in support of his 2015 Application. *See* Exhibit E. That summary, which is incorporated by reference herein, amply demonstrates the falsity

of the testimony from Dr. Burke and Dr. White that short falls cannot generally generate the forces necessary to inflict the kind of head trauma experienced by Miranda.

The testimony has also been debunked with specific reference to the circumstances of Miranda's fall from a bathroom stool. Two biomechanical engineers have now confirmed, based on new scientific learning that was unavailable in 1999, that Miranda's short fall from the bathroom stool would have produced forces sufficient to cause her fatal injuries. Both of these engineers reached their conclusions after considering the actual circumstances of the reported fall, including Miranda's height and weight, the height of the stool, and the composition of the bathroom floor.

One of these engineers (Dr. Kenneth Monson) approached the issue by applying techniques developed well after 1999 for calculating forces from a reported fall. Exh. D, App. Exh. 49. The other engineer (Dr. Chris Van Ee) approached the issue by recreating in a mock-up of the bathroom the actual fall experienced by Miranda and measuring the forces that would have been generated by that fall using an ATD test device commonly referred to as a "crash dummy." *Id.*, App. Exhs. 47, 47A, & 48.

These two approaches produced consistent results. Dr. Monson calculated that a fall from the bathroom stool would have resulted in a pre-impact total head

velocity of 12.1 miles per hour, peak force between 724 to 1207 pounds, and linear acceleration between 147 to 245 G. *Id.*, App. Exh. 49. Dr. Van Ee measured that a fall from the bathroom stool would have resulted in peak G's as high as 325, peak angular acceleration as high as 30,797 (rad/s2), and a HIC score (Head Injury Criteria) as high as 1425. *Id.*, App. Exhs. 47, 47A, & 48. After comparing these results to injury thresholds that were established and have become scientifically accepted long after 1999, both Dr. Monson and Dr. Van Ee confirmed that the reported fall would have generated forces sufficient to cause severe and fatal brain injuries. *Id.*, App. Exhs. 47, 47A, 48 & 49.

And, there's more. Dr. Janice Ophoven and Dr. Karl Williams, highly experienced forensic pathologists, both confirmed that, given the results of the biomechanical analyses, a determination of "homicide" was not scientifically supportable on these facts. Exh. D, App. Exhs. 50 & 51. Both pathologists confirmed that Miranda's fall could have produced her fatal injuries and that there was nothing in the medical records or the autopsy findings that would allow a forensic pathologist applying current scientific knowledge and scientific method (unavailable at the time of trial) to rule out the fall as the cause of Miranda's death. *Id.* Specifically, Dr. Ophoven and Dr. Williams confirmed that it is not scientifically possible, from the medical records and autopsy findings, to say that Miranda's brain injuries necessarily resulted from multiple blows or impacts as opposed to a single

impact. *Id.* In addition, Dr. Clayton A. Wiley (a neuropathologist) has confirmed that there was nothing in the medical records that, from a neuropathological standpoint, would preclude a finding that a fall from a stool caused Miranda's injuries or that would compel a finding that her brain injury resulted from inflicted blows. *See* Exh. D, App. Exh. 161.

In addition, Dr. White, the medical examiner who ruled that Miranda's death was a homicide, has partially recanted his trial testimony on this point. Dr. White now recognizes that new science on biomechanics and short falls could well have made a difference in his findings and testimony, had that new science been available in 1998 and 1999. According to Dr. White:

> I understand that, in the years since 1999, the topic of "short falls" and their potential to cause serious or fatal brain injuries in children has received significant attention in the medical and scientific literature. I further understand that there have been significant advances since 1999 in the scientific understanding of impact response in pediatric heads and that, as a result of these advances, Injury Assessment Reference Values and injury thresholds for pediatric heads have been dramatically reduced.

> If I were conducting Miranda Lopez's autopsy and making a manner-of-death determination today, I would acknowledge the potential benefit of conducting a biomechanical analysis and/or obtaining a biomechanical consultation, and I would be open to considering the input of experts in biomechanics. I do not know that biomechanical input would necessarily cause me to change my determination as to the manner of Miranda Lopez's death, but I do believe it would be appropriate and important for a jury to hear scientific evidence on the forces that would be generated from a fall from the stool in the bathroom as described by Mr. Vasquez and how those forces correlate

to currently accepted injury thresholds and Injury Assessment Reference Values.

Exh. D, App. Exh. 30.

In short, the clear message conveyed the jury—that Miranda could not have died from the kind of seemingly minimal forces generated in a short-distance fall— is now known to lack any scientific validity. Critically, the State of Texas agrees that this message was false. And, Vasquez has been able, through a scientifically valid recreation of Miranda's fall, to confirm the contrary: the fall generated forces sufficient to have caused the brain trauma Miranda experienced, which in turn supports Vasquez's defense that, while he hit Miranda, he did not do so with an amount of force from which one could infer an intentional or knowing killing.

In *Ex Parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012), an applicant relying on these same scientific principles (but with a less compelling case) was granted relief from her death sentence. Vasquez, by contrast, has so far been denied relief. The only explanation for this disparate treatment is the inflammatory evidence that Vasquez supposedly injected Miranda with a lethal dose of cocaine, which—as demonstrated above—was itself false.

## C. Materiality of the Evidence on Car-Crash Equivalency and Short Falls

As discussed above, a fair reading of the trial record indicates that the State's unreliable evidence on cocaine was the primary factor that led the jury to resolve the

*mens-rea* issue against Vasquez, as demonstrated, in part, by the jury's return of a verdict within minutes of having Dr. Backer's false testimony read aloud. That said, the testimony around car crash-equivalency and short falls was the only other evidence that could conceivably have pushed the jury to find that Vasquez intentionally or knowingly killed Miranda. Without that testimony, the jury would have had Vasquez's admission that he struck Miranda, but nothing else on which to conclude that Vasquez was guilty of anything other than criminally negligent homicide or, at most, manslaughter.

Accordingly, any analysis of whether a rational juror would have convicted Vasquez of capital murder or found him eligible for the death penalty should be made without considering *either* the evidence on cocaine *or* the evidence on car-crash equivalency and short falls. Since the evidence on car-crash equivalency and short falls was as false as the evidence on cocaine, neither should be given any weight in assessing Vasquez's actual innocence of capital murder and actual innocence of the death penalty.

## D. Discovery that the Evidence of Car-Crash Equivalency and Short Falls was False

As Vasquez demonstrated at the hearing on his 2015 Application, there has been a dramatic shift since the date of his trial in the scientific understanding of the forces necessary to cause fatal head trauma in infants. At the time of Vasquez's trial, this was an issue left largely to forensic pathologists relying on anecdotal

42

experiences and without any consideration of biomechanical engineering. In the years since Vasquez's trial, a scientific consensus has emerged that minimal forces, like those from a short fall, can cause fatal injury and that no valid determination can be made on the cause of death in a particular case without the benefit of a detailed biomechanical analysis like that performed by Dr. Monson and Dr. Van Ee.

Because scientific thinking on these issues has evolved over time, it is difficult to identify a precise tipping point at which biomechanical engineers and medical professionals would have been able to demonstrate the scientific invalidity of the State's evidence on car-crash equivalence and short falls. That point, though, clearly came many years after Vasquez's trial and many years after Vasquez's initial applications for post-conviction relief, as demonstrated by the comprehensive analysis of the medical and scientific literature that Vasquez introduced at the hearing on his 2015 Application. Moreover, the record reflects that Vasquez has been vigorously and continuously pursuing relief based on these scientific developments since shortly after the Texas legislature in 2013 enacted the statute authorizing habeas relief based on junk science.

There is thus nothing in the timing of this Petition that could preclude full consideration of all of the new evidence on which Vasquez relies.

43

### E.     Prior Consideration of Car-Crash Equivalency and Short Falls

Vasquez's new evidence of car-crash equivalency and short falls was the subject of his 2015 Application, in which Vasquez invoked both the Texas statute on junk science, Article 11.073, and the prohibition inherent in the Due Process Clause against convicting and sentencing an individual to die based on false evidence.

In proposed findings issued in 2021, the trial judge presiding over the 2015 Application briefly acknowledged Dr. Burke's testimony on car-crash equivalency, but he nowhere addressed whether that testimony had scientific validity or how it impacted the jury's resolution of the *mens-rea* requirements for capital murder. The closest the trial judge came to confronting these issues is in paragraph 219 of his findings and conclusions, where he completely mischaracterized Dr. Burke's testimony. There, the court asserted that Dr. Burke was simply comparing the injuries he observed on the CT scan of Miranda's brain to injuries that Dr. Burke had himself personally observed on the CT scans of other people who had actually been ejected from cars traveling 65 miles per hour. CR, Vol. 3 at 629. According to the court, Dr. Burke's "point was that Miranda's CT scan showed essentially the same measure of brain damage that he [Dr. Burke] had observed in the CT scan of another person who had been ejected from a vehicle going 65 miles per hour." *Id.*

44

This description of Dr. Burke's testimony is remarkably disingenuous. Dr. Burke nowhere testified that he had compared Miranda's CT scan to the actual CT scan of another person who had been actually ejected at 65 miles per hour from a car. Dr. Burke, moreover, never said that he personally had ever seen the CT scan of a 65 mph car-crash victim. Dr. Burke instead testified that he compared Miranda's CT scan to a "normal" CT scan of an uninjured brain. *See* Exh. D, App. Exh. 16 at 74-76. That is the only actual CT comparison that Dr. Burke testified to having performed.

What's more, Dr. Burke specifically explained to the jury that his conclusion on car-crash equivalency was not based on any personal comparison by him of Miranda's CT scan to the CT scans of car-crash victims. Rather, he testified that his conclusion on car-crash equivalency was based on "these studies that have been done" that relate to "Shaking Infant Syndrome" and "Shaking Impact Syndrome," including studies by "Duhayne." *Id.* at 91-93. Dr. Burke thus tied his testimony directly to "studies," "papers," and "articles" by prosecutors and child-abuse experts on the forces associated with brain injuries suffered by infants. *Id.* As Dr. Burke explained to the jury, these papers and studies related to what physicians and child-abuse experts could and should say "when we all [go] to court" to testify about pediatric head trauma in child-abuse prosecutions. *Id.*

45

Having thus mischaracterized Dr. Burke's testimony, the trial court never returned to any analysis of whether Dr. Burke's actual testimony was false or whether and how it impacted the jury's determination that the State had proven beyond a reasonable doubt that Vasquez acted with the *mens rea* required for a capital-murder conviction.

With respect to short falls, the trial court effectively agreed with Vasquez that the State's evidence that a short fall could not have caused Miranda's fatal brain injuries was false in light of the new science that has emerged since Vasquez's trial. *See* CR, at 635, 642-43. The court determined, however, that Miranda never suffered a fall, which in the court's view rendered the State's use of false evidence on short falls of no consequence.

This view, which may have been adopted by the Texas Court of Criminal Appeals when it denied Vasquez's 2015 Application, is highly problematic for at least two reasons. First, the trial record contained ample evidence from which the jury could have determined that Miranda fell backward from the bathroom stool exactly as described by Vasquez. Second, even if that were not the case, the State's false evidence on car-crash equivalence and short falls had a direct bearing on whether Vasquez hit Miranda with sufficient force to infer that he either wanted to kill her or knew that her death was reasonably certain to result. A jury armed with the truth—that fatal injuries can result from forces far less than those incurred in

high-speed car crashes, including seemingly minimal forces incurred in falls from very short distances—would almost certainly have credited Vasquez's defense that he did not intentionally or knowingly cause Miranda's death.

Accordingly, the resolution in state court of Vasquez's 2015 Application is entitled to no deference. There was either no actual finding of the impact of false evidence and junk science on the *mens-rea* issue or there was an implied finding that constituted a completely unreasonable determination of the facts in light of the evidence presented.[14]

## CLAIM ONE

**Vasquez is entitled to habeas relief because he is actually innocent of the crime of capital murder. Without the false evidence on cocaine and the junk science that marred his trial, no rational juror would have found that Vasquez acted with the mens *rea* necessary for a capital-murder conviction. Imposing the death penalty on Vasquez in these circumstances would violate the Eighth and Fourteenth Amendments to the United States Constitution. Vasquez asserts this actual-innocence claim both as a gateway for consideration of other constitutional claims and as a free-standing claim that independently requires relief.**

As demonstrated above, the so-called evidence that Miranda had a massive and lethal dose of cocaine in her system was critical to the State's theory that Vasquez acted with the *mens rea* necessary for capital murder. The State itself

---

[14] The Texas Court of Criminal Appeals did not expressly address the impact of junk science and false evidence on the *mens rea* issue, but did deny Vasquez relief. This may give rise to a presumption that the court nevertheless considered the issue, but that presumption is rebuttable. *See, e.g., Johnson v. Williams*, 568 U.S. 289, 303 (2013). The circumstances here indicate that the issue was overlooked. But, even if the issue were considered, it was resolved in a patently unreasonable way without any evidentiary support.

recognized the central role played by the cocaine evidence when it told the jury—specific to *mens rea*—that it was "so important" and the "straw that broke the camel's back." App. Exh. 19 at 45.

These circumstances give rise to a claim of actual innocence coupled with constitutional violations. Since the cocaine evidence was critical to the jury's finding of *mens rea*, Vasquez can establish, by clear and convincing evidence, that no rational juror would have convicted him of capital murder in light of Vasquez's new evidence that the Toxicology Report was unreliable and that Miranda had no cocaine in her system.

Vasquez's conviction, moreover, was procured through multiple constitutional violations. First, as set forth in Claims Four and Five, the State's use of the false evidence to convict Vasquez constitutes a stand-alone constitutional violation. *See Miller v. Pate*, 386 U.S. 1, 7 (1967)("the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence"); *Napue v. Illinois*, 360 U.S. 264, 269 (1959)("A conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment"); *Giglio v. United States*, 405 U.S. 150, 152 (1972) (same). That constitutional violation is compounded here by two additional constitutional violations: the State's *Brady* violation in failing to disclose exculpatory material related to the cocaine evidence (Claim Three) and the failure

of Vasquez's counsel to render effective assistance in attacking the cocaine evidence

(Claim Six).

Vasquez additionally asserts that, even if there had been no separate constitutional violations, his conviction would violate the United States Constitution. Depriving someone of their life and liberty in the face of evidence demonstrating their actual innocence violates the Eighth and Fourteenth Amendments, even in the absence of any other constitutional error.

## CLAIM TWO

**Vasquez is entitled to habeas relief because he is actually innocent of the death penalty. Without the false evidence of cocaine and the junk science that marred his trial, no rational juror would have provided the affirmative answers necessary under Texas law to impose the death penalty. Imposing the death penalty on Vasquez in these circumstances would violate the Eighth and Fourteenth Amendments to the United States Constitution. Vasquez asserts this actual-innocence claim both as a gateway for consideration of other constitutional claims and as a free-standing claim that independently requires relief.**

As further demonstrated above, the so-called evidence that Miranda had a massive and lethal dose of cocaine in her system was critical to the State's position that the jury should answer "yes" to the punishment-phase questions and thereby impose on Vasquez the ultimate penalty of death by lethal injection.

These circumstances give rise to a claim that Vasquez is actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333 (1992). Without the cocaine evidence that was so critical at the punishment phase, Vasquez can establish, by clear

and convincing evidence, that no rational juror would have found Vasquez eligible for the death penalty.

And, as with Claim One, the State's use of false evidence on cocaine is coupled with three separate constitutional violations: (1) the use of false evidence to obtain a death sentence (Claims Four and Five); (2) a *Brady* violation (Claim Three); and (3) ineffective assistance of counsel in the failure to address and rebut the false cocaine evidence (Claim Six). And, on the punishment issue, there is yet a fourth constitutional violation to consider, consisting of ineffective assistance of counsel (already found by this Court and the Fifth Circuit) in failing to develop and present available mitigating evidence. *See* Claim Nine.

Vasquez additionally asserts that, even if there had been no separate constitutional violations, his sentence would violate the United States Constitution. Depriving someone of their life and liberty in the face of evidence demonstrating their actual innocence violates the Eighth and Fourteenth Amendments, even in the absence of any other constitutional error.

## CLAIM THREE

**Vasquez is entitled to habeas relief because the State of Texas failed to disclose to Vasquez exculpatory information related to the false evidence of cocaine, in violation of the Due Process Clause of the United States Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963).**

As demonstrated above, the record reflects that the State of Texas had in its possession before trial critical information indicating that Dr. Backer's Toxicology

Report was fundamentally flawed and that it could not reliably be used to suggest that Miranda had *any* cocaine in her system, let alone twice the amount needed to kill an adult. The State failed to disclose that exculpatory evidence to Vasquez, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

Vasquez is entitled to relief under this claim "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. He is also entitled to relief even if the exculpatory information was not actually known to the prosecutors themselves, so long as it was known to some member of the State's team (such as Dr. Backer). As the Supreme Court has made clear, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

And relief could not be denied on this claim based on any notion that Vasquez himself should have independently discovered this issue. *See, e.g., United States v. Mason*, 293 F.3d 826, 829 (5th Cir. 2002) (defense counsel's failure to avail himself of readily available procedure that would have revealed falsity "does not relieve the government of its affirmative responsibility to correct false testimony").[15]

---

[15] Even if one were to ignore the documents from the State's file suggesting actual knowledge that the Toxicology Report was unreliable (Exhibits A & B to the 2023 Farrell Declaration), the record could still demonstrate the existence of a *Brady* violation. If the Court were to conclude that the conflict in the Toxicology Report was discoverable through the exercise of reasonable diligence before trial, it would necessarily follow that the prosecutors—who had their own independent duty to vet the cocaine testimony they procured from Dr. Backer and Dr. White—knew or should have

## CLAIM FOUR

**Vasquez is entitled to habeas relief because false evidence on cocaine (presented with knowledge of its falsity or through prosecutorial misconduct) materially affected and contributed to his capital conviction and death sentence, in violation of the Due Process Clause of the United States Constitution.**

As demonstrated above, the State had in its possession before trial critical information indicating that Dr. Backer's Toxicology Report was fundamentally flawed and that it could not reliably be used to suggest that Miranda had *any* cocaine in her system. Moreover, Dr. Backer either knew that there was a fatal flaw in the Toxicology Report or testified that the report was reliable with such recklessness and indifference as to be tantamount to knowingly and intentionally providing false testimony. *See* Valentine Decl. Exh. I, ¶ 10. Dr. Backer's culpability, moreover, is imputed to the prosecutors and to the State of Texas. *Kyles*, 514 U.S. at 437.

In these circumstances, the State's submission and reliance on the false evidence of cocaine constituted a violation of Vasquez's constitutional right to Due Process. *See Miller*, 386 U.S. at 7; *Napue*, 360 U.S. at 269; *Giglio*, 405 U.S. at 152 (State's knowing presentation of false evidence and knowing failure to correct false evidence violates the Due Process Clause).

---

known of exculpatory information. Under this view of the facts, and even without the benefit of the documents referred to in the text, the State knew or should have known that the negative entry for the "Drugs of Abuse" screen was in fatal conflict with the results reported under the "GC/MS" heading, thus rendering the entire Toxicology Report—and Dr. Backer's testimony—"unreliable." Yet, they failed to disclose that information to Vasquez in violation of his Due Process rights and *Brady v. Maryland*, 373 U.S. 83 (1963).

Any argument the State may make that Vasquez should have discovered these circumstances earlier than he did would only serve to bolster the conclusion that the State was complicit in the presentation of false evidence. Prosecutors are not charged with obtaining convictions, but rather with achieving justice. Inherent in this obligation is the requirement that, before offering expert testimony, a prosecutor must investigate the scientific basis for and the validity of the expert's conclusions. The prosecutors thus had a responsibility, at least as great as that imposed on Vasquez's lawyers, to exercise reasonable diligence to assess the validity of the Toxicology Report and the testimony of Dr. Backer and Dr. White.

Any determination that reasonable diligence by Vasquez would have unearthed the fatal inconsistency in the Toxicology Report before or during his trial would lead to one of only two possibilities regarding the prosecutors: (1) they fulfilled their own duty to exercise reasonable diligence, learned that the Toxicology Report was unreliable, and nevertheless knowingly offered false testimony; or (2) they failed to exercise reasonable diligence in assessing the Toxicology Report, but offered Dr. Backer's testimony anyway, thus engaging in prosecutorial misconduct.

Under that scenario, the Court would have to conclude that the State offered false evidence either knowingly or with a degree of culpability that the United States Supreme Court has deemed sufficient to give rise to a violation of the Due Process

Clause. *See, e.g., Giglio*, 405 U.S. at 154 (false use of testimony to obtain conviction violates Due Process whether the "result of negligence or design").

*     *     *

In sum, Vasquez was convicted and sentenced based on cocaine evidence that was unquestionably false. To the extent Vasquez is required to show knowledge or culpability in order to obtain relief under the Due Process Clause in this context, Vasquez can meet that requirement because: (1) the record supports a finding of actual knowledge by the prosecutors that the cocaine evidence was unreliable; (2) the record supports a finding of actual knowledge by Dr. Backer that his testimony was false and that knowledge is imputed to the State; (3) the record supports a finding that the prosecutors, if they did not actually know of the falsity, breached a duty to discover that the evidence was false; or (4) the record supports a finding that Dr. Backer, if he did not actually know of the falsity, breached a duty to discover that the evidence was false, which breach of duty is imputed to the State.

## CLAIM FIVE

**Vasquez is entitled to habeas relief because false evidence on cocaine (even if unknowingly presented with no prosecutorial misconduct) materially affected and contributed to his capital conviction and death sentence, in violation of the Due Process Clause of the United States Constitution.**

Vasquez is entitled to habeas relief even if one assume that the State and Dr. Backer innocently provided the false evidence that was so critical to Vasquez's conviction and death sentence. Depriving someone of their life or liberty based on

54

critical evidence that is unquestionably false cannot be squared with any reasonable interpretation of the Due Process Clause. Here, it is not only Vasquez who asserts that he was convicted and sentenced on false evidence. Here, the witnesses who provided the critical testimony (Drs. Backer and White) now agree that the evidence was false. So too does the State of Texas, which conceded this point when it agreed to the findings and conclusions that Vasquez submitted in state court in 2019 support of his 2015 Application and when it filed no opposition to Vasquez's 2022 Application. Here, the materiality of the false evidence has already been judicially determined by this Court and by the United States Court of Appeals for the Fifth Circuit.

In these circumstances, the State's use of false evidence to convict and sentence Vasquez should be construed to constitute a violation of the Due Process Clause even if the record is viewed as devoid of any evidence of direct or imputed prosecutorial misconduct. Due process protects against unfairness in criminal proceedings, not merely against prosecutorial wrongdoing. And, the corrupting impact of false testimony is as great when the prosecutor is innocent as when the prosecutor is culpable. As a result, the existence of a Due Process violation should not turn on any analysis of a prosecutor's knowledge or intent. It should be enough that to show false evidence that was material to the conviction or sentence.

This concept—that Due Process is violated when a conviction or sentence is based on evidence that is false and material, even if innocently presented—is inherent in existing Supreme Court precedent. *See Giglio*, 405 U.S. at 154 (false testimony violates Due Process whether the "result of negligence or design"). But, to the extent the concept is viewed as requiring an extension of existing doctrine, Vasquez hereby seeks that extension, which is especially appropriate where, as here, the State has effectively waived whatever interest it might otherwise have had in upholding the finality of the judgment against Vasquez.

## CLAIM SIX

**Vasquez is entitled to habeas relief because the failure of his trial counsel to discover and expose the falsity of the cocaine evidence denied him the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution.**

Vasquez did not learn that Dr. Backer considered Dr. Backer's own testimony to be unreliably false until just prior to Dr. Backer's execution of his Declaration on May 1, 2019. Farrell (2022) Decl., ¶ 13. As noted, Vasquez maintains that the circumstances showing the falsity of the State's cocaine evidence were not ascertainable through the exercise of reasonable diligence at any earlier point in time.

That said, any contrary determination by the Court—*i.e.*, that Vasquez could and should have discovered and asserted this false-evidence issue before now—

would establish beyond question that Vasquez did not receive the effective assistance of counsel guaranteed to him under the United States Constitution.

To the extent reasonable diligence would have uncovered this issue before 2019, the failure of Vasquez's trial lawyers to discover and raise it obviously "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Because the materiality of this evidence has already been determined by both this Court and the Fifth Circuit, Vasquez can further demonstrate prejudice under *Strickland*. And, the failure of Vaquez's prior lawyers to have raised this issue in Vasquez's earlier efforts at post-conviction relief constitutes cause sufficient for this claim to be considered now. *Trevino v. Thayer*, 569 U.S. 413 (2013).

## CLAIM SEVEN

**Vasquez is entitled to habeas relief because junk science and false evidence regarding the force of the blows to Miranda's head materially affected and contributed to his capital conviction and death sentence, in violation of the Due Process Clause of the United States Constitution.**

The use of false evidence of car-crash equivalency and short falls to procure Vasquez's conviction and sentence should be construed to violate Vasquez's rights under the Due Process Clause, even assuming it was submitted without any prosecutorial misconduct. *See Giglio*, 405 U.S. at 154.

Vasquez's assertion of this claim in state court was timely, as demonstrated by the Texas Supreme Court's acceptance of the 2015 Application and its remand of

that application to the trial court for an evidentiary hearing. Vasquez has exhausted

this claim as demonstrated by the Texas Court of Criminal Appeals' denial, on

August 25, 2021, of the 2015 Application. Vasquez's failure to have raised this

claim in his initial state habeas application and his first federal petition should be

excused for cause because the statute that authorized Vasquez to bring this claim in

state court was not enacted until 2013, well after the filing of Vasquez's initial efforts

to obtain post-conviction relief, and because the scientific consensus on which this

claim is based did not emerge until many years after Vasquez's trial and years after

his prior applications for post-conviction relief.

## CLAIM EIGHT

**Vasquez is entitled to habeas relief because the failure of his trial counsel to investigate and counter the evidence of sexual assault denied him the effective assistance of counsel guaranteed to him by the Sixth Amendment to the United States Constitution. This claim has already been adjudicated, but without the benefit of the new evidence discussed herein. This new evidence and Vasquez's proof of actual innocence allow the reassertion of this Claim.**

In his first federal habeas petition, Vasquez detailed the unreasonable failure

of his trial counsel to investigate and adequately counter the State's evidence that

Vasquez had sexually assaulted Miranda. This Court denied that clam, in large part

based on the conclusion that a more effective job of countering the evidence of

sexual assault would not have mattered. Vasquez was not prejudiced by his

counsel's failures, the Court ruled, because the evidence that Miranda had twice the

lethal dose of cocaine in her system, which a drug addict [like Vasquez] above others

would have understood," "provided a substantial basis of the jury's mens rea determination." App. Exh. 5 at 12-13.[16]

The new evidence now available to Vasquez demonstrates that the State's evidence of cocaine in Miranda's system was false, as was the evidence on car-crash equivalency. That new evidence severely undermines the Court's prior conclusion that a more effective attack on the sexual-assault evidence would have been futile, thus justifying relief from the Court's prior denial of this claim.

Vasquez sought that relief in the Rule 60(b) motion he filed on January 26, 2022. The Fifth Circuit still has under review whether a motion under Rule 60(b) was the appropriate vehicle for Vasquez to seek this relief. If the Fifth Circuit were to determine that Rule 60(b) is unavailable to Vasquez in these circumstances, then Vasquez should be allowed to seek relief on this point through this subsequent federal petition, even though this is a claim that was previously asserted and denied. *See Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)(proof of actual innocence allows consideration in a successive petition of constitutional claim previously adjudicated).

---

[16] Since Vasquez was not indicted for sexual assault, the evidence of sexual assault and relevant solely on the issue of whether Vasquez acted with the *mens rea* necessary for a capital murder conviction.

## CLAIM NINE

**Vasquez is entitled to habeas relief because the failure of his trial counsel to investigate and present available mitigating evidence denied him the effective assistance of counsel guaranteed to him by the Sixth Amendment to the United States Constitution. This Claim has already been adjudicated, but without the benefit of the new evidence discussed herein. This new evidence and Vasquez's proof of actual innocence allow the reassertion of this Claim.**

In his first federal habeas petition, Vasquez detailed the unreasonable failure of his trial counsel to investigate and present available mitigating evidence. This Court and the Fifth Circuit both determined that trial counsel's performance in this regard was constitutionally deficient. This Court (affirmed by the Fifth Circuit) nevertheless denied relief, in large part based on the conclusion that no amount of mitigating evidence could overcome the devastating evidence that Miranda had a lethal dose of cocaine in her system that Vasquez supposedly injected into her. App. Exh. 5 at 12-13.

The new evidence now available to Vasquez demonstrates that the State's evidence of cocaine in Miranda's system was false, as was the evidence of car-crash equivalency. That new evidence severely undermines the Court's prior conclusion that available mitigating evidence would have made no difference, thus justifying relief from the Court's prior denial of this claim.

Vasquez sought that relief in the Rule 60(b) motion he filed on January 26, 2022. The Fifth Circuit still has under review whether a motion under Rule 60(b) was the appropriate vehicle for Vasquez to seek this relief. If the Fifth Circuit were

to determine that Rule 60(b) is us unavailable to Vasquez in these circumstances, then Vasquez should be allowed to seek relief on this point through this subsequent federal petition, even though this is a claim that was previously asserted and denied. *See Kuhlmann*, 477 U.S. at 454.

## CONCLUSION

The evidence that Miranda had cocaine in her system was false. The evidence that Miranda suffered head trauma equivalent to being ejected from a speeding car at 65 miles per hour was likewise false. So too was the evidence that slight forces, such as those from a short fall, could not cause fatal injuries in infants. This false evidence, moreover, has played a critical role at every turn. It virtually guaranteed that Vasquez would be convicted of capital murder. It was critical to the jury's determination that Vasquez was eligible for the death penalty. And, it was a key determinant in the denial of Vasquez's prior claims based on the failure of his trial counsel to present available mitigating evidence and to counter the State's alleged evidence of sexual assault.

For all of the reasons set forth above, including the prior acknowledgment by the State of Texas that Vasquez's conviction and sentence should not stand, Vasquez respectfully prays that he be granted habeas relief from his capital conviction and his death sentence.

Respecting the finality of a criminal judgment that results from a fundamentally fair process is important, but the State has *no* interest in the finality of a criminal judgment procured through false evidence. Here, Vasquez has established with certainty that the evidence he challenges was both false and material. No one should be put to death based on false evidence, but denying relief to Vasquez here will guaranty that result.

Respectfully submitted

McGuireWoods LLP

By: _____

Thomas M. Farrell
State Bar No. 06839250
845 Texas Ave., Suite 2400
Houston, Texas 77002
Telephone: (713) 571.9191
Facsimile: (713) 571.9652
tfarrell@mcguirewoods.com

ATTORNEYS FOR RICHARD VASQUEZ

<u>Verification</u>

State of Texas )

County of Harris )

### <u>Affidavit of Thomas M. Farrell</u>

Before me, the undersigned authority, personally appeared Thomas M. Farrell, who upon being duly sworn by me testified as follows:

1.    I am a member of the State Bar of Texas.

2.    I am the duly authorized attorney for Richard Vasquez, Jr. I have the authority to prepare and verify his Subsequent Petition for Writ of Habeas Corpus.

3.    I have read the foregoing Subsequent Petition for Writ of Habeas Corpus, and I believe the allegations therein to be true and correct.

4.    I am signing this verification on behalf of my client Richard Vasquez, Jr.

_____
Thomas M. Farrell

Subscribed and sworn to before me this _____ day of February, 2023.

_____
Notary Public, State of Texas

My commission expires: _____

# EXHIBIT 2

| | |
|---|---|
| **From:** | Stephanie Rocha <stephanie.rocha@nuecesco.com> |
| **Sent:** | Wednesday, April 19, 2023 2:29 PM |
| **To:** | Farrell, Thomas M. |
| **Cc:** | Mark Gonzalez |
| **Subject:** | 98-CR-0730-E |
| **Attachments:** | 98-CR-0730-E.pdf |

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Good afternoon,

Please find the attached document on behalf of District Attorney, Mark Gonzalez.

**Thank you,**

**Stephanie Y. Rocha**
**Administrative Secretary**
**Nueces County District Attorney's Office**
**Office:  361-888-0621**
**Stephanie.Rocha@nuecesco.com**



## POSITION OF THE NUECES COUNTY DISTRICT ATTORNEY

1.    I am the District Attorney for Nueces County, Texas.

2.    I understand that Richard Vasquez was convicted of capital murder and sentenced to death in Case No. 98-CR-0730-E in the 148th Judicial District Court of Nueces County, Texas.

3.    In May 2019, I reviewed the circumstances surrounding Richard Vasquez's attempts to obtain post-conviction habeas relief from that conviction and death sentence. I determined, on behalf of the State of Texas, that the Subsequent Application for Post-Conviction Writ of Habeas Corpus that Mr. Vasquez filed on April 15, 2015, was meritorious and that Mr. Vasquez was entitled to relief.

4.    Accordingly, at my direction, my office informed the Court at the hearing on Mr. Vasquez's application (June 3, 2019) that the State of Texas agreed to the Findings of Fact and Conclusions of Law proposed by Mr. Vasquez and further agreed that Mr. Vasquez's conviction and sentence should be set aside.

5.    I understand that Mr. Vasquez is continuing to pursue relief from his conviction and sentence by filing certain new applications and motions. To the extent I have authority to respond on behalf of the State of Texas to any such applications and motions, I hereby reiterate the position that Mr. Vasquez is entitled to habeas relief and that his conviction and sentence should be set aside.

6.    In the interests of justice, Mr. Vasquez's conviction and sentence should be set aside.

_____
Mark A. Gonzalez

153677944_1.DOCX

# EXHIBIT 3(a)

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **RICHARD VASQUEZ,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | **NO. C-05-59** |
| **DOUGLAS DRETKE, DIRECTOR,** | § | **(Death Penalty Case)** |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE, CORRECTIONAL** | § | |
| **INSTITUTIONS DIVISION,** | § | |
| | | |
| Respondent. | | |

## PETITION FOR WRIT OF HABEAS CORPUS
## IN A CAPITAL CASE

Andrew M. Edison
State Bar No. 00790029

Eric B. Storm
State Bar No. 24033244

BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 221-1371 (Telephone)
(713) 221-2144 (Facsimile)

# TABLE OF CONTENTS

I.     JURISDICTION ........................................................................................................1

II.    PROCEDURAL HISTORY.......................................................................................2

III.   STANDARD OF REVIEW .....................................................................................3

IV.   CLAIM ONE: INEFFECTIVE ASSISTANCE OF COUNSEL – FAILURE TO
       INVESTIGATE AND PRESENT AVAILABLE MITIGATION EVIDENCE .................4

      A.     Argument Summary.......................................................................................4

      B.     Relevant Facts...............................................................................................5

      C.     Argument and Authorities.............................................................................14

V.    CLAIM TWO: INEFFECTIVE ASSISTANCE OF COUNSEL – FAILURE TO
       INVESTIGATE AND COUNTER THE STATE'S EVIDENCE OF SEXUAL ASSAULT29

      A.     Argument Summary.......................................................................................29

      B.     Relevant Facts...............................................................................................33

      C.     Argument and Authorities.............................................................................40

VI.   CLAIM THREE: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL –
       CONFLICT OF INTEREST .....................................................................................65

      A.     Argument Summary.......................................................................................65

      B.     Relevant Facts...............................................................................................65

      C.     Argument and Authorities.............................................................................66

VII.  PRAYER FOR RELIEF ...........................................................................................75

Page

**Cases**

*Atkins v. Virginia,*
536 U.S. 304 (2002)............................................................................ 23

*Baxter v. Thomas,*
45 F.3d 1501 (11th Cir. 1995) ........................................................... 15

*Castillo v. Estelle,*
504 F.2d 1243 (5th Cir. 1974) ...................................................... 68, 69

*Cuyler v. Sullivan,*
446 U.S. 335 (1980)........................................................ 66, 67, 71, 72

*Ellason v. State,*
815 S.W.2d 656, n.5
(Tex. Crim. App. 1991)....................................................................... 74

*Evitts v. Lucey,*
469 U.S. 387 (1985)............................................................................ 66

*Glasser v. United States,*
315 U.S. 60 (1942)............................................................................. 71

*Hernandez v. Johnson,*
1997 U.S. App. Lexis
12686, *15 (5th Cir 1997).................................................................. 70

*Holloway v. Arkansas,*
435 U.S. 475 (1978).............................................................. 66, 72, 73

*Jones v. State,*
843 S.W.2d 487
(Tex. Crim. App. 1992)................................................................. 65, 74

*Ladd v. Cockrell,*
311 F.3d 349 (5th Cir. 2002) .............................................................. 4

*Lockett v. Anderson,*
230 F.3d 695 (5th Cir. 2000) ......................................... 15, 16, 19, 63

*Mickens v. Taylor,*
535 U.S. 162 (2002)............................................................................ 67

*Mitchell v. Maggio,*
679 F.2d 77 (5th Cir. 1982) ............................................................... 69

*Moreland v. Scott,*
175 F.3d 347 (5th Cir. 1999) ............................................................. 70

*People v. Cooper,*
156 Misc.2d 483,
93 N.Y.S.2d 733 (1992)...................................................................... 70

*Perillo v. Johnson,*
205 F.3d 775 (5th Cir. 2000) ............................................................. 67

*Rompilla v. Beard,*
125 S.Ct. 2456 (2005) ................................................................................................. 15

*State v. Kelly,*
824 S.W.2d 568
(Tex. Crim. App. 1992) ................................................................... 31, 39, 40, 48

*Stephens v. United States,*
595 F.2d 1066 (5th Cir. 1979) ................................................................................ 68

*Stoker v. State,*
788 S.W.2d 1
(Tex. Crim. App. 1989) .......................................................................................... 74

*Strickland v. Washington,*
466 U.S. 668 (1984) ........................................... 5, 14, 15, 16, 22, 33, 40, 62, 66, 67

*Tennard v. Dretke,*
542 U.S. 274 (2004) ................................................................................................. 24

*United States v. Drones,*
218 F.3d 496 (5th Cir. 2000) ................................................................................... 15

*United States v. Martinez,*
630 F.2d 361 (5th Cir. 1980) ................................................................................... 68

*Wiggins v. Smith,*
539 U.S. 510 (2003) ................................................................ 3, 14, 15, 16, 19, 24

*Williams v. Taylor,*
529 U.S. 362 (2000) ........................................................................................... 3, 16

*Zuck v. State of Alabama,*
588 F.2d 436 (5th Cir. 1979) ....................................................................... 67, 68, 69

**Statutes**

28 U.S.C. § 2241 ........................................................................................................... 1

28 U.S.C. § 2254 ....................................................................................... 1, 2, 3, 4, 30, 34

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **RICHARD VASQUEZ,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | |
| | § | **NO. C-05-59** |
| **DOUGLAS DRETKE, DIRECTOR,** | § | **(Death Penalty Case)** |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE, CORRECTIONAL** | § | |
| **INSTITUTIONS DIVISION,** | § | |
| | | |
| **Respondent.** | | |

## PETITION FOR WRIT OF HABEAS CORPUS IN A CAPITAL CASE

Petitioner, Richard Vasquez, is currently in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division, confined on death row at the Polunsky Unit, Prison Number 999319, in Livingston, Texas. Through undersigned counsel and pursuant to the Constitution of the United States and 28 U.S.C. § 2254, Richard Vasquez petitions this Court to issue a Writ of Habeas Corpus and order his release from confinement or a new trial on grounds that his custody violates the Constitution and laws of the United States.

## I.
## JURISDICTION

This Court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Richard Vasquez was convicted in the 148th Judicial District Court in Nueces County, Texas. Nueces County is within the Southern District of Texas. Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## II.
## PROCEDURAL HISTORY

On June 22, 1999, Richard Vasquez was convicted and sentenced to death for murder of a child under the age of six. TEX. PENAL CODE ANN. § 19.03(a)(8). On August 30, 2000, Petitioner filed a direct appeal of his capital murder conviction and death penalty sentence in the Texas Court of Criminal Appeals. On October 3, 2001, the Texas Court of Criminal Appeals issued its opinion in the direct appeal affirming the conviction and sentence.

On June 27, 2001, while the direct appeal was still pending, Petitioner filed his post conviction application for writ of habeas corpus in state court pursuant to Article 11.071 of the Texas Code of Criminal Procedure seeking relief from his conviction and death sentence and seeking an evidentiary hearing. The Nueces County District Court granted Petitioner's request for an evidentiary hearing, which commenced on March 31, 2003. On January 7, 2004, the state filed its proposed findings of fact and conclusions of law.[1] On February 12, 2004, Petitioner likewise filed proposed findings and conclusions. On May 19, 2004, the district judge, without ruling on Petitioner's proposed findings of fact and conclusions of law, adopted every single finding and conclusion proposed by the State and recommended that Petitioner's application for writ of habeas corpus be denied. *See* Exhibit A.

On January 26, 2005, the Texas Court of Criminal Appeals, in an unpublished decision, adopted the trial judge's findings and conclusions and denied Petitioner's application for writ of habeas corpus. Petitioner has exhausted the remedies available in state court. 28 U.S.C. § 2254(b)(1).

On April 13, 2005, this Court granted Petitioner's application to proceed in forma pauperis and motions for appointment of counsel to represent him in filing a petition in federal

---

[1] A true and correct copy of the State's Proposed Findings and Conclusions and Order is attached hereto as Exhibit A.

court pursuant to 28 U.S.C. § 2254. That same day the Court appointed the undersigned attorneys to represent Mr. Vasquez in filing his § 2254 petition.

On June 27, 2005, Mr. Vasquez filed his first unopposed motion for extension of time to file his federal habeas corpus petition, which was granted by the Court on June 28, 2005. On October 17, 2005, the Court granted Petitioner's second unopposed motion for extension of time for filing his petition extending the deadline to file until January 26, 2006. Mr. Vasquez timely files his petition pursuant to 28 U.S.C. § 2254.

**III.**
**STANDARD OF REVIEW**

The standard of review in federal habeas cases is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a habeas petitioner may obtain relief with respect to any claim adjudicated on the merits in a state court proceeding if he demonstrates that the prior adjudication resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). A writ may be granted under this "unreasonable application" standard when a state court identifies the correct governing legal principle but unreasonably applies it to the facts of a petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). To warrant habeas relief, a state court's application of precedent must have been more than incorrect or erroneous; it must have been "objectively unreasonable." *See id.*; *see also Williams v. Taylor*, 529 U.S. 362, 409 (2000).

Alternatively, habeas relief is justified when a petitioner demonstrates that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). Pursuant to 28 U.S.C. § 2254(e)(1), the state court's factual determinations are presumed correct unless a petitioner

rebuts that presumption by clear and convincing evidence. *Ladd v. Cockrell*, 311 F.3d 349, 352

(5th Cir. 2002).

## IV.
## CLAIM ONE: INEFFECTIVE ASSISTANCE OF COUNSEL – FAILURE TO INVESTIGATE AND PRESENT AVAILABLE MITIGATION EVIDENCE

### A.    Argument Summary

Richard Vasquez was denied his Sixth Amendment right to effective assistance of

counsel due to his trial attorneys' failure to investigate and present readily available mitigation

evidence during the sentencing phase of his trial.    Trial counsel did not conduct a basic

investigation of Richard's family, social, and medical history as required by the American Bar

Association standards a nd other professional standards of practice.    Trial counsel failed to

employ a mitigation investigator even though they had sufficient funding to do so.    Trial counsel

failed to discover Richard's complete school records and medical records.    Counsel also failed to

interview critical family members and others who had relevant information for mitigation,

including Richard's father, mother, babysitter and cousins.    Trial counsel failed to ask their

retained psychiatrist to evaluate Richard for mental deficiencies or other medical or social

history which might have been used for purposes of mitigation.    Finally, they disregarded the

opinion of their own experts who suggested that further testing was required to rule out damage

to Richard's brain.

Consequently, trial counsel was completely unaware that Richard's father, Ricardo

Vasquez, introduced his son Richard to drug use and drug trafficking at an early age, that before

Richard was 12 years old the elder Vasquez taught his son how to steal, burglarize houses, and

fence stolen property, or that his father gave Richard his first dose of heroin when Richard was

only 12 years old.    Because trial counsel did not even attempt to interview Richard's mother,

Marta Vasquez, trial counsel failed to discover that she drank heavily during her pregnancy and

that she was despondent, depressed and neglectful. They also failed to learn the full extent of Richard's learning disabilities and difficulties in school.

The appropriate testing and discovery, which was performed in preparation for the state habeas proceeding, revealed that Richard suffers from post traumatic stress disorder, attention deficit disorder, poly-substance dependence, fetal alcohol syndrome, brain dysfunction, learning disabilities, and a borderline IQ. All of this evidence would have been admissible and would have informed the jury of important and compelling mitigating circumstances. Trial counsel's failure to present this evidence deprived Richard of his right to a reliable and individualized sentencing determination in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. Moreover, had all of the available mitigation evidence been presented to the jury, there is a reasonable probability that the jury's sentence would have been different.

The state court's attempt to label trial counsels' failure to discover and present this available mitigation evidence a "strategic decision" when trial counsel lacked sufficient information to rationally formulate and follow such a strategy is an objectively unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984) and subsequent Supreme Court precedent. Accordingly, because trial counsels' substandard performance deprived the jury of compelling, substantial mitigation evidence and undermined confidence in the jury's death penalty verdict, Richard is entitled to habeas corpus relief.

**B.      Relevant Facts**

Richard Vasquez was 18 at the time of the events at issue in this case. (RR 41: State's Ex. 1). He was living at the home of his aunt and uncle, Olivia and Juan Vasquez, who informally adopted Richard when he was approximately three and a half years old. (RR 34:56;

39:77, 86; SH Petitioner's Ex. 22 ¶ 11).[2]  Richard's girlfriend, Brenda Lopez, their four month old daughter, Megan Vasquez, and Brenda's four year old daughter from a prior relationship, Miranda Lopez, also lived in the home with Richard and his adoptive parents.  (RR 34:56).

Richard was seriously addicted to drugs, having used heroin, cocaine, and marijuana since he was as young as 11 years old.  (RR 39:100).  On March 5, 1998, after a long night of drug abuse and arguing with Brenda about issues related to their common addiction to drugs, Richard awoke at about 10:30 a.m. in a bad mood, thinking he had missed a court date.  (RR 37:80-82).  He immediately injected himself with a large dose of heroin, drove his aunt to work, and returned home to inject himself and Brenda with more drugs.  (RR 36: 83-85).  Richard then took Brenda to work and, after stopping at McDonald's for lunch, returned home with the children.  (RR 37:85-89).  He testified in his own defense at trial that he was angry, depressed and frustrated because he had to watch the children and could not go out to steal things to sell for money to buy more drugs.  (RR 37:77, 89-91).  He testified that he transferred his anger to the children.  (RR 37:126).  While he was still high on drugs and in this angry and depressed state of mind, Richard hit Miranda repeatedly in the head with his hand.  (RR 34:57-59; 37:92-93, 146).  When Miranda later fell down and became unconscious, Richard called 911 and attempted to administer first aid.  (RR 34:59; 37:95-99, 102).  Miranda was transported to the hospital where she eventually died.  (RR 41: State's Ex. 45).

---

[2] Throughout this Petition references to the Reporter's Record from the trial court will be cited in the following format: (RR Volume #: Page #).  References to the exhibits from the trial court will be cited as (RR Volume #: State's/Defendant's Ex. #).  References to the Clerk's Record from the trial court will be cited as (CR Volume #: Page #).  References to the Reporter's Record from the state habeas corpus evidentiary hearing will be cited as (SH Volume #: Page #).  References to the exhibits from the state habeas evidentiary hearing will be cited as (SH Petitioner's/State's Ex. #).  Exhibits attached to the state habeas application will be cited as (SH App. Ex. #).

During the sentencing phase of the trial, Richard's trial counsel put three of Richard's family members -- his aunt, uncle, and sister -- on the witness stand to beg the jury for mercy. (*See* RR 39:77-92). Richard's aunt and uncle testified how Richard's generally friendly behavior changed when he became addicted to drugs. (RR 39:79, 87). Richard's aunt also testified that Richard was involved in a train accident which killed one of his friends and caused Richard to be hospitalized with a head injury. (RR 39:88). The accident occurred when Richard was 15 years old. She stated that Richard had become severely depressed following that accident. (*Id.*).

However, the three members of the Vasquez family who testified were not asked to discuss many important details of Richard's background, including his relationship with his natural parents. Richard's aunt, Olivia Vasquez, submitted an affidavit during the state habeas proceeding in which she testified that "[n]one of Richard's lawyers at the trial ever talked to me about any of the information about our family's and Richard's dealings with his father." (SH Petitioner's Ex. 22 ¶ 32). She also stated that "[n]one of [Richard's] lawyers prepared me before I testified, I didn't know what to say, and all they told me was just answer the questions I was asked and to ask for mercy." (*Id.*). Richard's uncle likewise filed an affidavit stating that Richard's trial attorneys did not interview him or meet with him to prepare him for his trial testimony. (SH Petitioner's Ex. 21 ¶ 33). Speaking generally regarding the preparation of witnesses for the penalty phase of the trial, Robert Bujanos, the trial attorney who questioned Richard's family members during that phase of the trial, said: "it didn't seem to me that there was enough advance preparation, in my mind."[3] (SH 7:11). He recalled that counsel interviewed the Vasquez family for mitigation purposes in the hallway during the trial. (SH 7:13).

---

[3] When asked about what the trial attorneys did after each day of trial during the case in chief and penalty phase, Mr. Bujanos answered as follows:

Trial counsel admitted during the state habeas evidentiary hearing that they did not hire a mitigation specialist to assist them in their investigation of mitigation evidence. (SH 3:54; 7:11). Instead, they hired Jan Davis, a semi-retired former probation officer purportedly to conduct some witness interviews. (SH 3:21). Mr. Davis had absolutely no prior experience investigating mitigation in a capital murder case. (SH 3:34). He spent a total of 8.5 hours working on the case, including time spent traveling a total of 110 miles. (*See* SH Petitioner's Exhibit 13). The trial court approved a $1000 allotment for the services of Mr. Davis, but defense counsel only used $448.22 of that amount for his time and expenses. (*Id.*).

Trial counsel testified that they did not attempt to interview Richard's natural father, Ricardo Vasquez, or Richard's natural mother, Marta Vasquez, to find out their roles in Richard's life. (SH 3:37-38). Likewise, they failed to interview Richard's sister, Brenda Vasquez, Richard's cousins, and Richard's childhood caretaker, each of whom were available and willing to testify regarding Richard's social history. (*See* Petitioner's Exs. 25-29; SH 3:35). Counsel also failed to interview Miranda's mother and Richard's girlfriend, Brenda Lopez, even though she indicated she was willing to talk to defense counsel if prosecutors and legal aid representatives could be present. (SH 3:36-37).

Trial counsel acknowledged that because they did not do the necessary investigation, there were many things in Richard's background that they never knew, and thus could not convey to the jury. (SH 3:55). Among the information trial counsel did not know was that Richard's

---

. . . during the case in chief, very little outside of adjourning for court for the day. Very little planning that I was aware of happened. A stark recollection I have is that the Spurs were in the playoffs. And I asked Mr. Gilmore if we were going to do anything to get ready, and he laughed and told me he was going to watch the Spurs.

(SH 7:20).

mother drank beer and hard liquor during her pregnancy with Richard, causing Richard to suffer from fetal alcohol syndrome. (SH 3:40, 127; 4:136-37; Petitioner's Exs. 20, 21, 22, 23). They were not aware that Richard's family had a long history of drug abuse and depression. (SH 4:43; SH Petitioner's Exs. 21, 22, 23, 24). They had no idea that Richard's natural father often interacted with Richard during Richard's childhood and early teenage years and had a profound negative and corrupting impact on Richard's life. (SH 3:120-28).

Richard's father, Ricardo Vasquez, was a drug addict. Ricardo testified at the state habeas evidentiary hearing that he began using heroin and cocaine when he was approximately 14 years old and has been addicted for about 25 years. (SH 3:116-17). He stated that he has been in and out of prison most of his life for drug abuse and drug-related crimes. (SH 3:117, SH Petitioner's Ex. 24). From the time Richard was an infant, Ricardo took him to places to buy and use drugs. (SH 3:120). From a very young age, Richard saw his father using and dealing heroin, which Ricardo sold off the front porch of his home. (SH 3:121). Even after Richard moved in with Juan and Olivia, Ricardo frequently visited Richard and took him with him whenever he wanted to. (SH 3:127). Richard liked to be with his father and frequently hung out with Ricardo when he was out of prison. (SH 3:124, 127). As Richard grew older, Ricardo took him with him when he would rob houses to fund his drug habit. (SH 3:121-22; SH Petitioner's Ex. 24 ¶ 13). Ricardo taught Richard how to prepare and use heroin, which Richard began using when he was approximately 11 or 12 years old. (RR 39:100; SH 3:124). Ricardo also taught Richard how to deal drugs. (SH 3:125). About that same time when Richard was visiting his grandmother's house, Richard witnessed his father's arrest for heroin possession. (SH Petitioner's Ex. 22 ¶ 17). The event upset Richard so much he cried for days afterwards. (*Id.*).

Trial counsel was also not aware of the many other bad influences in Richard's family life. Both of Richard's grandfathers were alcoholics and one abused drugs. (SH Petitioner's Ex. 22 ¶ 19). Richard's sister's live-in boyfriend, Steve Velasquez, often used hard drugs with Richard. (SH Petitioner's Ex. 22 ¶ 22). Richard's natural mother's live-in boyfriend, Joe Lopez, was a drug dealer and provided Richard with heroin. (SH Petitioner's Ex. 23 ¶ 22). Richard's paternal uncle, Arnulfo Vasquez, died of a heroin overdose; his paternal uncle, Cleto Vasquez, also abused drugs and was shot in the head by drug dealers; and his paternal aunt's husband was shot and his body set on fire in a drug-related killing. (SH Petitioner's Exs. 22, 23, 24). Richard's maternal uncle, Arturo Ramirez, is a drug addict and also has served time in jail. (SH Petitioner's Ex. 23 ¶ 19). Richard's cousins, Robert Mungia and Chris Ramirez, are also drug addicts who used to hang around with Richard. (*Id.*).

Richard's former babysitter, Herlinda Rangel, knew Richard's parents before he was born and had knowledge of their contentious relationship and Richard's difficult home life as a young child. (SH Petitioner's Ex. 26). She stated at the state habeas proceeding, that even after Richard moved in with his aunt and uncle, Richard was frequently left alone after school while his parents worked. (*Id.*). She described how on one occasion she discovered a 10 year old Richard at home by himself smoking pot. (*Id.*). Because trial counsel did not conduct the requisite investigation, they had no knowledge of these facts and were simply unable to inform the jury of them.

The only expert testimony offered by the defense during the trial was that of a psychiatrist, Dr. Carlos Estrada. Dr. Estrada's mitigation testimony was basically limited to Richard's history of drug abuse and Dr. Estrada's opinion that Richard would not be a future danger to society if he remained institutionalized and free of drugs. (*See* RR 37:95-109).

Dr. Estrada testified during the state habeas proceeding that trial counsel never provided him with any medical records, school records or interviews with family members to assist him in his evaluation of Mr. Vasquez. (SH 7:66, 71, 79). In fact, trial counsel admitted that they did not request any medical records from any hospital reflecting any kind of treatment on Mr. Vasquez. (SH 3:34-35). They failed to request these records despite their knowledge that Richard had suffered a head injury in an auto-train accident. (*Id.*). Trial counsel also admitted that they did not independently request Richard's school records, instead relying on the limited records provided by the State in discovery. (SH 3:33-34). Dr. Estrada testified that, because he was not given any of this information, he was unable to evaluate Mr. Vasquez for learning disabilities or to detect symptoms of attention deficit hyperactivity disorder. (SH 7:79-80).

Dr. Estrada also stated that he was not trained to perform neuropsychological testing on Mr. Vasquez and that he was not asked to measure Mr. Vasquez's IQ (SH 7:81-82). Dr. Estrada testified that defense counsel did not provide him with any information about Mr. Vasquez's natural mother or ask him to explore the possibility that Mr. Vasquez suffered from fetal alcohol syndrome. (SH 7:81-82). He testified that all of this information would have been helpful to his evaluation and would have been important mitigation evidence. (SH 7: 71, 79, 82-84).

Dr. Bonikowski, a neurologist, was retained by the defense to render a neurological opinion. Dr. Bonikowski recommended that Mr. Vasquez undergo an MRI of his brain, neuropsychological testing, and a Quantitative Electroencephalogram (QEEG). (SH Petitioner's Ex. 12). Dr Estrada concurred with Dr. Bonikowski and recommended those tests in order to rule out the possibility of brain damage. (SH 7:95). Dr. Estrada wrote the following on Dr. Bonikowski's report: "Impression: Further testing as recommended needed to rule out brain damage, quantity and quality." (SH Petitioner's Ex. 61). Dr. Estrada also wrote a note to Dr.

Bonikowski stating, "To Dr. Bonikowski, regarding Richard Vasquez. Prescription, neuropsychological and electroencephalogram to rule out organicity. I agree with further tests." (SH Petitioner's Ex. 62).

Despite their knowledge of these recommendations from their retained experts, trial counsel did not have Richard undergo the proscribed testing. (SH 3:45-48). Trial counsel Joseph Collina admitted that because of his experience with other death penalty cases, he was aware that psychiatrists typically do not perform neuropsychological testing and that neuropsychological tests are usually performed by a clinical psychologist. (SH 3:48). Nevertheless, defense counsel failed to retain a clinical psychologist to evaluate Mr. Vasquez for possible brain damage. (SH 2:249-50).

State habeas counsel, with the assistance of a mitigation specialist and a clinical psychologist, did perform the basic investigation of Richard's social and medical history that trial counsel failed to do. The clinical psychologist, Dr. Ricardo Weinstein, visited with and examined Richard on May 21, 2001, May 22, 2001, January 7, 2003, and again at the beginning of April 2003. (SH 4:13). As part of his evaluation of Richard, Dr. Weinstein personally interviewed people who had the most contact with Richard during his life and developmental years including Richard's aunt and uncle, Olivia and Juan Vasquez, Richard's natural mother and father, Marta Ramirez Vasquez and Ricardo Vasquez, Sr., and Richard's caretaker Herlinda Rangel. (SH 4:23). He also reviewed multiple affidavits from those same individuals as well as affidavits from Richard's sister, niece, cousins, and maternal aunt. (SH 4:14-16; *see also* Petitioner's Exs. 20-29, 32). He reviewed the death certificates of three of Richard's uncles, Columbia Hospital records from Richard's August 1996 heroin overdose, Riverside Hospital records regarding Richard's head injury from the auto-train accident, Richard's school records,

hospital records from Richard's birth and early childhood, an MRI report from Dr. Wayne Laster, and various documents and evidence from this case. (SH 4:15-17).

Dr. Weinstein then performed multiple diagnostic tests on Richard to determine his brain function, language ability, and medical and social condition, including the neuropsychological testing and QEEG that was prescribed by trial counsel's experts but never requested by trial counsel. (SH 4:29-33). Dr. Weinstein determined that Richard suffers from long-term poly-substance dependence, which means he is addicted to a variety of drugs. (SH 4:33). Richard also suffers from cumulative post-traumatic stress disorder resulting from violent experiences and exposure to violence throughout his life. (SH 4:33-34). This condition causes Richard's "fight or flight" reaction to be in a constant state of arousal which makes him more prone to viceral reactions, irritability and poor judgment. (SH 4:35-36). Richard has learning disabilities that were not properly addressed in his early years. (SH 4:36). Additionally, Richard suffers from brain dysfunction with multiple causes, including Fetal Alcohol Syndrome, actual trauma to the brain, drug abuse, problems during the brain's development, and potential other causes. (SH 4:37). Dr. Weinstein tested Richard's IQ which measured in the low normal range of 83. Dr. Weinstein explained that this IQ level is borderline. (SH 4:59). Dr. Weinstein testified that Richard's brain dysfunction affects the frontal lobes of Richard's brain causing problems with impulse control, problems with abstract reasoning, problems with the ability to plan and organize his behavior in a goal-directed manner. Consequently Richard has a tendency to act and behave before he thinks and, even when he does think, he has difficulty controlling his behavior. (SH 4:61). A true and correct copy of Dr. Weinstein's complete report is attached hereto for the Court's convenience as Exhibit B. (*See also* Petitioner's Ex. 20).

**C.    Argument and Authorities**

### 1.    *Standard for Sixth Amendment Ineffective Assistance of Counsel Claims.*

The United States Supreme Court established a two-pronged test for assessing claims of ineffective assistance of counsel claims pursuant to the Sixth Amendment in *Strickland v. Washington*, 466 U.S. at 687-88. Under the first prong, a petitioner for habeas corpus must show that counsel's performance was deficient by demonstrating that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 687-88. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. Prevailing norms of practice are reflected in American Bar Association standards, which serve as guides to determining what is reasonable. *Id.* at 688-89.

ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the appointment and Performance of Counsel in Death Penalty Cases 11.4.1(c), p. 93 (1989); *See also Wiggins,*, 539 U.S. at 524 (applying the ABA Guidelines in force at the time of the defendant's trial).

Thus, preeminent among an attorney's duties in representing a client charged with a capital crime is the duty to conduct a reasonable investigation of the law and the facts.

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. "*Strickland* does not require any deference to decisions of counsel that are uninformed by an adequate investigation into the controlling facts and law." *Lockett v. Anderson*, 230 F.3d 695, 714 (5th Cir. 2000) (quoting *United States v. Drones*, 218 F.3d 496, 500 (5th Cir. 2000). Indeed, case law expressly rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice among them. *Baxter v. Thomas*, 45 F.3d 1501, 1514 (11th Cir. 1995)(failure to present mitigating psychiatric evidence not tactical when caused by misunderstanding on the part of counsel). The heart of the analysis is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was *itself reasonable*." *Id.* at 523 (emphasis in original); *see also Williams*, 529 U.S. at 396 (instructing that trial counsel has an "obligation to conduct a thorough investigation of defendant's background"). In assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins,* 539 U.S. at 527.

Once a Petitioner establishes that his counsel's performance fell below the objective standard of reasonableness, the second prong of *Strickland* requires a Petitioner to demonstrate that his counsel's deficient representation prejudiced the defense. *Strickland*, 466 U.S. at 692. When considering prejudice a court should not consider whether it may be possible that a jury could have heard all of the evidence and still have decided on the death penalty, that is not the test. *Rompilla v. Beard*, 125 S.Ct. 2456, 2469 (2005). Instead, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S at 694. In assessing prejudice, a court must reweigh the evidence in aggravation against the totality of available mitigating evidence and consider whether the "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability." *Wiggins*, 539 U.S. at 538 (quoting *Williams*, 529 U.S. at 398). If the Court can conclude "that a juror could have *reasonably* concluded that the death penalty was not an appropriate penalty in this case based on the mitigating evidence, prejudice will have been established." *Lockett v. Anderson*, 230 F.3d 695, 716 (5th Cir. 2000) (emphasis added).

### 2.    *Failure to Investigate Mitigation Evidence of Richard's Background.*

Here, clear and convincing evidence of trial counsels' failure to investigate Richard's troubled background and social history, (evidence Richard's state habeas counsel presented during the state evidentiary hearing), rebuts the state court's findings of fact supporting the Texas Court of Criminal Appeals' decision to deny habeas relief. The state court's somewhat redundant findings three to six each relate to trial counsel's failure to investigate mitigation evidence of Richard's social history as follows:

> 3.    The Court finds that, Vasquez's trial attorneys reasonably determined that pursuing further evidence of Vasquez's social history was unnecessary to make an informed choice among possible defenses, and their failure to investigate further the negative influence that Vasquez's biological parents played in his early years resulted from a reasoned strategic judgment and not from inattention.

> 4.    The court (sic) finds that all of Vasquez's trial attorneys were aware of his biological parents and his family history involving drug abuse and violence, but that they made a reasonable strategic decision to portray Vasquez as coming from a good home, as far as his adoptive parents, and that it would have been inconsistent with that strategy to present evidence concerning Vasquez's exposure to drugs and violence at an early age.

5. The Court finds that Vasquez's trial attorney Joseph Collina gathered sufficient information about Vasquez's social background through meetings with Vasquez and his adoptive parents, that his decision not to interview the biological parents because they could not provide additional information and would not have been good witnesses was reasonable under the circumstances, and that his decision not to hire an independent mitigation expert was reasonable because he already had sufficient evidence.

6. The Court finds that Vasquez's trial attorney Joseph Collina was aware that Vasquez's biological parents had an influence on him at a very young age, but made a reasonable strategic decision to portray Vasquez as coming from a good home without adverse influences and to bring out all that his adoptive parents had done for him, and not to say much about the biological parents at trial for fear of "throw[ing] mud" at the good impression Vasquez's adoptive family made.

These factual and legal findings are objectively unreasonable because they contradict the undisputed evidence presented during the state evidentiary hearing.

### a. Trial Counsel Was Not Aware of Richard's Social and Family History.

First, trial counsel were clearly not all "aware of [Richard's] biological parents and his family history involving drug abuse and violence," as finding four concludes. They could not have been because they failed to interview anyone concerning this family history. Olivia Vasquez, Richard's aunt, testified that "[n]one of Richard's lawyers at the trial ever talked to me about any of the information about our family's and Richard's dealings with his father." (SH Petitioner's Ex. 22 ¶ 32). Richard's uncle, Juan Vasquez, likewise filed an affidavit stating that Richard's trial attorneys did not interview him except to ask if he observed bruises on Richard when he was first arrested and prior to his confession. (SH Petitioner's Ex. 21 ¶ 33).

Trial counsels' recollections of investigating Richard's family history are sketchy at best. Regarding Olivia's statement that she was never interviewed about Richard's relationship with

his natural father, Mr. Bujanos, the lawyer who questioned both Olivia and Juan during the sentencing phase of the trial, answered as follows:

> I don't know. I was aware that there was some strife with the father, that there was a tumultuous relationship. And it's very, very difficult to recall. I want to be honest here and truthful, but it's very difficult to recall exactly what was said. And if that's her recollection, then I believe she is telling the truth. I just don't know for certain.

(SH 7:13). When asked later if he knew that Richard's father was in and out of prison most of Richard's life he stated that he heard that Richard's father "had some problems" but conceded that he didn't know if he "ran across" that fact until after the trial was over. (SH 7:16). He freely admitted that he did not know that Richard's father taught Richard to shoot heroin at age 12. (*Id.*). He said he did not know that Ricardo taught Richard to steal and rob and sell drugs. (*Id.*). He also was not informed that when Richard was 11 years old he witnessed his father's arrest at his grandmother's house or that the event had a serious emotional impact on Richard. (SH 7:17). He stated that he did not know that three of Richard's uncles died violent deaths. (SH 7:18).

Mr. Bujanos also admitted he was not aware of the fact that Richard's mother drank beer and hard liquor during her pregnancy with Richard. (SH 7:14). He acknowledged that he never met Richard's mother and that he did not even know her name. (SH 7:14). He stated that he did not know about her drinking habit and that such information would have been "extremely helpful" mitigation evidence. (*Id.*).

Mr. Gilmore, another one of Richard's trial lawyers, likewise could not remember most of the specific details regarding his investigation of Richard's social history. (*See* SH 2:217-20, 226-27). He stated that he did not recall what he did personally to investigate mitigation in Richard's case and he did not recall speaking with Richard's mother or father. (SH 2:219-20).

As noted above, Mr. Bujanos testified that defense counsel did little advance preparation for trial and interviewed the Vasquez family members for mitigation purposes in the hallway outside the courtroom. (SH 7:11, 13). A last-minute interview conducted in such a public setting simply could not have been sufficient to inform trial counsel of Richard's extensive and horrific family history. Nevertheless, even if we assume, as Mr. Bujanos suggested, that trial counsel had some awareness of a "tumultuous relationship" with Richard's father, such an awareness does not justify trial counsel's failure to investigate further. To the contrary, viewed from trial counsels' perspective at the time, if they did have some idea that there was "strife" and "tumult" related to Richard's natural parents, they had all the more reason to conduct a thorough investigation to find out if that conflict might have affected Richard. *See Wiggins,* 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

> b.   **Trial Counsel's Failure to Investigate Richard's Family and Social History was Not an Informed Strategic Decision.**

The conclusion of the state court that trial counsels' failure to investigate Richard's background was somehow the product of a strategic decision is also unreasonable. This is true because *Strickland* demands more than the mere decision of a strategic choice by counsel. It requires "informed strategic choices." *Lockett,* 230 F.3d at 714. As noted above, defense counsel here was not in possession of sufficient information to make an informed strategy decision. Because trial attorney Joseph Collina never met Richard's biological parents and did not know anything about the information they might possess, he had no idea that they "could not provide additional information and would not have been good witnesses" as finding number five concludes. For this same reason it is unreasonable to assume that trial counsel made a strategic

decision to portray Richard as "coming from a good home" instead of presenting evidence concerning Richard's natural parents as findings four and six suggest. Trial counsel could not have made such a "strategic" choice because they simply were not aware of one of the strategic alternatives -- namely the option of presenting evidence that Richard's natural parents exposed him to drugs and violence at an early age.

###### c.    Investigation of Richard's Family History and Social History is Consistent with Trial Counsel's strategy.

Incredibly, Mr. Collina suggested that "[Richard's] adoptive parents, who were closely related, brother and sister to the to the natural parents, were to testify <u>and did testify</u> that he was maltreated, ignored, and even -- his natural parents even contributed to his delinquency. And the jury was made aware of that." (SH 3:37) (emphasis added). This is simply not true. A theory in review of the trial record demonstrates that no such testimony was introduced at trial. (*See* RR 39:77-92). However, Mr. Collina's testimony underscores two important points. First, we see clearly that by the time of the state habeas evidentiary hearing, Mr. Collina's memory of the mitigation investigation and the sentencing hearing was not reliable. We also see that at least one trial attorney believed that the defense actually did not follow a rigid "good home" strategy at the expense of evidence of Richard's troubled family history as the state court assumed they did.

In fact, the state court's premise that an argument that Richard's adoptive parents tried to provide Richard with a good home was somehow mutually exclusive of an argument showing that Richard is the victim of negative influences from Richard's natural parents and extended family is fundamentally flawed. It is not hard to see how counsel could argue that Richard's aunt and uncle did their best to provide a loving home and thus deserve the jury's sympathy and at the same time argue that Richard was victimized by influences outside that loving home, including

-20-

his natural mother and father. Mr. Bujanos tried to make this very point in response to the State's

questioning in the state habeas proceeding.

> Q.    A little bit ago you said "Richard is a redeemable human
> being, how nice the family was might sway the jury." So
> I'm going to ask you a question about that now, about that
> comment. Wouldn't it be -- wouldn't it not be inconsistent
> with sound trial strategy to present both evidence of a good
> family and bad family environment? Would those not be
> mutually exclusive trial strategies?
>
> A.    To show that --
>
> Q.    Good family versus bad family environment.
>
> A     Yeah. You'd have to do one or the other.
>
> >    MS. GLEIMER:    That's all I have.
> >
> >    THE WITNESS:    Wait, wait.
>
> Q.    (By Ms. Gleimer)    Excuse me?
>
> A.    Now, let me -- there may be -- in families there's different
> members of families. Some may be good and some may be
> bad. And I think that's a part of an entire family. So I'd
> have to say that saying that they're mutually exclusive
> might be an oversimplification. I mean, for example, with
> Richard's father, that was a bad family situation; whereas --
>
> Q.    The aunt and uncle would be good?
>
> A.    -- Juan and Olivia Vasquez, from what I saw, that would
> have been -- you know, they were trying to be good
> parents. . . .

(SH 7:39-40).

A review of defense counsels' closing argument in the sentencing phase of this case

reveals that trial counsel actually advanced a version of both these arguments simultaneously in

Richard's defense. Trial counsel clearly tried to generate sympathy for Richard's family (*See* RR

40:27-28). However, they also argued that Richard was a victim of individuals from the "dark underside of our society." Mr. Collina argued:

> The dark underside of our society is the society of drugs, particularly when it impacts on children. Richard Vasquez, as you have determined, is a criminal. He is also a crime victim.
>
> . . .
>
> It is also mitigating that he has to grow up in a society where we have this dark side to our society and where he got involved in drugs and crime.

(RR 40:17, 24). Investigation of Richard's family background including his parents' and extended family's history of drug abuse and violence is completely consistent with Mr. Collina's closing argument in which he blames outside influences for Richard's involvement in drugs and crime. It is also consistent with the argument made throughout the trial that despite Richard's good home he became entangled in the wrong crowd and could not free himself of the influence of drugs. (*See, e.g.*, RR 37:21-22, 70-78). Focusing on the pervasive and corrupting influence of Richard's natural parents' and his extended family's addictions to liquor and hard drugs from before he was even born provides additional explanation for Richard's own addictions, and reinforces the idea that Richard had little or no chance to escape that destructive influence.

Because trial counsels' "good home" strategy does not contradict with a mitigation strategy emphasizing Richard's early introduction to drugs by his natural parents and extended family, the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. 2254(d)(2). Additionally, the state court's application of *Strickland* was objectively unreasonable because trial counsel's failure to investigate and present this mitigating evidence cannot be justified as an informed strategic decision.

### d. Trial Counsel's Failure to Investigate Richard's Family and Social History was Prejudicial to Richard.

As a result of trial counsels' failure to perform the necessary investigation regarding Richard's social history, the jury never knew about Richard's family's disturbing history of hard drug abuse, crime, depression, and violent death. The jury was also not informed that Richard was exposed to these profoundly negative influences and experiences at a very young age by multiple individuals he cared about and looked up to in his life. This available but uninvestigated social history relates directly to the cause of Richard's own heroin addiction, criminal behavior, and depression -- the very things that contributed to Richard's attitude and behavior on the day Miranda Lopez was killed. If these mitigating facts had been investigated and presented to the jury during the sentencing phase of the trial, it is probable that the result of that trial phase would have been different.

### 3. *Failure to Investigate Mitigation Evidence of Richard's Mental Deficiency.*

#### a. Relevance and Admissibility of Mental Impairment Mitigation Evidence.

The Supreme Court has repeatedly recognized the significance of mental impairments in determining the appropriate sentence for a capital defendant. In the extreme case, when a defendant's mental deficiency is substantial enough for the defendant to be diagnosed with mental retardation, the Supreme Court has drawn a bright line and declared the death penalty unconstitutional. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). However, even when a defendant's mental impairment is above the level of mental retardation,[4] the Supreme Court has held that impaired intellectual functioning has a mitigating dimension beyond the impact it has

---

[4] The American Psychiatric Association reports that the term "mild" mental retardation is typically used to describe people with an IQ level from 50 to approximately 70. *See Atkins*, 536 U.S. at 308 n.3 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 42-43 (4th ed. 2000)). Richard's full scale IQ score is borderline, measured at 83. (SH 4:59).

on the defendant's ability to act deliberately. *Tennard v. Dretke*, 542 U.S. 274, 288 (2004). Consequently, a defendant's low IQ is relevant mitigating evidence which "might serve 'as a basis for a sentence less than death.'" *Id.* (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)); *see also Wiggins,* 539 U.S. at 535 (evidence that the defendant had an IQ of 79 is relevant to and augmented his mitigation case); *Smith v. Texas*, 547 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores and history of participation in special-education classes as a reason to impose a sentence more lenient than death.").

### b.    Trial Counsels' Failure to Assist Dr. Estrada.

Despite the relevance and important mitigating effect of a defendant's diminished mental capacity, trial counsel failed to make sure that Mr. Vasquez received the appropriate tests to assess any mental deficiencies or impairment. Trial counsel hired Dr. Carlos Estrada, a psychiatrist to evaluate Richard. However, as noted above, because trial counsel failed to do the necessary investigation of Richard's medical and social history, Dr. Estrada was never given any medical records, school records or interviews with family members to assist him in his evaluation of Mr. Vasquez. (SH 7:66, 71, 79). Trial counsel admitted that they did not request any of Mr. Vasquez's medical records despite their knowledge that Richard had suffered a closed head injury in an auto-train accident. (SH 3:34-35; 7:70). Trial counsel also admitted that they did not independently request Richard's school records, but instead relied on the limited records provided to them by the State. (SH 3:33-34). Dr. Estrada testified that he was not given any of this information, including the school records trial counsel did obtain in discovery. Consequently, he had insufficient information to evaluate Mr. Vasquez for learning disabilities or to detect symptoms of attention deficit hyperactivity disorder. (SH 7:79-80).

Defense counsel also did not provide Dr. Estrada with any information about Mr. Vasquez's natural mother or ask him to explore the possibility that Mr. Vasquez suffered from fetal alcohol syndrome. (SH 7:81-82). He testified that all of this information would have been helpful to his evaluation and would have been important mitigation evidence. (SH 7: 71, 79, 82-84).

Dr. Estrada was basically limited to the information he could glean on his own during two face-to-face interviews with Richard. (SH 7:72). He testified that this arrangement was less than ideal because obtaining information from the defendant himself does not always produce the most accurate medical and social history. (SH 7:71).

Trial counsel's failure to provide Dr. Estrada with accurate medical, educational, and social history information proved to be prejudicial to Richard. Armed with the necessary background information, Dr. Ricardo Weinstein, the neurophysiologist hired to evaluate Richard during the state habeas proceeding, was able to determine that Richard suffered from post traumatic stress disorder, attention deficit disorder, poly-substance dependence, fetal alcohol syndrome, brain dysfunction, learning disabilities, and a borderline IQ. (*See* SH Petitioner's Ex. 20). All of this evidence would have been admissible and would have informed the jury of important and compelling mitigating circumstances. Had the jury been apprised of these circumstances there is a reasonable probability they would found him to be less culpable for Miranda's death and would have reached a different result.

### c.    Trial Counsels' Failure to Follow Their Experts' Advice.

In spite of his limited information from trial counsel, Dr. Estrada did learn of Richard's train accident and resulting head injury and referred Richard to Dr. Bonikowski, a neurologist. (SH 7:76). Dr. Bonikowski recommended that Mr. Vasquez undergo an MRI of his brain, neuropsychological testing, and a Quantitative Electroencephalogram (QEEG). (SH 7:77; SH

Petitioner's Ex. 12). Dr Estrada concurred with Dr. Bonikowski and recommended those tests in order to rule out the possibility of brain damage. (SH 7:95). Dr. Estrada wrote the following on Dr. Bonikowski's report: "Impression: Further testing as recommended needed to rule out brain damage, quantity and quality." (SH Petitioner's Ex. 61). Dr. Estrada also wrote a note to Dr. Bonikowski stating, "To Dr. Bonikowski, regarding Richard Vasquez. Prescription, neuropsychological and electroencephalogram to rule out organicity. I agree with further tests." (SH Petitioner's Ex. 62). Dr. Estrada testified that neuropsychological testing can assist in determining the type and severity of brain damage. (SH 7:78). Despite trial counsels' knowledge of these recommendations from their retained experts, trial counsel failed to have Richard undergo the proscribed testing. (SH 3:45-48).

### d.    State Court Finding and Conclusions Are Objectively Unreasonable.

Viewed as a whole, trial counsel did almost nothing to investigate Richard's mental and learning disabilities. They retained an "absolutely" inexperienced investigator, Jan Davis, ostensibly to conduct witness interviews, but then they only utilized him for 8.5 hours, much of which was consumed in meetings with counsel and travel time. (SH 3:34; SH Petitioner's Ex. 13). They did not request any of Richard's medical records or school records. (SH 3:34-35). The only school record's they did receive were provided to them by the state. (SH 3:33-34). They failed to interview Richard's natural parents and most of Richard's family. (SH 3:35-38). To the extent they interviewed anyone, they did it hastily in the courtroom hallway during the trial. (SH 7:11, 13).

The only medical experts trial counsel retained were a psychiatrist, Dr. Estrada, and at Dr. Estrada's recommendation, a neurologist, Dr. Bonikowski. However, they did not provide either of them with sufficient background information on Richard's medical, educational, and social history to inform the experts' evaluation of Richard. (SH 7:66, 71, 79). Finally, after the

limited expert evaluation by Dr. Estrada and Dr. Bonikowski was conducted, trial counsel failed to see that the additional testing those experts recommended to rule out brain damage was performed on Richard. (SH 3:45-48).

In spite of these facts, at the conclusion of the state habeas evidentiary hearing the State proposed several findings related to trial counsels' investigation of Richard's cognitive and learning disabilities, including the suggestion that Richard's trial counsel was reasonable to rely upon psychiatrist Dr. Estrada, "as their expert to examine Vasquez's mental status, explore mitigating circumstances, and determine what psychological testing needed to be done." (Ex. A, No. 9). The state court adopted this conclusion. (*Id.*).

Effectively, the state court concluded that trial counsel did not need to conduct any independent investigation of mitigation evidence concerning Richard's mental status and was reasonable to hand their duty to investigate evidence of mitigation over to their retained expert psychologist. This conclusion defies Supreme Court and Fifth Circuit precedent and established standards of practice for capital defense practitioners. ABA Guideline 11.4.1 makes clear that "Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1, p 93 (1989) (emphasis added). Counsel is required to among other things present evidence of medical history, educational history, employment, family and social history, including physical, sexual or emotional abuse, neighborhood surroundings and peer influence, professional intervention (by medical personnel, social workers, law enforcement personnel, clergy or others) or lack thereof. *Id.* at 11.8.6. Moreover the Supreme Court criticized counsel who in light of the ABA's "well-defined norms . . . abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his

-27-

history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Trial counsel performance is subject to this very same critique. Because trial counsel failed to perform more than a rudimentary investigation of Richard's background to assist and inform Dr. Estrada's evaluation, the state court's conclusion is objectively unreasonable.

Furthermore, the state court's conclusion is also unreasonable in light of the facts established in the state habeas proceeding. It is apparent from the record of that proceeding that trial counsel retained Dr. Estrada in only a limited role to analyze Richard related to three distinct issues. The referral questions to Dr. Estrada were limited to the following: (1) whether Richard was capable to waive his Miranda rights, (2) whether Richard was competent to stand trial, and (3) whether Richard was insane at the time of the offense. (SH 7:94). Dr. Estrada stated that he was not trained to perform neuropsychological testing on Mr. Vasquez and that he was not asked to measure Mr. Vasquez's IQ. (SH 7:81-82). Dr. Estrada was simply not given the task of serving as trial counsel's general mitigation specialist and they were unreasonable to rely on him as such.

Trial counsel had no misconceptions about Dr. Estrada's limited role. Joseph Collina admitted that because of his experience with other death penalty cases, he was aware that psychiatrists typically do not perform neuropsychological testing and that neuropsychological tests are usually performed by a clinical psychologist. (SH 3:48). Nevertheless, defense counsel failed to retain a clinical psychologist to evaluate Mr. Vasquez for possible brain damage. (SH 2:249-50).

Based on the clear and convincing evidence presented during the state habeas proceeding the findings of fact and conclusions of law adopted by the Texas court of Criminal Appeals are objectively unreasonable and should be disregarded.

**e.    Trial Counsel's Failure to Investigate Richard's Family and Social History was Prejudicial to Richard.**

The appropriate testing and discovery, which was performed by Richard's habeas counsel with the help of a mitigation specialist and Dr. Ricardo Weinstein in preparation for the state habeas proceeding, revealed that Richard suffers from post traumatic stress disorder, attention deficit disorder, poly-substance dependence, fetal alcohol syndrome, brain dysfunction, learning disabilities, and a borderline IQ. *See* Exhibit B (*see also* Petitioner's Ex. 20). Dr. Weinstein testified that Richard's brain dysfunction affects the frontal lobes of Richard's brain causing problems with impulse control, problems with abstract reasoning, problems with the ability to plan and organize his behavior in a goal-directed manner. Consequently Richard has a tendency to act and behave before he thinks and, even when he does think, he has difficulty controlling his behavior. (SH 4:61). All of this evidence would have been admissible and would have informed the jury of important and compelling mitigating circumstances. Trial counsel's failure to present this evidence deprived Richard of his right to a reliable and individualized sentencing determination in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. Moreover, had all of the available mitigation evidence been presented to the jury, there is a reasonable probability that the jury's sentence would have been different.

## V.
## CLAIM TWO: INEFFECTIVE ASSISTANCE OF COUNSEL – FAILURE TO INVESTIGATE AND COUNTER THE STATE'S EVIDENCE OF SEXUAL ASSAULT

**A.    Argument Summary**

The judgment of the Texas Court of Criminal Appeals denying Richard's claim of ineffective assistance for failure to investigate and counter the State's evidence of sexual assault is based on an unreasonable determination of the facts in light of the evidence presented in the state habeas corpus proceeding. 28 U.S.C. § 2254(d)(2). Also, the state court's conclusion that

trial counsels' failure to investigate and counter the State's evidence of sexual assault was a reasoned strategy decision is itself objectively unreasonable.

Although Richard confessed that on March 5, 1998 he hit Miranda in the head with his hand causing her injury, he vehemently and consistently denied sexually assaulting Miranda or injecting her with drugs. (RR 37:118, 122-123, 140). The evidence presented at trial also shows that he did not intend to kill Miranda as evidenced by the fact that he called for emergency first responders to save Miranda's life and tried to resuscitate her the best he knew how by administering first aid and a crude method of CPR. (RR 34:59; 37:95-99, 102). During both the guilt and punishment phases of trial, this exculpatory and mitigating evidence was ultimately overshadowed by the State's repeated and unsubstantiated contention that Richard "brutally raped" Miranda and then cleaned her genitals to cover up the heinous act. (RR 38:15-16, 37-38, 45, 46, 51-52, 53). Although the State never indicted Richard for rape, prosecutors used circumstantial evidence of sexual assault to incite the passions of the jury against Richard and to suggest his motive and intent to kill Miranda.

Despite the fact that Richard's trial counsel was given notice before trial that the State might introduce evidence related to sexual assault, trial counsel inexplicably failed to investigate and discover this potential evidence, failed to object to its introduction, failed to scrutinize and test adversarially the evidence itself, and failed to present readily available alternate-theory evidence. Taken together, trial counsels' numerous failures are staggering. Those failures are summarized as follows:

- Failure to investigate the factual basis for the State's allegations of sexual assault, including failure to visit the Vasquez home, the scene of the alleged crime;

- Failure to discover, scrutinize and test the State's DNA evidence including the electronic files that contained the

data from the DNA Testing performed by Mr. Huy Nguyen;

- Failure to visit the crime lab where the DNA tests were performed or otherwise discover the processes and protocols used by the lab;

- Failure to investigate the audit reports of the crime lab to determine if the lab was properly accredited and following industry standards;

- Failure to object to the introduction of circumstantial evidence and expert testimony on the State's un-indicted theory of sexual assault;

- Failure to retain their own DNA expert to review and counter the conclusions of the State's forensic witnesses;

- Failure to investigate the DNA profiles for all of the individuals living in the household with Richard and Miranda to identify possible alternate sources of the State's DNA evidence;

- Failure to effectively cross-examine the State's witnesses or challenge the reliability of their methodology for diagnosing Miranda's injuries as the result of sexual assault;

- Failure to request a pretrial hearing under *State v. Kelly*, 824 S.W.2d 568 (Tex. Crim. App. 1992) to challenge the admissibility of the State's DNA evidence;

- Failure to call as a witness Dr. Henderson, the surgeon who examined Miranda before her death, who reported that injuries to Miranda's vaginal and anal area were the result of a straddle injury, and injury caused by falling with one's legs straddling an object such as a bicycle cross-bar;

- Failure to introduce in evidence the written narrative which contained Dr. Henderson's conclusion that the injuries to Miranda's vaginal and anal area were consistent with a straddle injury;

- Failure to call Dr. Randall Frost, a board certified pathologist, who was prepared to testify and who would

have corroborated Dr. Henderson's written or verbal opinion;

- Failure to investigate and present testimony from Richard's family who were aware of other possible causes of a straddle injury to Miranda;

- Failure to introduce photos of the stationary exercise bike on which Miranda often played and may have fallen;

- Failure to have Richard examined by a psychologist to show that Petitioner does not have a psychological profile consistent with sexual abuse behavior; and,
- Failure to introduce testimony of Richard's family describing his history of appropriate conduct with children.

The state court, in evaluating Richard's application for habeas corpus relief, ignored these failures, deemed them irrelevant, or attributed them to "reasonable trial strategy." *See* Ex. A.

However, the state court's findings and conclusions are objectively unreasonable. Evidence presented during the state habeas evidentiary hearing demonstrates that trial counsels' failures were significant. Specifically, the state habeas evidentiary hearing exposed the faulty techniques and analysis of the State's DNA expert, undermining the thin evidence the State used to link Richard to injuries found on Miranda's genitals. The State's DNA expert even admitted that there were serious flaws in the Corpus Christi crime lab's testing methodology and that his trial testimony misstated significant facts, calling into question forensic evidence the State used to argue Miranda was sexually assaulted by the Petitioner. *(See generally* SH 2:131-150; 6:158-162). Because trial counsel failed to discover this evidence and failed to retain a forensics expert to evaluate and counter it, trial counsels' failures cannot be attributed to informed trial strategy. Moreover, had defense counsel bothered to introduce evidence of which they were aware - - including photographs and testimony regarding the exercise equipment in the Vasquez home; Dr. Henderson's testimony and report; and the testimony of Dr. Frost - - they would have

provided an authoritative, reasonable, and compelling explanation for the injuries to Miranda's genitals that was not otherwise established at trial.

It is likely that, but for the unproven, untrue, but alas, uncontradicted evidence of sexual assault the State introduced in the guilt phase of the trial, the jury would not have found beyond a reasonable doubt every element of capital murder nor rendered a death verdict. Additionally, but for the failure of trial counsel to effectively defend Richard, including counsels' failure to competently challenge the un-indicted rape allegation and present readily available and compelling alternate-theory evidence, the jury likely would not have returned a verdict of death. In short, the jury that rendered the verdict of guilt to the indictment and the verdict of death was mislead by faulty and incomplete evidence rendering both verdicts unreliable and unworthy of confidence. The state habeas court's conclusion to the contrary was an objectively unreasonable application of *Strickland*, 446 U.S. 668 and "an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d)(1)-(2). For these reasons, Richard Vasquez asks that this Court issue a writ of habeas corpus ordering his release from confinement or a new trial.

## B.    Relevant Facts

Despite the fact that Richard was never indicted for sexual assault,[5] the State repeatedly argued that he brutally raped Miranda. The State summarized its theory of the case during closing argument of the guilt phase contending that while Richard was alone with Miranda he beat her senseless, removed her jumper, and violently raped her while holding her from behind, ripping her genitals. (RR 38:15 16, 37-38, 45, 46, 51 52, 53). Prosecutors repeated these same arguments during the punishment phase describing their theory in the most inflammatory and graphic terms. (RR 40:13-14). The State used blood evidence found inside Miranda's clothing,

---

[5] (CR 1:2-5).

-33-

evidence that was later refuted in the state habeas proceeding,[6] to connect Richard to the injuries to Miranda's genitals. The State argued that after sexually assaulting Miranda, Richard redressed her and attempted to hide the evidence of his crimes. (RR 37:119; 38:38, 44).

The evidence the State introduced in support of its theory of sexual assault included: 1) several cuts or abrasions on Miranda's vaginal/anal area; 2) bruising on Miranda's hips; and 3) blood found in Miranda's clothing, on a burgundy bath towel, and on several pieces of toilet tissue. The cause of the bruising to Miranda's hips was speculative and inconclusive at best, and the remaining evidence was discredited or refuted by additional evidence that trial counsel failed to investigate or introduce, but which was later introduced in the state habeas corpus evidentiary hearing.

### 1. *Cuts and Abrasions.*

In regard to the cuts and abrasions, Leann Box, a sexual assault nurse examiner, testified that Miranda had four tears or abrasions on her genitals, some of them oozing. (RR 35:176, 186-88). She also identified an oozing tear on the bottom (6 o'clock) portion of the anus. (RR 35:190). Ms. Box suggested the injuries would have occurred in the twelve-hour period prior to her 7:00 p.m. examination. (RR 35:188, 209). She testified that great force would have been required to cause these injuries. (RR 35:196). She also testified that the cuts would have bled a great deal. (RR 35:213). Trial counsel failed to object to this testimony and challenge Ms. Box's expertise and qualifications to offer such "expert" opinions. (*See generally* RR 35:175-200).

Even so, Ms. Box could not say whether a penis could have caused these injuries to Miranda. Her testimony on cross examination is as follows:

> Q.    Are you suggesting this was done with a penis with great
>        force?

---

[6] *See infra* 52.

> A.    I was not there, so I don't know what caused the injury, but something caused the injury.
>
> Q.    Something caused the injury?
>
> A.    Yes.
>
> Q:    And you don't have the foggiest idea what it was?
>
> A.    No, sir, I was not there.

(RR 35:204). Ms. Box testified further that Miranda's hymen was without trauma and that she could not tell whether Miranda's anus had been penetrated. (RR 35:196, 215).

Dr. James Lukefahr, a pediatrician who did not personally examine Miranda but reviewed her medical records, also testified on behalf of the State regarding the injuries to Miranda's perineal area. (RR 35:219, 221). He indicated the wounds were fresh, deep, and consistent with anal rape. (RR 35:224, 231, 236). However, he testified that there is no way of knowing whether the injuries were caused by a man's penis or by some other foreign object. (RR 35:236). He also agreed that the report of the examining physician, Dr. Henderson, stated that Miranda's hymen was intact and that there were no internal injuries to the vagina or within the anus. (RR 35:232).

Dr. Lloyd White, the Nueces County medical examiner who performed the autopsy on Miranda observed the injuries to Miranda's external genitalia and described them as abrasions and lacerations or tears of the membranes and mucosa. (RR 35:26-27). He stated that there was no way of knowing how the damage was caused, but he suggested that the injuries were typical of some kind of blunt trauma. Dr. White stated that Miranda's injuries could have been caused by someone hitting or kicking her. He also agreed it was possible that Miranda was poked with an object including a penis. (RR 35:39-40, 53).

## 2.    *Hip Bruises.*

Ms. Box and Dr. Lukefahr each testified that Miranda had bruises on her each of her hip bones. They hypothesized that the bruises were caused by someone holding Miranda's hips from behind while attempting to rape her. (RR 35:183, 197; 225-28). However, Ms. Box observed that Miranda had numerous bruises all over her body, which were in various stages of healing. (RR 35:180-85). Moreover, she admitted that the exact time period when the bruising was inflicted is unknown. (RR 35:184-85). Dr. White confirmed that Miranda had bruises of variable intensity and variable color on many parts of her body, and concluded that they were not all inflicted at the same time. (RR 35:27).

## 3.    *Blood Evidence.*

Finally, the State introduced in evidence several blood-stained items that were tested for DNA at the Department of Public Safety. crime lab in Corpus Christi. Unlike the previous two categories of evidence that were used to prove Miranda's injuries and to infer the occurrence of sexual assault, the State used the DNA evidence from the blood-stained items to overcome the problem of the absence of semen and to connect Richard to the injuries to Miranda's vaginal/anal area. The particular blood evidence found on items the State used to advance its sexual assault theory include blood found on the inside of Miranda's clothing, on a burgundy bath towel, and on discarded toilet tissue.

### a.    **Blood Inside Miranda's Clothing.**

Mr. Huy Nguyen, the State's forensic scientist and DNA expert from the Texas Department of Public Safety Crime Lab (TDPSCL) in Corpus Christi testified that he found blood stains on the front, the back, and inside of Miranda's jumper. (RR 35:147). He stated that he performed two different types of DNA tests on the blood stains he took from the clothing, a D.Q. Alpha test and a Short Tandem Repeat test ("STR test"). (*Id.*). He stated he performed the

-36-

STR test on the stains taken from the front and rear of the clothing; however, he testified he only performed the D.Q. Alpha test on the stain taken from the inside of Miranda's jumper. Based on this D.Q. Alpa test, Mr. Nguyen alleged that the blood he found inside Miranda's jumper "matched" Richard and contained a "definite" mixture of Miranda's and his blood type. Mr. Nguyen testified as follows:

> A.     . . . The stains on the inside was (sic) the D.Q. Alpha type that <u>matches</u> Vasquez, but a possibility of Lopez in there. . . . So here, I could tell that his type was in there, but also a little bit of hers; there was a little mixture. Here was a <u>definite mixture</u> of both Vasquez's type and Lopez's type.

> Q.     When you say "here'" were you talking about the inside of the jumper?

> A.     Oh, yes, excuse me, the inside of the jumper.

(RR 35:148) (emphasis added).

Richard, who testified in his own defense during the guilt phase of the trial, had no explanation for why this blood was found inside the jumper. (RR 37:119). Richard testified that when he tried to open Miranda's mouth to keep her from swallowing her tongue, Miranda bit him causing him to bleed from his finger. (RR 37:95-99, 102). He said that Miranda was bleeding from her mouth and nose and some of the blood got on his finger when he tried to open her mouth. He said he later cleaned the blood off his finger on a towel from his room and on some toilet paper. (RR 37:114, 132). Investigating police officers noticed that Richard was bleeding from his thumb and forefinger. (RR 34:21, 34). They also observed blood on Miranda's nose and mouth. (RR 34:19).

As the following transcript excerpt illustrates, the State argued that the presence of Richard's blood inside the jumper indicated that Richard had removed Miranda's clothing and then dressed her again:

Q.     When did you take her clothes off?

A.     Whose clothes off?

Q.     Miranda's.

A.     I never took her clothes off.

Q.     Well, there was blood on the inside of her jumper, which makes it look like she was dressed back up, doesn't it?

A.     I never dressed her up.

Q.     How did blood get on the inside of her jumper?

A.     Like I said, she bit my thumb, and I had blood on my finger.

Q.     How did her blood get on the inside of her jumper?

A.     I don't know about that, ma'am.

(RR 37:119). Without a DNA expert to counter the State's evidence and point out that contrary to the testimony of Mr. Nguyen the blood inside Miranda's clothing could not be attributed to Richard,[7] Richard was unable to offer any alternative explanation to the State's sexual assault theory.

### b.     Blood on the Burgundy Bath Towel.

Mr. Nguyen also testified he performed DNA testing on a burgundy bath towel recovered from the hall bathroom. Based on his testing Mr. Nguyen concluded the towel contained a mixture of Richard's and Miranda's blood. (RR 35:137-38).

> When I did my initial D.N.A. analysis on the burgundy bath towel, I got none on the D.Q. Alpha. And that towel, I just kept it aside and later on I went back and did STR on the same stain and the profile I got was Vasquez and a little bit of Lopez.

(RR 35:138). The prosecutor suggested that the presence of both Richard's and Miranda's blood on the towel was evidence that Vasquez cleaned up Miranda's bloody genitals after the sexual

---

[7] *See infra* 52.

assault. (RR 37:132-33). As explained more fully below, upon closer examination at the state

habeas evidentiary hearing, it became apparent that Mr. Nguyen's own data shows that Miranda's

DNA is excluded from the towel because her profile does not match the profile taken from the

towel stain on four of the test markers. (SH 5:58-63).

### c.    Blood on the Toilet Tissue.

Finally, Mr. Nguyen testified that he found blood on 16 pieces of toilet tissue. He

testified that his D.Q. Alpha testing on the blood stains revealed Richard's DNA and possibly

some of Miranda's. (RR 35:150). He testified that he performed STR. testing on the same stain

and the only type that came up was Miranda's blood. (RR 35:150-51). Mr. Nguyen explained

the apparent discrepancy in the tests by stating that STR. is the more sensitive of the two tests so

when there is a large amount of one type of DNA "it will mask something else that might be

there." (RR 35:151). Thus, even though the STR. test did not show Richard's DNA, Mr.

Nguyen concluded based on the D.Q. Alpha test result that the discarded toilet tissue contained

mostly Miranda's blood and "a little bit of his." (*Id.*).

Again, the State used this evidence to advance its theory that Richard cleaned Miranda's

genitals after he sexually assaulted her. (RR 37:132). Again, this uncontroverted evidence from

the trial was later discredited by Dr. Libby in the state habeas corpus proceeding.[8] Trial counsel

did not request a pretrial hearing under *Kelly*, 824 S.W.2d at 573-574 to challenge the reliability

or admissibility of the State's DNA evidence and failed to retain a DNA expert to analyze and

refute it.[9]

---

[8] *See infra* 54.

[9]    [T]he trial court's first task is to determine whether the testimony is
sufficiently reliable and relevant to help the jury in reaching
accurate results. Unreliable...scientific evidence simply will not
assist the [jury] to understand the evidence or accurately determine

**C.    Argument and Authorities**

Much like the evidence Richard presented in state court regarding trial counsels' deficient performance during the penalty phase of the trial, clear and convincing evidence from the state court proceeding also demonstrates that trial counsels' representation of Richard during the guilt phase of the trial "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88.

---

a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts ...

As a matter of common sense, evidence derived from a scientific theory, to be considered reliable, must satisfy three criteria in any particular case:

(a) the underlying scientific theory must be valid;

(b) the technique applying the theory must be valid; and

(c) the technique must have been properly applied on the occasion in question.

Factors that could affect a trial court's determination of reliability include, *but are not limited to,* the following:

(1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained;

(2) the qualification of the expert(s) testifying;

(3) the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4) the potential rate of error of the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7) the experience and skill of the person(s) who applied the technique on the occasion in question.

...

To summarize, under Rule 702 the proponent of novel scientific evidence must prove to the trial court, by clear and convincing evidence and outside the presence of the jury, that the proffered evidence is relevant. If the trial court is so persuaded, then the evidence should be admitted for the jury's consideration, unless the trial court determines that the probative value of the evidence is outweighed by some factor identified in Rule 403.

*Kelly*, 824 S.W.2d at 573-574

1.    *Failure to Investigate the State's Evidence of Sexual Assault.*

Trial counsels' failures were legion.    Chief among them were counsels' failures to investigate the State's case and possible exculpatory and mitigating evidence.    Counsel did not perform even the most basic investigation of the State's evidence.    For example, trial counsel did not go inside the Vasquez home where the alleged crime took place to determine whether there might be anything in the home that would cast doubt on the State's theory of the case.    (SH 3:24). This failure ultimately proved prejudicial to Richard because defense counsel was unable to observe and photograph exercise equipment in the home that might have been the cause of a straddle injury to Miranda's genitals.[10]

Trial counsel also failed to discover, scrutinize, and test the State's DNA evidence including the electronic Genescan files that contained the data from the DNA testing performed by Mr. Nguyen.    (SH 2:25-26; 3:49).    Trial counsel was obviously aware that the State was likely to rely on this evidence, at least in part, to make its case for murder and also to support its allegation of sexual assault; however, trial counsel made absolutely no effort to discover the full extent of the State's evidence.[11]    Trial counsel never interviewed Mr. Nguyen or asked him to

---

[10] *See infra* 59.

[11] Richard's trial counsel testified during the state habeas proceeding as follows:

    Q:    Did you request any pretrial discovery regarding DNA?
    A:    No.  I was satisfied with the results.
    Q:    That's fine.  Did you request any pretrial discovery?
    A:    No.  We got – yes, we did request discovery.  But are you
          talking about additional discovery? I mean, we had –
    Q:    Additional from the couple of page report that you received
          from Mr. Nguyen.
    A.    We were satisfied with the couple of page report because
          we didn't want to stir up a hornets' nest. Sometimes if you
          ask for too much, you might get something you don't like.

(SH 3:49).

produce a copy of his file, which contained his notes on what kinds of DNA profiles were obtained from the samples he tested. (SH 2:25-26). Trial counsel did not visit the crime lab where the DNA tests were performed to find out the processes and protocols used by the lab. Trial counsel made no effort to investigate the audit reports or inspections of the crime lab to determine if the lab was properly accredited and following industry standards. (SH 2:26-27). They also did not ask to review validation studies or quality control documents from the lab. (SH 2:26).

The TDPSCL is a state government forensic laboratory (SH 9: State's Ex 8; *see* also SH 5: 149-50). Therefore, it must comply with government guidelines which include validation of new systems before using the systems in casework. (SH 2:11-13). Both D.Q. Alpha testing and STR testing using Perkin Elmer kits were used in this case. (RR 35:125-26, 132). These two types of forensic DNA tests utilize Polymerase Chain Reaction procedures (PCR). (RR 35:127-28, 132). Trial counsel received two Supplemental Reports from the State dated December 21, 1998 and May 21, 1999. (SH Petitioner's Exs. 58 & 59). These reports written by Mr. Nguyen, give conclusions for two types of testing: D.Q. Alpha testing using the Perkin Elmer kit, and STR testing using the Perkin Elmer Profiler Plus Kit (*Id.*). While the December 21, 1998 report provides profiles for the D.Q. Alpha tests performed, it does not list the profiles for the STR tests performed (SH Petitioner's Ex. 58). The report calculates a statistical frequency for how common or rare the DNA profiles of Richard and Miranda Lopez are as 1 in 5.7 billion. (*Id.*). No information is provided as to how these statistics were generated. (*Id.*).

Discovery of the complete case file and supporting documents was necessary for the defense to evaluate the reliability of the testing. Evaluation of the testing includes investigation of the following:

1. whether the system used was validated in general and followed in the instant case;
2. whether the analyst has a history of committing errors either in casework or in proficiency testing;
3. whether the laboratory was accredited;
4. whether the laboratory followed scientifically accepted protocols;
5. whether the lab recorded the chain of custody of evidence samples and reference samples;
6. whether there was mislabeling of critical samples, mishandling of critical samples, and/or contamination of critical samples;
7. whether proper controls (negative controls, positive controls, substance controls) were utilized;
8. whether quality control procedures are adequate for use of laboratory equipment and chemicals;
9. whether the analyst interpreted the data correctly;
10. the types of cells in the evidence samples (*i.e.*, blood, skin, etc.);
11. how the statistics were calculated; and
12. what alleles were declared for each sample.

(SH 5:27-32). Without this discovery, trial counsel could not possibly have known whether chain of custody was broken by the TDPSCL, whether the TDPSCL was accredited for forensic DNA testing, whether samples were switched or mislabeled, whether evidence was contaminated, whether Mr. Nguyen had made errors in other casework or in his proficiency tests, whether controls were used, whether the equipment and chemicals were working correctly, what procedures were followed, and if the new STR Profiler Plus system had been validated both externally by Perkin Elmer and internally by the TDPSCL. In short, trial counsel could not effectively scrutinize the State's forensic evidence without this discovery.

Proper discovery would have allowed trial counsel to identify the numerous flaws in the Corpus Christi crime lab's protocols and practices and call into question the testing and conclusions of the State's forensic scientists. Discovery obtained during the course of the state habeas proceeding included an August 30, 1996 inspection report from the American Society of

Crime Laboratory Directors/Laboratory Accreditation Board ("ASCLD/LAB"), the board

charged with inspecting and accrediting forensic laboratories. (SH 2:131). That report

concludes that the Corpus Christi crime lab should not be accredited in the area of DNA and

should not be re-accredited in the areas of controlled substances/blood alcohol, trace evidence,

and serology. (SH 2:137). The practices identified by the ASCLS/LAB to be substandard

include the following:

1.    The lab's failure to specify appropriate controls and standards in the lab's procedures and failure to use such controls and standards to insure the validity of examination results. The comment to this finding states that "[p]ositive and negative regent controls for presumptive blood and semen tests are not documented in the case file prior to use." (SH 2:131-32).

2.    The lab's failure to routinely check the reliability of its regents. Mr. Nguyen conceded during the state habeas hearing that when a reagent used in a presumptive test is not reliable, the information from the test is not scientifically sound. Mr. Ngueyen also admitted that regents were used to perform presumptive tests of the evidence in this case. (SH 2:132).

3.    The lab's failure to properly calibrate its instruments and equipment. Specifically, the thermalcycler was found beyond its calibration due date, two adjustable volume pipettes used for analysis of DNA were found to be out of calibration but still in use, the temperature verification system for calibrating the thermalcycler was beyond its calibration due date, and there was no program in place for the annual maintenance of the lab's microscopes. Mr. Nguyen admitted that the thermalcycler was used to perform the testing in this case. (SH 2:132-33).

4.    The examiner's failure to generate and the lab's failure to maintain in a case record all the notes, worksheets, photographs, spectra, printouts, charts, and other data and records used by examiners to support their conclusions. (SH 2:134).

-44-

5.  The lab's failure to review the examiner's reports to insure that their conclusions are reasonable and within the constraints of scientific knowledge. (*Id.*).

6.  The lab's failure to independently submit for evaluation individual DNA examiner's proficiency test results to an approved external test provider rather than pooling all of the examiners' results together for submission. (SH 2:135).

7.  The lab's failure to control and limit access to the operational area of the laboratory. Inspectors were able to gain access to the operational area of the lab without detection by opening an unmonitored, unalarmed half-door located near the evidence intake area. They also found that the evidence intake window was not lockable and that there was no monitoring device located near that work space to identify unauthorized intrusion into the lab. Mr. Nguyen admitted that one of the reasons to control and limit access to the operational area of the lab is to prevent evidence contamination. (SH 2:136).

8.  The lab's failure to install an intrusion alarm or security personnel to secure the evidence in the lab during the hours that the lab is vacant. (*Id.*).

Mr. Nguyen admitted that many of these problems identified by the ASCLD/LAB were violations of the quality assurance standards for forensic DNA testing laboratories promulgated by the DNA Advisory Board before his testing, reporting and testimony in this case. (SH 2:141-42, 144). Mr. Nguyen also admitted during the state habeas hearing that at the time of his DNA testing in this case, the Corpus Christi lab had no definitive criteria or protocols in place for when an examiner should call something a DNA match or an exclusion. (SH 6:150).

Post-trial discovery also uncovered letters from an inspection team from the Harris County Medical Examiner's Office which criticized the Corpus Christi lab for storing evidence in plastic bags at room temperature and failing to seal all evidence for storage. (SH 2:138-39). The Harris County inspectors observed:

> Sexual assault kits were sealed with only a pair of tape strips on opposite sides of the rectangular box while the other two sides of

the box were not sealed. One could easily add or remove items from this box without disturbing the evidence tape. The sealing of the evidence was matter of concern in view of the large number of personnel (drug section) other than serology/DNA analysts who have access to this storage area.

(SH 2:139; *see also* SH Petitioner's Ex. 6). Inspectors also noted that the amount of space for the analysis of Serology and DNA evidence was limited and recommended that the evidence screening table be moved to a location away from the main entrance door to avoid traffic near that screening area. (*Id.*). These problems were communicated to the manager of the Corpus Christi lab on or about July 16, 1998, within months of the March 5, 1998 date evidence was first collected in this case. (SH 2:140).

Discovery of the FBI's subsequent inspection of the Corpus Christi lab demonstrates that as late as August 29, 2001 the lab still had not corrected many of the same substandard practices identified by the ASCLS/LAB and the Harris County inspectors. (SH 2:146). The FBI's quality assurance audit determined that the Corpus Christi laboratory failed to follow documented procedures that minimize loss, contamination, and/or deleterious change of evidence; failed to label reagents with the identity of the reagent, the date of preparation or expiration, and the name of the individual preparing the regent; failed to identify and evaluate the reagents critical to the analysis process prior to use in casework; and failed to verify that all control results are within established tolerance ranges. (SH 2:145).

This substantial evidence of substandard practices at the Corpus Christi crime lab, if discovered and presented by trial counsel, would likely have undermined the jury's confidence in the forensic evidence against Mr. Vasquez generally. It also is likely to have specifically raised a reasonable doubt in the mind of the jurors as to the validity of the State's DNA evidence from the blood samples, the hair sample evidence, and the other evidence analyzed by Huy Nguyen.

Counsel's failure to perform this most basic discovery falls well below the standard of reasonable and effective representation and prejudiced Mr. Vasquez's defense.

## 2.    *Failure to Object to the State's Un-Indicted Allegation of Sexual Assault.*

Even though none of the State's allegations of sexual assault were made in the indictments, Richard's trial counsels' failure to timely object to these allegations and the evidence the State introduced in support of them also constitutes ineffective assistance of counsel.[12] Defense counsels' failure to object to this evidence is particularly disturbing in light of the fact that the State gave defense counsel advance notice of the possibility that sexual assault evidence might be introduced at trial.    On March 3, 1999, the State filed its Notice of Possible "Extraneous" Offenses Which May Or May Not Be Offered At Trial.  (CR II:659).  That Notice included the following allegation:

> (18) **AGGRAVATED SEXUAL ASSAULT OF A CHILD**: On or about March 5, 1998, in Nueces County, Texas, RICHARD VASQUEZ did then and there intentionally or knowingly cause his sexual organ, or an unknown object to contact or penetrate the sexual organ of Miranda Lopez, a child then under the age of fourteen.

(*Id.*).  Because the trial on the merits did not begin until more than three months after this notice was filed by the State on June 14, 1999, trial counsel had ample opportunity to investigate and prepare for the State's potential allegations regarding sexual assault.    Consequently, trial counsels' failure to prepare for and object to this evidence fell below the objective standard of reasonableness.

---

[12] Trial counsel did file a Motion in Limine on May 17, 1999 seeking to exclude evidence of "Other Offenses."  (CR II:690).  However, when the State presented its witnesses discussing the unindicted allegations of sexual assault, counsel failed to timely object.  (*See e.g.*, RR 35:175-200, 218-231).

### 3.    *Failure to Challenge the Reliability of the State's Experts' Theories and Testing Methodologies.*

A significant setback for the State's sexual assault theory at trial was the fact that vaginal and rectal swabs performed on Miranda confirm that there was no semen in or on Miranda's body. (RR 35:163). No semen was detected on Miranda's underpants either. (*Id.*). As the above-quoted argument illustrates, to account for this problem, the State speculated that, before calling 911, Richard tried to clean Miranda's bloody vaginal/anal area with rubbing alcohol, towels, and toilet tissue. (RR 35:213-214; 38:38, 53). Prosecutors suggested that because semen is water soluble, Richard may have successfully washed his semen off Miranda, leaving no trace anywhere. (RR 38:51). Mr. Nguyen testified during the guilt phase of the trial that if there had been semen on the towels and bedspread recovered from the scene and those items were subsequently washed with water, "you won't be able to detect it after that." (RR 35:141).

Trial counsel failed to object to this testimony or question the basis for Mr. Nguyen's "semen cleaning" theory. Trial counsel never asked Mr. Nguyen to explain his expertise in this particular area of forensics, never asked Mr. Nguyen to produce a single peer review or other scientific study that might corroborate his theory, and failed to ask the court for a *Kelly* hearing to scrutinize the reliability of Mr. Nguyen's scientific methodology, if indeed he had one.

Mr. Nguyen's theory was ultimately called into serious question after trial by Dr. Randall Libby, the DNA expert who was presented by Richard's state habeas counsel at the state habeas corpus evidentiary hearing. Dr. Libby testified that if there had been sexual penetration of the anus as the State suggested, he would expect to find some DNA (from skin cells) on the rectal swab. However, Richard's DNA was completely excluded from the swab of Miranda's anus. (SH 5:82-84). Dr. Libby also contradicted the suggestion that evidence of semen can be easily eradicated by merely washing it with water. Dr. Libby testified that even if clothing or bedding

-48-

containing semen is washed in a washing machine, its presence can still be detected by DNA tests. (SH 5:82). Nevertheless, because Richard's trial counsel did not consider it necessary to object to this evidence or present a single expert witness during the guilt phase of the trial, the State's sexual assault theory, including Mr. Nguyen's testimony, was essentially uncontroverted by the defense.

### 4.    *Failure to Competently Rebut the State's Sexual Assault Evidence.*

During the guilt/innocence phase of the trial, defense counsel did not call a forensics expert, or any other expert for that matter, to counter the evidence the State alleged proved sexual assault and which linked Richard to that crime. Pretrial motions and orders in the record reveal that trial counsel requested and received funding from the court to hire a forensic pathologist, however, no such expert was retained by defense counsel. (*See* CR II: 560, 568, 671). Mr. Collina, one of Richard's three trial attorneys, stated in response to questioning during the state habeas hearing that it was his opinion that the trial judge "would have approved any expert we asked for if we needed it, but it wasn't necessary. In our professional opinion, we didn't need any extra experts." (SH 3:113-14).

### a.    **Failure to Call a Forensics Expert.**[13]

Pursuant to a court order in the state habeas corpus proceeding, Mr. Collina also submitted his own affidavit testimony in which he explained his decision not to call an independent DNA expert as follows:

---

[13] Instead of hiring a forensic investigator to evaluate and defend the State's sexual assault allegations, trial counsel relied on Jan Davis, the semi-retired former probation officer, mentioned above, to do witness interviews. (SH 3:21). Mr. Davis was not asked to perform any tasks to establish that Miranda's injuries may have been caused by a straddle injury. (SH 3:24). Mr. Davis never went inside the Vasquez home. (*Id.*). He never visited the Corpus Christi crime lab or performed any other functions of a forensics investigator. (*See* SH Petitioner's Ex. 13).

-49-

> An independent DNA expert could not, and would not, have helped us one iota.

> There was no DNA evidence that Richard Vasquez had penetrated the child sexually. There was DNA evidence that the child's blood, and the defendant's blood, from a cut on his finger, had been found in the home. However, this was consistent with the defendant's testimony and confessions -- where he stated that the child fell and that she bit his finger when he was trying to administer first aid. The only evidence of sexual penetration was circumstantial, to wit: the unexplained, tear in her vaginal area.

(*See* State's Answer to Post-Conviction 11.071 Application for Writ of Habeas Corpus, Appendix #1, Affidavit of Joseph v. Collina ¶ 14). However, because trial counsel failed to do the necessary investigation of the State's evidence and failed to retain a forensics expert to help identify and explain the potential flaws in the State's evidence, Mr. Collina's explanation is uninformed and unpersuasive.

As explained already, a forensics expert could have refuted the State's "semen cleaning" theory and explained the significance of the fact that the State did not find any of Richard's DNA in or on Miranda's genitals. A forensics expert would also have been able to investigate the DNA profiles for all of the individuals living in the household with Richard and Miranda to identify possible alternate sources of the DNA evidence the State used to argue sexual assault -- evidence that Richard's testimony and confessions could not explain, including the blood inside Miranda's clothing and the mixture of Miranda's and Richard's blood on the burgundy towel and on the toilet paper. The State failed to inform its DNA expert of all the individuals living in the home where the evidence was recovered and never obtained reference samples from the other individuals living in the home. Mr. Nguyen admitted during the state habeas corpus hearing that he had no idea Miranda's half-sister Megan, Richard's sister Brenda, and his aunt and uncle lived in the home. (SH 2:30). He also admitted that he did not obtain reference samples from those individuals. (SH 2:39).

This failure is a significant oversight on the part of trial counsel and the State because the other individuals in the home were close relatives of both Richard and Miranda and likely had similar DNA profiles, creating the opportunity for misleading test results. (SH: 2:31-36).[14] At the state habeas hearing, Mr. Nguyen testified that it is likely in a family setting where many people touch objects and share towels, that epithelial cells from multiple individuals could slough off and be deposited on those objects, causing a mixture of DNA. (SH 2:37-38). He also admitted that it is possible that close relatives will share alleles at certain loci along a DNA strand, and it will be impossible to make a positive identification of who contributed certain DNA without taking reference DNA samples from all of the individuals in the household. (SH 2:36-37; 42). At a minimum, trial counsel should have pointed out that the State's failure to obtain these additional DNA profiles renders the conclusions of the State's DNA expert scientifically unreliable and casts serious doubt on the State's theory of sexual assault. A forensics expert would have assisted trial counsel in identifying this significant failure as Dr. Libby was able to do during the state habeas hearing. (*See* SH 6:36-37, 42).

Retaining a forensics expert would also have helped counsel identify and obtain the required pretrial discovery to effectively contest the State's evidence. Had trial counsel retained a DNA expert, the DNA scientist would have advised trial counsel as to what materials were needed to evaluate the reliability of the TDPSCL testing in this case. The DNA expert could have assisted in the formulation of a discovery request for the DNA casefile and the other necessary supporting documents. Once that essential discovery was obtained, a DNA expert could have identified testing flaws and possible sources of contamination as evidenced in the

---

[14] Richard's aunt is his mother's sister and his uncle is his father's brother. (SH 2:33). Therefore, everyone in the household shared some common DNA with either Richard or Miranda.

lab's records. Dr. Libby did exactly that during the state habeas proceeding pointing out several errors in testing protocol that could have caused evidence contamination in this case. (*See, e.g.,* SH 6:37-50). Based on his review of the lab reports, Dr. Libby concluded that Mr. Nguyen's conclusions are generally not reliable or accurate and are outside of generally accepted guidelines in the scientific community. (SH 6:55).

Additionally, as Dr. Libby demonstrated in the state habeas evidentiary hearing, a forensics expert would have been able to specifically refute the State's conclusions related to the blood found inside Miranda's clothing, on the burgundy towel, and on the toilet paper. At trial Mr. Nguyen testified on behalf of the State that the stains on the inside of Miranda's jumper were a "definite mixture of both Vasquez's type and Lopez's type." (RR 35:148). What the State did not disclose and what trial counsel did not know because they did not do the required discovery, is that Mr. Nguyen's notes show that the stain is contaminated with additional DNA inside the jumper that does not match either Mr. Vasquez or Miranda. Dr. Libby testified that the blood inside Miranda's jumper was actually a mixture of several blood types and the actual sources of the blood could not be identified without looking at the DNA profile for all of the individuals in the household. (SH 5:75-77). As noted already, none of the DNA profiles of the other household members were investigated by trial counsel or tested by the State. Because the blood evidence found inside Miranda's clothing is contaminated, Mr. Nguyen's conclusion that Richard's blood was inside Miranda's clothing is unreliable, and thus cannot support the State's sexual assault theory.

Mr. Nguyen's conclusions related to the blood found on the burgundy bath towel would also have been refuted by proper discovery and adversarial scrutiny by a defense expert. Mr. Nguyen testified that the D.Q. Alpha testing revealed nothing. But, when he went back and did

additional STR testing on the same stain, "the profile [he] got was Vasquez and a little bit of Lopez." (RR 35:138). The actual data from Mr. Nguyen's testing reveal a different story. The electronic Genescan data, which trial counsel failed to obtain from the crime lab in pretrial discovery, show that Miranda's DNA is excluded from the towel because her profile does not match the profile taken from the towel stain on four of the test markers. (SH 5:58-63). Dr. Libby interpreted this data to mean that Miranda's DNA is not on the bath towel. (SH 5:63). Obviously, this evidence would have been important to corroborate Richard's testimony that he used the towel to clean the blood from his fingers and to refute the State's suggestion that he used the towel to clean Miranda's genitals. Trial counsel's failure to discover this evidence and failure to retain a forensic expert to interpret and present it to the jury is inexcusable and cannot be attributed to strategic decision making.

The remaining piece of evidence the State used to connect Richard to the injuries to Miranda's genitals, blood found on the toilet tissue, was also called into question by Dr. Libby. Mr. Nguyen testified that his D.Q. Alpha testing on the toilet tissue revealed Richard's DNA and possibly some of Miranda's DNA. (RR 35:150). Although Mr. Nguyen's subsequent STR test revealed only Miranda's DNA on the toilet tissue, Mr. Nguyen continued to assert that Mr. Vasquez's DNA was likely "masked" by the large amount of Miranda's DNA. (RR 35:150-51). Mr. Nguyen concluded that the discarded toilet tissue contained mostly Miranda's blood and "a little bit of his." (RR 35:151). This testimony was not contradicted at trial.

However, under persistent cross examination at the state habeas proceeding, Mr. Nguyen admitted that none of Richard's alleles appear on any of the nine sites examined by the STR test. (SH 2:85-87). Dr. Libby testified that in light of this evidence, Mr. Nguyen's opinion that Richard's DNA was on the tissue was *not* scientifically acceptable. (SH 5:57). Dr. Libby stated

that only scientific conclusion to be reached from the results of the DNA testing is that Richard's DNA was not on the toilet tissue. (SH 5:56-58). Had this information been elicited at trial it obviously would have cast additional doubt on the reliability of Mr. Nguyen's opinions and conclusions generally. The fact that Richard's DNA was not found on the toilet tissue would also have blown a huge hole in the State's theory that Richard used the toilet tissue to wipe his semen off Miranda. Because trial counsel failed to retain a forensics expert, Mr. Nguyen's faulty conclusions went unchallenged.

### b. Failure to Call Expert on Sexual Assault.

Mr. Collina admitted during the state habeas corpus proceeding that he had evidence that Dr. Bruce Henderson, the surgeon who actually treated Miranda before she died, specifically stated that he did not believe Miranda's injuries resulted from sexual abuse and that the injuries were in fact the result of a straddle injury, (SH 3:17-18). Despite his knowledge of this evidence, Mr. Collina stated he never even met Dr. Henderson and did not attempt to interview him. (SH 3:18-19). Defense counsel never called Dr. Henderson to testify as a witness and the evidence of Dr. Henderson's opinion, which Mr. Collina suggested at trial was contained in Dr. Henderson's hand-written report, was never introduced into evidence at trial. (SH 3:18; *see also* RR 35:54-55). At the state habeas evidentiary hearing, Mr. Collina conceded that what he referred to at trial as Dr. Henderson's "handwritten report" was actually the Log of Contact Narratives from the Texas Department of Protective and Regulatory Services case file on Brenda Lopez. (SH 3:31-32) That log contained the following report:

> Dr. Henderson stated Miranda had severe lacerations which did need to be repaired to her anus but that he was not confirming sexual abuse. Dr. Henderson stated the lacerations could have occurred by a severe punch to Miranda causing her to fall on something straddling it causing the same injuries. Dr. Henderson ended by saying there was no internal damage to Miranda. He called her injury a "straddle injury."

(SH RR 8: tab 14). Obviously, if trial counsel had done its duty to follow up on this evidence, of which counsel was aware, and at least interviewed Dr. Henderson to find out if he would repeat these same opinions at trial, Richard's alternate straddle injury theory and in turn his overall defense of the sexual assault would have been significantly strengthened. Even if trial counsel had done nothing more than introduce in evidence the Log of Contact Narratives during the guilt phase of the trial, Mr. Vasquez's defense would have been appreciably advanced.

Defense counsel did meet with Dr. Randall Frost, the assistant medical examiner in San Antonio, Bexar County. (SH 3:17). Dr. Frost was prepared to testify that Miranda's injuries could have been caused by a straddle injury; however, trial counsel never called Dr. Frost as a witness. (*Id.*).

Mr. Collina attempted to justify his failure to call Dr. Frost by saying that Dr. Frost's testimony was unnecessary because it would have been redundant of testimony from the State's medical examiner, Dr. White. (*Id.*). However, as discussed more fully in the next section, the trial court record demonstrates that Dr. White never expressed any of his own opinions regarding the straddle injury theory. Instead, Dr. White merely confirmed that he remembered seeing Dr. Henderson's Statement calling the injuries a straddle injury. (RR 35:39-55). Because Dr. White did not himself endorse the straddle injury theory as a plausible explanation for Miranda's injuries, Dr. Frost's opinion would not have been redundant of Dr. White's testimony. To the contrary, Dr. Frost would have been the only expert witness at trial offering an opinion that Miranda's injuries might have been the result of a straddle injury. Furthermore, in the face of opinions from Ms. Box and Dr. Lukefahr, who both expressly rejected the straddle injury

theory,[15] even redundant testimony from a single defense expert would have significantly bolstered the argument.

### c.   Ineffective Cross Examination.

Instead of calling any of their own expert witnesses during the guilt/innocence phase of the trial, trial counsel attempted to rely on cross examination of the State's witnesses to advance the defense theory that the injuries to Miranda's genitals were straddle injuries. As noted above, both Ms. Box and Dr. Lukefahr rejected the suggestion and Dr. White's testimony was inconclusive, suggesting that the injuries might have been caused by a number of things including a man's penis. (RR 35:39-40, 53,198, 225). Dr. White was never asked to offer his own opinion as to whether the injuries might have been the result of a straddle-type fall. Instead, he was asked if he recalled seeing a handwritten report of Dr. Henderson, in which *Dr. Henderson* stated that the injuries were consistent with a straddle injury.

> Q.   Okay. Oh, do you remember when I came to your office on the 28th of April about 2:00 in the afternoon?
>
> A.   Yes.
>
> Q.   We were sitting at the table therein the conference room. Do you remember looking at a handwritten report of Dr. Henderson at that time?
>
> A.   Yes.
>
> Q.   Can you find that report?
>
> A.   We probably – was this his operative report or admissions?
>
> Q.   Well, I didn't have it. I had the benefit of yours, but I remember you and I looking at it. And do you recall it mentioning a straddle injury?
>
> A.   Yes, I do, yes.

---

[15] (RR 35:198, 225).

> Q.    Dr. Henderson felt these injuries were consistent with a straddle injury?
>
> A.    Yes, I do recall that statement in the --
>
> Q.    That's okay. If you recall it, then we don't need to look.

(RR 35:54-55).

Obviously, the introduction of the actual narrative of Dr. Henderson would be far more credible and persuasive to the jury than Dr. White's vague recollection of having seen the "report" sometime in the past. Contrary to the suggestion of counsel, the jury did "need to look" to see the full context of Dr. Henderson's opinion to fully assess its credibility. It is also probable that the manner in which the document was discussed but not shown to the jury created some doubt in the mind of the jurors as to whether Dr. Henderson did in fact discuss a straddle injury, whether Dr. Henderson's statement was definitive or merely a preliminary opinion, whether the report contained other damaging information that would make the defendant not want to produce it, etc. Because, by trial counsels' own admission, they never obtained a copy of Dr. Henderson's narrative, the defense was unable to present to the jury the best evidence of the document's existence, the document itself.

Additionally, if as trial counsel said they did,[16] they knew that Dr. White was willing to testify that Miranda's injuries could have been caused by a straddle injury, they should have asked him to offer that opinion. Their failure to ask Dr. White for his own opinion on this crucial defense theory, particularly when they failed to present any other expert who shared that opinion, was itself ineffective assistance of counsel.

---

[16] Mr. Collina testified that he spoke with Dr. White before the trial and that he was aware of Dr. White's opinion. (SH 3:16-17) ("He said it could have been a straddle injury or it could have been sexual penetration.").

#### d.    Failure to Present Available Alternate-Theory Evidence.

Richard's trial counsel called a grand total of four witnesses, including Richard's uncle and Richard himself, to make Richard's case during the guilt/innocence portion of the trial.[17] *See generally* (RR 37). However, none of the witnesses were asked to explain potential causes for the injuries to Miranda's genitals or to introduce alternate-theory evidence that was known to trial counsel. Mr. Collina admitted in his affidavit submitted in the state habeas corpus proceeding that defense counsel failed to introduce evidence that would have provided plausible support for Richard's straddle injury theory.

> When Bujanos, one of defendant's attorneys, had the defendant's uncle on the stand, he should have introduced the several photos of a stationary bike that was located in or near the family home. I had, prior to trial, asked the uncle to take these photos. The child was known to have ridden the bike without permission. The uncle would not have been able to testify that he had seen the child fall; but, the photos and the uncle's testimony would have provided some plausible explanation – as to how the child victim had suffered her vaginal injury.

(State's Answer to Post-Conviction 11.071 Application for Writ of Habeas Corpus, Appendix #1, Affidavit of Joseph v. Collina ¶ 16). Richard's uncle, Juan Vasquez, also submitted an affidavit in the state habeas proceeding further describing the information he would have presented if defense counsel had given him the opportunity to do so.

> At the time of the incident, I was teaching Alicia to ride a two-wheeler. I had taken the training wheels off her bike. Miranda wanted to learn too so I was teaching her too. She was learning on Alicia's bike. Alicia and Miranda always played together. Alicia was about one year older than Miranda. Whatever Alicia would do, Miranda wanted to do. Miranda would also like to play on my wife Olivia's exercise stepper, power rider and exercise bicycle. They were much too big for her and she would fall. I do not

---

[17] The first witness called by the defense, Officer William Edge, testified regarding a conversation he had with Richard's girlfriend, Brenda, regarding the location of a footstool found at the crime scene. The transcript of Officer Edge's testimony is a page-and-a-half in length. *See* (RR 37:1-2).

> believe that Richard Raped Miranda. I understand that Richard hit
> Miranda. I understand that she fell down off a stool sometime
> after Richard hit her. I told the lawyers about this equipment and
> they told us to take a picture of them and bring it to court. We did
> this, and we brought the picture but they never asked me about it.

(SH Petitioner's Ex. 21). Juan testified during both the guilt and punishment phases of the trial

but was never asked to present information regarding Miranda's attempts to ride a two-wheel

bike or play on the adult exercise equipment. No other witness or evidence was presented in

support of the straddle injury theory.

Mr. Collina himself explained the significance of this alternate-theory evidence as

follows:

> It was important to give the jury an alternate theory for how that
> child suffered that injury. The State's theory was that it was sexual
> assault. It was very important for us to establish an alternate
> theory, which we did not. Well, we did it, but in a less effective
> way.
>
> . . .
>
> But it would have been embellished if the jury had something to
> carry around in their hand. Jurors like to touch things, too, not just
> hear testimony. They like to see things. So I wanted to appeal to
> all the senses of the jury, not just the verbal. Photos would have
> been nice.

(SH 3:30-31). Had defense counsel done what they should have to introduce all of the available

alternate-theory evidence, including the photographs and testimony from Juan Vasquez

establishing the existence of the oversized exercise equipment in the Vasquez home; testimony

regarding Miranda's tendency to play on that equipment; Dr. Henderson's testimony and

narrative calling Miranda's wounds a straddle injury; and/or the testimony of Dr. Frost and Dr.

White affirming the possibility that the injuries were caused by a straddle injury, they would

have provided an authoritative, reasonable, and compelling explanation for the injuries to

Miranda's genitals.

### e.    Failure to Present Other Available Evidence to Refute the State's Unindicted Sexual Assault Allegation.

Trial counsel also failed during the punishment phase of the trial to introduce evidence regarding Richard's psychological profile, which is inconsistent with sexually abusive behavior. Although trial counsel retained a psychiatrist, Dr. Carlos Estrada, to testify regarding Richard's drug addiction and lack of future dangerousness if he is kept free of narcotic drugs, Dr. Estrada was never asked whether Richard's psychological characteristics are consistent with child molestation or sexual deviance. (RR 39:95-107).

Richard's state habeas counsel retained a psychologist with experience evaluating sex offenders, Dr. Ricardo Weinstein, to evaluate Richard's psychological characteristics. The relevant portion of Dr. Weinstein's evaluation is as follows:

> I have evaluated over 1000 individuals charged with sexual misconduct, most of them accused of molesting minors. The evaluations have served the purpose of assisting at trial or sentencing. My clinical experience and knowledge of the literature have allowed me to conclude that sexual abuse occurs for the most part in a contextual environment, the context is always related to the perpetrator. The following descriptions cover the great majority of cases:
>
> 1.   Psychopaths. These individuals molest minors without rhyme or reason and in no specific context. Richard is not a psychopath, therefore this is not applicable.
>
> 2.   Pedophiles. These individuals have sexual arousal to children and/or young adolescents. This is often their exclusive source of arousal. Richard has a long history of arousal to age appropriate females. He has been sexually active since he was in his early teens. He has been exposed to children and has had many opportunities to engage in sexual behaviors with children and has no history of doing so.

3. Shy/withdrawn individuals that are socially inadequate and feel threatened pursuing adults. They adultmorphize children to satisfy their sexual desires. Richard has no problems socializing or meeting age appropriate females.

4. Family dynamics where the child becomes the substitute "partner," eventually leading to a sexualized relationship. There is no evidence that this dynamic existed in Richard's relationships.

5. Sexual acts performed under the influence of alcohol or drugs due to disinhibition. Richard's heroin addiction does not fall into this category. Heroin does not disinhibit behavior.

... It is my opinion that he does not present any characteristics of a pedophile and that the dynamics of his relationship with the mother of the victim were such that it is very unlikely that he would have acted in a sexually violent or inappropriate way against the child.

(SH Petitioner's Ex. 20 at 15). All of Richard's family members submitted affidavits in the state habeas proceeding confirming that there has never been a question of Richard acting sexually inappropriately with children. They also testified that Richard was frequently trusted with the care of young girls. For example, Juan reports: "I have seen Richard many times with my nieces. Brenda has three daughters: Alicia (10/11/92), Briana (01/23/96) and Dominic (02/23/99). He has always been appropriate with them. Richard was always appropriate with Miranda too." (SH Petitioner's Ex. 21 ¶ 30). The Petitioner's sister, Brenda, states: "I have three daughters: Alicia (10/11/92), Briana (01/23/96) and Dominic (02/23/99). I have seen Richard with my daughters often. He has always been appropriate with them. Whenever I saw Richard with Miranda, he was always appropriate with her too. I never saw Richard hit Miranda. I do not believe Richard raped Miranda." (SH Petitioner's Ex. 25 ¶ 26). Trial counsel failed to investigate and present this important mitigating evidence, which would have aided Richard's

attempt to cultivate the juror's residual doubt on the issue of sexual assault during the punishment phase of the trial.

Other than Richard himself, the only witness called by the defense during either phase of the trial to address the State's allegations and evidence of sexual assault was Magada Hinojosa, an investigator for the Robstown office of Child Protective Services. (RR. 37:3). Ms. Hinojosa testified regarding a visit she made to Richard's home in January 1998 where she interviewed Miranda, observed her demeanor, and had the opportunity to remove her clothing and examine Miranda physically. (RR. 37:5-7). She stated that her investigation did not reveal any bruising on Miranda's body or any evidence of sexual abuse. (RR. 37:7). Neither Ms. Hinojosa nor any other witness called by the defense attempted to counter the evidence in support of the state's sexual assault theory detailed above. In the end, the only evidence trial counsel presented in support of Richard's straddle injury theory was Dr. White's brief mention on cross examination of having seen Dr. Henderson's "handwritten report." Trial counsels' failure to discover and present the wealth of available evidence that was both known to and readily discoverable by trial counsel cannot be justified as reasonable trial strategy. Put simply, trial counsel did not meet the objective standard for reasonable defense counsel.

5.    *Trial Counsel's Multiple Failures to Investigate, Refute, and Counter the State's Sexual Assault Evidence Prejudiced Mr. Vasquez During both the Guilt and Punishment Phases of Trial.*

As described above, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. If the Court can conclude that a juror could have reasonably concluded that the death penalty was not an appropriate penalty in this

case based on the mitigating evidence, prejudice will have been established." *Lockett*, 230 F.3d

at 716.

That standard has been met in this case. The significance of the State's un-indicted

allegation of rape to both Richard's conviction for murder and his death sentence cannot be

overstated. The State itself argued its significance in its closing argument to the jury during the

guilt phase of the trial as follows:

> The rape – yes, the rape is not on the documents either, and why is
> the rape so important? Because it shows his intent at the time of
> the killing. It shows the anger he had because rape is a crime of
> anger. That is what sexual assault is. So it shows – the importance
> of the rape is that it shows his state [of] mind, his intent. It shows
> the circumstances of the offense, and it shows what he did not
> want to admit to.

(RR 38:50). This quote makes clear that the State used the allegation of rape to establish many

of the elements of capital murder including his motive and intent to kill Miranda. It also

confirms that the State used the rape allegation to prove aggravating circumstances and to incite

the jury's hatred against Richard. Finally, it demonstrates the State's use of the rape allegation to

otherwise impeach Richard's credibility with the jury. Because the evidence of sexual assault

was not effectively refuted by trial counsel, Richard's claims that he did not intend to kill

Miranda and evidence that Richard called for medical attention and performed CPR to save her

life were disregarded by the jury.

At the punishment phase of the trial, the State's allegations of sexual assault once again

played a prominent role. Prosecutors used the salacious allegations to great effect to inflame the

passions of the jurors. Prosecutors repeated their theory using the most inflammatory rhetoric

and graphic detail as illustrated by the following excerpts:

> This defendant forcibly restrained and raped Miranda. This
> defendant ripped her privates open. Ladies and Gentlemen, I really
> don't know how else to say this. This defendant made a hole in

> Miranda that wasn't supposed to be there. He mutilated her
> privates. . . .
>
> . . .
>
> This defendant cleaned her up with rubbing alcohol. Imagine the
> torment, the excruciating pain Miranda must have felt as he
> cleaned her privates, her open wounds up with rubbing alcohol.
> He used rubbing alcohol to clean up all of that blood. Imagine the
> pain she must have suffered, that is, if she was conscious at the
> time. . . . Think about it. He couldn't have done anything worse to
> Miranda. He tortured her.

(RR 40:13-14).

If trial counsel had done the appropriate investigation and retained the necessary experts

they could have called into question the State's DNA evidence linking Richard to the injuries to

Miranda's genitals as Dr. Libby was able to do in the state habeas proceeding. They also would

have been able to refute with authority Huy Nguyen's "semen washing" hypothesis and explained

more completely the significance of the fact that none of Mr. Vasquez's DNA was found in or on

Miranda's genitals. Additionally, if trial counsel had taken action to investigate and present

readily available alternate-theory evidence suggesting Miranda's genital cuts were straddle

injuries, including expert and lay testimony, photographs, and medical reports, that evidence

would likely have created reasonable doubt in the mind of the jury and taken away much of the

persuasive impact of the sexual assault allegation at both the guilt and punishment phases of the

trial. This evidence alone is sufficient to undermine confidence in the jury's verdict and call into

question the reasonableness of the Texas Court of Criminal Appeal's factual review.

## VI.
## CLAIM THREE: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL – CONFLICT OF INTEREST

### A.    Argument Summary

Richard Vasquez's right to the effective assistance of appellate counsel was violated because Grant Jones, the attorney representing Richard in his direct appeal of his conviction for capital murder and subsequent death sentence, was laboring under an undisclosed conflict of interest. At the time he was representing Richard in his appeal, Mr. Jones also owed a duty of loyalty as a prosecutor to the same jurisdiction of the State of Texas that was the prosecuting authority against Richard. Significantly, Richard was never informed that his right to appeal was so fundamentally compromised. As a result, Richard was denied his constitutional rights guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution. Moreover, because Mr. Jones' contemporaneous representation of the State is an actual conflict of interest, harm to Richard's appeal is presumed.

### B.    Relevant Facts

Grant Jones represented the State on two capital cases at the same time he represented Richard on his direct appeal. Mr. Jones represented the State of Texas as a Special Prosecutor for the Nueces County Prosecutor's Office in *State v. Richard Cartwright*, Case No. 96-CR-2397-F, 214th District Court, Nueces County, Texas. (SH App. Ex. 25). Mr. Jones also represented the State of Texas as a Special Prosecutor for the Nueces County Prosecutor's Office in *State v. Jermarr Arnold*, Case No. 90001446-A, 28th District Court, Nueces County, Texas, as evidenced by the Requisition and Purchase Order for Nueces County for "legal services rendered . . . as special prosecutor." *Id.* In addition, the invoice registry indicates that Mr. Jones received checks from the State of Texas for his services as the District Attorney in the *Arnold* case on January 12, 2000 ($1,162.50) and in the *Cartwright* case on February 24, 2000 ($1,237.50). *Id.*

Mr. Jones represented the State of Texas in opposition to Mr. Arnold's post-conviction application challenging his capital murder conviction and death sentenced from July 15, 1996 through December 15, 1999. *Id.* The same exhibit reveals that Mr. Jones also defended the State's capital conviction and death sentence of Mr. Cartwright from April 30, 1999 through January 14, 2000. The fee application from Mr. Jones to the Nueces County court demonstrates that Mr. Jones represented Mr. Vasquez on appeal from June 22, 1999 through September 13, 2000. *Id.* Therefore, from June 22, 1999 through December 15, 1999, Mr. Jones had all three cases simultaneously.

## C.    **Argument and Authorities**

### 1.    *Richard's Right to Conflict-Free Appellate Counsel.*

The United States Supreme Court has long held that where a state affords a convicted prisoner the right to appeal his conviction, the Due Process Clause of the Fourteenth Amendment guarantees the right to effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.").

Integral to the Sixth Amendment right to effective assistance of counsel is the right to counsel that is free of conflicts of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 351 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 481-82 (1978). If a defendant's counsel has an actual conflict of interest that adversely affected his performance, prejudice is presumed and no proof of prejudice is required. *Strickland,* 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 345-350). *Cuyler*'s adverse effect standard is intentionally lower than the normal "actual prejudice" standard from *Strickland*, which requires a petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under *Cuyler*, the test is whether the actual conflict

burdening counsel's performance had adverse effect on counsel's performance.[18] *Mickens v. Taylor*, 535 U.S. 162, 172-73 (2002). Ordinarily, to meet this test the defendant need only establish that there was a plausible alternative defensive strategy that could have been pursued, but was not because of the actual conflict of interest. *Perillo v. Johnson*, 205 F.3d 775, 808 (5th Cir. 2000). However, when the conflict of interest involves a defendant's appellate counsel, even this low threshold becomes insurmountable. Because there is no record of appellate counsel's performance other than the appellate briefs themselves, an appellant is left speculate about what arguments might have been included in the briefing but were not because of the conflict of interest. Even if an appellant can identify arguments that might have been made on appeal but were omitted by appellate counsel, there is no way, absent a more substantial record, to demonstrate that the arguments were omitted because of the conflict of interest. A better rule, limited to conflicts that affect an appellant's right to conflict-free appellate counsel, is to assume the appeal has been detrimentally affected upon a showing of an actual conflict of interest.

An actual conflict of interest occurs when counsel actively represents conflicting interests. *Strickland*, 466 U.S. at 692; *see also Zuck v. State of Alabama*, 588 F.2d 436, 439 (5th Cir. 1979) ("If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists."). An actual conflict may also exist when an attorney represents two clients whose interests in the outcome of a matter are different. *Perillo*, 205 F.3d at 804. In such cases, counsel breaches the most basic of counsel's duties, the duty of loyalty, and the resulting harm is difficult to measure. *Strickland*, 466 U.S. at 692.

---

[18] *Cuyler* involved a conflict of interest of the defendant's trial counsel. At trial there is a substantial record of counsel's performance from which to determine the adverse effects of a conflict of interest. When appellate counsel labors under a conflict of interest the record is limited to the appellate briefs and thus the adverse effect of a conflict of interest on counsel's performance is virtually undetectable.

The Fifth Circuit has on several occasions reviewed facts very similar to the present case and found the existence of actual conflict of interest justifying habeas corpus relief. In *Castillo v. Estelle*, 504 F.2d 1243 (5th Cir. 1974), for example, the defendant's trial counsel was simultaneously representing one of the principal witnesses for the State in an unrelated matter. Although the trial judge and the prosecutor were informed, the defendant was not aware of and did not consent to the conflicting representation. *Id.* at 1244-45. The Fifth Circuit expressed its concerns regarding defense counsel's conflict of interest as follows:

> When there is a conflict of interest such as exists in this case, the prejudice may be subtle, even unconscious. It may elude detection on review. A reviewing court deals with a cold record, capable, perhaps, of exposing gross instances of incompetence but often giving no clue to the erosion of zeal which may ensue from divided loyalty. Accordingly, where the conflict is real, as it is here, a denial of the right to effective representation exists, without a showing of specific prejudice.

*Id.* at 1245. The Fifth Circuit held that, as a matter of law, the conflict denied the defendant effective representation. *Id.*; *see also United States v. Martinez*, 630 F.2d 361, 363 (5th Cir. 1980), *cert denied*, 450 U.S. 922 (1981) (actual conflict where defense counsel previously represented witness for prosecution); *Stephens v. United States*, 595 F.2d 1066 (5th Cir. 1979) (actual conflict where defense counsel concurrently represented prosecution witness).

Similar concerns over the reduced zeal and vigor of a conflicted defense attorney motivated the Fifth Circuit in *Zuck v. State of Alabama* to reverse the district court's denial of habeas corpus relief. In that case, the law firm that represented the defendant in his murder trial was also representing the prosecutor in an unrelated civil matter. *Zuck*, 588 F.2d at 438. The State argued that this dual representation did not create an actual conflict because the real party in interest in *Zuck* was the people of the State of Alabama and the prosecutor's only interest was

in achieving justice, not in convicting Zuck. *Id.* at 439. The Fifth Circuit rejected these arguments reasoning as follows:

> [T]he sixth amendment requires that a defendant may not be represented by counsel who might be tempted to dampen the ardor of his defense in order to placate his other client. The fact that a particular lawyer may actually resist that temptation is of no moment. The right to effective assistance of counsel is so vital to a fair trial that courts are compelled to examine every potential infringement of that right with the most exacting scrutiny.

*Id.* at 440. The Fifth Circuit concluded that the potential prejudice arising from the conflict in *Zuck* was even greater than that found in *Castillo* because the danger of ineffective representation was not limited to the cross-examination of a single witness but rather could affect the entire trial. *Id.* at 339. These same concerns are amplified when a capital defendant's appellate counsel also works as a prosecutor for the State because of the high stakes associated with an appeal of a capital conviction, the fact that the attorney has responsibility for the defendant's entire direct appeal, and the sparse appellate record from which to identify the adverse effects caused by appellate counsel's conflicts of interest.

The Fifth Circuit's distinction between the facts in *Zuck* those in *Mitchell v. Maggio*, 679 F.2d 77, 79-80 (5th Cir. 1982) also gives important insights on the conflicts of interest at issue in the present case. *Mitchell* involved a defense attorney who represented a defendant charged with aggravated and forcible rape in state court. At the same time the attorney was representing the defendant he was also an assistant city attorney assigned as a prosecutor in city traffic court. Because the jurisdiction of the city traffic court and the state court differed, the court concluded that there was no opportunity for divided loyalty as there was in *Zuck*.

> We stress that the prosecutorial positions at issue were as city employees prosecuting in city courts only. It is clear that the representation of a defendant charged in a state court with aggravated rape does not conflict with the official duties of an assistant city attorney assigned to a New Orleans city court. Even

-69-

> if the city is considered as a sometime client of its city court prosecutors, such a prosecutor is nevertheless not in a "divided loyalty" situation when he represents a defendant in a state court prosecution.

*Id.* at 80.

The same cannot be said of a criminal defense attorney who works simultaneously as a prosecutor for the State in the same jurisdiction as the defendant's trial. When a criminal defense attorney also represents the State as a prosecutor in criminal cases in the same jurisdiction, the interests of his clients are clearly adverse to one another such that an actual conflict of interest exists. *See, e.g., People v. Cooper*, 156 Misc.2d 483, 487, 93 N.Y.S.2d 733, 736 (1992) (holding that an attorney who worked as a prosecutor and as a criminal defense attorney at the same time in the same jurisdiction undermined the confidence of both of his clients, the defendant and the community, because the dual representation "constituted an obvious and actual conflict of interest"). To avoid such conflicts of interest, the American Bar Association directed that "[d]efense counsel should not represent a criminal defendant in a jurisdiction in which he or she is also a prosecutor." *American Bar Association Standards for Criminal Justice*, "Defense Function Standards," Standard 4-3.5(g). Nevertheless, case law suggests that for an actual conflict to exist when a defense attorney works as a prosecutor in the same jurisdiction, the attorney must represent the State and the accused at the same time. *See, e.g., Cooper*, 156 Misc.2d at 487; *cf. Moreland v. Scott*, 175 F.3d 347, 348 (5th Cir. 1999) (no actual conflict when an criminal defense attorney ran for district attorney and anticipated future employment for the State); *Hernandez v. Johnson*, 1997 U.S. App. Lexis 12686, \*15 (5th Cir 1997) (no actual conflict for defense attorney who nine years prior to trial worked as a prosecutor in the same jurisdiction that convicted defendant for prior felonies).

**2.**    *Richard's Appellate Counsel had an Actual Conflict of Interest.*

In the instant case, Richard's appellate counsel, Grant Jones, was actively struggling to "serve two masters" – the inherently contradictory masters of a capitally-sentenced prisoner and the State of Texas – *at the same time. See Glasser v. United States*, 315 U.S. 60, 75 (1942). Mr. Jones was simultaneously representing Richard and the State as a part-time prosecutor within the same jurisdiction. Mr. Jones represented the State on two capital cases at the same time he represented Richard on his direct appeal. Mr. Jones represented the State of Texas as a Special Prosecutor for the Nueces County Prosecutor's Office in *State v. Richard Cartwright*, Case No. 96-CR-2397-F. (SH App. Ex. 25). Mr. Jones also represented the State of Texas as a Special Prosecutor for the Nueces County Prosecutor's Office on the habeas corpus proceeding of death-sentenced Jermarr Arnold, as evidenced by the Requisition and Purchase Order for Nueces County for "legal services rendered . . . as special prosecutor." *Id.* In addition, the invoice registry indicates that Mr. Jones received checks from the State of Texas for his services as the District Attorney in the *Arnold* case on January 12, 2000 ($1,162.50) and in the *Cartwright* case on February 24, 2000 ($1,237.50). *Id.*

Mr. Jones represented the State of Texas in opposition to Mr. Arnold's post-conviction application challenging his capital murder conviction and death sentenced from July 15, 1996 through December 15, 1999. *Id.* The same exhibit reveals that Mr. Jones also defended the State's capital conviction and death sentence of Mr. Cartwright from April 30, 1999 through January 14, 2000. *Id.* The fee application from Mr. Jones to the Nueces County court demonstrates that Mr. Jones represented Mr. Vasquez on appeal from June 22, 1999 through September 13, 2000. *Id.* Therefore, from June 22, 1999 through December 15, 1999, Mr. Jones had all three cases simultaneously. This scenario presents more than just and "appearance of impropriety," rather it represents an actual conflict of interest. *See Cuyler*, 446 U.S. at 350.

### 3.    *Prejudice to Richard is Presumed.*

In the instant case, appellate counsel never disclosed either to the appointing Court or to Richard that he had an actual conflict of interests while he was working on Richard's appeal. The conflict was only discovered through the investigation of post-conviction habeas counsel. Therefore, it is impossible to discern with any accurate specificity how this actual conflict prejudiced Richard's appeal. The appellate record is so short that it is also difficult to determine how the conflict may have affected counsel's performance. A review of the briefing is also not particularly illuminating. Although it is easy to identify things that might have been argued but were not, or arguments that could have been written more persuasively and with greater factual and legal support, it is impossible to attribute any of these deficiencies in appellate briefing to appellate counsel's conflict of interest. For these reasons the *Cuyler* requirement of showing an adverse affect on counsel's performance should not be extended to cases involving an undisclosed conflict affecting appellate counsel.

In *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978), a case involving joint representation of co-defendants, the Supreme Court recognized that in some instances "a rule requiring a defendant to show that a conflict of interests . . . prejudiced him in some specific fashion would not be susceptible of intelligent, even-handed application." The Supreme Court acknowledged that a defendant cannot prove the negative; that is, what counsel did not do that should have been done but for the conflict of interest, particularly when there is little record available for review. The high court observed as follows:

> In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. But in a case of joint representation of conflicting interests the evil – it bears repeating – is in what the advocate finds himself compelled to

> *refrain* from doing, not only at trial but also as to possible pretrial
> plea negotiations and in the sentencing process. It may be possible
> in some cases to identify from the record the prejudice resulting
> from an attorney's failure to undertake certain trial tasks, but even
> with a record of the sentencing hearing available it would be
> difficult to judge intelligently the impact of a conflict on the
> attorney's representation of a client. And to assess the impact of a
> conflict of interest on the attorney's options, tactics, and decisions
> in plea negotiations would be virtually impossible. Thus an
> inquiry into a claim of harmless error here would require, unlike
> most cases, unguided speculation.

*Id.* at 490-91 (emphasis in original) (internal citations omitted). The same is true of an inquiry

into the detrimental affect of a conflict of interest on appellate counsel's performance.

Consequently, this Court should do as the *Holloway* court did, presume prejudice based on the

existence of counsel's actual conflict of interest and reverse Richard's conviction for ineffective

assistance of counsel. *See id.* at 489-91.

Alternatively, to the extent Richard is required to identify evidence of how the actual

conflict affected appellate counsel's performance, Richard would show the Court that a review of

the appellate briefing filed by Mr. Jones in this case reveals a definite pro-state bias in the

statement of facts and in the presentation of the argument. Indeed, the statement of the facts

reads like a summary of the State's case. Many of the facts argued by the State but disputed by

Richard at trial and to this day, were recited by counsel without qualification or equivocation.

For example, Mr. Jones wrote "[a] bruising pattern on [Miranda's] hips and fresh tearing in the

perineum area indicated that someone had made a forcible attempt to penetrate either her vagina

or rectum." (Brief of Appellant at 3). This statement is contrary to the facts presented at trial,

which did not show any evidence of penetration of either Miranda's vagina or her rectum. As

noted above, Ms. Box testified that Miranda's hymen was without trauma and that she could not

tell whether Miranda's anus had been penetrated. (RR 35:196, 215). Dr. Lukefahr agreed that

the report of the examining physician, Dr. Henderson stated that Miranda's hymen was intact and

that there were no internal injuries to the vagina or within the anus. (RR 35:232). Counsel not only neglected to mention these facts and accepted the State's theory as true, he also failed to make any mention of the alternative straddle injury theory.

The cursory arguments made in the ten total pages of argument that follow the statement of facts appear to be little more than "straw men" to be easily refuted by the State. The brief itself only raises three points of error, two of which have been repeatedly rejected by the Texas Court of Criminal Appeals. Appellate counsel raised the following points of error in the direct appeal:

1.  Whether infliction of death in this case is cruel and unusual punishment prohibited by the eighth Amendment to the United States Constitution, when the jury was not provided material information about parole law as it applies to persons convicted of capital murder;

2.  Whether the Due Process Clause of the Fourteenth Amendment was violated in this case by the refusal of the trial court to instruct the jury in the penalty phase of a capital trial that, under State law, the defendant was ineligible for parole for a period of 40 calendar years under a capital murder life sentence; and,

3.  Whether the evidence is sufficient to support the jury's affirmative finding of future dangerousness.

Appellate counsel conceded that the first two of these claims, related to instructions to the jury regarding the application of parole law, have been rejected by Texas' highest criminal court. (*See* Brief of Appellant at 12 (citing *Smith v. State*, 898 S.W.2d 838 (Tex. Crim. App. 1995) and asking the Court of Criminal Appeals to reconsider its decision in that case). *Smith* reiterated the longstanding rule in Texas that parole is not a matter for a jury's consideration in a capital murder trial. *Smith*, 898 S.W.2d at 846; *see also Jones v. State*, 843 S.W.2d 487, 495 (Tex. Crim. App. 1992); *Ellason v. State*, 815 S.W.2d 656, 665, n.5 (Tex. Crim. App. 1991) ("The matter of parole is not a proper consideration for jury deliberation on punishment in a capital murder trial."); *Stoker v. State*, 788 S.W.2d 1, 16 (Tex. Crim. App. 1989), *cert. denied*, 498 U.S.

951 (1990) (testimony regarding parole is "an impermissible area of inquiry for the jury"). In the face of such established precedent, appellate counsel's first two points of error were certainly doomed, and perhaps designed, to fail. Consequently, Richard's entire direct appeal was based on one viable point of error presented in a total of five and a half pages of briefing. (*See* Brief of Appellant at 16-21).

This review of the appellate briefing, if such a review is required at all, demonstrates that Richard's appeal was adversely affected by Mr. Jones' conflict of interest. Therefore, prejudice is presumed and habeas corpus relief is justified.

## VII.
## PRAYER FOR RELIEF

Wherefore, Petitioner Richard Vasquez requests that this Court grant this petition and issue a writ of habeas corpus ordering Richard Vasquez to be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional death sentence. Petitioner further requests that Richard Vasquez be ordered to provide this Court with a record of all state court proceedings and grant such other relief as law and justice require.

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By: _____

Andrew M. Edison
State Bar No. 00790029

Eric B. Storm
State Bar No. 24033244

711 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 221-1371 (Telephone)
(713) 221-2144 (Facsimile)

ATTORNEYS FOR PETITIONER RICHARD
VASQUEZ

## VERIFICATION

Under penalty of perjury, I hereby certify that all factual allegations made herein are true
and correct except for those allegations made upon information and belief.

_____
Eric B. Storm

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing petition was served on the
Attorney General for the State of Texas, Counsel for Respondent, by mailing the Petition via first
class mail RRR on 26th day of January, 2006 to the following address:

Mr. Tom Jones
Office of the Attorney General
Post Conviction Litigation
P.O. Box 12548
Austin, TX 78711-2548

_____
Eric B. Storm

# EXHIBIT 3(b)

## UNITED STATES DISTRICT COURT
## IN THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **RICHARD VASQUEZ,** | § | |
| **Petitioner** | § | |
| **v.** | § | |
| | § | **Civ. No. CC-05-059** |
| **NATHANIEL QUARTERMAN,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice—Correctional** | § | |
| **Institutions Division** | § | |
| **Respondent.** | § | |

### MEMORANDUM AND ORDER

A Nueces County jury convicted Petitioner Richard Vasquez of the capital murder of four-year-old Miranda Lopez and sentenced him to death. His conviction and sentence were twice upheld by the Texas Court of Criminal Appeals—on direct appeal and in state habeas corpus proceedings. *Vasquez v. State*, No. 73,461 (Tex. Crim. App. Oct. 3, 2001); *Ex parte Vasquez*, No. 59,201-01 (Tex. Crim. App. Jan. 26, 2005). Vasquez is now before this federal court, alleging constitutional violations in his trial, sentencing and appeal, and seeks a writ of habeas corpus.

Anyone convicted in state court and in custody has the right to challenge the constitutionality of that detention by seeking a writ of habeas corpus from a federal court. *Danforth v. Minnesota*, 128 S.Ct. 1029, 1036 (2008). Congress, however, limited the power of the federal courts to grant relief to habeas petitioners when it passed the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"). 28 U.S.C. § 2254(d) (2000). Under the AEDPA, a state prisoner can obtain relief with respect to any claim adjudicated on the merits in State court proceedings only if the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). *Williams v. Taylor*, 120 S.Ct. 1495, 1519 (2000).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or if the state court decides a case differently than the Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 120 S.Ct. at 1519. The "unreasonable application" clause requires the federal courts to inquire "whether the state court's application of clearly established federal law was objectively unreasonable," not merely incorrect. *Id.* at 1521; *Smith v. Quarterman*, 515 F.3d 392, 399 (5th Cir. 2008). "A state court unreasonably applies established federal law when it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case." *Smith v. Quarterman*, 515 F.3d at 399. A petitioner bears the burden of demonstrating the unreasonableness of state factual findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Vasquez raises three claims of ineffective assistance of counsel in violation of the Sixth Amendment. First, he asserts that his trial counsel failed to adequately

rebut evidence that he sexually assaulted Miranda Lopez. Vasquez next argues that

his counsel's investigation and presentation of mitigation evidence was deficient.

Finally, Vasquez argues that his appellate counsel was ineffective due to the

alleged conflict of interest created by that attorney's representation of the State of

Texas in two unrelated special prosecutions.

Respondent Nathaniel Quarterman, who has custody of petitioner and is

charged with the duty to discharge the sentence of the jury, seeks summary

judgment. "As a general principle, Rule 56 of the Federal Rules of Civil

Procedure, relating to summary judgment, applies with equal force in the context

of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). For

ordinary summary judgment motions, the district court construes the facts in the

case in the light most favorable to the non-moving party. However, where a

habeas petitioner's factual allegations have been adversely resolved by express or

implicit findings of state courts, the prisoner must demonstrate by clear and

convincing evidence that the presumption of correctness established by 28 U.S.C.

§ 2254(e)(1) should not apply. Otherwise, it is inappropriate for the facts of a case

to be resolved in the petitioner's favor. *See Marshall v. Lonberger*, 103 S.Ct. 843,

849-50 (1983); *Foster v. Johnson*, 293 F.3d 766, 777 (5th Cir. 2002).

Consequently, where the Texas state courts have determined facts, this Court is

bound by such findings unless an exception to 28 U.S.C. § 2254 applies.

With regard to the claim of ineffective assistance of counsel at the

guilt/innocence phase of the trial, the Court finds that the state court's decision

neither "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law," nor "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). On Vasquez's second claim, the Court finds that the state court's determination that Vasquez's counsel reasonably investigated Vasquez's background was an "unreasonable determination of facts." *Id.* However, the Court finds that the state court's conclusion that no prejudice resulted from omitted mitigation was not an "unreasonable application" of federal law. *Id.* The Court finds that the state court's rejection of Vasquez's third claim—ineffective assistance of appellate counsel— was not "contrary to" or an "unreasonable application of" clearly established federal law. *Id.* Having considered the petition, the summary judgment motion, the state court record, and applicable law, the Court therefore GRANTS respondent's Motion for Summary Judgment and DENIES Vasquez's petition.

I. Background Facts and Proceedings

The facts, as set forth by the Texas Court of Criminal Appeals, are as follows:

> Vasquez was charged with intentionally or knowingly causing the death of Miranda Lopez by striking her on the head with his hand. During the guilt/innocence stage, the evidence showed that at the time of the offense, Vasquez, who was eighteen years old, was living with his parents; his girlfriend, Brenda Lopez; their four-month-old child, Meagan; and Brenda's four-year-old child, Miranda. Vasquez had a serious addiction to heroin and cocaine which had begun when he was thirteen. Although his adoptive parents made numerous

4

efforts to help him with his drug problem, Vasquez remained clean only for a short period of time and invariably reverted to his drug use.

By March 1998, Vasquez and Brenda had become so addicted to drugs that, according to Vasquez, they stopped caring about themselves, the children, or anything else except drugs. They would leave the children anywhere so that they could go out and steal things to sell in order to buy more drugs. Vasquez would become infuriated when the drugs ran out and he did not have any more money to feed his habit.

According to Vasquez, he and Brenda argued throughout the night of March 4th, during which time he injected himself with heroin and cocaine before falling asleep in the early hours of March 5th. Vasquez injected himself with heroin again at 10:30 a.m. before taking Brenda to work between 11 a.m. and noon. Vasquez drove Brenda to work while the children sat in the back seat of the car. On the way, Vasquez got angry with Brenda because he had to watch the children and would not be able to go steal more things to sell for drugs.

After Vasquez and the children returned home, sometime during the late morning, Vasquez's neighbor saw a child Miranda's age playing in the backyard. After about 10-15 minutes, she heard a loud, angry voice coming from Vasquez's door. She saw Vasquez standing there and heard him say to the girl in Spanish, "You're going to get it, stupid." Vasquez denied that this incident ever occurred.

According to Vasquez's testimony at trial, after he dropped Brenda off, he and the children returned home and Vasquez needed a fix. He called Brenda to ask her where the heroin was and Brenda would not tell him. This angered Vasquez and although Vasquez acknowledged that Miranda was not doing anything wrong, he struck her in the head. He could not say how many times he hit her. He then called Brenda again who told him where the drugs were and he injected another round of heroin. He told Miranda to go get a stool from his parents' room and brush her teeth. When Miranda came back with the stool, Vasquez claimed that Miranda fell down. He put toothpaste on her toothbrush and left the room. When he came back, Miranda was face down in the sink. He repeatedly tried to make her stand, but she kept falling down. He then put her on his parents' bed and called "911" around 1:30 p.m., telling the dispatcher that

5

Miranda was choking. When the deputy constable and the emergency medical technicians arrived at the house, Vasquez said that Miranda had fallen off a wooden stood and hit her head. No wooden stool was in the area, although one was later found next to the bed where Vasquez placed Miranda. Miranda had blood on her nose and mouth which Vasquez claimed was a result of Miranda biting him when he put his fingers in her mouth to prevent her from swallowing her tongue. The paramedics also noted that Miranda had a bump on the back of her head, noticeable bruises of various stages on her back, and bruising around her eyes which indicated a possible head injury. Miranda was taken to the hospital. In the meantime, Vasquez called Brenda and told her that Miranda had fallen off of a stool and hit her head. He picked up Brenda at work and they headed to the hospital—both injecting heroin on the way.

It was determined by Dr. Michael Burke, a paramedic neurosurgeon who performed brain surgery on Miranda, that Miranda suffered from trauma to the head. He testified that her brain injuries were equivalent to those she would have sustained had she been ejected from a car traveling 65 m.p.h. Burke's final diagnosis was that Miranda suffered severe brain injury from child abuse. Leann Box, a sexual assault nurse, examined Miranda at 7 p.m. and noted that she had extensive bruising on her head, face, chest, hips, pelvic region, genitalia area, ankle, thigh, shoulder, back, and arms. Some of these bruises were formed from injuries made within the previous twelve to twenty-four hours. The bruising on Miranda's hips was consistent with injuries that could be caused from being held from behind while being sexually assaulted.

Box also performed a detailed genital exam. Miranda had multiple abrasions and tears in her genital-anal region. Many of the tears were the result of injuries that had occurred no more than twelve hours earlier. Miranda had a two-centimeter tear between her anus and labia minora that was approximately one half-centimeter deep (just short of muscle tissue). In over 200 sexual assault examinations, Box had never seen a tear this thick. This type of tear would be caused from a great deal of force and would have likely bled a great deal. Box testified that the tear was not bloody when she examined Miranda, which led her to believe that it had been cleaned. Although extremely painful, rubbing alcohol and pressure could have stopped the bleeding.

6

Vasquez was arrested and crime scene technicians photographed him, noting the bruising on his hand, fresh cuts to his thumb and finger, and needle marks on his arms. At Vasquez's home, officers and the crime scene technicians found blood on the wall and shower curtain in the bathroom where Miranda allegedly fell. There was a blood-stained t-shirt and coveralls were found in a clothes hamper, which Vasquez's father said he put there after finding them in the house. After searching the garbage, the crime scene personnel found two syringes, the cap to a tube of toothpaste, a hair brush, a long black hair, toilet paper with blood on it, and tissue paper that appeared to be saturated with rubbing alcohol inside of a garbage can in a plastic bag. Vasquez's father testified that he had taken the trash out of the bathroom and put it in the garbage can.

A pediatrician who helped establish a clinic for examining sexual assault victims testified as an expert witness. He summarized his findings by stating that in his twenty hears of practice, "This is really one of the most severe sexual assaults that I have seen in my career." Additionally, the Nueces County Medical Examiner testified that an analysis of Miranda's blood indicated a potentially lethal amount of cocaine in her system. It was double the lethal amount for an adult. The doctor could not determine how the cocaine got into Miranda's body.

Vasquez could not explain the bruising, genital-anal injuries, or the cocaine. He denied sexually assaulting Miranda or giving her drugs. But Vasquez did admit that he was the only adult in the house that morning and that he had struck Miranda in the head.

*Vasquez v. State*, No. 73,461 at 3-7.

II.    Analysis

Vasquez raises two claims of ineffective assistance of trial counsel and one claim of ineffective assistance of appellate counsel. To prevail on a claim for ineffective assistance of counsel, petitioner must show (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) that "the deficient performance prejudiced the defense. This requires showing that

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 104 S.Ct. 2052, 2064 (1984).

### A. *Failure to Investigate and Counter the State's Evidence of Sexual Assault*

Vasquez alleges that he received ineffective assistance from his trial counsel because they failed to adequately investigate and counter the State's evidence of sexual assault. Countering the evidence of sexual assault was critical to the defense, both because the evidence was inflammatory to the jury and because the State used the sexual assault as evidence of Vasquez's *mens rea.* The state trial court considered this claim and, finding adversely to the petitioner, denied the writ of habeas corpus. State Court Findings of Fact and Conclusions of Law (May 19, 2004) (attached as appendix A to this opinion). The Texas Court of Criminal Appeals affirmed. *Ex parte Vasquez*, No. 59,201-01.

Although Vasquez was never indicted for rape or sexual assault, the State presented evidence, including several expert witnesses, and argument on this issue. The prosecution heavily relied upon this evidence, as it was entitled to do, to show Vasquez's violent, intentional state of mind. Vasquez asserts that trial counsel should have explored inadequacies in the Corpus Christi crime lab, tested the DNA of other relatives to determine whether they too matched any of the samples taken, and challenged the admissibility of the DNA evidence presented. Vasquez argues that his attorneys should have presented a DNA expert to counter the State's expert,

Dr. Nguyen. Vasquez further argues that counsel failed to adequately present evidence that Miranda had suffered a straddle injury, rather than a sexual assault.

Vasquez demonstrates neither the deficiency of performance nor the prejudice required by *Strickland* for a showing of ineffective assistance of counsel. The state court's rejection of this claim of ineffective assistance of counsel was neither "contrary to" nor an "unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1).

1.    DNA Evidence

During the state habeas proceedings, the trial court considered the DNA evidence admitted in Vasquez's case and found that,

> Vasquez's trial attorneys reasonably decided not to challenge the State's DNA evidence or hire an independent DNA expert because the DNA evidence offered by the State was generally neutral and did not tend to prove anything more than Vasquez's own admission that he had beaten the victim to death and that both he and the victim were bleeding at the time, and because the DNA evidence may even have helped the defense by showing that none of Vasquez's semen was found in the victim or on her clothes.

Appendix A at 9. At trial, the State's DNA expert, Dr. Nguyen, testified that the fingernail scrapings taken from Miranda revealed no evidence of a struggle with Vasquez. 35 Tr. 141.[1] He further explained that no semen was found on or inside of the victim's body. 35 Tr. 168-69. The defense highlighted this testimony in its closing arguments. 36 Tr. 28. The bloodstains about which Nguyen testified were consistent with both the State's account of events (a violent assault) and the

---

[1] "Tr." refers to the transcript of Richard Vasquez's trial. "H" refers to transcripts of the state habeas corpus proceedings.

defendant's explanation (Miranda's fall and Vasquez's wounded hand). Therefore, the DNA evidence that Vasquez's trial counsel allegedly failed to rebut was largely favorable to the defense and otherwise equivocal. Vasquez failed to prove by clear and convincing evidence that the state court's finding was unreasonable. 28 U.S.C. 2254(e).

Vasquez argues that counsel should have presented an expert to rebut Nguyen's assertion that semen could be washed away. Even were defense counsel deficient in failing to present such evidence, however, petitioner fails to demonstrate a reasonable probability that the omission prejudiced the defendant. During state habeas proceedings, the defense presented the testimony of Dr. Libby, a DNA expert, that semen is detectable even after washing. At trial, two of the State's experts, Nurse Box and Dr. Lukefahr, offered various explanations for the common absence of semen in cases of sexual assault. Vasquez also testified to his explanation—that no sexual assault occurred. With alternative explanations before the jury, the petitioner has not demonstrated a reasonable probability that undermining one of them would have caused a different result.

2. Straddle Injury

Vasquez avers that his trial counsel deficiently failed to offer evidence of the alternative theory that Miranda suffered a straddle injury, rather than a sexual assault and argues that a credible alternative explanation could have blunted the effects of the inflammatory evidence. Vasquez first urges the testimony of Dr. Bruce Henderson that Miranda might have had a straddle injury. Vasquez,

however, fails to demonstrate that Dr. Henderson would have even been willing to testify and therefore falls short of the necessary showing. *McCullar v. Scott*, 58 F.3d 635, 635 (5th Cir. 1995) ("In order for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial."). Furthermore, the jury heard Henderson's conclusion when defense counsel cross-examined Dr. White, who reviewed Henderson's records. Therefore Vasquez demonstrates no prejudice from the omission of the testimony.

Vasquez does assert that Dr. Randall Frost, an assistant medical examiner, was prepared to testify. The state trial court found during the habeas proceedings that "Vasquez failed to offer any evidence to show that Dr. Randall Frost's testimony would have aided the defense in any way." Appendix A at 8. Frost's speculative testimony, that the injuries *could* have been caused by a straddle injury, would not likely have overcome the testimony of the State's two witnesses, both experts in sexual assault. Petitioner fails to demonstrate by clear and convincing evidence that the state court's finding is unreasonable. 28 U.S.C. § 2254(e).

Vasquez also claims that counsel should have offered the testimony of family members that they saw Miranda playing on an exercise bicycle that could have caused a straddle injury. The state court found that "Vasquez failed to offer any evidence from family members to show that they could have testified to anything other than speculative suggestions." Appendix A at 8. Given the depth of

the abrasions, these injuries would have bled. Such an injury would have occurred in the twelve hours prior to her death, when Miranda was in the care of Richard Vasquez or another member of the family who would have noticed profuse bleeding. Vasquez does not assert, however, that any witness could testify that they had seen Miranda fall, heard her cry or complain of an injury, noticed blood or the abrasion when they bathed her, or otherwise present any direct evidence that Miranda sustained a straddle injury. Vasquez, therefore, offers no witness who could directly confront the testimony of two experts, Nurse Box and Dr. Lukefahr, that Miranda suffered a sexual assault. Petitioner fails to demonstrate by clear and convincing evidence that the state court's finding is unreasonable. 28 U.S.C. § 2254(e). Vasquez fails to show any prejudice resulting from the omission of such inconclusive testimony.

3.    Cumulative Prejudice

Petitioner fails to meet the required showing for the evidence specifically discussed above. Furthermore, even if defense counsel had succeeded in parrying *all* evidence of sexual assault, Vasquez fails to show a reasonable probability of a different outcome. Contrary to Vasquez's assertion, the evidence of sexual assault was not critical to the jury's finding of intent to kill. An expert testified that Miranda's severe head injuries were equivalent to those caused by a 65 m.p.h. car crash. She had bruising throughout her body. Medical testimony suggested that Vasquez lied to doctors and the 911 operator about the nature of Miranda's injuries. She had twice the lethal dose of cocaine in her system, which a drug

addict above others would understand. 36 Tr. 20. All of this evidence provided

substantial basis for the jury's *mens rea* determination. Vasquez, therefore, fails to

demonstrate a reasonable probability that in the absence of the evidence of sexual

assault, a jury would have found him not guilty of murder.

B. *Failure to Investigate and Present Available Mitigation Evidence*

Vasquez next asserts that his trial counsel failed to adequately investigate

and present available mitigation evidence. In order to determine whether Vasquez

received ineffective assistance of counsel, the court must determine whether

"counsel's representation fell below an objective standard of reasonableness."

*Strickland*, 104 S.Ct. at 2063-64. The American Bar Association Guidelines for

the Appointment and Performance of Counsel in Death Penalty Cases ("ABA

Guidelines") state that counsel for a capital defendant should make "efforts to

discover all reasonably available mitigating evidence." ABA Guidelines 11.4.1

(1989) (attached as Appendix B to this opinion).[2] Although the ABA Guidelines

are not mandatory, they are the only standards of reasonable practice that either

side has offered the Court. Furthermore, the Supreme Court has repeatedly relied

upon the ABA Guidelines to inform its determination of the "objective standard of

reasonableness" set forth in *Strickland v. Washington*. *Rompilla v. Beard*, 125

S.Ct. 2456, 2466 n. 7 (2005) (ABA Guidelines are "standards to which we [the

Supreme Court] have long referred as guidelines for determining what is

---

[2] The 1989 Guidelines were superseded in 2003, but the 1989 version was still in effect at the time of Vasquez's trial.

reasonable"); *Wiggens v. Smith*, 123 S.Ct. 2527, 2536-37 (2003); *Strickland*, 104 S.Ct. 2052 (1984). The Fifth Circuit has similarly relied upon the ABA Guidelines in *Sonnier v. Quarterman.* 476 F.3d 349, 357-58 (5th Cir. 2007).

### 1. Evidence on Vasquez's Family and Social Background

#### a. Performance

Vasquez argues that his attorneys failed to adequately investigate his social history to present as mitigation evidence in the punishment phase of his trial. The Supreme Court has repeatedly acknowledged the importance of presenting a defendant's childhood and family background as mitigation evidence. *See, e.g., Rompilla v. Beard*, 125 S.Ct. 2456; *Wiggens v. Smith*, 123 S.Ct. 2527; *Williams v. Taylor*, 120 S.Ct. 1495. The Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 109 S.Ct. 2934, 2947 (1989) (quoting *California v. Brown*, 107 S.Ct. 837, 841 (1987) (O'Connor, J., concurring)). Indeed, the Fifth Circuit has acknowledged that "[g]enerally accepted standards of competence require that counsel conduct an investigation into [a defendant's] background." *Smith v. Quarterman*, 515 F.3d 392, 405 (5th Cir. 2008).

For example, the Supreme Court in *Williams v. Taylor* found deficient investigation where counsel did not begin preparing for mitigation until a week

before the trial and failed to uncover available records that would have demonstrated defendant's "nightmarish childhood." *Williams v. Taylor*, 120 S.Ct. at 1514. In *Wiggens*, the Supreme Court found the mitigation investigation unreasonable where defense counsel relied solely upon three sources—an IQ test, the presentence investigation report and Baltimore's department of social service records. Wiggens's attorneys failed to hire a mitigation specialist or interview witnesses and therefore failed to discover his history of severe abuse. *Wiggens*, 123 S.Ct. at 2537. The Fifth Circuit has similarly found deficient investigation where defense counsel, at defendant's request, failed to interview potential mitigation witnesses in the defendant's family. *Sonnier v. Quarterman*, 476 F.3d 349. (5th Cir. 2007).

Vasquez's counsel claimed that they made a strategic decision to present Vasquez as coming from a good home. It is true that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 2535. *See also, Burger v. Kemp*, 107 S.Ct. 3114 (1987) (counsel reasonably decided not to present evidence of family background after several interviews with defendant's mother, a family friend and former army colleagues); *Smith v. Quarterman*, 515 F.3d at 405 (finding reasonable investigation where counsel interviewed numerous family members and childhood acquaintances). However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggens*, 123 S.Ct. at 2535

(quoting *Williams v. Taylor*, 120 S.Ct. 1495). The *Wiggens* Court found the curtailment of investigation especially unreasonable where the limited records suggested a troubled childhood that should have been uncovered. *Id.* at 2538 ("In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

Thus, like the Court in *Wiggens*, this Court must focus on whether the underlying the allegedly strategic choice "was itself reasonable." *Id.* at 2536. The trial court made the following findings of fact and conclusions of law:

> Vasquez's trial attorneys reasonably determined that pursuing further evidence of Vasquez's social history was unnecessary to make an informed choice among possible defenses, and their failure to investigate further the negative influence that Vasquez's biological parents played in his early years resulted from a reasoned strategic judgment and not from inattention. . . .

> Vasquez's trial attorneys adequately investigated mitigating evidence concerning his social history, but exercised sound trial strategy in declining to present such evidence at trial, since it could have prejudiced his case on punishment issues.

Appendix A at 2, 20. This Court must determine, therefore, whether petitioner has demonstrated by clear and convincing evidence that the state court's finding was unreasonable and petitioner's attorneys failed to conduct an objectively reasonable investigation.

None of Vasquez's attorneys interviewed his biological mother or father, both of whom were willing to testify on Vasquez's behalf. 2 H. 219, 3 H. 38, 8 H.

Ex. 23. Juan Antonio Vasquez and Olivia Vasquez, Richard Vasquez's uncle and

aunt, stated in affidavits that petitioner's attorneys barely spoke to them before

their testimony in the mitigation case and never prepared them to testify. 8 H. Ex.

21, 22. Defense counsel testified that they hired no mitigation specialist to assist

them in preparing the penalty phase of the trial, though they felt that the trial court

would have approved funds for such an expert. 2 H. 221, 3 H. 55, 113-14. Indeed,

Mr. Collina, the attorney responsible for petitioner's mitigation case, stated that he

thought mitigation experts were only useful for defendants with "no family." 3 H.

54. Collina stated that because Vasquez "had a loving family," no mitigation

expert was necessary. 3 H. 55.

Had Vasquez's attorneys interviewed his parents and sister, they would have

developed an entirely different understanding of his extremely troubled childhood.

Marta Vasquez, petitioner's biological mother, drank throughout her pregnancy and

continued to drink daily during Vasquez's youth. 8 H. Ex. 23. Ricardo Vasquez, the

petitioner's biological father, testified that he began using cocaine and heroin at the

age of fourteen and became addicted. 3 H. 116. He has been in prison frequently

since that time. 3 H. 117. From the time that Richard Vasquez was a baby, his father

took him to buy drugs, and used drugs in his presence. Richard also saw his father

selling drugs from the front porch of their home. Ricardo brought Richard with him

to rob houses for drug money. He even taught Richard to sell heroin. Richard

watched his father get arrested.

Collina dismissed the importance of Vasquez's biological parents, claiming they were involved in his life only "at a very young age." 3 H. 77. However, Ricardo Vasquez affirmed that even after Richard was adopted they continued to spend time together. 3 H. 123, 127. Richard also continued to spend time with his mother Marta into his teenage years. Marta lived with a drug addict and dealer who also used drugs with Richard. 3 H. 126.

Ricardo Vasquez further explained the history of drug abuse and violence that permeated their family. One of Richard's uncles died of an overdose, while two others were murdered in drug-related violence. Richard's sister Brenda has also been addicted to cocaine and heroin, and her boyfriend used drugs with Richard. 8 H. Ex. 21, 25. Several other family members, including Richard's grandparents and great-grandparents, had drug and alcohol addictions. 8 H. Ex. 21.

Mr. Collina billed for only twenty hours of preparation for trial. 3 H. 107. At the state habeas proceedings, defense counsel testified that they did not have copies of his juvenile probation file or a complete set of medical records. 3 H. 75-76. Although they made minimal use of an investigator for the guilt/innocence phase, he did not work on the mitigation case. 3 H. 23. The defense used less than half of the fees approved by the Court for investigation. 3 H. 23.

Vasquez's counsel conducted virtually no investigation of a mitigation case. They never spoke to Vasquez's biological parents and only very briefly with his adoptive parents. Like the attorneys in *Sonnier*, "the trial attorneys did not talk to [petitioner's] family and acquaintances at the length or depth required for

[mitigation] purposes." *Sonnier*, 476 F.3d at 357-58. They failed to hire a mitigation specialist, or even to use their court-funded investigator to speak with Vasquez's family. Vasquez's attorneys never had an accurate understanding of even the vague outlines of his childhood. With only the exception of his aunt and uncle, everyone in Vasquez's family suffered from drug and alcohol addictions. His family's whole way of life centered on addiction and crime. He was initiated into drugs and crime by not only his father but by almost every role model he had.

What little petitioner's attorneys did know should have led them to do additional investigation. Upon the suggestion of a troubled childhood, a reasonable attorney would have had at least a brief conversation with the biological parents to determine whether they could offer any important mitigation. Such a conversation would have quickly disproved counsel's unfounded preconception of the biological parents' minimal role in Richard's life. Instead, Vasquez's counsel failed to follow up on the modicum of background information they had. Indeed, Collina's justification for the mitigation strategy—Vasquez's loving family and the minimal role of his biological parents in his life—suggests that their "strategy" had little, if any, factual basis, and that the meager mitigation evidence presented was the result of "inattention, not reasoned strategic judgment." *Wiggens*, 123 S.Ct. at 2537.

For the reasons described above, the Court concludes that Vasquez's attorneys failed to perform an objectively reasonable investigation of mitigating evidence. Petitioner has demonstrated by clear and convincing evidence that the

state court's factual finding was unreasonable. 28 U.S.C. § 2254(e). The state

court's conclusion that there was no deficiency was an "unreasonable application"

of federal law, as clearly established by the Supreme Court in *Wiggens v. Smith*,

published before the state court's findings of fact and conclusions of law. 123

S.Ct. 2527.

### b. Prejudice

Because the Court finds that Vasquez's counsel "fell below an objective

standard of reasonableness," the Court must now consider the second prong of

*Strickland*—whether "the deficient performance prejudiced the defense."

*Strickland v. Washington*, 104 S.Ct. at 2064. In order to meet the second prong of

*Strickland*, a petitioner must demonstrate "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been

different. *Id.* A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id.* at 2068.

In evaluating a claim of ineffective assistance of counsel at the sentencing

phase of a capital trial, the reviewing court considers, "whether there is a

reasonable probability that, absent the errors, the sentencer . . . would have

concluded that the balance of aggravating and mitigating circumstances did not

warrant death." *Id.* at 2069. The Supreme Court has found prejudice from failure

to uncover mitigation when the available evidence was truly horrific, including

extreme physical abuse and neglect. *See, e.g., Williams v. Taylor*, 120 S.Ct. 1495,

1514 (defendant's parents had been imprisoned for criminal neglect); *Rompilla v.*

*Beard*, 125 S.Ct. 2456, 2468-69 (abuse included, *inter alia*, "his father . . . beat him when he was young with his hands, fists, leather straps, belts and sticks . . . His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement-filled . . ."); *Wiggens*, 123 S.Ct. at 2542 ("physical torment, sexual molestation, and repeated rape" at the hands of both defendant's biological mother and his subsequent foster parents). However, prejudice from omitted mitigation is especially hard to establish when the evidence at the guilt phase of trial is overwhelming or when the details of the crime are especially gruesome. *Id.* at 2057; *Jones v. Johnson*, 171 F.3d 270 (5th Cir. 1999); *Russel v. Lynaugh*, 892 F.2d 1205 (5th Cir. 1989).

The trial court found that "had the jury been confronted with the mitigating evidence put forward by Vasquez in connection with the [state habeas proceedings], there is no reasonable probability that it would have resulted in a different sentence." Appendix A at 12. At trial, it was undisputed that four-year-old Miranda died while in Vasquez's sole care from a blow he delivered to her head. One expert stated that her injuries were equivalent to a 65 m.p.h. car accident. She had a lethal quantity of cocaine in her system. There was significant evidence of some type of sexual assault. There was also evidence of a history of abuse of the child. It is obviously difficult for the Court to predict what might influence a jury, but this Court finds that Vasquez's background, though terrible, does not reach the compelling level found sufficient to constitute prejudice by the Supreme Court. In the face of these gruesome facts, against such a young victim,

Vasquez fails to demonstrate by clear and convincing evidence that the state court's finding on this point was unreasonable. 28 U.S.C. § 2254(e). Petitioner has failed to demonstrate the prejudice required by *Strickland*.

### 2. Evidence of Various Disorders

Vasquez further argues that during the punishment phase of the trial, counsel should have presented evidence that he suffers various disorders, including post traumatic stress disorder, attention deficit disorder, poly-substance dependence, fetal alcohol syndrome, learning disabilities, and a borderline IQ. Defense counsel did have reports from two doctors, Dr. Bonikowski, a neurologist, and Dr. Estrada, a psychologist. Vasquez now urges that his attorneys should have pursued further testing, including an MRI and an EEG.

Regardless of whether defense counsel should have pursued these additional tests, the Court finds no prejudice from the omission of any such evidence. Evidence of mental and neurological conditions is double-edged: while it could elicit the jury's sympathy, it could equally bolster the State's claims of future dangerousness by showing poor ability to control impulses and learn from past mistakes. *See, e.g. Penry v. Lynaugh*, 109 S.Ct. 2934, 2938-39 (1989) (evidence of mental retardation could be both mitigating and aggravating). The Fifth Circuit counsels deference to strategic decisions not to present such double-edged mitigation evidence. *See, e.g. Martinez v. Quarterman*, 481 F.3d 249, 254 (5th Cir. 2007) (mental disorder causing "savage and uncontrolled aggressiveness"

was double-edged and counsel reasonably decided not to pursue it); *Rector v. Johnson*, 120 F.3d 551 (5th Cir. 1997) ("[A] tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable."); *Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996) (evidence of mental illness was double-edged).

Indeed, the opinions of Dr. Weinstein presented by petitioner epitomize the problem. After reviewing documentation and performing numerous tests, Weinstein diagnosed Vasquez with the disorders listed above. The effects of these disorders, as he described them, include "relevant limitations on his ability to regulate his behavior and emotions," inability to "regulate his response" to overwhelming circumstances, and the tendency to "act[] impulsively and without the awareness of his behavior." 8 H. Ex. 20. While this evaluation certainly helps to explain Vasquez's violent outburst against Miranda, it also suggests that Vasquez would continue to be a danger due to his inability to moderate his behavior.

The Court must again consider whether there is a reasonable probability that with the benefit of this evidence, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 104 S.Ct. at 2069. The state court found that presenting evidence of mental impairment would have been "ineffective." Appendix A at 7. Petitioner fails to demonstrate by clear and convincing evidence that the state court's finding is unreasonable. 28 U.S.C. §2254(e). Given the double-edged nature of this

evidence, the overwhelming evidence of guilt and the brutality discussed above, the Court finds that Vasquez fails to demonstrate a reasonable probability that the mitigating evidence would have altered the jury's balancing of aggravating and mitigating factors. The State Court's rejection of this claim was neither "contrary to" nor an "unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1).

### C. *Appellate Counsel's Conflict of Interest*

Finally, Vasquez argues that he received ineffective assistance of appellate counsel due to a conflict of interest. Attorney Grant Jones represented Vasquez in his direct appeal, while he represented the State of Texas in two capital postconviction cases under appointment as a special prosecutor for Nueces County.

A defendant is constitutionally entitled to effective assistance of appellate counsel when he has a right to appeal under State law." *Evitts v. Lucey*, 105 S.Ct. 830, 835-36 (1985). The *Strickland* two-prong standard applies to claims of ineffective assistance of appellate counsel. *Duhamel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992). To demonstrate ineffective assistance, petitioner must demonstrate "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 100 S.Ct. 1708, 1718 (1980) (finding effective assistance where attorneys representing multiple defendants presented a consistent innocence defense for each, causing no actual conflict).

There is apparently no Supreme Court or Fifth Circuit precedent factually similar to this case. Vasquez cites a single New York State decision in support of his claim that the representation presents an actual conflict of interest. *People v. Cooper*, 156 Misc.2d 483, 487, 93 N.Y.S.2d 733, 736 (Erie County 1992).[3] In that case, the defendant's counsel simultaneously served as a part-time prosecutor in the county where defendant was prosecuted. The County Court found an "obvious and actual conflict of interest" and also emphasized the "appearance of impropriety." *Id.* at 487-88. However, the decision turned largely on ethical rules and opinions of the New York State Bar Association Professional Ethics Committee. *Id.* Furthermore, the attorney in *Cooper*, served as a part-time prosecutor for the County, a role that suggests an ongoing relationship with the prosecutor's office. Mr. Jones, on the other hand, served as a special prosecutor, which is an appointment made only for a particular case. *State v. Rosenbaum*, 852 S.W.2d 525, 529 (Tex. Crim. App. 1993) (Clinton, J., concurring).

The Court finds more persuasive the opinion of the Seventh Circuit in *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993). In *Small*, the petitioner argued that he received ineffective assistance of trial counsel because his court-appointed lawyer also served as a special prosecutor in an unrelated case. The Seventh Circuit found no actual conflict of interest:

---

[3] Vasquez's additional citations are factually inapposite. *Cuyler v. Sullivan*, 100 S.Ct. 1708 (1980) (representation of multiple defendants); *Holloway v. Arkansas*, 98 S.Ct. 1173 (1978) (same); *Castillo v. Estelle*, 504 F.2d 1243 (5th Cir. 1974) (simultaneous representation of defendant and key state witness); *Zuck v. Alabama*, 588 F.2d 436 (5th Cir. 1979) (simultaneous representation of prosecutor in an unrelated civil matter).

> [The petition] contains no suggestion that his attorney "actively represented conflicting interests." All it alleges is that his attorney served as a special prosecutor in an unrelated murder. More is necessary . . . . [W]e do not find a conflict of interest where there exist separate and distinct criminal cases involving neither the same parties nor facts.

*Id.* at 417. Like the attorney in *Small*, Jones undertook "separate and distinct criminal cases involving neither the same parties nor facts." Therefore, Vasquez fails to demonstrate any actual conflict of interest.

Vasquez fails to prove an actual conflict, and he also fails to demonstrate that any conflict adversely affected his lawyer's performance. *Id.* ("Although prejudice is presumed when counsel is burdened by an actual conflict of interest, it may be presumed only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance."). Vasquez does not assert that had he known of Mr. Jones's conflict he would have requested different counsel. Further, while petitioner claims a "pro-state bias" in the appellate briefing and argues that several "straw men" arguments were included, Vasquez identifies no single claim that appellate counsel neglected to raise on appeal. The State Court's rejection of this claim of ineffective assistance of counsel was neither "contrary to" nor an "unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1).

III.　Certificate of Appealability

Vasquez does not request a certificate of appealability ("COA"), but this Court may *sua sponte* determine whether he is entitled to such relief. *See Alexander v. Johnson*, 211 895, 898 (5th Cir. 2000) ("The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") The AEDPA dictates an issue-by-issue consideration of appealability. *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997). To obtain a COA, a petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S.Ct. 1595, 1603-04 (2000).

This Court has carefully considered each of Vasquez's claims and finds that his claim of ineffectiveness in addressing evidence of sexual assault is foreclosed by clear precedent. This Court concludes that under such precedents, Vasquez has failed to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Court finds, however, that reasonable jurists could reach differing conclusions on the effect of Vasquez's counsel's failure to adequately investigate his family and personal history.

Because no Fifth Circuit or Supreme Court case law addresses Vasquez's claim of ineffective assistance of appellate counsel, reasonable jurists could also disagree whether the facts give rise to an actual conflict of interest. Therefore, this Court concludes that Vasquez is entitled to a COA on his claims that he received ineffective assistance during the mitigation and appellate stages of his case.

IV. Order

For the foregoing reasons, it is ORDERED as follows:

1. Respondent Nathaniel Quarterman's Motion for Summary Judgment is GRANTED;

2. Petitioner Richard Vasquez's Petition for Writ of Habeas Corpus is DENIED; and

3. A Certificate of Appealability shall issue as to Vasquez's claim that he received ineffective assistance of counsel during the mitigation and appellate stages of his case.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Corpus Christi, Texas on this 28th day of March, 2008.

HAYDEN HEAD
CHIEF JUDGE

# EXHIBIT 3(c)

**REVISED August 12, 2010**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 11, 2010

No. 08-70034

Lyle W. Cayce
Clerk

RICHARD VASQUEZ

Petitioner-Appellant

United States Courts
Southern District of Texas
FILED

NOV 02 2010

David J. Bradley, Clerk of Court

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:05-CV-59

Before WIENER, STEWART, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Petitioner Richard Vasquez appeals from the district court's denial of his petition for habeas corpus relief under 28 U.S.C. §§ 2253 & 2254. The district court did, however, issue a certificate of appealability ("COA") *sua sponte* on the two issues now before us: (1) whether Vasquez received ineffective assistance

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

of trial counsel when his attorneys failed to investigate and present significant mitigating evidence during the penalty phase of his trial; and (2) whether Vasquez received ineffective assistance of appellate counsel because his attorney labored under an actual conflict of interest arising from the attorney's undisclosed, simultaneous service as a special prosecutor in multiple death penalty cases in the same jurisdiction. Although troubled by the performance of Vasquez's trial counsel and by the divided loyalties of Vasquez's appellate counsel, the demanding standard of review imposed by the Anti-Terrorism and Effective Death Penalty Act[1] ("AEDPA") ties our hands. We affirm.

## I. Facts & Proceedings

The Texas Court of Criminal Appeals summarized the facts adduced at trial when it affirmed Vasquez's conviction on direct appeal.[2] We recount here only those facts that bear on Vasquez's two claims of ineffective assistance of counsel ("IAC").

In 1999, a Texas jury convicted eighteen-year-old Richard Vasquez of the brutal beating death of Miranda Lopez,[3] the four-year-old daughter of Vasquez's girlfriend, Brenda Lopez, from a prior relationship. Vasquez and Lopez also had a four-month-old daughter, Meagan, and the four of them had lived together with Vasquez's adoptive parents, who were his paternal aunt and uncle.

---

[1] 28 U.S.C. § 2254(d)(1)-(2).

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[2] *Vasquez v. State*, No. 73,461 (Tex. Crim. App. Oct. 3, 2001) (unpublished).

[3] TEX. PENAL CODE ANN. § 19.03 (a)(8).

During the guilt/innocence phase of the trial, it emerged that Vasquez had been addicted to cocaine and heroin from the age of twelve or thirteen; that his girlfriend, Brenda, was similarly addicted; and that at the time of the murder in March 1998, Vasquez and Brenda were on a prolonged heroin binge in which "'they stopped caring about themselves, the children, or anything else except drugs. They would leave the children anywhere so that they could go out and steal things in order to buy more drugs.'"[4] Throughout the night before the murder, Vasquez and Brenda had argued, and they injected themselves with heroin some time in the early morning hours before falling asleep. When he awoke, Vasquez injected himself with more heroin before driving Brenda to work at around noon, taking the two children with him in the car. On the way, Vasquez became angry with Brenda because he had to stay home and watch the children while she worked. No one was home when he returned, and he telephoned Brenda to ask her where she had hidden the remainder of their drugs. When she refused to tell him, Vasquez became angry and unleashed his frustration on Miranda. She died as a result of severe brain injuries sustained when Vasquez, in a drug-fueled rage, struck her several times in the head. At trial, significant evidence emerged that Miranda had also been severely sexually assaulted before she died, responsibility for which Vasquez denied.[5] A toxicology report revealed cocaine levels in Miranda's blood that were double the lethal amount for an adult, although neither the doctor nor Vasquez could explain the presence of the drug in her blood.

---

[4] *Vasquez v. State*, No. 73,461 (Tex. Crim. App. Oct. 3, 2001) (unpublished).

[5] Vasquez's state and federal petitions also included an additional ineffective assistance of counsel claim premised on trial counsel's failure adequately to rebut the state's evidence that he sexually assaulted Miranda Lopez. The district court denied this claim and did not grant a certificate of appealability with respect to it. Consequently, we do not consider it here.

Vasquez was represented by three attorneys at trial. As part of his defense, Vasquez's trial attorneys offered the testimony of a psychiatrist, Dr. Carlos Estrada, who informed the jury that Vasquez had been addicted to narcotics from the age of twelve and that his behavior was typical of addicts. Dr. Estrada also testified that, if rehabilitated, Vasquez would not be a danger to society. It later emerged, however, that Estrada had told Vasquez's attorneys that Vasquez's medical records and school record were incomplete and that Vasquez appeared to warrant additional neurological testing. Vasquez's attorneys never requisitioned these additional tests, and no further psychological or neurological evidence was presented to the jury in either phase of his trial.

During the sentencing phase, Vasquez's counsel called three additional witnesses: Vasquez's aunt and uncle (his adoptive parents), and his sister, each of whom essentially begged the jury for mercy. Not one of them was asked to disclose any information regarding the role of Vasquez's biological parents in his life, his ongoing relationship with his biological father, his family's history of substance abuse and criminality, or any past or present mental disorders that may have affected Vasquez's childhood or development.

In affidavits submitted in connection with his state habeas petition, Vasquez's aunt and uncle each stated that none of Vasquez's attorneys had met with them to discuss possible mitigating evidence, and none prepared the Vasquezes to testify at sentencing. One of Vasquez's attorneys later admitted that counsel's only interviews with the Vasquez family to prepare the mitigation case were held in the courthouse hallway during the trial. They never spoke with Vasquez's biological parents at all. Neither did Vasquez's attorneys hire a mitigation specialist; rather, the court-authorized investigator they *did* hire, who had no experience investigating mitigating evidence in capital murder cases, spent just eight and a half hours working on the case, which included time spent traveling 110 miles.

4

Had Vasquez's trial attorneys undertaken even a rudimentary investigation of Vasquez's family and social history, they would have unearthed a frightening portrait of addiction and destruction. Vasquez's mother drank heavily and regularly during her pregnancy, inflicting Vasquez with Fetal Alcohol Syndrome. Vasquez's father, Ricardo Vasquez, was a drug addict and lifelong foot soldier in the drug trade who spent much of his life in and out of prison for narcotics-related crimes. Ricardo maintained a close relationship with his son, refusing to allow Vasquez's clean-living aunt and uncle legally to adopt the boy. From the time Vasquez was a child, he witnessed his father using and dealing heroin, often from the front porch of their home. Ricardo took Vasquez with him to rob houses and taught Vasquez how to use and sell heroin. Vasquez began using marijuana when he was ten, and by thirteen he was addicted to heroin and cocaine. Vasquez's father was not the only corrupting influence: When Vasquez was eight, a paternal uncle who lived nearby was murdered in a drug-related homicide; when Vasquez was nine, another paternal uncle died of a drug overdose; three years later, yet another paternal uncle was murdered in narcotics-related violence.

When, at age fourteen, Vasquez's aunt and uncle tried to get him help for his substance abuse, Ricardo lured Vasquez back to a life of drugs and drug-trafficking by taking the boy along with him when he made deliveries as a drug runner and when he robbed houses. Even when Ricardo was incarcerated, Vasquez's environment fueled his addiction: His father's friends would seek him out and share their drugs with him; his sister Brenda, also a cocaine addict, had a series of boyfriends who sold heroin and who would supply Vasquez with whatever he wanted; even his biological mother, who lived nearby and had informally surrendered custody of Vasquez to his aunt and uncle, co-habited with a drug-dealer who provided Vasquez with drugs. The toxic combination of addiction and crime that pervaded Vasquez's family life and adolescence

5

eventually took its toll. Neurological tests undertaken as part of his state habeas petition revealed that he suffered from brain dysfunction arising from multiple causes (including Fetal Alcohol Syndrome, actual trauma to the brain, and drug abuse), cumulative post-traumatic stress disorder, learning disabilities, and a borderline low-normal IQ of 83. None of the foregoing mitigating evidence was discovered and presented to the sentencing jury by his counsel.

Vasquez appealed his conviction and sentence to the Texas Court of Criminal Appeals, which affirmed both.[6] While his direct appeal was still pending, Vasquez filed a state petition for habeas corpus in his trial court, asserting eleven grounds for relief, including those under consideration here. Following an evidentiary hearing, the trial court entered findings of facts and conclusions of law denying relief on all grounds. The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions in an unpublished opinion and denied Vasquez's state application for the writ of habeas corpus.[7]

Following the exhaustion of his state remedies, Vasquez filed a federal habeas petition in the Southern District of Texas, advancing three claims for relief premised on violations of his Sixth Amendment right to the effective assistance of trial and appellate counsel. The district court denied relief on all three claims, but granted a certificate of appealability *sua sponte* on the two claims now before us: (1) whether trial counsel's investigation into mitigating evidence was so deficient and prejudicial as to violate his Sixth Amendment right; and (2) whether Vasquez's appellate attorney labored under an actual conflict of interest that deprived him of his Sixth Amendment right.[8]

---

[6] *Id.*

[7] *Ex parte Vasquez*, No. 59,201-01 (Tex. Crim. App. Jan. 26, 2005).

[8] *Vasquez v. Quarterman*, No. CC-06-059, 2008 WL 859147 (S.D. Tex. Mar. 28, 2008).

## II. ANALYSIS

### A.    Standard of Review

Because Vasquez's IAC claims were brought in the district court after April 24, 1996, they are governed by the provisions of the AEDPA.[9] We review the district court's interpretation of the AEDPA *de novo* and its findings of fact for clear error.[10] The AEDPA's deferential standard of review only applies to the state court's adjudication of a petitioner's claim on the merits,[11] a condition satisfied here.

IAC claims are mixed questions of fact and law, and thus are "reviewed under the 'contrary to' and 'unreasonable application' prong of 28 U.S.C. § 2254(d)."[12] A state court's decision is "contrary to" clearly established Supreme Court precedent when it "applies a rule that contradicts the governing law set forth in [the Court's] cases," or reaches an opposite conclusion from a Supreme Court case upon facts that are "materially indistinguishable."[13] A state court

---

[9]  28 U.S.C. § 2254(d)(1)-(2).

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[10]  *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998). In a habeas petition, however, the state court's findings constrain the district court's determination of the facts. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254(e)(1).

[11]  28 U.S.C. § 2254(d).

[12]  *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

[13]  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (O'Connor J., concurring) (concurrence commanded a majority for the proposition cited).

"unreasonably applies" clearly established federal law when it correctly identifies the governing law but unreasonably applies it to the facts of a particular case.[14] To warrant reversal, the state court's application of the law must be objectively, not subjectively, unreasonable.[15]

When the state court denies relief without issuing a written order or otherwise specifying its reasons, our inquiry under the AEDPA is not affected. Rather, we "(1) assume that the state court applied the proper clearly established federal law; and (2) then determine[] whether its decision was contrary to or an objectively unreasonable application of that law."[16]

## B.    Analysis

## 1.    The *Wiggins* claim

Under the familiar standard set forth in *Strickland v. Washington*,[17] a petitioner claiming ineffective assistance of counsel must prove that (1) counsel's performance fell below the objective, professional standard of reasonableness, *and* (2) such deficient performance prejudiced the defense. To establish prejudice, the petitioner must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different."[18]

### a.    Deficient performance

---

[14] *Id.* at 407-09.

[15] *Id. Accord Schiro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher standard.").

[16] *Jordan v. Dretke*, 416 F.3d 363, 367-68 (5th Cir. 2005) (internal citations and marks omitted).

[17] 466 U.S. 668, 687-88 (1984).

[18] *Mickens v. Taylor*, 535 U.S. 162, 166 (2002).

In *Wiggins v. Smith*,[19] the Supreme Court recognized that, in a capital case, counsel's performance may be deficient if it does not include an adequate investigation into mitigating evidence, including research into a capital defendant's *"family and social history."*[20] The Texas Court of Criminal Appeals held that Vasquez's attorneys' performance was neither deficient nor prejudicial. Thereafter, the federal district court held that counsel's performance was constitutionally deficient, but that it did not prejudice Vasquez's defense. On appeal to us, Vasquez challenges the district court's conclusion regarding prejudice by identifying several ways in which the district court allegedly misapplied the applicable prejudice analysis. Before us, the government does not contest the district court's conclusion that counsel's performance was deficient;[21] instead, the government contends that the district court correctly interpreted and applied the *Strickland* standard of prejudice. Consequently, our task is confined to determining (1) whether it was objectively unreasonable for the Texas Court of Criminal Appeals to conclude that the outcome of Vasquez's capital sentencing would *not* have been different if his trial counsel had investigated (and, presumably, presented) evidence of his family life and social history, including his mental impairments, and (2) whether the district court erred as a matter of law in its application of *Strickland*.

### b.    Prejudice

Under *Strickland* and its progeny, Vasquez must demonstrate that, but for counsel's failures to investigate and present evidence of his family life and

---

[19]  539 U.S. 510 (2003).

[20]  *Id.* at 524 (recognizing as the applicable standard of professional conduct the American Bar Association Standards for Criminal Justice); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (same).

[21]  We have already held that "[g]enerally accepted standards of competence require that counsel conduct an investigation into [a defendant's] background." *Smith v. Quarterman*, 515 F.3d 392, 405 (5th Cir. 2008).

social history, there is a "reasonable probability" that a jury would not have sentenced him to death.[22]  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."[23]

Vasquez essentially insists that the district court erred in its application of the *Strickland* standard because it failed to consider how the evidence of his family life and background would have affected the totality of the evidence presented to the sentencing jury regarding his culpability.  He contends that, contrary to Texas and federal law,[24] the district court employed several erroneous modes of analysis, including (1) improperly "weighing" mitigating evidence against aggravating evidence; (2) improperly assessing the evidence of Vasquez's childhood and mental impairments in a "threshold-based analysis" against the depravity suffered by the successful habeas petitioners in *Wiggins* and *Rompilla*; (3) improperly discounting the evidence of mental impairment as "double-edged"; and (4) misconstruing the petitioner's standard of proof when it

---

[22] *Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

[23] *Id.*

[24] As a threshold matter, we note that Vasquez's claim that the district court misapplied *Texas* law must implicate a violation of a federal right if it is to be cognizable on federal habeas review. *Hankins v. Quarterman*, 288 Fed. App'x 952, 960 n.28 (5th Cir. 2008) (citing *Smith v. McCotter*, 786 F.2d 697, 702-03 (5th Cir. 1986) (citing *Baldwin v. Blackburn*, 653 F.2d 942, 948 (5th Cir. 1981), *cert. denied*, 456 U.S. 950, *reh'g denied*, 457 U.S. 1112 (1982) (holding that a failure to comply with state law requirements presents a federal habeas issue only if it involves federal constitutional issues))). The Texas mitigation special issue instruction tracks the constitutional requirement articulated in *Penry v. Lynaugh*, in which the Court held that a defendant has a right to "[sentencing] instructions informing the jury that it could consider and give effect to the mitigating evidence of [petitioner's] [mental infirmities] and . . . background by declining to impose the death penalty, [as a ] . . . . vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989). Inasmuch as the Texas mitigation special issue was modeled on *Penry* to ensure compliance with federal constitutional law, Vasquez's claim is cognizable on federal habeas review.

10

held that Vasquez had to establish prejudice by "clear and convincing evidence."

We address each contention in turn.

### i.    *Improper weighing of evidence*

The Supreme Court has long recognized that a state may employ any procedure it chooses to administer the death penalty as long as that procedure meaningfully "limit[s] the class of murderers to which the death penalty may be applied."[25] Once this limiting condition has been satisfied, all states ask "the sentencer . . . to determine whether a defendant thus found eligible for the death penalty should in fact receive it. Most States channel this function by specifying the aggravating factors (sometimes identical to the eligibility factors) that are to be weighed against mitigating considerations."[26] State practices diverge here, as some permit the sentencer to consider aggravating circumstances that are not included in the list of aggravating circumstances that made the defendant death-penalty eligible initially.[27] Regardless of the differences between state practices, however, the only federal constitutional requirement is that "in *all* capital cases the sentencer must be allowed to weigh the facts and circumstances that arguably justify a death sentence against the defendant's mitigating evidence."[28] To comply with this standard, Texas law instructs the sentencer to consider "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating

---

[25]    *Brown v. Sanders*, 546 U.S. 212, 216 (2006) (analyzing different state capital sentencing schemes in the context of determining "what happens when the sentencer imposes the death penalty after at least one valid eligibility factor has been found, but under a scheme in which an eligibility factor or a specified aggravating factor is later held to be invalid.").

[26]    *Id.*

[27]    *Id.* (observing same).

[28]    *Id.* 216-17.

11

circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."[29]

This was precisely the analysis undertaken by the district court in this case. After undertaking an extensive review of the evidence in mitigation, the court went on to note the other evidence put before the jury regarding (1) the victim's youth; (2) the undisputed fact that she died while in Vasquez's sole care from blows to the head that "were equivalent to a 65 m.p.h. car accident;" (3) the fact that she had lethal quantities of cocaine in her system; (4) the significant evidence of some type of sexual assault; and (5) evidence of other wounds on her body that pointed to a history of physical abuse. To guide its assessment of the post-conviction record of evidence in aggravation and in mitigation, the district court properly looked to cases in which the Supreme Court had applied this very standard.[30] The district court then concluded that Vasquez's background, "though terrible," would not have so altered a jury's perception of his moral culpability that the Texas Court of Criminal Appeals had *unreasonably* erred—the standard imposed by AEDPA—in its conclusion that a jury would have convicted Vasquez to death anyway.

    ii.    *Comparing instant evidence with that in* Wiggins *and* Rompilla

We deem unavailing Vasquez's claim that the district court erroneously "weighed" the mitigating evidence against the aggravating evidence, or committed error when it compared the mitigating evidence in Vasquez's case to that of successful *Wiggins* petitioners. The Supreme Court instructs courts to consider "the totality" of mitigating evidence–both the evidence adduced at sentencing and evidence that was omitted or went undiscovered—in its prejudice

---

[29] TEX. CRIM. PROC. CODE ANN. art 37.071 § 2(e) (Vernon 1997).

[30] *Vasquez v. Quarterman*, No. CC-05-059, 2008 WL 859147, at *11-12 (S.D. Tex., March 28, 2008).

analysis.[31] The Texas Code of Criminal Procedure instructs a sentencing jury similarly.[32]   Consequently, there is no prescribed or proscribed procedure—"balancing," "weighing," or otherwise—by which a jury (or a court) must analyze the mitigation evidence under either Texas[33] or federal law,[34] so long as both the newly discovered mitigation evidence and the original mitigation evidence is taken into consideration. Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime. We have, therefore, repeatedly upheld the commonsense notion that the relative mix of mitigating and aggravating evidence must be reassessed when a court engages

---

[31] *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (holding that the state supreme court erred when it "failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation").

[32] The Texas statute requires a jury to consider:
Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
TEX. CRIM. PROC. CODE ANN. art 37.071 § 2(e) (Vernon 1997).

[33] *Mosley v. State*, 983 S.W.2d 249, 263 n.18 (Tex. Crim. App. 1998) (instructing that "[w]hile the[ ] cases have some language indicating that the mitigation question does not involve aggravating circumstances, such language should properly be viewed as simply observing that the issue does not require their consideration. Such an observation does not, however, preclude permitting the jury to consider aggravating factors in making its evaluation . . . the jury is not, and should not be, required to look at mitigating evidence in a vacuum . . . ."); *accord Ex parte Gonzalez*, 204 S.W.3d 391, 394 (Tex. Crim. App. 2006) (noting that "Texas's capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances. It asks the jury to answer a mitigation question.").

[34] *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994) (holding that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision" and reaffirming that "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty'" ) (citing *Zant v. Stephens*, 462 U.S. 862, 875 (1983)).

in a *Strickland* prejudice analysis.[35] Vasquez is correct that, in support of its balancing approach to prejudice analysis, the district court relied on two cases that were decided *before* the Texas statute was amended to reflect *Penry*'s insistence that juries be allowed to consider the effect of mitigating evidence on general moral culpability.[36] Nevertheless, our review of the district court's analysis in its entirety leads us to conclude that its citation to two stale cases does not trump the fact that its analysis properly considered the potential impact of the omitted mitigation evidence on the jury's sentencing determination in conformity with prevailing Texas and Supreme Court precedent.

With respect to Vasquez's claim that the district court erred in comparing the mitigating evidence in Vasquez with that of other (successful) habeas petitioners who had brought similar claims, nothing in *Wiggins, Rompilla,* or *Williams* suggests that a court may not, in its assessment of prejudice stemming from uninvestigated mitigating evidence, engage in the kind of "cross-case comparison" that is the foundation of common law reasoning. On the contrary, we have noted that prejudice analysis "is illumined, although not necessarily controlled by, a comparison with cases in which the Supreme Court determined whether there was a reasonable probability that the trial attorneys' failure to

---

[35] *Wood v. Quarterman,* 491 F.3d 196, 203 (5th Cir. 2007) (holding that *Wiggins* requires the court to "reweigh[] the evidence in aggravation against the totality of the available mitigating evidence"); *Blanton v. Quarterman,* 543 F.3d 230, 239 (5th Cir. 2008) ("In reviewing the issue of prejudice at capital sentencing we weight the quality and quantity of the available mitigating evidence, including that presented in post-conviction proceedings, along with any aggravating evidence.")).

[36] *Vasquez v. Quarterman,* No. CC-05-059, 2008 WL 859147, at *11 (S.D. Tex., March 28, 2008) (citing *Jones v. Johnson,* 171 F.3d 270 (5th Cir. 1999) (applying pre-1991 sentencing statute); *Russell v. Lynaugh,* 892 F.2d 1205 (5th Cir. 1989) (same)).

discover and present mitigation evidence had affected the outcome of the sentencing proceedings."[37]

   *iii.    Evidence of mental impairment as "double-edged"*

Vasquez's claim that the district court misconstrued the standard of prejudice applicable to newly-discovered evidence of mental impairment is predicated on a faulty interpretation of the district court's reasoning. Vasquez's argument is somewhat unclear: He appears to argue that the court misconstrued the prejudice standard because its analysis was incorrectly driven by deference to counsel's strategic choice not to present evidence of mental impairment in light of the fact that such evidence can be double-edged. This, however, mischaracterizes the district court's reasoning and the governing legal standard. The court assumed that the performance of Vasquez's counsel was deficient for failing to investigate evidence that Vasquez suffered from post traumatic stress disorder, attention deficit disorder, drug addiction, Fetal Alcohol Syndrome, learning disabilities, and a borderline I.Q. The court then reasoned that "[r]egardless of whether defense counsel should have pursued . . . additional . . . tests [for mental impairment]," even if evidence of mental impairment *were* added to the case for mitigation, the "overwhelming evidence of guilt and the brutality discussed" rendered it unlikely that the mental impairment evidence would have so "altered the jury's balancing of aggravating or mitigating factors."[38] The district court correctly noted that evidence of mental impairment "certainly helps to explain Vasquez's violent outburst against Miranda" and that it "could elicit the jury's sympathy."[39] That court thus clearly contemplated the

---

[37] *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007) (comparing impact of petitioner's excluded mitigation evidence by reference to mitigation evidence in *Williams* and *Rompilla*).

[38] *Vasquez*, 2008 WL 859147 at *22.

[39] *Id.* at *12.

explanatory power and, implicitly, the exculpatory power of the mental-impairment evidence. In so doing, the court's reasoning is entirely in keeping with governing Supreme Court law and the law of this circuit.

The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating,[40] and we have repeatedly rejected IAC claims "where alleged failures to investigate mitigating evidence did not prejudice the defendant because of the double-edged nature of the evidence available."[41] Thus, the district court did not misperceive or misapply the relevant standard of *Strickland* prejudice, and Vasquez has not offered any other grounds from which we could conclude that the state court's prejudice determination was objectively unreasonable. We perceive no error, either on the part of the state court or the federal district court.

    *iv.*    *Standard of proof of prejudice*

Vasquez next contends that the district court assigned him the incorrect standard of proof when it stated that he had to establish prejudice by "clear and convincing evidence."[42] Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[43] Nevertheless, "[o]n questions of law, as well as mixed questions of

---

[40] *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (noting that "mental retardation and history of abuse is thus a two-edged sword: it may diminish [petitioner's] blameworthiness for [the] crime even as it indicates that there is a probability that he will be dangerous in the future").

[41] *Cockrum v. Johnson*, 119 F.3d 297, 304-05 (5th Cir. 1997) (collecting cases).

[42] *Vasquez*, 2008 WL 859147 at *12-13 (noting that "Petitioner fails to demonstrate by clear and convincing evidence that the state court's finding [that evidence of Vasquez's mental impairments would not have been reasonably likely to lead the jury to withhold the death penalty] is unreasonable.").

[43] 28 U.S.C. § 2254(e)(1).

16

law and fact, the district court was required, under AEDPA, to defer to the state-court's decision unless it 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.'"[44] "An ineffective assistance of counsel claim presents a mixed question of law and fact."[45]

Based on the foregoing, the district court erred when it stated that "Petitioner fails to demonstrate by clear and convincing evidence that the state court's finding is unreasonable."[46] Moreover, this error is revealed in the district court's own opinion. In its initial articulation of the standard of review, the court expressly identified the correct standard under the AEDPA, and went on to conclude, after its review of the newly adduced mitigating evidence, that "Vasquez fails to demonstrate a reasonable probability that the mitigating evidence would have altered the jury's balancing of aggravating and mitigating factors" and that, therefore, "[t]he State Court's rejection of this claim was neither 'contrary to' nor an 'unreasonable applicable of' clearly established federal law." These additional statements by the district court, articulating and assigning the correct burden to petitioner, lead us to conclude that it was a simple drafting error that made it appear as though the district court had engrafted the heightened "clear and convincing" evidence standard of proof onto the objective unreasonableness standard mandated by the AEDPA. Even though we recognize that this drafting error incorrectly stated the governing standard of proof, we affirm the district court's ruling on Vasquez's *Wiggins* claim because,

---

[44] *Bartee v. Quarterman*, 339 Fed. App'x 429, 432 (5th Cir. 2009) (internal citations omitted); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

[45] *Ward v. Dretke*, 420 F.3d 479, 486 (5th Cir. 2005).

[46] *Vasquez*, 2008 WL 859147 at *12-13.

under the correct standard, Vasquez has not proven that the state court's prejudice determination was objectively unreasonable.

## 2.  IAC predicated on appellate counsel's conflict of interest

Vasquez also asserts an IAC claim against his appellate counsel, insisting that his attorney on appeal labored under an actual conflict of interest because he simultaneously served as a special prosecutor seeking to uphold two unrelated capital convictions for the same district attorney's office that prosecuted Vasquez. The state court's conclusion that no actual conflict existed is a conclusion of law,[47] and as such it is subject to the "contrary to" or "unreasonable application" standard of review under the AEDPA.

To obtain relief based on counsel's conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."[48] Importantly, the mere "*possibility* of conflict is insufficient to impugn a criminal conviction."[49] In *Mickens v. Taylor*, the Supreme Court explained that

> we think 'an actual conflict of interest' mean[s] precisely a conflict *that affected counsel's performance*–as opposed to a mere theoretical division of loyalties. It was shorthand for the statement [in *Cuyler*] that 'a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. . . .Thus, the [*Cuyler*] standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect.  An 'actual

---

[47] *Cuyler v. Sullivan*, 446 U.S. 335, 342 (1980).

[48] *Id.* at 348. Note here that Vasquez *was unaware* that counsel simultaneously represented the Nueces district attorney's office in other capital appeals, and the record does not indicate that this fact was divulged to the appellate court.

[49] *Id.* (emphasis added).

18

conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.[50]

This circuit has further refined the *Cuyler* inquiry by requiring that "[a] defendant must show more than a speculative or potential conflict;"[51] to meet this standard requires that "it . . . be demonstrated that the attorney made a choice between possible alternative courses of action . . . . If he did not make such a choice, the conflict remained hypothetical."[52]  Relevant factors may include (1) whether the attorney had confidential information that was helpful to one client but harmful to the other client; (2) whether and how closely related were the subject matters of the cases; (3) how close in time the multiple representations occurred; and (4) whether the prior representation has terminated.[53]  Ultimately, however, we have noted before that "*Cuyler*'s 'actual conflict' and 'adverse effect' elements have been described as 'rather vague'" and such a determination is therefore "tightly bound to the particular facts."[54]

Vasquez's conflict-based IAC claim may be reduced to the assertion that, because the interests of a criminal defendant and the office of the prosecutor that convicted him are inescapably adverse, his appellate attorney was, *ex definitio*, actively representing conflicting interests.  All the authorities that Vasquez cites involved a defense attorney's present representation of a defendant and the past representation (civil or criminal) of a witness for the

---

[50] *Mickens v. Taylor*, 535 U.S. 162, 164 (2002) (addressing "what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known.")

[51]  *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006).

[52]  *Id.* (citing *Beets v. Scott*, 65 F.3d 1258, 1277 (5th Cir. 1995) (en banc).

[53]  *U.S. v. Burns*, 526 F.3d 852, 856 (5th Cir. 2008).

[54]  *Perillo v. Johnson*, 205 F.3d 775, 782 (5th Cir. 2000) (citing *Beets*, 65 F.3d at 1265).

prosecution in the defendant's ongoing criminal trial.[55] Consideration of the particular situation presented here—a special prosecutor who *simultaneously* serves as a capital defense attorney in the same jurisdiction—appears to be *res nova* in this circuit, and, indeed, in all but one other circuit. It appears that only the Seventh Circuit has addressed this particular type of conflict, and it squarely rejected the argument that Vasquez advances here. In *Small v. Endicott,* the Seventh Circuit held that a pro se defendant failed to demonstrate the existence of a cognizable actual conflict under the Sixth Amendment because he did not point to anything other than the fact "that his attorney served as a special prosecutor in an unrelated murder" in the same jurisdiction while he was defending the petitioner.[56] The *Small* court reasoned that "we do not find a conflict of interest where there exist separate and distinct criminal cases involving neither the same parties nor facts."[57]

We do not today suggest that an arrangement such as the one presented here could not, under different circumstances, present an actual conflict,[58] but we cannot conclude on the record before us that the state court's conclusion was

---

[55] *United States v. Martinez,* 630 F.2d 361, 363 (5th Cir. 1980); *Stephens v. United States,* 595 F.2d 1066, 1066 (5th Cir. 1979); *Zuck v. Alabama,* 588 F.2d 436, 439 (5th Cir. 1979); *Castillo v. Estelle,* 504 F.2d 1243 (5th Cir. 1974) .

[56] 998 F.2d 411, 417 (7th Cir. 1993).

[57] *Id.*

[58] *See, e.g., Burger v. Kemp,* 483 U.S. 776, 784-85 (1987). In *Kemp,* the Court treated partners in a law firm who represented different defendants in different trials involving a single criminal transaction as a single attorney for conflicts purposes. "The two partners [had] shared their legal research and discussed the cases with one another," and the respective theories of each co-defendant "sought to emphasize the culpability of the other in order to avoid the death penalty." *Id.* at 780. Although the Court "assum[ed] without deciding" that two law partners are considered one attorney for the purposes of the conflicts analysis, *Kemp* nevertheless suggests that a special prosecutor and a prosecutor may be treated as law partners—and therefore, have one another's loyalties and conflicts imputed to the other—under certain circumstances.

objectively unreasonable. As in *Small v. Endicott*, Vasquez's appellate counsel served as a special prosecutor in totally "separate and distinct" capital cases. Further, Vasquez does not allege that his counsel possessed confidential, "zero-sum" information that would have aided his defense but would have required his attorney to breach a duty to the Nueces County district attorney's office. Bearing in mind that the only circuit to have considered such a fact pattern held that it did not rise to the level of an actual conflict, we conclude that, under the highly deferential standard of review imposed by the AEDPA, the state court was not objectively unreasonable in holding that, without more, appellate counsel's simultaneous service as a special prosecutor in unrelated capital cases did not establish an actual conflict under prevailing federal law as established by the Supreme Court.

## III. CONCLUSION

We hold that although it was objectively unreasonable for the state court to conclude that Vasquez's trial counsel's performance was constitutionally sound, Vasquez was not prejudiced by his trial counsel's deficient performance. We also hold that it was not objectively unreasonable for the state court to conclude that Vasquez's appellate counsel did not labor under an actual conflict of interest. The judgment of the district court denying habeas relief to Vasquez is, therefore,

AFFIRMED.

Case: 23-40079     Document: 00516720436     Page: 225     Date Filed: 04/20/2023

# EXHIBIT 3(d)

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RICHARD VASQUEZ | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | NO. C-05-59 |
| DOUGLAS DRETKE, DIRECTOR, | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | **CAPITAL CASE** |
| JUSTICE, CORRECTIONAL | § | **NO EXECUTION DATE** |
| INSTITUTIONS DIVISION, | § | |
| | § | |
| Respondent. | § | |

## MOTION FOR RELIEF FROM JUDGMENT UNDER RULE 60(b)(6)

Thomas M. Farrell
State Bar No. 06839250
tfarrell@mcguirewoods.com

Charles B. Hampton
State Bar No. 00793890
champton@mcguirewoods.com

McGuireWoods LLP
600 Travis Street, Suite 7500
Houston, Texas 77002
Telephone: (713) 571-9191
Facsimile: (713) 571-9652

**Page**

MOTION FOR RELIEF FROM JUDGMENT UNDER RULE 60(B)(6) ................................... 1

I.     INTRODUCTION .................................................................................................. 1

II.    MATERIALS SUPPORTING THE REQUESTED RELIEF ........................................... 3

III.   PROCEDURAL HISTORY....................................................................................... 4

    A.     Conviction and Direct Appeal .................................................................. 4

    B.     First State Habeas Application................................................................... 4

    C.     Federal Habeas Petition In This Court...................................................... 4

    D.     Subsequent Habeas Application in State Court (2015)............................. 6

    E.     Subsequent Habeas Application in State Court (2022).......................... 10

    F.     1983 Complaint in Federal Court ........................................................... 10

IV.    FACTS ON COCAINE ALLEGEDLY IN MIRANDA'S SYSTEM ............................... 10

    A.     The False Evidence of Cocaine Intoxication Offered in this Court..................... 10

    B.     The Truth about Cocaine ........................................................................ 12

    C.     Prior Consideration of the Cocaine Issue.............................................. 15

V.     FACTS ON CAR-CRASH EQUIVALENCY .............................................................. 16

    A.     The False Evidence of Car-Crash Equivalency Offered in this Court................. 16

    B.     The Truth About Car-Crash Equivalency ............................................... 18

    C.     Prior Consideration of Car-Crash Equivalency ..................................... 20

VI.    FACTS ON SHORT FALLS ................................................................................... 22

    A.     The False Evidence on Short Falls Offered in this Court ....................... 22

    B.     The Truth About Short Falls ................................................................... 23

    C.     Prior Consideration of Short Falls ......................................................... 26

VII.   THE MISCONDUCT THAT UNDERMINED THIS PROCEEDING........................... 27

VIII.  VASQUEZ PROPERLY INVOKES RULE 60 ......................................................... 31

    A.     This is Not a Successive Habeas Petition in Disguise ........................... 31

    B.     This Motion is Timely Under Rule 60(c) ............................................... 32

IX.    VASQUEZ IS ENTITLED TO RELIEF FROM THIS COURT'S JUDGMENT ............ 35

CONCLUSION.................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*Banks v. Dretke,*
   540 U.S. 668 (2004)..................................................................................29

*Berger v. United States,*
   295 U.S. 78 (1935)....................................................................................29

*Brady v. Maryland,*
   373 U.S. 83 (1963)....................................................................................10

*Buck v. Davis,*
   137 S. Ct. 759 (2017)....................................................................... *passim*

*Clark v. Davis,*
   850 F.3d 770 (5th Cir. 2017) ....................................................................31

*Giglio v. United States,*
   405 U.S. 150 (1972)..................................................................................30

*Gonzalez v. Crosby,*
   545 U.S. 524 (2005)......................................................................31, 32, 35

*Kyles v. Whitley,*
   514 U.S. 419 (1995)..................................................................................29

*Liljeberg v. Health Services Acquisitions Corp.,*
   486 U.S. 847 (1988)..................................................................................35

*Mesarosh v. United States,*
   352 U.S. 1 (1956)......................................................................................34

*Napue v. Illinois,*
   360 U.S. 264 (1959)..................................................................................30

*Rembrandt Vision Techs, L.P. v. Johnson & Johnson Vision Care,*
   818 F.3d 1320 (Fed. Cir. 2016)................................................................29

*Seven Elves, Inc. v. Eskenazi,*
   635 F.2d 396 (5th Cir. 1981) ..............................................................35, 39

*Strickland v. Washington,*
   466 U.S. 668 (1984)................................................................................2, 5

Date Filed: 04/20/2023          Page: 229          Document: 00516720436          Case: 23-40079

*Strickler v. Greene,*
  527 U.S. 263 (1999)...................................................................................29

*Tamayo v. Stephens,*
  740 F.3d 986 (5th Cir. 2014) ...................................................................31

*Trevino v. Thaler,*
  569 U.S. 413 (2013)............................................................................10, 30

*United States v. Mason,*
  293 F.3d 826 (5th Cir. 2002) ...................................................................30

*Williams v. Thaler,*
  602 F.3d 291 (5th Cir. 2010) ...................................................................35

**State Cases**

*Ex Parte Chabot,*
  300 S.W.3d 768 (Tex. Crim. App. 2009).......................................... *passim*

*HECI Exploration Co. v. Neel,*
  982 S.W.2d 881 (Tex. 1998)...............................................................16, 22

*Ex Parte Henderson,*
  384 S.W.3d 833 (Tex. Crim. App. 2012)..........................................26, 27

**Federal Statutes**

28 U.S.C. § 2254.............................................................................................4

28 U.S.C. § 2254(d)(2) ................................................................................22

42 U.S.C. § 1983......................................................................................10, 21

**State Statutes**

Texas Code of Criminal Procedure
  Article 11.073 ....................................................................................... *passim*

Texas Penal Code Annotated
  § 19.03(a)(8) ...............................................................................................4

Date Filed: 04/20/2023     Page: 230     Document: 00516720436     Case: 23-40079

**Rules**

Federal Rules of Civil Procedure
Rule 60 .................................................................................................................31
Rule 60(b) ....................................................................................................... *passim*
Rule 60(B)(6) ................................................................................................... *passim*
Rule 60(c) .........................................................................................................32, 35
Rule 60(c)(1) ........................................................................................................32

**Other Authorities**

2009:  Imwinkelried, Shaken Baby Syndrome: A Genuine Battle of the Scientific
(and Non-Scientific) Experts ....................................................................................19

2005: Bandak, Shaken Baby Syndrome: a Biomechanical Analysis of Injury
Mechanisms ..............................................................................................................19

2008: Barnes, et al, Traumatic Spinal Cord Injury: Accidental Versus
Nonaccidental Injury ................................................................................................19

2011: Barnes, Imaging of Nonaccidental Injury and the Mimics: Issues and
Controversies in the Era of Evidence-Based Medicine ...........................................20

2004: Geddes, et al, The Evidence for Shaken Baby Syndrome ...................................19

Holmgren, Prosecuting The Shaken Infant Case (2001) (Exh. D, App. Exh. 167) .......17

Papetti, Outside the Echo Chamber (2019), (Exh. D, App. Exhs. 90, 154, 167)...........18

2019: Papetti, Outside the Echo Chamber .....................................................................20

Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting it
Right (2012). Exh. D, App. Exh. 82 .........................................................................19

2014: Squier, "Shaken Baby Syndrome and Forensic Pathology," ...............................20

Tuerkheimer, The Next Innocence Project (2009) ........................................................18

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RICHARD VASQUEZ | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | NO. C-05-59 |
| DOUGLAS DRETKE, DIRECTOR, | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | **CAPITAL CASE** |
| JUSTICE, CORRECTIONAL | § | **NO EXECUTION DATE** |
| INSTITUTIONS DIVISION, | § | |
| | § | |
| Respondent. | § | |

### MOTION FOR RELIEF FROM JUDGMENT UNDER RULE 60(B)(6)

Richard Vasquez, Petitioner, is currently confined on death row at the Texas Department of Criminal Justice's Polunsky Unit in Livingston, Texas. Vasquez moves this Court under Rule 60(b)(6) of the Federal Rules of Civil Procedure to set aside the following orders and judgment: Memorandum and Order dated March 28, 2008 (ECF No. 25); Final Judgment dated March 28, 2008 (ECF No. 26); and Order denying reconsideration dated July 22, 2008 (ECF No. 35). Vasquez respectfully shows:

### I.    INTRODUCTION

Both this Court and the United States Court of Appeals for the Fifth Circuit have already determined that Richard Vasquez was denied at trial the effective legal representation guaranteed to him under the Sixth Amendment to the United States Constitution. The State of Texas nevertheless induced the Court in 2008 to excuse this serious violation of Vasquez's constitutional rights on the theory that it didn't matter. According to the State, even competent legal representation would not have overcome the compelling force of three "gruesome" facts—the

Date Filed: 04/20/2023    Page: 231    Document: 00516720436    Case: 23-40079

same alleged facts that have been used at every prior stage of this case in an effort to paint Vasquez as a monster undeserving of any relief.

First, the State cited supposed evidence that the brain trauma sustained by Miranda Lopez could *only* have come from blows inflicted to her head by Vasquez. Second, the State relied heavily on false evidence that Vasquez inflicted those blows with forces equivalent to ejecting Miranda from a speeding car traveling at 65 miles per hour, which supposedly permitted a reliable inference that Vasquez *intended* to kill her. Third, the State touted testimony purportedly showing that, before beating her to death, Vasquez injected Miranda with a massive and lethal dose of cocaine.

In 2008, this Court accepted the State's invitation to rely on this evidence and concluded from it that Vasquez could not establish the prejudice required by *Strickland v. Washington*, 466 U.S. 668 (1984) as a condition to relief on a claim for the ineffective assistance of counsel ("IAC").

Here's the problem. *As the State of Texas has recently confessed*, the evidence the State urged this Court to use as the sole basis for denying IAC relief was **false**. The State has recently acknowledged, on the record and in open court, that Miranda's backward fall from a bathroom stool could have generated forces sufficient to have caused Miranda's death, thus debunking the State's prior narrative that Mirada could *only* have died at Vasquez's hands. The State has also recently conceded, again on the record, that the so-called evidence that Vasquez struck Miranda with the force of a speeding car was false and *never* had any scientific validity. Finally, the State has recently confirmed, in open court, that its evidence on cocaine intoxication was unreliably false and that, in reality, there was no *real* evidence that Miranda had *any* cocaine in her system.

By this motion, Vasquez is not asserting a claim based on the State's use of this false evidence *at his trial*. Rather, Vasquez challenges the State's use of false evidence *in this Court* to

defeat Vasquez's IAC claim. That use of false evidence impacted the integrity of the prior proceedings *in the United States District Court of the Southern District of Texas*. In this unusual context, where the State has conceded that it relied on false evidence to procure denial of Vasquez's IAC claim, Vasquez is entitled to relief under Rule 60(b) without having to comply with the procedures mandated by the Antiterrorism and Effective Death Penalty Act.

## II.    MATERIALS SUPPORTING THE REQUESTED RELIEF

Vasquez bases his request for relief on all the materials already on file in this case and reflected on the Court's docket. Vasquez also relies on the following additional materials submitted herewith:

| Exh. A | Subsequent Application for Post-Conviction Habeas Relief (State Court), filed April 15, 2015 |
|--------|---------------------------------------------------------------------------------------------|
| Exh. B | CCA Order remanding Subsequent Application for review on the merits, entered March 23, 2016 |
| Exh. C | Transcript of State Court Hearing, June 3, 2019 |
| Exh. D | Exhibits 1 - 168 admitted at State Court Hearing, June 3, 2019 |
| Exh. E | Proposed Findings of Fact and Conclusions (State Court), filed June 3, 2019 |
| Exh. F | Findings of Fact, Conclusions of Law, Recommendation, and Order, entered in State Court, February 26, 2021 |
| Exh. G | Objections to Findings of Fact, Conclusions of Law, Recommendation and Order by District Court, filed in CCA, May 6, 2021 |
| Exh. H | CCA *Per Curium* Opinion, entered August 25, 2021 |
| Exh. I | Declaration of Dr. Jimmie Valentine, dated December 17, 2021 |
| Exh. J | Declaration of Thomas M. Farrell, dated January 12, 2022 |
| Exh. K | Declaration of John Gilmore, dated December 14, 2021 |
| Exh. L | Declaration of Nicholas Trenticosta, dated December 10, 2021 |
| Exh. M | Declaration of Richard Vasquez, dated December 8, 2021 |

### III.   PROCEDURAL HISTORY

#### A.   Conviction and Direct Appeal

On June 22, 1999, Richard Vasquez was convicted and sentenced to death for the capital murder of Miranda Lopez, a child under the age of six. TEX. PENAL CODE ANN. § 19.03(a)(8).  On August 30, 2000, Vasquez filed a direct appeal of his capital murder conviction and death sentence in the Texas Court of Criminal Appeals.  On October 3, 2001, the Texas Court of Criminal Appeals affirmed the conviction and sentence.

#### B.   First State Habeas Application

On June 27, 2001, while his direct appeal was still pending, Vasquez filed a post-conviction application for writ of habeas corpus in state court, which included an IAC claim.  On May 19, 2004, after an evidentiary hearing, the District Judge adopted every finding and conclusion proposed by the State and recommended that Vasquez's application for writ of habeas corpus be denied.  On January 26, 2005, the Texas Court of Criminal Appeals, in an unpublished decision, adopted the trial judge's findings and conclusions and denied Vasquez's application.

#### C.   Federal Habeas Petition In This Court

On January 26, 2006, Vasquez timely petitioned this Court for habeas relief under 28 U.S.C. § 2254.

Vasquez's petition raised three claims.  In Claim One, he demonstrated that he was denied the effective assistance of counsel due to his lawyers' failure to develop and present available mitigating evidence.  In Claim Two, Vasquez showed that he was denied the effective assistance of counsel due to counsel's failure to investigate and counter the State's evidence of sexual assault. On Claim Three, he established that he was denied the effective assistance of counsel on direct appeal because his appellate lawyer was laboring under a conflict of interest.

This Court resolved Vasquez's petition on summary judgment. In a Memorandum and Order (ECF No. 25) dated March 28, 2008, the Court denied habeas relief on all three claims.[1]

On Claim One, this Court agreed with Vasquez that his trial counsel had provided him with constitutionally deficient representation, finding that they "conducted virtually no investigation of a mitigation case" and that their failure was not the result of any "reasoned strategic judgment." ECF No. 25 at 18, 19. In the Court's words, "Vasquez's attorneys failed to perform an objectively reasonable investigation of mitigating evidence." *Id.* at 19. While the state court had found to the contrary, this Court rejected that finding, holding that Vasquez had "demonstrated by clear and convincing evidence that the state court's factual finding was unreasonable" and that "the state court's conclusion that there was no deficiency [in counsel's performance] was an 'unreasonable application' of federal law." *Id.* at 19-20.

The Court nevertheless denied relief on Claim One under the second prong of *Strickland v. Washington*, finding that, due to the "gruesome facts" of the case, Vasquez could not establish that he had been prejudiced by his counsel's failures. *Id.* at 21. Specifically, the Court found that the mitigating evidence that counsel failed to develop and present could not have overcome the State's purported evidence that Miranda died from "a blow Vasquez delivered" inflicting forces "equivalent to a 65 m.p.h. car accident" and that she "had a lethal quantity of cocaine in her system" that, according to the State, Vasquez had injected into her. *Id.*

On Claim Two, the Court denied relief under *Strickland's* performance prong and its prejudice prong. Importantly, the Court concluded that, "even if defense counsel had succeeded in parrying all evidence of sexual assault, Vasquez [had failed] to show a reasonable probability

---

[1] By this Motion, Vasquez does not seek relief from this Court's disposition of Claim Three. He does, however, move for relief under Rule 60(b) from the judgment denying him relief on Claims One and Two.

of a different outcome." *Id*. at 12. According to the Court, "the evidence of sexual assault was not critical to the jury's finding of intent to kill." *Id*. Rather, in the Court's view, the factors that led the jury to find the *mens rea* necessary for a capital murder conviction were the expert testimony that "Miranda's severe head injuries were equivalent to those caused by a 65 m.p.h. car crash" and the purported evidence that Miranda "had twice the lethal dose of cocaine in her system, which a drug addict [like Vasquez] above others would have understood." *Id*. at 12-13. "All of this evidence provided a substantial basis of the jury's *mens rea* determination," meaning that, in the Court's view, "Vasquez . . . fail[ed] to demonstrate a reasonable probability that in the absence of the evidence of sexual assault, a jury would have found him not guilty of murder." *Id*. at 13.

This Court issued a Certificate of Appealability on Claims One and Three, but not on Claim Two. On appeal, the United States Court of Appeals for the Fifth Circuit held, as had this Court, that "it was objectively unreasonable for the state court to conclude that Vasquez's trial counsel's performance [on mitigation issues] was constitutionally sound." ECF No. 46 at 21. In other words, the Fifth Circuit, like this Court, found that Vasquez had been denied the minimum level of representation guaranteed to him by the United States Constitution. The Fifth Circuit nevertheless affirmed the denial of relief on the same ground cited by this Court—that any case in mitigation could not have overcome "the undisputed fact that the victim died while in Vasquez's sole care from blows to the head that 'were equivalent to a 65 m.p.h. car accident'" and "the fact that [Miranda] had lethal quantities of cocaine in her system." *Id*. at 12.

### D.    Subsequent Habeas Application in State Court (2015)

In 2013, the Texas legislature enacted a statute allowing for post-conviction habeas relief upon a showing that currently available scientific evidence, had it been available at trial, would likely have precluded conviction. TEX. CODE CRIM. PROC. ART. 11.073. On April 14, 2015, Vasquez filed a state-court application for relief under that statute. *See* Exhibit A. The Texas

Case: 23-40079   Document: 00516720436   Page: 237   Date Filed: 04/20/2023

Court of Criminal Appeals made a preliminary assessment that Vasquez's application was timely and could go forward under Article 11.073. *See* Exhibit B. The Court of Criminal Appeals remanded Vasquez's application to the trial court to determine on the merits whether new science on biomechanics (and on the forces necessary to cause fatal head injuries in infants) would have made a difference had it been available and presented at Vasquez's trial. *Id.*

The CCA's remand order required the trial court to make this assessment under two different scenarios. First, the trial court was required to assume that Miranda fell backward from a stool as described by Vasquez. *See* Exh. A at 35 (raising new-science claim relating to cause of death). That scenario presented the question whether the new science could have convinced the jury that Miranda died from the fall rather than from Vasquez-inflicted blows to the head. Second, the trial court was required to assess, assuming Miranda did not suffer the fall that Vasquez described, whether the new science could have convinced the jury that, although Vasquez-inflicted blows may have caused Miranda's death, they were not inflicted with a level of force sufficient to support a finding of the *mens rea* required for capital murder. *Id.* at 36-37 (raising new-science claim relating to *mens rea*).

Vasquez's application also contained a claim for relief under *Ex Parte Chabot,* 300 S.W.3d 768 (Tex. Crim. App. 2009). In *Chabot*, the Texas Court of Criminal Appeals held that a conviction or sentence based on false testimony—even if "unknowingly" presented by the State— constitutes a due process violation. Vasquez argued that two aspects of the State's evidence were false and entitled him to relief under *Chabot*: (1) evidence that Vasquez hit Miranda with the same force she would have experienced in an ejection from a speeding car; and (2) evidence that a "short fall" from a stool could not have caused Miranda's fatal brain injury. *Id.* at 34-37. The Texas

Court of Criminal Appeals' remand order required the trial court to resolve both aspects of this *Chabot* claim.

After remand, the trial court scheduled a hearing for June 3, 2019, to hear evidence on these issues. In preparation for the hearing, Vasquez (through the undersigned counsel) assembled an overwhelming body of evidence demonstrating that the State's testimony from Vasquez's trial on car-crash equivalency and on the ability of short falls to produce fatal injuries in infants was false. Before the hearing commenced, Vasquez previewed that evidence for the State and shared with the State the proposed findings of fact and conclusions of law that he planned to file with the court. *See* Exh. J at ¶ 15. After reviewing the materials Vasquez presented, the State withdrew its opposition to Vasquez's habeas application, agreed to the findings and conclusions proposed by Vasquez, and indicated its intent to inform the court of the State's agreement that Vasquez was entitled to relief from his conviction and sentence. *Id.*

At the hearing on June 3, 2019, Vasquez offered, without objection, the body of evidence that he had previously previewed for the State, including: the testimony of multiple experts (biomechanical engineers, forensic pathologists, neuropathologists, and toxicologists); the testimony of the medical examiner who had determined the cause and manner of Miranda's death and performed her autopsy; and dozens of scientific textbooks, papers, and studies. *See* Exhibits C & D. All of this evidence confirmed that major aspects of the State's testimony at Vasquez's trial were false. The State offered no evidence at all, let alone any controverting evidence. Instead, the State of Texas stated on the record, in open court, that the State agreed with Vasquez's proposed findings and conclusions and agreed that the record established Vasquez's right to habeas relief. *See* Exhibit C at 8-12, 69.

On February 26, 2021, after 20 months, Judge Banales issued findings of fact and conclusions of law in which he rejected the joint position, advocated by both Vasquez and the State of Texas, that Vasquez was entitled to habeas relief. *See* Exhibit F.

Judge Banales acknowledged the current existence of new scientific evidence unavailable at the time of trial. *Id.* at 635. He further recognized that this new science could have made a difference in the trial outcome, assuming there had been evidence that Miranda fell backward from a stool. *Id.* at 642-43. But, Judge Banales purported to make a fact finding (from the original trial record, with no new evidence on this point) that Miranda never fell at all. *Id.* at 635. From that conclusion, Judge Banales determined that the new science was irrelevant and recommended that relief be denied on both Vasquez's claim under the new-science statue and under *Chabot*. *Id.* Judge Banales, however, completely ignored and failed to address Vasquez's separate claim that the new science could have led to a different trial result on the *mens-rea* issue, even if one assumes that Miranda never fell at all.

After these findings and recommendation were transmitted to the Texas Court of Criminal Appeals, Vasquez filed a detailed objection that, among other things, highlighted Judge Banales' failure to consider the impact of new science on the *mens-rea* issue. *See* Exhibit G. The Texas Court of Criminal Appeals nevertheless adopted Judge Banales' findings and recommendation and denied relief in a *per curium* opinion dated August 25, 2021. *See* Exhibit H. The opinion contained *no* substantive analysis or discussion. The Court of Criminal Appeals, like Judge Banales, failed to address in any way Vasquez's claim that the new scientific evidence would have led to a different trial result even if one assumes that Miranda never suffered the "short fall" that Vasquez observed.

### E.     Subsequent Habeas Application in State Court (2022)

On January 12, 2022, Vasquez filed in state court a subsequent habeas application asserting six claims for relief. First, Vasquez asserted two *Chabot* claims that his sentence and conviction were procured through false evidence that Miranda had cocaine in her system. Second, Vasquez asserted a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). Third, Vasquez asserted an actual-innocence claim. Fourth, Vasquez asserted two claims that he received ineffective assistance of counsel through the failure of his lawyers to challenge the false cocaine evidence. This 2022 application remains pending in state court.[2]

### F.     1983 Complaint in Federal Court

On January 24, 2022, Vasquez filed a complaint under 42 U.S.C. § 1983, Case No. 22-cv-00012, alleging that he was denied procedural due process in the resolution of the subsequent habeas application he filed in state court in 2015. This Section 1983 complaint remains pending.

## IV.     FACTS ON COCAINE ALLEGEDLY IN MIRANDA'S SYSTEM

### A.     The False Evidence of Cocaine Intoxication Offered in this Court

The cocaine evidence that (at the State's urging) played such a prominent role in the denial of Vasquez's IAC claim came from three sources: Dr. Ronald Backer, a toxicologist whose laboratory tested a blood sample drawn from Miranda before she died; Dr. Lloyd White, the Nueces County Medical Examiner who had commissioned the testing; and the Toxicology Report issued by Dr. Backer's lab and attached by Dr. White to his autopsy report.

---

[2] Vasquez's 2022 state-court application, unlike this Motion, *does* challenge the use of false evidence at his 1999 trial (and the effectiveness of his counsel as relates to that false evidence). After exhausting state-court remedies on the claims made in the 2022 state-court application, and to the extent necessary, Vasquez reserves the right to file a subsequent federal petition on these points. If such a petition becomes necessary, Vasquez will be able to show, under *Trevino v. Thaler*, 569 U.S. 413 (2013), good cause for failing to have raised these claims in earlier applications.

Although Dr. Backer was not shown the Toxicology Report during his testimony, he testified unequivocally about the test results set forth in that report. Dr. Backer swore, without reservation, that the testing performed by his lab revealed "an acute toxic" amount of cocaine in Miranda's blood and that, from his calculations, the cocaine was "put in her body" somewhere between one and two hours before her admission to the hospital. *See* Exh. D, App. Exh. 27 at 7, 13, 14. Dr. Backer was clear that the testing reflected in the Toxicology Report detected cocaine in Miranda's blood twice, through two different test methods. *Id.* First, according to Dr. Backer's testimony, his laboratory detected cocaine in Miranda's blood through an initial screen for cocaine (and other "drugs of abuse") that came back positive. *Id.* at 7. Second, in Dr. Backer's telling, a subsequent test (with an instrument called a "gas chromatograph mass spectrometer") not only confirmed the presence of cocaine, but revealed cocaine in Miranda's system at a shockingly high level. *Id.* at 6, 7.

Dr. White testified that, based on the Toxicological Laboratory Report, he listed "cocaine intoxication" as a "contributing condition" to Miranda's death in his autopsy report. *See* Exh. D, App. Exh. 13 at 38. He further explained that "contributing conditions" are "things that are unrelated directly at least to the cause of death, but to things that may have had a deleterious or harmful effect on the individual." *Id.* Dr. White also answered "yes" to a question about whether "Miranda had double the amount of what was lethal in an adult of cocaine." *Id.* at 59.[3]

---

[3] Neither Dr. Backer nor Dr. White could explain how the cocaine allegedly got into Miranda's blood. The State nevertheless asserted to the jury that Vasquez used a needle to inject cocaine into Miranda; "he shoots her up with cocaine"; "look at when he shot her up with cocaine"; "she had to be injected"; "why would he inject her with cocaine"—to "stop her from struggling"; "he lied about injecting her with the lethal dose of cocaine"; "no one told him to shoot her up with cocaine." *See* Exh. D, App. Exhs. 17-22.

**B.     The Truth about Cocaine**

As noted, Dr. Backer testified that the tests performed by his laboratory confirmed the existence of cocaine in Miranda's system not once, but twice. Specifically, he indicated that the initial screen was positive for cocaine and that the second "GC/MS" confirmation test reliably showed 0.18 mg/L of parent cocaine and 0.42 mg/L of a cocaine metabolite. *See* Exh. D, App. Exh. 27 at 7. Both aspects of this testimony were false.

First, according to the Toxicology Report itself, the initial screen was "negative," not "positive," indicating that there was no cocaine at *any* level in Miranda's blood. *See* Exh. D, App. Exh. 29. Dr. Backer falsely stated the reverse of this in his testimony. *Id.*, App. Exh. 27 at 7. Second, while the Toxicology Report does reference the 0.18 mg/L and 0.42 mg/L figures described by Dr. Backer, he falsely testified that those results from the GC/MS confirmation were meaningful and reliable. *Id.* at 13-14.

In fact, the purported results from the GC/MS confirmatory test were utterly meaningless. If Miranda's blood really had 0.18 mg/L of parent cocaine and 0.42 mg/L of a cocaine metabolite, the "drugs of abuse" screen would necessarily have been "positive," but it was actually reported as "negative."[4] *See* Exh. D, App. Exhs. 28 & 29; Exh. I. In other words, the Toxicology Report was at war with itself, with an initial negative result that cannot possibly be squared with a later positive result. Because of this direct conflict between the test results, neither result was reliable, which means that Dr. Backer's unequivocal testimony that there was cocaine in Miranda's system lacked any foundation. *Id.* Dr. Backer's testimony that the test results from his lab confirmed the presence of cocaine was thus false. *Id.*

---

[4] Assuming the testing equipment was working properly and the screens were properly administered, blood containing 0.18 mg/L of parent cocaine and 0.42 mg/L of metabolite could not possibly have returned a "negative" result from the "drugs of abuse" screen. *See* Exh. D, App. Exhs. 28 & 29.

Case: 23-40079    Document: 00516720436    Page: 243    Date Filed: 04/20/2023

In light of this conflict in the Toxicology Report, Dr. Backer recently recanted his trial testimony. In a Declaration dated May 1, 2019, Dr. Backer acknowledged that there was an "irreconcilable conflict" in the Toxicological Report between the "negative" result for the "drugs of abuse" screen and the levels of cocaine and metabolite reported from the GC/MS confirmation test. *See* Exh. D, App. Exh. 28. Dr. Backer further acknowledged that this same "irreconcilable conflict" infected his trial testimony. *Id.* Finally, Dr. Backer acknowledged that, in light of this "irreconcilable conflict," the Toxicological Report and his trial testimony were "not reliable evidence." *Id.*

Dr. Backer's candid (albeit belated) acknowledgment of the fatal flaws in his report and testimony is confirmed by the testimony of Dr. Jimmie L. Valentine, a renowned expert in the field of toxicology. Dr. Valentine's detailed report demonstrates what Dr. Backer himself admitted: "Dr. Backer provided false testimony at trial." *See* Exh. D, App. Exh. 29 at 3. As Dr. Valentine explains:

> The Toxicological Laboratory Report had an irreconcilable conflict between the Initial Drug Screen Test of the decedent's blood, which tested negative for cocaine metabolite, benzoylecgonine, and a subsequent confirmation test that detected the presence of and quantitated both cocaine and benzoylecgonine. Both results, purportedly from the same sample of the decedent's blood, could not have been true and accurate at the same time since the negative screening results did not align with the confirmation results.

> This irreconcilable conflict rendered the blood testing results as given in the Toxicology Report unreliable for use by Lloyd White, M.D., Ph.D., the Nueces County medical examiner, who testified at trial that the decedent had cocaine in her system prior to death and that cocaine intoxication was a contributing condition of death.

> Similarly, this irreconcilable conflict rendered the blood testing results as given in the Toxicology Report unreliable for use by Ronald C. Backer, Ph.D., the toxicologist called by the State at trial, who testified that the decedent had cocaine in her system prior to death.

> Because the blood testing results as given in the Toxicology Report were the sole basis for Dr. White's and Dr. Backer's testimony that the decedent had cocaine in

her system prior to death, this conclusion could not be scientifically used as the basis for such testimony at trial. For similar reasons, there was no medical or scientific basis for Dr. White to issue a death certificate that identified "cocaine intoxication" as a contributing condition to death.

*Id.* at 3.

Dr. White also recanted his trial testimony on cocaine, providing a sworn declaration (May 23, 2019) in which he confirmed the existence and significance of the fatal flaw in the Toxicology Report:

> In reviewing the Toxicological Laboratory Report, I can see now that it states that the "Drugs of Abuse Screen" was "negative." I do not believe that, in 1998 and 1999, I would have appreciated the significance of this negative finding or its impact on the finding below it from the "Confirmed GC/MS" test of 0.18 mg/L of Blood Parent cocaine and 0.42 mg/L of Blood Benzoylecgonine. I now understand, from having reviewed the Declaration of Ronald Backer, who signed the Toxicological Laboratory Report in March 1998 as President of Universal Toxicology Laboratories, that there is an "irreconcilable conflict" between the negative finding on the Drugs of Abuse Screen and the later finding of the presence of parent cocaine and benzoylecgonine and that such conflict means, in Dr. Backer's words, that the Toxicology Laboratory Report is "unreliable evidence." I did not know that in 1998 and 1999; if I had known it, I would not have listed cocaine intoxication as a contributing condition for Miranda Lopez, nor would I have testified about cocaine in her system at Mr. Vasquez's trial.
>
> Had I known what I know today, I would have insisted on a second toxicology report, and I would have taken steps to independently verify its accuracy, before including any mention of cocaine in my autopsy report or findings.

*See* Exh. D, App. Exh. 30.

Here is the bottom line on cocaine: The only two witnesses who testified to cocaine in Miranda's system now acknowledge that their testimony was false. The expert Vasquez retained for his subsequent habeas application has confirmed, with a detailed scientific explanation for his conclusion, that the testimony was false. And, the State of Texas itself, having endorsed the findings and conclusions that Vasquez submitted in support of the subsequent habeas application, agrees that the cocaine evidence offered at trial, and re-offered in this Court, was false. In short,

everyone now agrees that the cocaine evidence used as a primary reason for denying IAC relief to Vasquez was unreliable and constituted no evidence at all.

### C.     Prior Consideration of the Cocaine Issue

As demonstrated by the Farrell Declaration, the fatal inconsistency in the Toxicology Report was not discovered by Vasquez or his counsel until April 2019 as they were preparing for the hearing on Vasquez's subsequent habeas application in state court. *See* Exh. J at ¶ 13. Accordingly, the State's use of false evidence on cocaine was not raised at any stage of the process before June 3, 2019. *Id.* The State's reliance on false cocaine evidence did not form the basis of any stand-alone claim for relief before Judge Banales.

Vasquez nevertheless submitted to Judge Banales the evidence demonstrating that the Toxicology Report was totally unreliable and that Dr. Backer's testimony was false. He did so not because these circumstances were asserted as an independent ground for relief in his subsequent application, but because they were potentially relevant to the assessment of whether the new science on biomechanics and "short falls" would have made a difference had it been available at the time of Vasquez's trial.[5] *See* Exhibit J at ¶ 17.

In his Findings of Fact and Conclusions of Law dated February 26, 2021, Judge Banales recognized the implications of this issue, stating "[c]ertainly, the findings as stated in the Toxicology Report raise[ ] concerns." Exhibit F at 652. But, instead of dealing with the ramifications of this issue, Judge Banales simply surmised, without support, that there was a "clerical error" in the Toxicology Report and further assumed that the error occurred in the initial

---

[5] Under Article 11.073, Vasquez had to show that new science unavailable at the time of trial would likely have led to different result. On the *mens-rea* issue, Vasquez met this burden in part by showing that new science would have refuted the State's evidence of car-crash equivalency. But, to avoid any suggestion that evidence of cocaine intoxication would have independently supported the jury's *mens-rea* determination, Vasquez went further and demonstrated that the State's cocaine evidence was itself unreliable, based as it was on false testimony from Dr. Backer. *See* Exhibit J at ¶ 17.

Case: 23-40079     Document: 00516720436     Page: 245     Date Filed: 04/20/2023

negative entry as opposed to the subsequent positive entry. *Id.* at 653. These assumptions were not supported by *any* evidence.

One could of course speculate as to the source of the conflict. Did a technician mistakenly include in the report positive test results from someone else's blood (not Miranda's)? Or, after the initial negative result on Miranda's blood, did her sample get contaminated with someone else's before the technician obtained a second screen with positive results? Or, after the initial negative screen, was there an equipment or instrumentation malfunction that resulted in a false positive on the second screen? Or, as Judge Banales speculated, was there a "clerical" error in the report? If so, was the clerical error in the initial negative entry or did it occur in the later positive entry?

There was no basis in the record before Judge Banales on which to adopt any one of these speculative explanations or any of the other potential scenarios one's imagination could invent. To the contrary, the record allowed only one conclusion: the Toxicology Report's reference to an initial screen negative for cocaine was in fatal conflict with the later reference to a second screen positive for cocaine. As Drs. Backer, White, and Valentine all now acknowledge, both results could not have been true. This means that neither had any reliability.[6]

## V.     FACTS ON CAR-CRASH EQUIVALENCY

### A.     The False Evidence of Car-Crash Equivalency Offered in this Court

The evidence of car-crash equivalency that the State used in this Court to defeat Vasquez's IAC claim came from Dr. Michael Burke, the surgeon who operated on Miranda.

---

[6] In any event, given Judge Banales' resolution of the new-science issues under Article 11.073 and *Chabot*, his findings on cocaine, and the Court of Criminal Appeals' later adoption of them, were not necessary to the judgment denying Vasquez's 2015 Application and thus cannot form the basis of any issue preclusion or collateral estoppel against Vasquez. *See, e.g., HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 892 n.2 (Tex. 1998) (collateral estoppel only applies to factual determinations "essential to the judgment in the first action").

Dr. Burke testified that the "only time" the level of injury sustained by Miranda's brain is "seen is in a high-speed motor vehicle accident, 65 miles an hour, ejected from the car, severe head trauma. That's the mechanism of injury we're talking about." *See* Exh. D, App. Exh. 16 at 79. Dr. Burke further testified, in reference to Miranda's brain injury:

- "Again, it's the high speed motor vehicle accident that causes this kind of picture."

- "[W]ith respect to this particular incident again, it's the equivalent of being ejected from a motor vehicle at 65 miles an hour on a high-speed rollover."

- "This child got the living daylights beat out of her to the point that she quit breathing and there was nothing that could be done about it."

- Vasquez struck Miranda with "the strength of a 65-mile an hour car."

*Id.* at 79, 87, 91-92.

Dr. Burke effectively told the jury that there were literally only two ways that Miranda could have sustained her fatal brain injuries:  being ejected from a car traveling at 65 miles per hour or being severely beaten by Mr. Vasquez with blows that were as strong as if she had been ejected from a car at 65 miles per hour. As Dr. Burke said, in the absence of evidence of a severe car crash, "[t]here is nothing else" that can cause injuries of the type suffered by Miranda other than "child abuse." *Id.* at 92. Since Miranda was not in a car accident, her condition presented a "hallmark of child abuse," with no other possible explanation. *Id.*

To substantiate this testimony, Dr. Burke pointed only to various studies and papers on Shaken Baby Syndrome that, in Dr. Burke's words, told physicians and child-abuse experts what they could and should say about the cause of pediatric head injury "when we all [go] to Court." *Id.* at 92. Dr. Burke, however, failed to disclose that these studies and papers were promoted, not by scientists, but by prosecutors, and that they lacked any scientific basis. *See, e.g.*, Holmgren, Prosecuting The Shaken Infant Case (2001) (Exh. D, App. Exh. 167). The prosecutor who wrote

Date Filed: 04/20/2023     Page: 248     Document: 00516720436     Case: 23-40079

one widely cited paper on how to prosecute cases of alleged child abuse, citing only court cases, not scientific studies, exhorted experts to testify just as Dr. Burke did in this case:

> A key component on expert testimony on SBS involves translating the mechanisms of trauma into constructs jurors can readily understand and which adequately reflect the men rea requirements for the charge.  This can be done in a variety of ways.  First, experts can provide analogies for the degree of violence associated with this conduct.  For example, the expert can testify that the forces the child experiences are the equivalent of a 50-60 m.p.h. unrestrained motor vehicle accident.

*Id.* at 307.

By equating Miranda's injuries to those from a high-speed car crash, Dr. Burke was following the longstanding practice advocated by this prosecutor and others of using scientifically invalid analogies to inflame juries against those accused of child abuse.  *See* Tuerkheimer, The Next Innocence Project (2009) at 29; Papetti, Outside the Echo Chamber (2019), at 311-12 (Exh. D, App. Exhs. 90, 154, 167).

## B.     The Truth About Car-Crash Equivalency

It is now clear that there has *never* been any scientific or medical support for the car-crash analogy that Dr. Burke used so forcefully to demonize Vasquez.  As stated in the 2006 Fourth Edition of an authoritative text (Medicolegal Investigation of Death), "[w]hen testifying as to the degree of impact, statements such as: *'forces equivalent to thirty miles per hour'* or *'a fall from a three-story building'* have been used to serve as an analogy for the jury.  **These statements are not supported by scientific facts**." Exh. D, App. Exh. 65 at p. 377 (italics in original; bold added).

Additional studies also make clear that Dr. Burke's car crash analogy lacked any scientific foundation.  For example, as reported by Dr. Barnes, Chief of the Section of Pediatric Neuroradiology at Stanford University Medical Center, "it is no longer generally accepted that short falls can never cause [subdural hemorrhage, retinal hemorrhage, and encephalopathy] . . . or that massive force—typically described as the equivalent of a multi-story fall or a car accident—

is required." Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting it Right (2012). Exh. D, App. Exh. 82 at p. 214.

And, of great significance on this point is the action of the National Association of Medical Examiners. In 2001, NAME issued a Position Paper associating fatal brain injuries in children with motor vehicle accidents and falls from considerable height (greater than 10 feet) and essentially saying that short falls cannot cause similar results. But, in October 2006, NAME withdrew that Position Paper and at the same time published additional papers that cast substantial doubt on its 2001 pronouncements. Exh. D, App. Exhs. 156 & 157.

Many other studies since Vasquez's 1999 trial also establish the lack of any scientific validity to Dr. Burke's 65-mph car-crash testimony:

- 2004: Geddes, et al, The Evidence for Shaken Baby Syndrome, stating: "No one would be surprised to learn that a fall from a two story building or involvement in a high speed road traffic crash can cause retinal and subdural bleeding, but what is the minimum force required? It is one thing clearly to state that a certain quantum of force is necessary to produce a subdural hematoma; it is quite another to use examples of obviously extreme force . . . and then to suggest that they constitute the minimum force necessary." (Ellipses in original.) App. Exh. 108 at p. 719.

- 2005: Bandak, Shaken Baby Syndrome: a Biomechanical Analysis of Injury Mechanisms, reporting that the practice of equating severe brain injuries in children in only "qualitative" terms usually referring to "falls from great heights onto hard surfaces or from severe motor vehicle crashes" is "unsubstantiated" and results from a "lack of education an experience in Injury Biomechanics." App. Exh. 76 at pp. 71-72.

- 2008: Barnes, et al, Traumatic Spinal Cord Injury: Accidental Versus Nonaccidental Injury, reporting on a case study that disproved with a biomechanical analysis the "previously accepted" view that, "in the absence of a history of significant trauma (i.e., a motor vehicle accident or 2-story fall)" subdural and retinal hemorrhages and infant encephalopathy are "diagnostic of" nonaccidental injury and child abuse. App. Exh. 114 at p. 178.

- 2009: Imwinkelried, Shaken Baby Syndrome: A Genuine Battle of the Scientific (and Non-Scientific) Experts, revealing that "prosecution experts frequently give analogies. The most common analogies are to the amount [of force] generated by high speed automobile accidents and a fall from a several-story building . . . [but] it is fallacious to conclude that the amount of force generated in these types of accidents is the necessary minimum quantum of force." App. Exh. 162 at text accompanying notes 122-127.

Date Filed: 04/20/2023    Page: 250    Document: 00516720436    Case: 23-40079

- 2011: Barnes, <u>Imaging of Nonaccidental Injury and the Mimics: Issues and Controversies in the Era of Evidence-Based Medicine</u>, stating that "injury on an accidental basis" consisting of severe brain injury "does not require a force that can only be associated with a motor vehicle accident or multistory fall." App. Exh. 81 at p. 212.

- 2014: Squier, "<u>Shaken Baby Syndrome and Forensic Pathology</u>," reporting that "we now know that these assumptions [that severe pediatric brain injury] require[] forces . . . equivalent to a multi-story fall or a motor vehicle accident" are "wrong." App. Exh. 163 at p. 248.

- 2019: Papetti, <u>Outside the Echo Chamber</u>, concluding "[t]he motor vehicle and multi-story analogies, which filled the child abuse literature and courtrooms for decades . . . were without basis." App. Exh. 90 at p. 314.

In short, Dr. Burke's analogy provided dramatic support for the State's efforts to dehumanize Vasquez, but it had no scientific or medical validity.

## C.    Prior Consideration of Car-Crash Equivalency

In his 2021 findings, Judge Banales briefly acknowledged Dr. Burke's testimony on car-crash equivalency, but he nowhere addressed whether that testimony had scientific validity or how it impacted the jury's resolution of the *mens-rea* requirements for capital murder. The closest Judge Banales came to confronting these issues is in paragraph 219 of his findings and conclusions, where he completely mischaracterized Dr. Burke's testimony. There, Judge Banales claimed that Dr. Burke was simply comparing the injuries he observed on the CT scan of Miranda's brain to injuries that Dr. Burke had himself personally observed on the CT scans of other people who had actually been ejected from cars traveling 65 miles per hour. CR Vol. 3 at 629. According to Judge Banales, Dr. Burke's "point was that Miranda's CT scan showed essentially the same measure of brain damage that he [Dr. Burke] had observed in the CT scan of another person who had been ejected from a vehicle going 65 miles per hour." *Id.*

This description of Dr. Burke's testimony is a remarkably disingenuous attempt to recast what Dr. Burke actually said. Dr. Burke nowhere testified that he had compared Miranda's CT scan to the actual CT scan of another person who had been actually ejected at 65 miles per hour

20

from a car. Dr. Burke, moreover, never said that he personally had ever seen the CT scan of a 65-mph car-crash victim. Dr. Burke instead testified that he compared Miranda's CT scan to a "normal" CT scan of an uninjured brain. *See* Exh. D, App. Exh. 16 at 74-76. That is the *only* actual CT comparison that Dr. Burke testified to having performed.

What's more, Dr. Burke specifically explained to the jury that his conclusion on car-crash equivalency was *not* based on any personal comparison by him of Miranda's CT scan to the CT scans of car-crash victims. Rather, he testified that his conclusion on car-crash equivalency was based on "these studies that have been done" that relate to "Shaking Infant Syndrome" and "Shaking Impact Syndrome," including studies by "Duhayne." *Id.* at 91-93. Dr. Burke thus tied his testimony directly to "studies," "papers," and "articles" by prosecutors and child-abuse experts on the forces associated with brain injuries suffered by infants. *Id.* As Dr. Burke explained to the jury, these papers and studies related to what physicians and child-abuse experts could and should say "when we all [go] to court" to testify about pediatric head trauma in child-abuse prosecutions. *Id.*

Having thus mischaracterized Dr. Burke's testimony, Judge Banales never returned to any analysis of whether Dr. Burke's actual testimony was false or whether and how it impacted the jury's determination that the State had proven beyond a reasonable doubt that Vasquez acted with the *mens rea* required for a capital-murder conviction.[7] Judge Banales' findings on car-crash equivalency, in any event, were not essential to the judgment denying relief to Vasquez and constituted an unreasonable determination of the facts in light of the evidence presented. They are

---

[7] The refusal by Judge Banales and the Texas Court of Criminal Appeal to address the *mens-rea* implications of the new scientific evidence violated Vasquez's right to procedural due process. That violation is the subject of Vasquez's pending action under 42 U.S.C. § 1983.

thus entitled to no deference. *See HECI Exploration*, 982 S.W. 2d at 892 n.2; 28 U.S.C. § 2254(d)(2).

## VI.    FACTS ON SHORT FALLS

### A.    The False Evidence on Short Falls Offered in this Court

In an effort to convince this Court to deny Vasquez relief, the State highlighted the supposed evidence that a fall from a bathroom stool could not have caused Miranda's brain injury and subsequent death. This testimony, which came from Dr. White and Dr. Burke, was used in conjunction with the testimony on car-crash equivalency to substantiate the State's position that there was overwhelming *mens-rea* evidence sufficient to overcome any case in mitigation that could have been offered at the punishment phase.

Dr. White testified that the manner of Miranda's death was "homicide," defined by Dr. White as "death caused by an action of another person."[8] *See* Exh. D, App. Exh. 13 at 43. In the context of a discussion about the number and force of inflicted blows from Mr. Vasquez, Dr. White also testified that Miranda "was struck hard enough to produce fatal injury." *Id*. at 41. Through this testimony, Dr. White effectively testified that Miranda's fall from the stool in the bathroom could not have caused her death.

Dr. White also testified that "[m]ost fatal falls are from height; in other words, at least ten or fifteen feet. Falls from so-called ground level or falls from a very low level producing fatal injuries are very, very rare; although they do occur." *Id*. at 42. According to Dr. White's testimony, a fall of the type that Miranda sustained from the stool in the bathroom would be "very unlikely" to cause fatal injuries. *Id*. Through this testimony, when coupled with his testimony

---

[8] If Dr. White had determined that a fall from the stool could have caused Miranda's death, he would have been required, under established procedures for medical examiners, to list the manner of death as "accident" or at least "undetermined."

that Miranda's death was a homicide that resulted from a person striking Miranda hard enough to produce fatal injury, Dr. White effectively testified that the fall from the stool *in this case* could not have caused Miranda's death.

Dr. Burke, as already noted, testified that the "only time" the level of injury sustained by Miranda's brain is "seen is in a high-speed motor vehicle accident, 65 miles an hour, ejected from the car, severe head trauma. That's the mechanism of injury we're talking about." *See* Exh. D, App. Exh. 16 at 79. Dr. Burke further testified, in reference to Miranda's brain injury, that "[a]gain, it's the high speed motor vehicle accident that causes this kind of picture." *Id.* Dr. Burke claimed that, in the absence of evidence of a severe car crash, "[t]here is nothing else" that can cause injuries of the type suffered by Miranda other than "child abuse." *Id.* at 92. Since Miranda was not in a car accident, her condition presented a "hallmark of child abuse," with no other possible explanation. *Id.*

Through this testimony, Dr. Burke, like Dr. White, effectively indicated that Miranda's fall from the stool in the bathroom could not have caused her fatal injuries and did not in fact cause her death.

**B.     The Truth About Short Falls**

The testimony that the State proffered in this Court to the effect that Miranda's injuries could not have resulted from a short fall—and therefore must have resulted solely from blows that Vasquez inflicted with extreme force—has been thoroughly debunked, both in a general sense and in a specific sense. Generally, there are now dozens of medical and scientific studies, papers, and textbooks on forensic pathology and biomechanics confirming that short falls from minimal distances can and do cause fatal brain injuries in infants. Those materials are summarized in the proposed Findings of Fact and Conclusions of Law that Vasquez submitted in state court in support of his 2015 Application. *See* Exhibit E. That summary, which is incorporated by reference herein,

amply demonstrates the falsity of the testimony from Dr. Burke and Dr. White that short falls cannot generally generate the forces necessary to inflict the kind of head trauma experienced by Miranda.

The testimony has also been debunked with specific reference to the circumstances of Miranda's fall from a bathroom stool. Two biomechanical engineers have now confirmed, based on new scientific learning that was unavailable in 1999, that Miranda's short fall from the bathroom stool would have produced forces sufficient to cause her fatal injuries. Both of these engineers reached their conclusions after considering the actual circumstances of the reported fall, including Miranda's height and weight, the height of the stool, and the composition of the bathroom floor.

One of these engineers (Dr. Kenneth Monson) approached the issue by applying techniques developed since 1999 for calculating forces from a reported fall. Exh. D, App. Exh. 49. The other engineer (Dr. Chris Van Ee) approached the issue by recreating in a mock-up of the bathroom the actual fall experienced by Miranda and measuring the forces that would have been generated by that fall using an ATD test device commonly referred to as a "crash dummy." *Id.*, App. Exhs. 47, 47A, & 48.

These two approaches produced consistent results. Dr. Monson calculated that a fall from the bathroom stool would have resulted in a pre-impact total head velocity of 12.1 miles per hour, peak force between 724 to 1207 pounds, and linear acceleration between 147 to 245 G. *Id.*, App. Exh. 49. Dr. Van Ee measured that a fall from the bathroom stool would have resulted in peak G's as high as 325, peak angular acceleration as high as 30,797 (rad/s2), and a HIC score (Head Injury Criteria) as high as 1425. *Id.*, App. Exhs. 47, 47A, & 48. After comparing these results to injury thresholds that were established and have become scientifically accepted since 1999, both

Case: 23-40079     Document: 00516720436     Page: 255     Date Filed: 04/20/2023

Dr. Monson and Dr. Van Ee confirmed that the reported fall would have generated forces sufficient to cause severe and fatal brain injuries. *Id.*, App. Exhs. 47, 47A, 48 & 49.

And, there's more. Dr. Janice Ophoven and Dr. Karl Williams, highly experienced forensic pathologists, both confirmed that, given the results of the biomechanical analyses, a determination of "homicide" was not scientifically supportable on these facts. Exh. D, App. Exhs. 50 & 51. Both pathologists confirmed that Miranda's fall could have produced her fatal injuries and that there was nothing in the medical records or the autopsy findings that would allow a forensic pathologist applying current scientific knowledge and scientific method to rule out the fall as the cause of Miranda's death. *Id.* Specifically, Dr. Ophoven and Dr. Williams confirmed that it is not scientifically possible, from the medical records and autopsy findings, to say that Miranda's brain injuries necessarily resulted from multiple blows or impacts as opposed to a single impact. *Id.* In addition, Dr. Clayton A. Wiley (a neuropathologist) has confirmed that there was nothing in the medical records that, from a neuropathological standpoint, would preclude a finding that a fall from a stool caused Miranda's injuries or that would compel a finding that her brain injury resulted from inflicted blows. *See* Exh. D, App. Exh. 161.

In addition, Dr. White, the medical examiner who ruled that Miranda's death was a homicide, has partially recanted his trial testimony on this point. Dr. White now recognizes that new science on biomechanics and short falls could well have made a difference in his findings and testimony, had that new science been available in 1998 and 1999. According to Dr. White:

> I understand that, in the years since 1999, the topic of "short falls" and their potential to cause serious or fatal brain injuries in children has received significant attention in the medical and scientific literature. I further understand that there have been significant advances since 1999 in the scientific understanding of impact response in pediatric heads and that, as a result of these advances, Injury Assessment Reference Values and injury thresholds for pediatric heads have been dramatically reduced.

> If I were conducting Miranda Lopez's autopsy and making a manner-of-death determination today, I would acknowledge the potential benefit of conducting a biomechanical analysis and/or obtaining a biomechanical consultation, and I would be open to considering the input of experts in biomechanics. I do not know that biomechanical input would necessarily cause me to change my determination as to the manner of Miranda Lopez's death, but I do believe it would be appropriate and important for a jury to hear scientific evidence on the forces that would be generated from a fall from the stool in the bathroom as described by Mr. Vasquez and how those forces correlate to currently accepted injury thresholds and Injury Assessment Reference Values.

Exh. D, App. Exh. 30.

In short, the clear message conveyed to this Court—that Miranda could not have died from a short-distance fall—is now known to lack any scientific validity. **Critically, the State of Texas agrees that this evidence was false**. And, Vasquez has been able, through a scientifically valid recreation of Miranda's fall, to confirm the contrary: the fall generated forces sufficient to have caused the brain trauma Miranda experienced.

In *Ex Parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012), an applicant relying on these same scientific principles (but with a less compelling case) was granted relief from her death sentence. Vasquez, by contrast, was denied relief. The only explanation for this disparate treatment is the inflammatory evidence that Vasquez supposedly injected Miranda with a lethal dose of cocaine, which—as demonstrated above—was itself false.

### C.    Prior Consideration of Short Falls

As noted, in findings that the Texas Court of Criminal Appeals adopted, Judge Banales effectively agreed with Vasquez that the State's evidence that a short fall could not have caused Miranda's fatal brain injuries was false. Judge Banales determined, however, that Miranda never suffered a fall, which in his view rendered the State's use of false evidence on short falls of no consequence.

For multiple reasons, Judge Banales' conclusion that Miranda never fell was an unreasonable determination of the facts in light of the evidence presented and is entitled to no deference. *See* Exhibit G. On this point, Vasquez incorporates herein the Objection to Judge Banales' findings that he filed in the Texas Court of Appeals on May 6, 2021. *Id*.

## VII.   THE MISCONDUCT THAT UNDERMINED THIS PROCEEDING

As the above discussion plainly reveals, the integrity of the process through which this Court was induced to deny Vasquez relief on his IAC claim was severely impaired by the use of false evidence on three critical points. To obtain relief for this under Rule 60(b), Vasquez need not prove actual fraud or intentional misconduct; his burden is only to show extraordinary circumstances resulting in injustice. That said, the circumstances here show clearly and convincingly the existence of misconduct more than sufficient to meet any standard for culpability that the Court may choose to apply in exercising its discretion under Rule 60(b)(6).

First, there clearly was misconduct in connection with Dr. Backer's testimony. At the time of his testimony, Dr. Backer was a board certified forensic toxicologist with decades of experience. *See* Exh. D, App. Exh. 27 at 3-4. His laboratory, moreover, was certified by the federal government to perform drug testing. *Id*. As a certified toxicologist running a certified lab, Dr. Backer was subject to ethical rules and professional standards that required him, before testifying in a criminal case, to have a full understanding of any report or test results that he was sponsoring and to have a solid scientific basis for any conclusions he was expressing. *See* Exhibit I. Dr. Backer could not have discharged these responsibilities in the Vasquez case without having studied and fully understood the Toxicology Report dated March 19, 1998, that formed the only basis for his testimony that there was cocaine in Miranda's system. *Id*.

How then did Dr. Backer come to confirm the presence of cocaine in Miranda's blood in the face of a report that, as he now acknowledges, contained an irreconcilable conflict and was unreliable? There are only two realistic possibilities. Dr. Backer either testified without reviewing and understanding the Toxicology Report or he reviewed and understood the report but consciously failed to disclose the fatal inconsistency that rendered it unreliable. If the former is true, then Dr. Backer engaged in serious professional misconduct. *See* Exhibit I. If the latter is true, then Dr. Backer intentionally provided false testimony and committed a fraud on the Court and on the parties. *Id.*

A third possibility—that Dr. Backer studied the report before testifying and innocently overlooked the fatal inconsistency in it—cannot seriously be entertained. The Toxicology Report is only one page. As the image below depicts, the positive result for parent cocaine (0.18 mg/L) appears immediately after the "Negative" result for the "Drugs of Abuse Screen."

| | |
|---|---|
| **Drugs of Abuse Screen** | |
|     Blood | **Negative** |
| **Confirmed GC/MS** | |
|     Blood Parent cocaine | 0.18 mg/L |
|     Blood Benzoylecgonine | 0.42 mg/L |
|     Blood Cocaethylene | Negative |

Exh. D, App. Exh. 25.

It is not conceivable that a competent toxicologist with Dr. Backer's certifications could have noted the 0.18 mg/L entry for parent cocaine without also seeing the negative entry for drugs of abuse. And, any such competent toxicologist seeing those results would have immediately understood that there was an irreconcilable conflict. *See* Exhibit I. In short, if Dr. Backer reviewed the Toxicology Report before testifying, as was his professional responsibility, there is no innocent basis on which to explain away his false testimony. Intentional fraud or professional misconduct

are the only viable possibilities. And, that fraud or misconduct should be imputed to the State. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (prosecutors are charged with knowledge of everyone "acting on the government's behalf in the case"); *Rembrandt Vision Techs, L.P. v. Johnson & Johnson Vision Care*, 818 F.3d 1320, 1328 (Fed. Cir. 2016) (granting 60(b) relief based on false expert testimony even without complicity by the party and counsel sponsoring the testimony).

The circumstances similarly show a level of misconduct in connection with the State's use in this Court of false evidence on car-crash equivalency and short falls.

The assessment of this issue must start from the well-established premise that prosecutors are not charged with obtaining or upholding convictions, but rather with achieving justice. *Berger v. United States*, 295 U.S. 78, 87 (1935) (sovereign's "interest in a criminal prosecution is not that it shall win a case, but that justice be done"); *Strickler v. Greene*, 527 U.S. 263, 281 (1999)(prosecutors play a "special role" in the "search for truth in criminal trials"); *Banks v. Dretke*, 540 U.S. 668, 697 (2004)(same).

Vasquez and his lawyers, moreover, were entitled to rely on the presumption that the prosecutors had fulfilled their obligations in this regard. *See, e.g., Strickler*, 527 U.S. at 287 (criminal defendant entitled to rely on the "presumption, well established by 'tradition and experience' that prosecutors have fully 'discharged their official duties'")(quoting *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995)). "Courts, litigants, and juries properly anticipate that the 'obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] on the prosecuting attorney, will be faithfully observed." *Banks*, 540 U.S. at 696 (quoting *Berger*, 295 U.S. at 88).

Case: 23-40079   Document: 00516720436   Page: 260   Date Filed: 04/20/2023

Inherent in this obligation is the requirement that, before offering or relying on expert testimony, those representing the State must investigate the scientific basis for and the validity of the expert's conclusions. The State thus had a responsibility, at least as great as that imposed on Vasquez's lawyers, to exercise reasonable diligence to assess the validity of the scientific testimony on car-crash equivalency and short falls before re-offering it in this Court in 2008 as an alleged basis for denying Vasquez's IAC claim. *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (due process is violated "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears").

By 2008, the State should have known that Dr. Burke's testimony on car-crash equivalency and short falls was false and lacked scientific validity.[9] When the State re-offered that testimony in this Court, there are two possibilities: (1) the prosecutors fulfilled their own duty to exercise reasonable diligence, learned that the testimony lacked scientific support, and nevertheless knowingly relied on false testimony in this Court or (2) they failed to exercise reasonable diligence to assess the testimony and thus engaged in prosecutorial misconduct. In either case, the State engaged in culpable conduct that was at least negligent, if not worse. *See, e.g., Giglio v. United States*, 405 U.S. 150, 154 (1972) (false use of testimony to obtain conviction violates due process whether the "result of negligence or design").

---

[9] In 1999, when Vasquez was tried, the false science on car-crash equivalency and short falls proffered by the State had not yet been debunked by new scientific learning. By 2008, when the State re-urged that false evidence in this Court, much (although admittedly not all) of the new science on which Vasquez relies had already emerged. *See* Exh. D, App. Exhs. 55-126, 155-167. As a result, the State of Texas knew or should have known that it was urging this Court in 2008 to deny Vasquez relief based false evidence. Any argument that the same applies to Vasquez's lawyers would be unavailing for at least two reasons. First, a defendant's own lack of due diligence is no defense to a due-process claim based on the State's use of false evidence in a criminal case. *See, e.g., United States v. Mason*, 293 F.3d 826, 829 (5th Cir. 2002) (defense counsel's failure to avail himself of readily available procedure that would have revealed falsity "does not relieve the government of its affirmative responsibility to correct false testimony"). Second, in the habeas context, a petitioner should not be charged with procedural defaults based on the failure of his post-conviction counsel to provide effective assistance of counsel. *Trevino v. Thaler*, 569 U.S. 413, 421-22 (2013).

30

Thus, even if Vasquez were required to show culpability in order to obtain Rule 60(b) relief, he could meet that burden.

## VIII.  VASQUEZ PROPERLY INVOKES RULE 60

### A.    This is Not a Successive Habeas Petition in Disguise

The Antiterrorism and Effective Death Penalty Act limits the circumstances in which a party challenging a capital conviction and sentence can file a second or successive petition in federal court for habeas relief. In some circumstances, a motion purportedly brought under Rule 60(b) to challenge a federal court's denial of an initial federal petition is properly characterized as a successive petition that must comply with the AEDPA's requirements. *Gonzalez v. Crosby*, 545 U.S. 524, 530-31 (2005). That, however, is only the case where the motion directly attacks the substance of the federal court's resolution of a habeas claim on the merits or asserts a new substantive claim on the merits that was not included in the original petition. *Id.* at 531. If a motion instead raises defects in the integrity of the federal habeas proceeding, including those that precluded the federal court from fairly resolving a claim on the merits, it is properly considered under Rule 60(b) and is not subject to the AEDPA requirements applicable to subsequent habeas petitions. *Id.*

Notwithstanding the limitations of the AEDPA, Rule 60(b) remains available to capital defendants seeking habeas relief when, for example, the district court failed to reach the merits of a habeas claim due to the erroneous application of some procedural bar, like the statute of limitations. *See, e.g.*, *Tamayo v. Stephens*, 740 F.3d 986, 990 (5th Cir. 2014). Rule 60(b) can also provide an avenue for relief when habeas counsel was burdened by a conflict of interest that interfered with a court's ability to consider a habeas issue on the merits. *See, e.g.*, *Clark v. Davis*, 850 F.3d 770, 779 (5th Cir. 2017). And, Rule 60(b) remains the appropriate way to raise fraud or other misconduct that resulted in a flawed resolution of a habeas claim. *See, e.g.*, *Gonzalez*, 545

Date Filed: 04/20/2023    Page: 261    Document: 00516720436    Case: 23-40079

U.S. at 528-29. In each of these examples, Rule 60(b) is used—not just to obtain reconsideration of a prior merits-based determination—but to remedy a defect that undermined the integrity of the federal process.

Here, Vasquez is not using Rule 60(b) to challenge the State's use of false evidence at his original trial to convict him or to procure a death sentence. Rather, Vasquez seeks relief under Rule 60(b) to remedy the State's use of false evidence *in this Court* to defeat Vasquez's IAC claim. The focus is on false evidence that infected the integrity of *this proceeding* and impaired *this Court's* ability to fairly adjudicate Vasquez's IAC claim, making this the quintessential example of the kind of motion that can proceed under Rule 60(b) unaffected by AEDPA requirements. *See, e.g., Gonzalez*, 545 U.S. at 528-29.

### B.     This Motion is Timely Under Rule 60(c)

Rule 60(c)(1) provides that a motion under Rule 60(b)(6) must be filed "within a reasonable time." As demonstrated by the Declarations submitted herewith, Vasquez can meet this timing requirement.

To assess whether Vasquez asserts this motion "within a reasonable time," it is important to consider three questions: (1) what is the factual and legal basis for the motion; (2) when did Vasquez have actual or constructive knowledge of those factual and legal circumstances; and (3) from the point of actual or constructive knowledge, did Vasquez act with reasonable dispatch?

On the first question, and as revealed by the foregoing discussion, there are three key points underpinning this Rule 60(b) motion: the actions taken by Dr. Backer and Dr. White to renounce their trial testimony on the presence of cocaine in Miranda's system; the actions taken by Dr. White to clarify and to partially recant his trial testimony on the manner of Miranda's death and whether, from a biomechanical standpoint, a short fall could have caused her fatal injuries; and the State of Texas' acknowledgment that Vasquez's conviction and death sentence should be set aside.

Case: 23-40079   Document: 00516720436   Page: 263   Date Filed: 04/20/2023

On the second question, it is undisputed that these three circumstances did not come into existence until May 2019. Dr. Backer recanted his testimony on May 1, 2019. Exh. D, App. Exh. 30. Dr. White recanted his testimony on May 23, 2019. *Id.* App. Exh. 28. And, the State of Texas did not inform Vasquez of its position that he should be granted habeas relief until late May 2019, just prior to officially announcing that position in open court on June 3, 2019. Exh. J at ¶ 15.

Further to the second question, there is no basis on which to conclude that Vasquez should have anticipated that these developments would occur at any point earlier than May 2019. On this point, Vasquez relies on his own Declaration, Exhibit M, and on the Declarations of the lawyers who have represented him at each stage of the process: John Gilmore (trial counsel, Exhibit K); Nicholas Trenticosta (initial state habeas counsel, Exhibit L); and Thomas M. Farrell (current counsel, Exhibit J)[10].

Collectively, these Declarations establish that Vasquez and his lawyers had no basis, prior to May 2019, on which to expect that the State of Texas would join Vasquez's efforts to have his conviction and sentence set aside. They further establish that, prior to May 2019, neither Vasquez nor his lawyers had any reason to believe that Dr. Backer and Dr. White would recant their trial testimony. These Declarations go on to confirm that Vasquez and his lawyers were unaware, before May 2019, of any basis on which to challenge the conclusion in the Toxicology Report that Miranda's blood had 0.18 mg/L of parent cocaine and 0.42 mg/L of cocaine metabolite. Finally, the Declarations reasonably explain why Vasquez and his lawyers did not consult with a defense-retained toxicologist before his original trial or in connection with his initial state and federal applications for habeas relief.

---

[10] On information and belief, Andrew Edison, Vasquez's initial Art. 11.073 counsel, would provide similar testimony. But, since he is now a federal magistrate judge, Vasquez has not yet been able to secure his testimony.

Case: 23-40079    Document: 00516720436    Page: 264    Date Filed: 04/20/2023

If thus follows that the starting point on the third question for assessing whether Vasquez acted with reasonable dispatch is May 2019. Since May 2019, Vasquez has unquestionably exercised reasonable diligence and acted with deliberate speed to obtain relief based on the three key factors that underlie this motion. Upon learning that Dr. Backer and Dr. White disavowed their trial testimony, Vasquez promptly brought that information to the attention of the State of Texas and secured the State's agreement that Vasquez was entitled to habeas relief. Vasquez then promptly informed the state trial court of all of these circumstances—and of the State's agreement that Vasquez was entitled to habeas relief—at the hearing on June 3, 2019.

The question then becomes whether Vasquez should have brought this Rule 60(b) motion at that point (June 2019)—while his state-court application remained under consideration—or whether it was reasonable for him to defer this motion until after the resolution of the state-court proceeding. In this unique context, Vasquez respectfully submits that following the latter course was the reasonable and appropriate approach. By June 2019, Vasquez's state-court application had effectively become a joint application, with the State of Texas in full agreement that Vasquez was entitled to relief from his conviction and death sentence. In that context, Vasquez had a reasonable basis to believe that he would obtain full relief from the state court and that there would never be any need to file this Rule 60(b)(6) motion. *See, e.g., Mesarosh v. United States*, 352 U.S. 1, 6 (1956) (recognizing the critical importance of the government's concession that false testimony justifies relief); *Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (same). Vasquez, as a result, should not be penalized for deferring this motion from June 2019 until the resolution of the state-court application.

The last point to discuss on this issue relates to the time that has passed since August 25, 2021, when the Texas Court of Criminal Appeals issued its opinion denying Vasquez relief on his

Case: 23-40079     Document: 00516720436     Page: 265     Date Filed: 04/20/2023

state-court application. Given the complexities inherent in post-conviction capital litigation, it was more than reasonable for Vasquez to take this time to assess his legal options, to decide whether to file a petition for writ of *certiorari*, and to research and prepare this motion. Since this motion is being filed just days after expiration of the deadline for filing a *certiorari* petition, Vasquez respectfully submits that he has acted with reasonable dispatch to file this motion.

For all of these reasons, this motion has been made "within a reasonable time," as required by Rule 60(c).

## IX.   VASQUEZ IS ENTITLED TO RELIEF FROM THIS COURT'S JUDGMENT

Rule 60(b)(6) exists "as 'a grand reservoir of equitable power to do justice in a particular case . . . .'" *Williams v. Thaler*, 602 F.3d 291, 311 (5th Cir. 2010) (quoting *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1458 (5th Cir. 1992)). The Rule "seeks to strike a delicate balance between the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981). Relief is only available under Rule 60(b)(6) upon a showing of "extraordinary circumstances," but, "[i]n determining whether extraordinary circumstances exist, a court may consider a wide range of factors." *Buck v. Davis*, 137 S. Ct. at 778. These factors include "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Services Acquisitions Corp.*, 486 U.S. 847, 863-64 (1988). As the grand reservoir of equitable power, Rule 60(b)(6) is "liberally construed in order to achieve substantial justice." *Seven Elves*, 635 F.2d at 396.

Rule 60(b)(6) "has an unquestionably valid role to play in habeas cases" and, "like the rest of the Rules of Civil Procedure, applies in habeas corpus proceedings." *Gonzalez*, 545 U.S. at 529, 534. In assessing "extraordinary circumstances" in the habeas context, the position of the

respondent (the State that prosecuted the petitioner and secured his conviction and sentence) can plays a significant and near-dispositive role. Normally, of course, the State appears in habeas cases to oppose relief and to advocate in favor of the conviction and sentence at issue. *See Buck*, 137 S.Ct. at 779 ("It is not every day that a State seeks to vacate the sentences of . . . defendants found guilty of capital murder."). When the State takes the "remarkable" step of confessing error or acknowledging that a convicted defendant should receive a new trial or a new sentencing hearing, that goes a long way to "confirm[ing]" the "extraordinary nature" of the case for Rule 60(b)(6) purposes. *Id*. at 778, 779. In that circumstance, the "State's interest in finality deserves little weight." *Id*. at 779.

And, with the fact-specific and multi-factorial approach to Rule 60(b)(6), the focus is not necessarily on the culpability of the party who benefitted from the judgment under review, but on justice and on the integrity of the system. *See, e.g.*, Wright & Miller, Federal Practice and Procedure § 2864. Accordingly, a movant under Rule 60(b)(6) need not show that the injustice he seeks to undo resulted from intentional wrongdoing or misconduct by the opposing party. *Id*. Indeed, relief has been granted under Rule 60(b)(6) when the movant's own lawyer was responsible for the circumstances that infected the integrity of the process and led to an unjust result. *Buck*, 137 S. Ct. at 779.

Here, a unique constellation of factors cries out for relief under Rule 60(b)(6). First, it is critical to note that Vasquez is not starting from a blank slate, trying to use the circumstances raised in this motion to establish for the first time that a constitutional violation occurred. Rather, he begins from this Court's prior determination, made in 2008 and subsequently affirmed by the Fifth Circuit, that Vasquez's constitutional rights were violated. This Court has already determined that Vasquez was denied his Sixth Amendment right to effective counsel. The only question now is

whether the integrity of the process through which this Court determined that Vasquez was not thereby prejudiced was compromised.

Second, as in *Buck v. Davis*, the State of Texas has effectively confessed error and now concedes that Vasquez's conviction and sentence should not stand. As a result, the State's interest in preserving the finality of the judgment against Vasquez is entitled to little or no weight. 137 S.Ct. at 779.

Third, this motion is based on the extraordinary circumstance that two expert witnesses for the State have recanted their trial testimony on the very points that were critical to this Court's decision to deny habeas relief.

Fourth, that there is merit in Vasquez's substantive position is patently obvious. This Court has already assessed the materiality of the cocaine evidence and the evidence on short falls and car-crash equivalency that Vasquez addresses in this motion, correctly determining that they were the lynchpins of the State's *mens-rea* theory and of the jury's answers to the punishment-phase questions. As the State told the jury with respect to the cocaine evidence, "it's so important" and "it's the straw that breaks the camel's back." *See* Exh. D, App. Exh. 19 at 45, 47. Without this evidence, there is a strong likelihood that Vasquez would never have been convicted of capital murder or that the jury would never have determined him eligible for the death penalty.

Fifth, it is clear that Vasquez is not simply complaining about error that infected his trial, but has instead demonstrated that the integrity of the proceedings *in this Court* were severely compromised. Here, the State did far more than ask this Court to hold that Vasquez had failed to rebut any presumption of correctness applicable to findings by the state habeas court. The state habeas court, in fact, had not made any specific fact finding regarding the impact that the cocaine evidence or the evidence on car-crash equivalency or short falls would have had on the mitigation

evidence that Vasquez's lawyers failed to develop and present.[11] Rather, the State asked this Court to go further than the state court had gone and to make specific findings that the cocaine, short-fall, and car-crash evidence would have rendered futile any case in mitigation that Vasquez's lawyers could have presented. In doing so, the State specifically asked this Court to rely on evidence—now known to be completely false—of Miranda's "slow death from [Vasquez's] blows to her head, the damage equated with that of a 65-mile-per-hour car crash, twice-lethal dose of cocaine in her body. . . ." ECF No. 34 at 14.

Sixth, relief is appropriate here due to the severe "risk of undermining the public's confidence in the judicial process," *Buck*, 137 S. Ct. at 778. *Buck* involved the obviously improper suggestion that the defendant's race made it more likely that he would be violent in the future and thus more deserving of the death penalty. Executing a defendant on that basis, to be sure, would shake public confidence in the judicial system. It would be a mistake, though, to limit *Buck* to that narrow circumstance. The public would have no confidence in a system that would allow an execution based on supposed evidence that the defendant's race made him inherently dangerous. The public would have no more confidence in a system that would permit an execution based on demonstrably false expert testimony that the defendant injected a little girl with cocaine. Since an execution on either basis would shock the conscience, splitting hairs between false testimony based on race and false testimony about other circumstances would be plainly inconsistent with the "grand reservoir of equitable power to do justice" that resides in Rule 60(b)(6).[12]

---

[11] With respect to *Strickland's* prejudice prong, the state court made only a general finding that there was no prejudice, with no subsidiary findings specific to the ability of the cocaine evidence or the evidence on car-crash equivalency to overcome mitigating evidence. *See* ECF. No. 25-1 at ¶ 23.

[12] In fact, the record here demonstrates that the false evidence on cocaine and on car-crash equivalency played a far more prominent role in Vasquez's conviction and sentence than did the race-based testimony in *Buck*.

Seventh, the "risk of injustice to the parties," *Buck*, 137 S. Ct. at 778, compels a decision in Vasquez's favor. Granting relief will impose *no* injustice on the State of Texas, which has already conceded that Vasquez's conviction and sentence should be set aside. As in *Buck*, "the people of Texas lack an interest in enforcing a capital sentence on so flawed a basis." 137 S. Ct. at 779. And, the injustice to Vasquez of an execution based on demonstrably false evidence presented at a trial where he had constitutionally deficient representation is so obvious as to require no further discussion.

For all of these reasons, Vasquez invokes "the incessant command of the court's conscience that justice be done in light of all the facts." *Seven Elves*, 635 F.2d at 401.

## CONCLUSION

Vasquez understands the natural reluctance to re-open final judgments years after they were rendered. But, doing so on the unique facts here would not create any precedent threatening the legitimate interest in protecting the finality of judgments fairly obtained. Rare is the case where two expert witnesses recant their scientific testimony on critical points. Rarer still is the case where the State—normally incentivized to uphold the results of criminal trials—confesses error and agrees that a conviction and sentence should be overturned. Vasquez was previously denied habeas relief, notwithstanding his receipt of constitutionally deficient legal representation, based on evidence that everyone now recognizes as false. The Court can and should correct this injustice based on the extraordinary circumstances of this case.

Accordingly, Vasquez respectfully moves the Court to set aside its prior orders and judgment, ECF No. 25, ECF No. 26, and ECF No. 35.

Respectfully submitted

McGuireWoods LLP

By: */s/ Thomas M. Farrell*
    Thomas M. Farrell
    State Bar No. 06839250
    Charles B. Hampton
    State Bar No. 00793890
    600 Travis Street, Suite 7500
    Houston, Texas 77002
    Telephone:  (713) 571.9191
    Facsimile:  (713) 571.9652
    tfarrell@mcguirewoods.com
    champton@mcguirewoods.com

ATTORNEYS FOR RICHARD VASQUEZ

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing instrument was served on all counsel of record on January 26, 2022, via the Court's ECF filing system.

                */s/Thomas M. Farrell*
                Thomas M. Farrell

150006608_4

# EXHIBIT 3(e)

ENTERED
July 11, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| RICHARD VASQUEZ, | § | |
| | § | |
| Petitioner, | § | |
| v. | § | CIVIL ACTION NO. C-05-59 |
| | § | |
| BOBBY LUMPKIN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division | § | |
| | § | |
| Respondent. | § | |

## ORDER

Texas death-row inmate Richard Vasquez filed a federal petition for a writ of habeas corpus in 2006. D.E. 15. On March 28, 2008, Vasquez's petition was denied in a Memorandum and Order that addressed all his claims. D.E. 25.[1] Over a decade later, Vasquez has filed a Motion for Relief from Judgment under Rule 60(b)(6). D.E. 51. The Court denies Vasquez's Rule 60(b) motion for the reasons discussed below.

## I.   Background

The State of Texas charged Vasquez with capital murder for the beating death of his girlfriend's four-year-old daughter. In 1999, Vasquez stood trial in the 148th

---

[1]     The Honorable United States District Judge Hayden Head presided over the adjudication of Vasquez's federal petition.

Judicial District Court, Nueces County Texas. The evidence before the jury showed that Vasquez "became angry and unleashed his frustration on [the young victim]. She died as a result of severe brain injuries sustained when Vasquez, in a drug-fueled rage, struck her several times in the head." *Vasquez v. Thaler*, 389 F. App'x 419, 422 (5th Cir. 2010). The trial evidence revealed other tragic circumstances surrounding her death: "significant evidence emerged that [the victim] had also been severely sexually assaulted before she died, responsibility for which Vasquez denied. A toxicology report revealed cocaine levels in [her] blood that were double the lethal amount for an adult, although neither the doctor nor Vasquez could explain the presence of the drug in her blood." *Id.*

Vasquez's Rule 60(b) motion challenges testimony and evidence which the State presented at his trial. Vasquez's motion focuses on two factors: (1) one of the State's witnesses testified that Vasquez had inflicted "brain injuries . . . equivalent to those [the victim] would have sustained had she been ejected from a car traveling 65 m.p.h." and (2) the State adduced testimony describing how the victim had a "potentially lethal amount of cocaine" in her system when she died. *Vasquez v. State*, No. 73,461, slip op. at 3-7 (Tex. Crim. App. Oct. 3, 2001). Vasquez's 2006 federal petition did not directly challenge the evidence relating to those two factors. Respondent's motion for summary judgment discussed those two factors, but primarily in the context of showing that no prejudice resulted from any error in trial

counsel's representation. D.E. 20 at 4-7, 23-24, 32, and 36. Respondent, however, did not belabor the impact of the trial evidence. Respondent briefly mentioned the now-challenged evidence and tersely asserted that "the horrific nature of the crime and Vasquez's escalating criminal history" precluded any finding that error prejudiced his defense. D.E. 20 at 24.

Both the district and circuit court opinions extensively discussed the trial testimony and forensic evidence. The evidence, however, was discussed in two contexts: (1) when summarizing the facts and (2) in weighing an unrelated ineffective-assistance-of-counsel claim against the evidence which the jury considered. D.E. 20 at 12-13; *Vasquez v. Thaler*, 389 F. App'x 419, 427 (5th Cir. 2010).

Notwithstanding changes in forensic science and developments in Vasquez's understanding of the evidence, Vasquez has not litigated any relevant issue in federal court since the denial of federal habeas review. Vasquez's federal habeas case has sat dormant for years after the Supreme Court denied certiorari review in 2011.

The challenged brain-injury and cocaine evidence became the focus of a successive state habeas application which Vasquez filed in 2015 ("2015 application"). *Ex parte Vasquez*, No. 59,201-03 (Tex. Crim. App. Apr. 15, 2015). Vasquez's 2015 application argued that the trial evidence lacked serious foundation, partially because changes had occurred in forensic science after his trial. The Nueces

County District Attorneys' Office did not offer a zealous defense during the state

habeas proceedings. In fact, the Nueces County District Attorney's Office explicitly

stated on the record that "a new trial would be appropriate under the circumstances."

D.E. 51-3 at 10. Vasquez says that the Nueces District Attorney's Office also made

three concessions during the successive habeas proceedings:

(1)    the victim's "backward fall from a bathroom stool could have
        generated forces sufficient to have caused her death, thus
        debunking the State's prior narrative that [the victim] could *only*
        have died at Vasquez's hands";

(2)    "the so-called evidence that Vasquez struck [the victim] with the
        force of a speeding car was false and *never* had any scientific
        validity"; and

(3)    the "evidence on cocaine intoxication was unreliably false and .
        . . there was no *real* evidence that [the victim] had *any* cocaine
        in her system."

D.E. 51 at 7 (emphasis in original).

Notwithstanding any concession by the Nueces District Attorney's Office, the

trial-level habeas court still entered findings of fact and conclusions of law

recommending that relief be denied. Pursuant to Texas habeas procedure, the district

judge's recommendation was forwarded on to the Texas Court of Criminal Appeals.

Vasquez filed objections to the lower court's recommendation. Vasquez raised

several points of error, including that the district judge's recommendation did not

address all his arguments. D.E. 51-6 at 11. The Texas Court of Criminal Appeals

denied Vasquez's 2015 application in 2021. *See Ex parte Vasquez*, No. WR-59,201-
4 / 15

03, 2021 WL 3746008, at *1 (Tex. Crim. App. Aug. 25, 2021).

Now, over a decade after the conclusion of federal review, Vasquez moves for relief under Rule 60(b)(6). Vasquez specifically states that he does not base his motion on error in the trial or state habeas proceedings. Instead, Vasquez moves for relief from judgment because "the integrity of the [federal] process . . . was severely impaired by the use of false evidence . . . ." D.E. 51 at 32. Vasquez argues that the Respondent's reliance on the allegedly false trial evidence when litigating his federal habeas action "infected the integrity of *this proceeding* [meaning the substantive consideration of his federal habeas petition] and impaired *this Court's* ability to fairly adjudicate Vasquez's [ineffective-assistance-of-counsel] claim." D.E. 51 at 7, 37 (emphasis in original).

Respondent opposes Vasquez's motion. D.E. 58. In this case, "the real party in interest is the State of Texas." *Saldano v. Roach*, 363 F.3d 545, 551 (5th Cir. 2004). The Director of the Texas Department of Criminal Justice, Correctional Institutions Division represents Texas in this action. Notwithstanding any concession of error by the District Attorney in a state court proceeding, Respondent has not conceded any error here.[2] Respondent contends that, notwithstanding the title of his pleading, Vasquez's Rule 60(b)(6) motion is actually a successive habeas

---

2 The Nueces County District Attorney's Office has made no effort to intervene in, or otherwise influence, this lawsuit.

petition. Alternatively, Respondent contends that Vasquez is not entitled to Rule 60(b)(6) relief because his motion is untimely and does not demonstrate extraordinary circumstances. Vasquez has not replied to Respondent's arguments.

## II.    Alleged Fraud on the Court

Before answering the procedural question of which vehicle Vasquez should use to challenge the trial evidence, the Court pauses to observe a flaw inherent in Vasquez's arguments. No matter how the Court characterizes the pleading now before the Court, Vasquez's arguments depend on showing that Respondent committed fraud during the initial federal habeas proceedings. Vasquez specifically argues that Respondent committed "fraud or other misconduct that resulted in a flawed [federal] resolution of a habeas claim." D.E. 51 at 36. Vasquez bears a heavy burden when alleging fraud by Respondent. The Fifth Circuit has decided that such a "defect in the integrity of the federal habeas proceeding" could include a "fraud on the court," but only in limited circumstances:

> To establish fraud on the court, it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its discretion. Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court. Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court.

*Fierro v. Johnson*, 197 F.3d 147, 154 (5th Cir. 1999) (quoting *First Nat'l Bank of Louisville v. Lustig*, 96 F.3d 1554, 1573 (5th Cir. 1996)).

Vasquez says that "the State of Texas knew or should have known that it was urging this Court [during the initial proceedings] to deny Vasquez relief based [on] false evidence." D.E. 51 at 35 n.9. Despite his protestations, Vasquez's allegations of fraud plainly rely on what happened at trial and in his successive state habeas proceedings. Nothing on the record suggests that the Respondent in this action knew that any trial evidence was based on invalid scientific principles or on a false factual foundation. *See Fierro v. Johnson*, 197 F.3d 147, 154 (5th Cir. 1999) ("To establish fraud on the court, it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its discretion."); *Herring v. United States*, 424 F.3d 384, 386 (3d Cir. 2005) (stating that a fraud on the court requires: "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court"). Vasquez has not shown any intentional effort by Respondent to obfuscate the record or hide information. *See Fierro*, 197 F.3d at 154 ("[O]nly the most egregious conduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court.").

Vasquez's arguments depend on showing that the State *should have known* the trial evidence lacked a sure factual or scientific foundation.[3] The Fifth Circuit has refused to impute any alleged fraud in the trial court to the respondent in federal habeas proceedings. *See Lave v. Davis*, 655 F. App'x 255, 259-60 (5th Cir. 2016); *Fierro*, 197 F.3d at 155-56. Vasquez argues that Respondent "had a responsibility, at least as great as that imposed on Vasquez's lawyers, to exercise diligence to assess the validity of the scientific testimony . . . before re-offering it in this court in 2008 . . . ." D.E. 51 at 35. Vasquez has not cited any law stating that the State must retest and reevaluate its trial evidence—even if not disputed by the inmate—as it defends a criminal judgment throughout postconviction remedies.

Nothing in Vasquez's federal petition questioned the forensic evidence from trial. Nothing in the petition or state court record provided any indication that the state of scientific evidence may have changed after trial. The federal pleadings only required consideration of the forensic trial evidence in a narrow context: looking at the evidence that had been before the jury in assessing prejudice from trial counsel's representation. The nature of federal habeas review did not require any serious reappraisal of that unchallenged evidence. Federal habeas review "focuses on what a state court knew and did." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). A

---

[3]     Vasquez based his successive state habeas arguments on a "change in scientific thinking" that occurred after trial. D.E. 59-15 at 46. With that focus, Vasquez cannot argue that the State perpetrated fraud at trial with regard to the forensic evidence relating to the victim's brain injury.

federal court's review of ineffective-assistance-of-counsel claims focuses on the information that was actually before the jury. *See Trevino v. Davis*, 829 F.3d 328, 339-40 (5th Cir. 2016) ("[A] federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the Petitioner's trial counsel chosen a different course)."). Because nothing directly challenged or called into question the trial evidence, Vasquez has not shown that the State should have known that trial evidence may have been false. In short, Vasquez has not provided any serious substantiation to his allegations of fraud.

## III.   The Difference Between Rule 60(b) Motions and Successive Habeas Petitions

The viability of Vasquez's motion depends on whether he has filed a true Rule 60(b)(6) motion or whether he has, in effect, filed a successive federal habeas petition. Federal courts must often confront a decisive question: "What is the difference between a proper Rule 60(b) motion and one that is a disguised successive motion for habeas relief?" *Fratta v. Lumpkin*, No. 21-70001, 2022 WL 44576, at *2 (5th Cir. Jan. 5, 2022). The Antiterrorism and Effective Death Penalty Act ("AEDPA") strongly encourages a petitioner to present all legal and factual arguments in one habeas petition. *See McCleskey v. Zant*, 499 U.S. 467, 498 (1991). Because of AEDPA's strict limitations, state prisoners sometimes attempt to "use Rule 60(b) motions to evade AEDPA's limitations on successive habeas petitions." *Jackson v. Lumpkin*, 25 F.4th 339, 340 (5th Cir. 2022) (citing *Gonzalez v. Crosby*,

545 U.S. 524, (2005)); *see also Will v. Lumpkin*, 978 F.3d 933, 937 (5th Cir. 2020)

(stating that federal courts are "concerned that petitioners will use Rule 60(b)

motions to subvert the statutory framework and get an impermissible second look at

their denied habeas claims"). In *Gonzalez*, the Supreme Court explained that a valid

Rule 60(b) in a habeas case identifies "some defect in the integrity of the federal

habeas proceeding," such as a procedural error in determining nonsubstantive issues.

545 U.S. at 524, 532 n.4. However, the *Gonzalez* Court cautioned that a pleading

labeled as a Rule 60(b) motion is actually a successive petition "when it presents a

new claim for relief, or when it presents new evidence in support of a claim already

litigated, or when it asserts a change in the substantive law governing the claim, or

when it attacks the federal court's previous resolution of a claim on the merits." *Ruiz*

*v. Quarterman*, 504 F.3d 523, 526 (5th Cir. 2007) (footnote omitted) (citing

*Gonzalez*, 545 U.S. at 529). The Court must decide whether Vasquez's Rule

60(b)(6) motion truly challenges the habeas proceeding or whether he advances new

grounds for relief.

Vasquez may proceed on his Rule 60(b)(6) motion only if it challenges the

integrity of the habeas proceeding, instead of attempting to litigate new law or facts.

*See Gonzales v. Davis*, 788 F. App'x 250, 252 (5th Cir. 2019). Vasquez's briefing

makes clear that he relies on evidence developed after the federal judgment issued

in this case. Vasquez's motion is not completely clear on what relief he seeks in

asking the Court to reopen the judgment—whether he asks the Court (1) to reassess his earlier federal claims in light of the new evidence or (2) to allow the litigation of new habeas claims. Vasquez's motion amounts to a successive federal petition under either scenario. Under the first scenario, Vasquez's motion is "if not in substance a habeas corpus application, at least similar enough that failing to subject it to the same requirements would be inconsistent with the statute" because it "circumvents AEDPA's requirement that a new claim be dismissed unless it relies on either a new rule of constitutional law or newly discovered facts." *Gonzalez*, 545 U.S. at 531. Vasquez's arguments are "effectively indistinguishable from alleging that [he] is, under the substantive provisions of the statutes, entitled to habeas relief." *Id.* at 532. And under the second scenario, offering new evidence to support new claims is the very definition of a new habeas petition.

AEDPA deprives this Court of authority to consider a successive action in the first instance. *See* 28 U.S.C. § 2244(b). Until the Fifth Circuit authorizes review, this Court lacks authority to consider the arguments in Vasquez's Rule 60(b) motion.

## IV.    Alternative Rule 60(b) Analysis

Alternatively, Vasquez has not shown entitlement to Rule 60(b)(6) relief. Rule 60(b) contains six categories for relief: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence that by due diligence could not have been discovered before the court's decision; (3) fraud by the adverse party; (4)

voiding of the judgment; (5) satisfaction of the judgment; (6) any other reason justifying relief. *See* Fed. R. Civ. P. 60(b). Vasquez has explicitly moved for relief under Rule 60(b)(6), the "catch-all provision." The Rule 60(b)(6) "catch-all" provision covers "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6); *see also Hess v. Cockrell*, 281 F.3d 212, 215-16 (5th Cir. 2002). A court will only grant a Rule 60(b)(6) motion "if extraordinary circumstances are present." *Id.* at 216 (quoting *Bailey v. Ryan Stevedoring Co., Inc.*, 894 F.2d 157, 160 (5th Cir. 1990)).

Despite relying on the catch-all provision, Vasquez's Rule 60(b) motion repeatedly alleges that Respondent's reliance on the challenged trial evidence is a species of fraud. D.E. 51 at 32-34, 36. The Rule 60(b) categories of relief "are mutually exclusive from one another, meaning that an action cannot be brought through the catch-all provision of Rule 60(b)(6) if it could have been brought through one of the Rule's first five subsections." *United States v. Fernandez*, 797 F.3d 315, 319 (5th Cir. 2015) (internal quotation omitted); *see also Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1338 (9th Cir. 1986) ("Clause 60(b)(6) is residual and 'must be read as being exclusive of the preceding clauses.'"). Rule 60(b)(3) explicitly allows for relief from judgment in cases of "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Vasquez's arguments properly fall under Rule 60(b)(3) which requires filing "no more than a year after the entry of the judgment

12 / 15

or order or the date of the proceeding." Rule 60(c)(1); *see also Gonzalez*, 545 U.S. at 535. Vasquez's motion, which he should have brought under Rule 60(b)(3), was filed too late.

Alternatively, Vasquez is not entitled to relief even if he has properly filed under Rule 60(b)(6). Reopening a judgment under Rule 60(b)(6) requires a movant to clear two hurdles. First, "[a] motion under Rule 60(b)(6) must be made within a reasonable time, unless good cause can be shown for the delay." *Clark v. Davis*, 850 F.3d 770, 780 (5th Cir. 2017) (quotation and footnotes omitted). "Timeliness . . . is measured as of the point in time when the moving party has grounds to make [a Rule 60(b)] motion. . . ." *In re Osborne*, 379 F.3d 277, 283 (5th Cir. 2004). The scientific principles underlying Vasquez's new forensic evidence were available to him many years ago. Vasquez discusses tactical reasons for which he would withhold his motion. Still, Vasquez sat on the factual basis for his Rule 60(b) motion rather than expeditiously seeking federal relief. Vasquez has not shown any legal principle precluding him from immediately filing his Rule 60(b) motion when the new arguments became available.[4] The Court finds that his Rule 60(b)(6) motion is not timely.

---

[4]    Even accepting Vasquez's argument that the concessions by the Nueces County District Attorney's Office on successive state habeas review provide a basis to reopen judgment, he still waited several months after the conclusion of that proceeding before seeking relief in this Court.

Second, "relief under Rule 60(b)(6) is available only in 'extraordinary circumstances.'" *Buck v. Davis*, 137 S. Ct. 759, 777 (2017) (quoting *Gonzalez*, 545 U.S. at 533). Vasquez's allegations do not show any knowing fabrication of evidence, intentional misrepresentation of scientific principles, or intentional obfuscation by the State attorneys at any point in the legal process. Vasquez instead argues that scientific understanding of some evidence changed after trial and that experts could conclude that some trial testimony was not factually correct. While possibly serving as grounds for consideration in a successive federal habeas petition, Vasquez has not shown that the circumstances he presents are exceptional ones requiring relief under Rule 60(b)(6). The Court alternatively finds that Rule 60(b) relief would not be appropriate in this case.

## V.    **Conclusion**

The Court finds that Vasquez's Rule 60(b)(6) motion is, in effect, a successive federal habeas petition which the Court lacks jurisdiction to adjudicate absent authorization from the Fifth Circuit. In the alternative, the Court finds that Vasquez is not entitled to relief under Rule 60(b).

The Court, therefore, **DENIES** Vasquez's Rule 60(b)(6) motion. D.E. 51. The Court also denies any remaining requests for relief. Should Vasquez seek appellate review, the Court does not certify any issue for consideration under 28 U.S.C. § 2253(c).

The Clerk will deliver a copy of this Order to the parties.

ORDERED on July 11, 2022.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

# EXHIBIT 3(f)

# United States Court of Appeals
# for the Fifth Circuit

United States Courts
Southern District of Texas
FILED

MAR 21 2023

Nathan Ochsner, Clerk of Court

No. 22-70009

United States Court of Appeals
Fifth Circuit

**FILED**
February 24, 2023

Lyle W. Cayce
Clerk

RICHARD VASQUEZ,

*Petitioner—Appellant,*

*versus*

BOBBY LUMPKIN, *Director, Texas Department of Criminal Justice, Correctional Institutions Division,*

*Respondent—Appellee.*

---

Application for Certificate of Appealability from the
United States District Court
for the Southern District of Texas
USDC No. 2:05-CV-59

---

Before HAYNES, ENGELHARDT, and WILSON, *Circuit Judges.*
PER CURIAM:[*]

Richard Vasquez moves for a certificate of appealability ("COA") to seek review of the district court's denial of his Rule 60(b) motion for relief from judgment in his federal habeas case. The district court denied Vasquez's motion, ruling that it was actually an unauthorized successive

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

habeas petition. We conclude that reasonable jurists would not debate this determination, and we therefore DENY Vasquez's application for a COA.[1]

I.

In 1999, a Texas jury convicted Vasquez of capital murder for killing his girlfriend's four-year-old daughter, Miranda. During trial, the state prosecutors introduced testimony that Miranda: (1) was severely sexually assaulted before she died; (2) suffered blows to the head that were equivalent in force to being in a 65-mile-per-hour car accident; and (3) had cocaine levels in her blood that were double the lethal amount for an adult. Vasquez appealed his conviction and death sentence to the Texas Court of Criminal Appeals ("TCCA"), which affirmed. The TCCA also denied his petition for state habeas relief.

In 2006, Vasquez petitioned for federal habeas relief under 28 U.S.C. § 2254. In 2008, the district court denied the requested relief but granted a COA on Vasquez's claim that he received ineffective assistance of counsel at trial and on appeal. We affirmed, and the Supreme Court denied certiorari review. *See Vasquez v. Thaler*, 389 F. App'x 419, 432 (5th Cir. 2010) (per curiam), *cert. denied*, 563 U.S. 991 (2011). His petition did not directly challenge the aforementioned trial evidence; nor did the State specifically rely on that evidence in its response to Vasquez's petition.

In 2015, Vasquez filed a successive state habeas application challenging the evidence related to Miranda's brain injury and the reports of cocaine in her system. He argued that recent developments in forensic

---

[1] Vasquez subsequently filed a motion for authorization to file a successive petition pursuant to 28 U.S.C. § 2244(b)(3)(A). *In re Vasquez*, No. 23-40079 (5th Cir. 2023). That motion remains pending, and this opinion addresses only the request for a COA in this case regarding the district court's denial of Vasquez's Rule 60(b) motion.

science had cast doubt on the validity of that evidence. The TCCA disagreed that relief was warranted and denied Vasquez's application. *Ex parte Vasquez*, No. WR-59,201-03, 2021 WL 3746008, at *1 (Tex. Crim. App. Aug. 25, 2021).

In 2022—a decade after the conclusion of his federal habeas case—Vasquez returned to federal court and filed a motion for relief under Rule 60(b) of the Federal Rules of Civil Procedure. He urged the district court to reconsider his habeas petition, asserting that the initial judgment was procured through fraud. The district court disagreed. By order entered on July 11, 2022, the district court denied Vasquez's motion, concluding that it lacked jurisdiction because the motion was, in substance, an unauthorized successive habeas petition. The court ruled, in the alternative, that Vasquez failed to show extraordinary circumstances warranting Rule 60(b) relief. After the district court denied Vasquez a COA, Vasquez moved for a COA from this court.[2]

## II.

A COA is generally required to appeal a district court's denial of a Rule 60(b) motion for relief from a federal habeas judgment. *See Hernandez v. Thaler*, 630 F.3d 420, 428 (5th Cir. 2011) (per curiam). To obtain a COA, a movant must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). A movant can satisfy this standard by "demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional

---

[2] Around the same time as this appeal, Vasquez appealed the district court's July 8, 2022, dismissal of his claim under 42 U.S.C. § 1983 alleging that he had been denied due process. *Vasquez v. Collier*, No. 22-70008 (5th Cir. 2022). Vasquez moved to voluntarily dismiss that appeal before any decision by this court; the dismissal has been granted.

claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see Slack*, 529 U.S. at 484.

In this context, Vasquez must establish that reasonable jurists could debate whether the district court correctly construed his Rule 60(b) motion as a successive habeas petition. The Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes strict limitations on successive habeas petitions. As a result of the difficulty in being able to file those petitions, state prisoners occasionally "use Rule 60(b) motions to evade AEDPA's limitations on successive habeas petitions." *Jackson v. Lumpkin*, 25 F.4th 339, 340 (5th Cir. 2022). So, Rule 60(b) motions that actually present habeas "claims" must be "treated as successive habeas petitions subject to the strictures of" 28 U.S.C. § 2244(b). *Id.* Otherwise, "use of Rule 60(b) would impermissibly circumvent the requirement that a successive habeas petition be precertified by the court of appeals as falling within an exception to the successive-petition bar." *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005).

Based on these concerns, the Supreme Court has guided that a federal district court only has jurisdiction to consider a Rule 60(b) motion in habeas proceedings if the motion attacks "some defect in the integrity of the federal habeas proceedings," and "not the substance of the federal court's resolution of a claim on the merits." *Id.* One example of such a defect is "[f]raud on the federal habeas court." *Id.* at 532 n.5. On the other hand, if a Rule 60(b) motion advances a new claim or attempts to attack the federal court's previous resolution of a claim on the merits, then the motion will be treated as a successive habeas petition. *Id.* at 532–33.

### III.

Vasquez urges that his Rule 60(b) motion was not a disguised successive habeas petition because it attacked a defect in the federal

proceedings. He relies on a "fraud on the court" theory. To support this theory, Vasquez contends that the state trial prosecutors relied on "false evidence"—i.e., the purportedly scientifically invalid evidence of Miranda's brain injuries and high levels of cocaine in her system—to procure his conviction. Per Vasquez, that evidence has since been invalidated by recent developments in forensic science. So, Vasquez argues that the State committed fraud on the court when it relied on that evidence here in responding to his federal habeas petition. He urges that the fraud impaired the district court's ability to fairly adjudicate his ineffective assistance of counsel claim. Thus, he reasons that this "fraud" moves his challenge into the proper scope of a Rule 60(b) motion. The district court rejected Vasquez's theory, and we conclude that jurists of reason would not disagree on or debate this contention.

To start, fraud on the federal court is a very difficult standard to meet. Generally, a petitioner must "show an unconscionable plan or scheme which is designed to improperly influence the court in its discretion." *Fierro v. Johnson*, 197 F.3d 147, 154 (5th Cir. 1999) (quotation omitted). We've instructed then, that fraud on the court is limited to claims of "only the most egregious misconduct." *Id.* (quotation omitted). Examples include "bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated." *Id.* (quotation omitted). Conversely, less egregious misconduct, such as nondisclosure, generally will not suffice. *See id.*; *see also First Nat'l Bank of Louisville v. Lustig*, 96 F.3d 1554, 1573 (5th Cir. 1996). Importantly, though, we are only concerned with conduct of the parties in the federal proceedings. *Fierro*, 197 F.3d at 153–54.

Here, Vasquez's fraud theory centers entirely on purportedly false evidence used by the *prosecution* at the *state* trial. His contentions here are that the State's continued reliance on that evidence constituted fraud on the federal court. But we have long held that "alleged fraud by the *state trial*

prosecutor" is insufficient to "establish fraud on the *federal* court." *See Lave v. Davis*, 655 F. App'x 255, 259 (5th Cir. 2016) (per curiam) (emphasis added); *see also Fierro*, 197 F.3d at 153–54 ("[I]t is important to keep in mind that in reviewing the district court's denial of the motion to vacate, we deal only with allegations of fraud on the *federal* courts, not any fraud that may have been perpetrated upon the state courts."). As a result, jurists of reason thus could not debate that the *federal* proceedings did not involve fraud.

In sum, we conclude that reasonable jurists would not debate that Vasquez failed to establish fraud on the federal court. Consequently, reasonable jurists would not debate the propriety of the district court's ruling that Vasquez's Rule 60(b) motion was an unauthorized successive habeas petition.

Accordingly, IT IS ORDERED that the motion for a COA is DENIED.